**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CHRISTIAN W. SANDVIG *et al.*,

              Plaintiffs,

v.

WILLIAM P. BARR, in his official capacity as
Attorney General of the United States,

              Defendant.

Case No. 1:16-cv-1368 (JDB)

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION .......................................................................................................... 1

BACKGROUND AND PRIOR PROCEEDINGS ........................................................ 2

STATEMENT OF FACTS ............................................................................................ 3

LEGAL STANDARD.................................................................................................... 7

ARGUMENT.................................................................................................................. 8

    I.    As this Court has already decided, Plaintiffs have standing to challenge the
constitutionality of the Access Provision..................................................................... 8

    II.   As applied to Plaintiffs, the Access Provision violates the First Amendment. ................... 9

        A.  The First Amendment protects Plaintiffs' false speech. ................................................. 11

        B.  The Access Provision is subject to strict scrutiny........................................................ 12

        C.  The Access Provision does not survive either strict or intermediate scrutiny. .............. 15

CONCLUSION................................................................................................................ 22

# TABLE OF AUTHORITIES

**Cases**

*281 Care Comm. v. Arneson*,
766 F.3d 774 (8th Cir. 2014) ...................................................................... 11, 13

*\*America v. Preston*,
468 F. Supp. 2d 118 (D.D.C. 2006) ...................................................................... 20

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...................................................................................................... 7

*Animal Legal Def. Fund v. Herbert*,
263 F. Supp. 3d 1193 (D. Utah 2017) ............................................................... 13, 22

*Animal Legal Def. Fund v. Otter*,
44 F. Supp. 3d 1009 (D. Idaho 2014) ............................................................... 12, 22

*Animal Legal Def. Fund v. Reynolds* ("*Reynolds I*"),
297 F. Supp. 3d 901 (S.D. Iowa 2018) .................................................. 10, 12, 13, 22

*Animal Legal Def. Fund v. Reynolds* ("*Reynolds II*"),
--F. Supp. 3d--, 2019 WL 140069 (S.D. Iowa, Jan. 9, 2019) ....................... 10, 16, 22

*Animal Legal Def. Fund v. Wasden*,
878 F.3d 1184 (9th Cir. 2018) .............................................................. 10, 12, 16, 22

*\*Ashcroft v. American Civil Liberties Union*,
535 U.S. 564 (2002) .................................................................................................... 12

*\*Bartnicki v. Vopper*,
532 U.S. 514 (2001) .................................................................................................... 21

*Brown v. Entm't Merchs. Ass'n*,
564 U.S. 786 (2011) .................................................................................................... 15

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ...................................................................................................... 7

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985) .................................................................................................... 10

*Czekalski v. Peters*,
475 F.3d 360 (D.C. Cir. 2007) ...................................................................................... 7

*Edenfield v. Fane*,
507 U.S. 761 (1993) .................................................................................................... 17

*Edwards v. District of Columbia,
    755 F.3d 996 (D.C. Cir. 2014) ................................................................ 16, 17, 22

Ehrman v. United States,
    429 F. Supp. 2d 61 (D.D.C. 2006) ........................................................................ 7

Hamilton v. Miller,
    477 F.2d 908 (10th Cir. 1973) ............................................................................ 20

*Havens Realty Corp. v. Coleman,
    455 U.S. 363 (1982) ............................................................................................ 20

Holder v. Humanitarian Law Project,
    561 U.S. 1 (2010) ................................................................................................ 10

Kyles v. J.K. Guardian Sec. Servs., Inc.,
    222 F.3d 289 (7th Cir. 2000) .............................................................................. 20

Lujan v. Def.s of Wildlife,
    504 U.S. 555 (1992) .............................................................................................. 8

McIntyre v. Ohio Elections Comm'n,
    514 U.S. 334 (1995) ............................................................................................ 15

Mobley et. al. v. Facebook, Inc.,
    No. 5:16-cv-06440-EJD (N.D. Cal. Feb. 13, 2017) ........................................... 14

NAACP v. Claiborne Hardware Co.,
    458 U.S. 886 (1982) ............................................................................................ 21

Nat'l Fair Housing Alliance et al. v. Facebook, Inc.,
    No. 1:18-cv-02689-JGK (S.D.N.Y. Mar. 27, 2018) .......................................... 14

Pinson v. U.S. Dep't of Justice,
    246 F. Supp. 3d 211 (D.D.C. 2017) ...................................................................... 7

Rains v. Cascade Indus., Inc.,
    402 F.2d 241 (3d Cir. 1968) .................................................................................. 7

Reed v. Town of Gilbert,
    135 S. Ct. 2218 (2015) ........................................................................................ 12

Richardson v. Howard,
    712 F.2d 319 (7th Cir. 1983) .............................................................................. 20

*Susan B. Anthony List v. Driehaus,
    573 U.S. 149 (2014) .............................................................................................. 8

*United States v. Alvarez*,
  567 U.S. 709 (2012)...................................................................................... 11, 13, 21

*United States v. Chappell*,
  691 F.3d 388 (4th Cir. 2012) ..................................................................... 13

*United States v. Drew*,
  259 F.R.D. 449 (C.D. Cal. 2009) ................................................................. 2

*United States v. Lowson*,
  No. 10-cr-114 (KSH), 2010 WL 9552416 (D.N.J. Oct. 12, 2010) ........... 2

*United States v. O'Brien*,
  391 U.S. 367 (1968)...................................................................................... 16

*United States v. Playboy Entm't Grp., Inc.*,
  529 U.S. 803 (2000)...................................................................................... 15

*United States v. Williams*,
  690 F.3d 1056 (8th Cir. 2012) ................................................................. 13, 15

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989)...................................................................................... 12

*Western Watersheds Project v. Michael*,
  -- F. Supp. 3d --, 2018 WL 5318261 (D. Wyo. Oct. 29, 2018) ............... 10

*Zuch v. Hussey*,
  394 F. Supp. 1028 (E.D. Mich. 1975)....................................................... 20

**Statutes**

Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C) ....................... 2

Fair Housing Act, 42 U.S.C. § 3601 *et seq.*...................................................... 4

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ........... 4

**Other Authorities**

Equal Emp't Opportunity Comm'n, Notice,
  No. 915.002 (May 22, 1996)........................................................................ 19

U.S. Dep't of Housing and Urban Dev., Off. of Policy Dev. and Research,
  *Housing Discrimination Against Racial and Ethnic Minorities 2012* (June 2013)................. 19

## INTRODUCTION

This case concerns the ability of researchers to conduct online testing that is critical to ensuring that civil rights protections continue to apply in the twenty-first century, without fear of prosecution under the Computer Fraud and Abuse Act ("CFAA"). Plaintiffs are academics who intend to conduct online audit tests to determine whether hiring websites discriminate among users on the basis of characteristics, such as race or gender, that are protected by civil rights laws. Such testing requires creating fictitious accounts and providing false information to websites, in violation of the websites' terms of service ("ToS"), thereby exposing Plaintiffs to criminal liability under the CFAA's Access Provision, which prohibits accessing a website in violation of its ToS. Plaintiffs' testing misrepresentations are protected by the First Amendment, however, and the government cannot constitutionally prosecute them for engaging in such speech. The Access Provision, as applied to Plaintiffs' civil rights testing activity, cannot survive strict or intermediate scrutiny, because it is not narrowly tailored to promote any substantial or important government interest.

The CFAA's prohibition on Plaintiffs' research into online discrimination is of real concern given growing indications that proprietary algorithms are causing websites to discriminate among users, including on the basis of race, gender, and other characteristics protected from discrimination under the civil rights laws. Plaintiffs' intended false speech is in service of research of significant social value, and will cause no harm or, at most, *de minimis* harm to a target website's operations. In such circumstances, application of the Access Provision to criminalize Plaintiffs' intended false speech in the course of testing violates the First Amendment.

1

## BACKGROUND AND PRIOR PROCEEDINGS

Plaintiffs filed the Complaint in this case on June 29, 2016, alleging that a provision of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C) (the "Access Provision"), is unconstitutional both on its face and as applied to Plaintiffs. Plaintiffs asserted claims under the First Amendment's freedom of speech and petition clauses, and the Fifth Amendment's due process clause. Plaintiffs sought an injunction and declaratory judgment, among other relief. Defendant moved to dismiss on September 9, 2016, arguing that Plaintiffs lacked standing to bring their claims and had failed to state claims upon which relief could be granted. Def.'s Mot. to Dismiss, ECF No. 10.

On March 30, 2018, this Court issued an order granting in part and denying in part Defendant's motion to dismiss. Interpreting the Access Provision narrowly, the Court concluded that only Plaintiffs Alan Mislove and Christopher Wilson's research plans would violate the law. Mem. Op. on Def.'s Mot. to Dismiss, ECF No. 24 ("MTD Op.") at 32, 315 F. Supp. 3d 1, 27 (D.D.C. 2018).

The CFAA's Access Provision creates liability when an individual, in accessing a protected computer, does so in a manner that "exceeds authorized access." 18 U.S.C. § 1030(a)(2)(C). Courts and federal prosecutors have interpreted the prohibition on "exceed[ing] authorized access" to make it a crime to visit a website in a manner that violates the terms of service or terms of use established by that website. *See* MTD Op. at 21, 25 & n.9, 315 F. Supp. 3d at 19–20, 22 & n.9; *United States v. Lowson*, No. 10-cr-114 (KSH), 2010 WL 9552416 (D.N.J. Oct. 12, 2010); *United States v. Drew*, 259 F.R.D. 449 (C.D. Cal. 2009); *see also* Pl.s' Statement of Undisputed Material Facts ("SOF") ¶ 1. This Court held that the Access Provision

2

does not cover all ToS violations, but only a subset of such violations that limit *what* information a website user may access. MTD Op. at 32, 315 F. Supp. 3d at 26–27.

The Court additionally held that, based on their intention to create fictitious user accounts on employment websites in the course of their research, Plaintiffs Mislove and Wilson have standing to challenge the Access Provision. MTD Op. at 32–33, 44, 315 F. Supp. 3d at 26–27, 34. The Court then rejected Defendant's argument that the Access Provision, as applied to Plaintiffs, regulates conduct, not speech, *id.* at 35–38, 315 F. Supp. 3d at 28–30, and determined that Plaintiffs had plausibly alleged that the Access Provision, as applied to their research plans, violates the First Amendment, *id.* at 44, 315 F. Supp. 3d at 34. The Court stated that, "absent any evidence that the speech would be used to gain a material advantage, plaintiffs' false speech on public websites retains First Amendment protection and rendering it criminal does not appear to advance the government's proffered interests." *Id.* at 38, 315 F. Supp. 3d at 30 (citation and alteration omitted).

Plaintiffs Mislove and Wilson now move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on their claim that, as applied to them, the Access Provision violates the First Amendment.

## STATEMENT OF FACTS

Plaintiffs are academics who intend to access or visit certain online hiring websites for purposes of conducting academic research regarding potential online discrimination. SOF ¶ 61. Plaintiffs intend to study algorithmic discrimination in the employment context. They have designed and intend to conduct a study that would determine whether the algorithms used by some hiring websites produce results that discriminate against job seekers by race, gender, or other characteristics (hereinafter Plaintiffs' "research plan"). SOF ¶ 62. Plaintiffs are concerned

that violating terms of service in the course of the research plan will subject them to criminal prosecution under the Access Provision. SOF ¶ 103.

In the offline world, audit testing has been used to seek evidence of discrimination in housing and employment contexts and such evidence has sometimes played a role in the enforcement of anti-discrimination laws, such as the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, which prohibits discrimination in employment. SOF ¶ 26. Audit testing can include pairing individuals of different races to pose as home- or job-seekers to determine whether they are treated differently. SOF ¶ 28.

In a paired housing discrimination test, two people who are different with respect to the characteristic being tested (e.g., a white tester and a Black tester) pose as equally qualified homeseekers and make the same inquiry about available homes. Multiple pairs may be sent to test the same housing provider or real estate agency. SOF ¶ 30. Similarly, to test for employment discrimination, pairs of real testers apply for jobs, presenting equal credentials. *See* SOF ¶ 33. In a correspondence test, auditors submit two job applications for fictional applicants that vary only with respect to racial or gender signifiers or other protected characteristics. *Id*. The federal government, through the U.S. Department of Housing and Urban Development ("HUD") and the Equal Employment Opportunity Commission, has stated that false information provided to the target of a housing or employment test can include the fact that the tester is seeking a home or a job when the tester is not, in fact, seeking a home or a job, as well as false information about the qualifications of the tester to receive the home or job they are applying for. *See* SOF ¶¶ 34–39. Studies sponsored by HUD have stated that their paired testing involved providing false information to the target of the test. *See* SOF ¶ 35 (noting that testers "were assigned income,

assets, and debt levels to make them equally qualified to buy or rent the advertised housing unit"
as well as "comparable family circumstances, job characteristics, education levels, and housing
preferences").

Transactions involving social goods covered by federal and state civil rights laws—e.g.,
housing, credit, and employment—are increasingly taking place online. SOF ¶ 40. Certain
persons and groups have raised concerns that analytics could enable intentional or unintentional
discrimination based on protected class status under civil rights laws. SOF ¶ 54. The federal
government has repeatedly acknowledged the potential for analytics or algorithmic targeting to
lead to discrimination against individuals based on their protected class status, such as race,
gender, or age. SOF ¶ 55. Outcomes-based audit testing is a method of testing that examines the
outputs or outcomes of decision-making systems governed by an algorithm, and enables
researchers to compare the content that is shown to different users online. SOF ¶¶ 57–58.
Outcomes-based audit testing is a way to determine whether users are experiencing
discrimination in transactions covered by civil rights laws on the basis of their protected class
status; without such testing, there may be no way to determine whether such discrimination is
occurring. SOF ¶¶ 59–60.

Plaintiffs' research plan involves studying online hiring websites that advertise
employment opportunities, allow users to apply for employment opportunities, or allow
employers or recruiters to view potential job candidates. SOF ¶ 63. Plaintiffs seek to determine
whether the ranking algorithms on such websites produce discriminatory outputs by
systematically ranking specific classes of people (e.g., people of color or women) below others.
This could happen intentionally or inadvertently. SOF ¶ 68. Plaintiffs' research plan requires
providing false information to the websites they study, and/or creating tester accounts using false

5

or misleading information on the websites they study. SOF ¶¶ 81–82. In particular, it requires

providing false information to websites about the qualifications of fictitious job applicants in

order to isolate the effect of the characteristic being studied, such as race or gender. SOF ¶ 85.

No adequate alternative exists where research seeks to isolate the impact of a single such

characteristic. *Id*. Plaintiffs' methodology is standard within their research community. *See*

SOF ¶ 84.

Many website or platform terms of service prohibit providing false or misleading

information and/or creating tester accounts using false information, including employment

websites. *See* SOF ¶¶ 2–3. Plaintiffs are aware that their research plan will violate target

websites' terms of service prohibiting providing false information and/or creating accounts using

false information. SOF ¶ 86.

Plaintiffs' intention in providing false or misleading speech to websites is to conduct

academic research into online discrimination, and specifically, to determine whether online

hiring websites use algorithms whose results discriminate against job seekers by race, gender, or

other protected class status under civil rights laws. SOF ¶¶ 100–01. Plaintiffs have designed their

research plan to have at most a *de minimis* impact, if any, on the target websites' operations, by

creating or using the minimum number of accounts necessary to conduct the study, and by

avoiding sending too many service requests to a website to minimize any load on the website's

servers. *See* SOF ¶¶ 76–77, 97.

Plaintiffs intend to engage in the research plan because they believe that it will have

significant social value. SOF ¶ 105. First, individual algorithm audits may uncover harmful

discriminatory practices that, once exposed, will force the relevant parties to change their

behavior. *Id*. This may also deter other organizations from using similar algorithms. Second,

6

Plaintiffs' research findings will aid academics and regulators who wish to expand on Plaintiffs' findings or conduct their own audits. *Id*. Finally, by educating computer scientists and the general public about the phenomenon of intentional or unintentional algorithmic discrimination, Plaintiffs hope to inform an important societal debate about the role and norms of algorithms in daily life. *Id*.

## LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). After the movant has identified the basis for its motion, the burden is on the nonmovant to identify specific facts in the record that reveal a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "When . . . both parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard." *Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006) (citing *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)).

Though a court considering a motion for summary judgment analyzes all underlying facts and inferences in the light most favorable to the nonmovant, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), and "eschew[s] making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), "conclusory allegations and unsubstantiated speculation[] by the nonmovant do not create genuine issues of material fact," *Pinson v. U.S. Dep't of Justice*, 246 F. Supp. 3d 211, 218 (D.D.C. 2017) (quotation marks and citation omitted).

## ARGUMENT

**I.      As this Court has already decided, Plaintiffs have standing to challenge the constitutionality of the Access Provision.**

Plaintiffs satisfy Article III's standing requirements where they establish an injury that is (1) concrete, particularized, and actual or imminent; (2) fairly traceable to the challenged statute or conduct; and (3) likely to be redressed by a favorable decision. *Lujan v. Def.s of Wildlife*, 504 U.S. 555, 560–61 (1992). As the Court noted in deciding Defendant's motion to dismiss, in a pre-enforcement First Amendment challenge, the first prong requires only that plaintiffs intend to engage in a course of conduct that is arguably affected with a constitutional interest and proscribed by a statute, and that there exists a credible threat of prosecution thereunder. MTD Op. at 12–13, 315 F. Supp. 3d at 14–15 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)).

This Court previously held that "[i]t is clear that" Plaintiffs have satisfied the second and third prongs of the standing requirement. *See* MTD Op. at 13, 315 F. Supp. 3d at 14. The Court further held that Plaintiffs satisfied the "injury-in-fact" requirement because Plaintiffs alleged that they intend to engage in constitutionally protected speech that would violate the Access Provision. MTD Op. at 13, 18, 315 F. Supp. 3d at 14, 18. Furthermore, Plaintiffs face a credible threat of prosecution because the government has enforced the Access Provision in the past and "has not expressly disavowed any intent to prosecute" Plaintiffs for their intended speech. MTD Op. at 20–23, 315 F. Supp. 3d at 19–21.

The record fully supports the factual allegations that the Court relied on in its standing determination. Of particular importance, there remains no dispute that the U.S. Department of Justice's ("DOJ") current Intake and Charging Policy for Computer Crime Matters does not foreclose federal prosecutors from seeking charges under the Access Provision for violations of

website ToS. SOF ¶¶ 17, 19. Moreover, the government has made no express disavowal of prosecution separate from the statements that were rejected by this Court as insufficient to negate the credible threat of prosecution. *See* MTD Op. at 22–23 & n.8, 315 F. Supp. 3d at 20–21 & n.8. Indeed, the Chief of the Computer Crime and Intellectual Property Section of the Criminal Division of the DOJ does not believe that it is impossible that the DOJ would bring a prosecution under the Access Provision for the ToS violations that Plaintiffs intend to commit where those violations result in *de minimis* harm. *See* SOF ¶ 20. The record, *see* SOF ¶ 13, also supports this Court's finding that the government "does not know whether prosecutors may have employed the Access Provision to obtain plea agreements in which defendants admitted to harmless ToS violations." *See* MTD Op. at 21, 315 F. Supp. 3d at 20.

Plaintiffs accordingly have standing to challenge the constitutionality of the Access Provision.

## II.     As applied to Plaintiffs, the Access Provision violates the First Amendment.

The only claim remaining in this case is Plaintiffs Wilson and Mislove's claim that the government cannot constitutionally prosecute them for the false statements they make in the course of their intended research. MTD Op. at 37–38, 315 F. Supp. 3d at 29–30. In the circumstances presented by Plaintiffs' intended speech, the First Amendment prohibits the government from prosecuting them for providing false information to websites or creating tester accounts with false information. The government action that is being challenged is the criminalization of those false statements—statements that would render Plaintiffs liable under the Access Provision solely because of their falsity.

As this Court previously held, the Access Provision regulates Plaintiffs' speech because "the conduct triggering coverage under the statute consists of communicating a message." MTD

Op. at 36 n.14, 315 F. Supp. 3d at 29 n.14 (quoting *Holder v. Humanitarian Law Project*, 561

U.S. 1, 28 (2010)); *see also Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1194 (9th Cir.

2018) (statute prohibiting the use of false statements to gain access to private agricultural

facilities regulates speech, not simply conduct); *Animal Legal Def. Fund v. Reynolds* ("*Reynolds

I*"), 297 F. Supp. 3d 901, 918 (S.D. Iowa 2018) (same); *Animal Legal Def. Fund v. Reynolds*

("*Reynolds II*"), --F. Supp. 3d--, 2019 WL 140069, at *5 (S.D. Iowa, Jan. 9, 2019) (same).

That Plaintiffs' protected speech would occur on privately-owned online platforms does

not allow the government to regulate that speech without regard to the First Amendment's

requirements, regardless of whether those private platforms constitute a particular kind of forum

or none at all. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)

(noting that forum analysis is appropriate in the context of *government-owned* property). After

all, "[i]f a person's First Amendment rights were extinguished the moment she stepped foot on

private property, the State could, for example, criminalize any criticism of the Governor, or any

discussion about the opposition party, or any talk of politics whatsoever, if done on private

property." *Western Watersheds Project v. Michael*, -- F. Supp. 3d --, 2018 WL 5318261, at *8

n.7 (D. Wyo. Oct. 29, 2018). This, of course, would "run[] directly afoul of the First

Amendment, which was fashioned to assure unfettered interchange of ideas for the bringing

about of political and social changes desired by the people, whether in the public square or in

private coffee shops and cafes." *Id.* (citation omitted).[1]

The government does not, and cannot, dispute that as applied to Plaintiffs, the Access

Provision operates as a ban on false speech. Plaintiffs seek relief for civil rights testing and

---

[1] This case, therefore, does not challenge the ability of online websites to remove false posts or fictitious accounts, but rather the federal government's ability to criminally prosecute someone *solely* for the falsity of the information provided to a website.

research when it causes no material harm to a target website's operations, or at most a *de minimis* harm that is not legally cognizable. To rule against Plaintiffs would be to accept that the government could in fact prosecute them for their false statements in the course of their research. The First Amendment does not permit such an outcome.

### A. The First Amendment protects Plaintiffs' false speech.

False speech cannot be criminalized where it does not cause harm. *United States v. Alvarez*, 567 U.S. 709, 722–23 (2012). "The Nation well knows that one of the costs of the First Amendment is that it protects the speech we detest as well as the speech we embrace." *Id.* at 729. "[T]arget[ing] falsity, as opposed to the legally cognizable harms associated with a false statement . . . is no free pass around the First Amendment." *281 Care Comm. v. Arneson*, 766 F.3d 774, 783 (8th Cir. 2014). For that reason, false statements receive the full protections of the First Amendment so long as they do not cause "legally cognizable harm" or provide "material gain" to the speaker. *Alvarez*, 567 U.S. at 719, 723. Thus, as this Court has already held, "'absent any evidence that the speech [would be] used to gain a material advantage,' plaintiffs' false speech on public websites retains First Amendment protection." MTD Op. at 38, 315 F. Supp. 3d at 30 (quoting *Alvarez*, 567 U.S. at 723) (alteration in original).

There is no factual dispute that the Access Provision does not distinguish between false speech that causes material harm and false speech that merely violates a website's ToS, with nothing more—and that the Access Provision would therefore criminalize Plaintiffs' proposed speech online even where that speech is not intended to cause harm and in fact causes no harm. As discussed further below, the record shows that Plaintiffs' intended speech is not made to gain a material advantage or to cause legally-cognizable harm falling into the categories identified in

*Alvarez*, such as fraud or perjury. *See infra* Section II.C.[2]  Thus, per *Alvarez* and this Court's

prior opinion, Plaintiffs' speech enjoys full constitutional protection and its prohibition cannot

survive either strict or intermediate scrutiny.

### B.  The Access Provision is subject to strict scrutiny.

"As a general matter, the First Amendment means that government has no power to

restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v.*

*American Civil Liberties Union*, 535 U.S. 564, 573 (2002) (citations, alterations, and internal

quotation marks omitted). Content-based regulations include those that on their face "'draw[]

distinctions based on the message a speaker conveys,'" *Reed v. Town of Gilbert*, 135 S. Ct. 2218,

2227 (2015), or cannot be "*justified* without reference to the content of the regulated speech,"

*Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citation and internal quotation marks

omitted).

Though the Court has determined that the Access Provision *on its face* is not a content-

based restriction on speech, MTD Op. at 36, 315 F. Supp. 3d at 29, the Access Provision's

application to Plaintiffs specifically is content based, because it would apply to Plaintiffs only

when the message they convey to a website is false, instead of true. As this Court has already

found, "it is the content of plaintiffs' speech to the targeted websites—that they represent their

identities falsely or misleadingly instead of truthfully—that triggers the sites' ToS and, thereby,

the criminal penalties of the CFAA," and thus Plaintiffs "would violate the Access Provision

---

[2] Recent cases considering so-called "ag-gag" laws have concluded that making
misrepresentations in the course of gaining access to agricultural facilities and/or obtaining
employment under false pretenses for investigative purposes does not itself, without more, fall
into the category of speech made for "material gain." *See Wasden*, 878 F.3d at 1195 (gaining
entry to private property under false pretenses did not convey a material gain on speaker);
*Reynolds I*, 297 F. Supp. 3d at 923 (gaining entry to private property under false pretenses
"without more, does not generate . . . 'material gain'"); *see also Animal Legal Def. Fund v. Otter*,
44 F. Supp. 3d 1009, 1022 (D. Idaho 2014).

because of the *false content* of their particular message." MTD Op. at 36 n.14, 315 F. Supp. 3d at 29 n.14 (emphasis added) (citation and alterations omitted). This application of the Access Provision is a quintessential content-based restriction on speech. *See Animal Legal Def. Fund v. Herbert*, 263 F. Supp. 3d 1193, 1210 (D. Utah 2017) (law discriminating between truthful and false speech was content based); *Reynolds I*, 297 F. Supp. 3d at 919 (same). As a content-based restriction, the Access Provision must satisfy strict scrutiny.

While the *Alvarez* plurality did not articulate a bright-line rule governing when to apply strict scrutiny in evaluating restrictions on false speech, *compare Alvarez*, 567 U.S. at 722 (four Justices applying strict scrutiny), *with id.* at 731 (Breyer, J., concurring) (two Justices applying intermediate scrutiny), some courts considering restrictions on false speech, incorporating factors from the *Alvarez* concurrence and dissent, have focused on the value of the expression at issue and the likelihood that the targeted expression will result in significant harm in determining what level of scrutiny to apply. *See 281 Care Comm.*, 766 F.3d at 784 (applying strict scrutiny to Minnesota Fair Campaign Practices Act because political speech "occupies the core of the protection afforded by the First Amendment"); *United States v. Chappell*, 691 F.3d 388, 392, 395–96 (4th Cir. 2012) (upholding ban on impersonating a law enforcement officer because it targeted dangerous conduct and was unlikely to chill valuable communication); *United States v. Williams*, 690 F.3d 1056, 1063–64 (8th Cir. 2012) (upholding conviction for making false bomb threats because charged offenses "criminalize only those lies that are particularly likely to produce harm" and do not chill valuable speech). Under this analysis, too, the Access Provision should be subject to strict scrutiny.

The value of Plaintiffs' false speech on online platforms—particularly creating tester accounts that misrepresent users' real names and identifying characteristics, such as Plaintiffs

intend to do—outweighs the potential for significant harm. Academics and journalists such as Plaintiffs must engage in such misrepresentation to conduct valuable public-interest research that exposes whether private companies are engaging in discriminatory practices, just as testers in the offline world have long misrepresented themselves to employers and landlords in order to enforce civil rights laws. *See* SOF ¶¶ 26–39, 56–60. The federal government has recognized the value of such testing, and has even sponsored testing involving such deception. *See* SOF ¶¶ 34– 39.

Plaintiffs' intended research, in particular, may uncover harmful discriminatory practices that, once exposed, will force the relevant parties to change their behavior or deter other organizations from using similar algorithms. *See* SOF ¶ 105. Plaintiffs' research may also lead to civil rights enforcement actions. Indeed, private parties have brought claims against online platforms alleging civil rights violations. *See e.g.*, First Amended Complaint, *Mobley et. al. v. Facebook, Inc.*, No. 5:16-cv-06440-EJD (N.D. Cal. Feb. 13, 2017) (class action lawsuit alleging violations of Title VII and the Fair Housing Act for race discrimination in online ad targeting); Complaint, *Nat'l Fair Housing Alliance et al. v. Facebook, Inc.*, No. 1:18-cv-02689-JGK (S.D.N.Y. Mar. 27, 2018) (lawsuit brought by fair housing organizations alleging violations of the Fair Housing Act and New York City Administrative Code in online ad targeting).

Even apart from the value of Plaintiffs' intended false speech to online websites, there are myriad other legitimate reasons why individuals may want to misrepresent their identities online. Many may have to identify themselves online with pseudonyms in order to protect their safety or livelihood while nonetheless participating in the digital public square. Such individuals may include survivors of domestic abuse, harassment, and stalking who will be in danger if found by their abusers; teenagers who identify as members of the LGBT community and would experience

14

offline harassment and bullying if their real identities were exposed; political dissidents and others involved in contentious political activity; people seeking healthcare information, including about sexuality, birth control, and abortion, who may not want their real names associated with their queries; and prominent figures, including politicians and judges, and their family members, who may wish to lead private lives online unassociated with their public identities.

While bad actors may engage in false and misleading speech that causes real harm, it is far from certain that people misrepresenting their identities online are bad actors or will cause any harm at all. This is particularly so as compared to the certain or near-certain harms of making false bomb threats or impersonating law enforcement. *See Williams*, 690 F.3d 1056 (making false bomb threats); *Chappell*, 691 F.3d 388 (impersonating law enforcement). And where, as here, a speech restriction affects not only harmful speech but also speech of significant value, "our society accords greater weight to the value of free speech than to the dangers of its misuse." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995).

Accordingly, strict scrutiny is the appropriate measure by which to assess the Access Provision. Under this demanding scrutiny, the Access Provision is invalid "unless it is justified by a compelling government interest and is narrowly drawn to serve that interest." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011); *see also United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 817 (2000) ("'Content based regulations are presumptively invalid,' and the Government bears the burden to rebut that presumption." (internal citation omitted)). For the reasons described below, the government cannot satisfy this heavy burden.

**C.  The Access Provision does not survive either strict or intermediate scrutiny.**

Under either strict or intermediate scrutiny, the Access Provision fails to pass constitutional muster as applied to Plaintiffs. Regulations subject to intermediate scrutiny are

15

permissible only when narrowly drawn to further a substantial government interest. *United States v. O'Brien*, 391 U.S. 367, 377 (1968). Courts have not hesitated to strike down statutes prohibiting false speech under this standard. *See, e.g.*, *Wasden*, 878 F.3d at 1198 (finding statute unconstitutional under both strict and intermediate scrutiny); *Reynolds II*, 2019 WL 140069 (same). The Access Provision fails the narrow tailoring standard when applied to Plaintiffs under either standard of review.

This Court found that the government interests underpinning the Access Provision are the prevention of computer theft and other cybercrime. MTD Op. at 37, 315 F. Supp. 3d at 29–30. The government may additionally contend that the Access Provision advances its interests in promoting private property rights; preventing economic harm; deterring fraud and other related criminal conduct; protecting third-party users from difficulty finding authentic accounts or a distorted user experience; protecting the integrity of data, websites, and platforms; and protecting public and national interests from misinformation. *See, e.g.*, Deposition Transcript of John T. Lynch, Jr. ("Lynch Depo.") (Pl. Ex. 4), at 26–32, 64–65. For the reasons explained above regarding the value of Plaintiffs' speech, *see supra* Section II.B, the government cannot demonstrate that its enumerated interests are substantial with respect to *specifically preventing* false speech in the course of civil rights testing and research.

Even assuming, however, that the interests the government asserts are substantial in the abstract, "[t]hat the [government's] asserted interests are substantial in the abstract . . . does not end our inquiry." *Edwards v. District of Columbia*, 755 F.3d 996, 1003 (D.C. Cir. 2014) (applying intermediate scrutiny). As this Court previously explained, "[t]he question is . . . whether the statute fails narrow tailoring as applied to Mislove and Wilson's plan to create profiles containing false information and access websites using artificial tester profiles, in

violation of ToS that prohibit providing false information." MTD Op. at 37, 315 F. Supp. 3d at 30 (citations and alterations omitted). "To satisfy narrow tailoring, the [government] must prove the challenged regulations directly advance its asserted interests." *Edwards*, 755 F.3d at 1003. This burden "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on . . . speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id.* (quoting *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993)).

The government cannot meet this burden in this as-applied challenge. The government admits that its interests in the Access Provision are not implicated by every violation of a website term of service prohibiting providing false information, because some such ToS violations would be trivial. *See* SOF ¶ 24. It also admits that it has no interest in prosecuting harmless terms of service violations under the Access Provision. *See* SOF ¶ 25. The government admits that "harmless" terms of service violations do not mean that literally no harm arises out of the violation. *See* SOF ¶ 22. Rather, harmless violations may encompass violations that cause "minimal" harm, such as minimal loss of employee time or resources. *Id.* As an example of minimal harm, the government points to a potential dating profile that does not contain truthful information about the user's weight. Lynch Depo. at 48. Even though such misrepresentations online may distort the user experience, which is an asserted government interest, the government has nonetheless acknowledged that it has no interest in prosecuting such harmless violations of use restrictions, *id.* at 38–40, 48, and in fact agrees that this would be "acceptable false information," *id.* at 48, *even if* such false information results in users becoming "upset with the [website]," feeling that the website "is not presenting accurate profiles," or "decid[ing] not to use that [website] anymore," *id.* at 50; *see also* SOF ¶ 23. Such lies simply do not create the type of

significant harms that the Access Provision is intended to avoid, and prosecuting such lies does not amount to a substantial government interest.

As further evidence that the government has no substantial interest in prosecuting false speech under the Access Provision that is harmless or causes *de minimis* harm, DOJ has in fact proposed amending the CFAA, to ensure that the law is only applied to "deter significant threats to privacy and security," and not to prosecute harmless violations. Statement of David M. Bitkower, Deputy Assistant Att'y Gen., Crim. Div., Dep't of Justice, Before the Subcomm. on Crime and Terrorism, S. Comm. on the Judiciary (July 8, 2015) ("Bitkower Statement"), ECF No. 10-3, at 6–7. Under the amendments that DOJ has proposed, an individual would be subject to CFAA liability *only* for ToS violations used to obtain information worth $5,000 or more, further a separate felony offense, or obtain information stored in a government computer. *See id*. at 7.

Plaintiffs' proposed research would not be used to obtain financially valuable information, further any other criminal offense, or access a government computer. Plaintiffs' research will have a minimal impact, if any, on third-party users and on the target websites' operations, because Plaintiffs will take precautions including limiting the rate at which they use the online platform to avoid burdening its servers and taking steps to avoid significant interactions with real users. SOF ¶¶ 75–78. To the extent that Plaintiffs' research does cause some minimal harm to websites' operations or third-party users, such as by imposing a minimal increase in traffic to a website, or annoying or wasting the time of a third-party user who interacts with a fictitious account or posting, those harms are exactly of the type that the government admits it does *not* have a substantial interest in preventing, such as lies told on a dating website, even if they cause users to feel upset with or stop using that website. The

potential, minimal, harms are simply not of the magnitude of the "significant threats to privacy and security" that the DOJ has told Congress it has an interest in deterring through the CFAA. *See supra* p. 18. Thus, as this Court has held, "rendering [Plaintiffs' false speech] criminal" simply does not "advance the government's proffered interests." MTD Op. at 38, 315 F. Supp. 3d at 30 (citation omitted).

Indeed, harms far more significant than these have long been accepted in the context of offline employment and housing discrimination testing. In such testing, paired testers pose as equally qualified job or home seekers and make the same inquiries into available jobs or homes to see whether applicants are treated differently on the basis of a characteristic such as race or gender. *See* SOF ¶¶ 28–30, 33. These tests involve testers misrepresenting their identities, intentions to seek employment or housing, and/or qualifications for a home or job. SOF ¶¶ 34–39 (citing U.S. Equal Emp't Opportunity Comm'n, Notice, No. 915.002, at 1 (May 22, 1996), stating that "[t]esters are individuals who apply for employment which they do not intend to accept, for the sole purpose of uncovering unlawful discriminatory hiring practices," and U.S. Dep't of Housing and Urban Dev., Off. of Policy Dev. and Research, *Housing Discrimination Against Racial and Ethnic Minorities 2012* (June 2013), at 5, stating that "[m]inority and white testers . . . were assigned income, assets, and debt levels to make both testers unambiguously well qualified for the representative sample of advertised units and to make the minority tester slightly better qualified"). As HUD has stated, the paired testing methodology imposes costs of "interacting with a fictitious customer," and "may invade the privacy rights of the person or office being tested." U.S. Dep't of Housing and Urban Dev., Off. of Policy Dev. and Research, *Housing Discrimination Against Racial and Ethnic Minorities 2012* (June 2013), at 4; *see also* SOF ¶ 36.

19

Despite these costs to private business, "[t]he Supreme Court has long recognized the value of testers with respect to civil rights claims." *America v. Preston*, 468 F. Supp. 2d 118, 124 (D.D.C. 2006) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373–74 (1982)). As courts have emphasized, there is a "strong public interest in eradicating discrimination from the workplace," and "testers provide evidence that . . . 'is frequently valuable, if not indispensable,'" even though the testers must engage in misrepresentation. *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 299 (7th Cir. 2000). Thus, while "[i]t is surely regrettable that testers must mislead" people "as to their real intentions[,] . . . this requirement of deception [is] a relatively small price to pay to defeat racial discrimination." *Richardson v. Howard*, 712 F.2d 319, 321 (7th Cir. 1983); *see also Hamilton v. Miller*, 477 F.2d 908, 909 n.1 (10th Cir. 1973) (rejecting trial court's criticism that housing tester acted "under false pretenses" on the ground that "[i]t would be difficult indeed to prove discrimination in housing without this means of gathering evidence"); *Zuch v. Hussey*, 394 F. Supp. 1028, 1051 (E.D. Mich. 1975) (labeling as "irrelevant" fact that testers were not bona fide home purchasers and noting that "evidence gathered by a tester may, in many cases, be the only competent evidence available to prove that the defendant has engaged in unlawful conduct"), *aff'd*, 547 F.2d 1168 (6th Cir. 1977).

In spite of precautions to limit their intrusion, offline discrimination studies require that real estate agents or employers spend time interacting with people whom they incorrectly believe to be prospective home buyers or employees. Plaintiffs' proposed research, by contrast, will impose far less significant costs, if it imposes any at all. And, again, the research is of significant societal value. Outcomes-based audit testing, involving violating websites' ToS by creating tester accounts, enables researchers to discover how websites treat different users, and is a way

to determine whether users are experiencing discrimination in transactions covered by civil rights laws on the basis of their protected class status. SOF ¶¶ 57–59, 82–83.

To the extent websites might suffer reputational harms or loss of business due to the public learning about a poor showing on a discrimination audit, such harms would result not from Plaintiffs' false speech in conducting the audit, but from the resulting publication of the results of their research. Such harms are not legally cognizable if they result from protected First Amendment activity, especially where the activity is speech on a matter of public concern, as is the case with research findings about discrimination. *See, e.g.*, *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) (holding that individuals boycotting businesses to protest racial discrimination could not be held liable for the businesses' lost earnings resulting from nonviolent First Amendment-protected activity); *Bartnicki v. Vopper*, 532 U.S. 514, 533–34 (2001) (stating that one of the "core purposes" of the First Amendment is protecting the right to publish truthful information of public concern and finding that the privacy interests at stake in that case gave way to "the interest in publishing matters of public importance").

Where false speech does not cause the type of harm that a statute is intended to avoid, courts have not hesitated to find such false speech regulations unconstitutional. In *Alvarez*, six Justices agreed that the Stolen Valor Act was not narrowly tailored because Congress could have preserved the integrity of military honors by enacting a narrower statute, such as by applying the law only to lies that are intended to "secure moneys or other valuable considerations," *Alvarez*, 567 U.S. at 723, or by requiring "a showing that the false statement caused specific harm," *id.* at 738 (Breyer, J., concurring). Courts considering prohibitions on false speech in ag-gag laws have similarly struck down laws that criminalize false speech where those laws have applied to false speech that does not cause actual, legally-cognizable harm to the government's asserted interests.

21

*See Wasden*, 878 F.3d at 1195; *Reynolds II*, 2019 WL 140069 at \*9; *Reynolds I*, 297 F. Supp. 3d at 923; *Herbert*, 263 F. Supp. 3d at 1205; *Otter*, 44 F.Supp.3d at 1022.

As in *Alvarez*, the government here cannot prove that the challenged law, as applied to Plaintiffs' research plan, directly advances its asserted interests. The Access Provision is therefore not narrowly tailored and cannot survive either strict or intermediate scrutiny. *See Edwards*, 755 F.3d at 1003.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant them summary judgment on their claim that the Access Provision, as applied to their intended research, violates the First Amendment.

Dated: March 7, 2019

Respectfully submitted,

*/s/ Esha Bhandari*

Arthur B. Spitzer (D.C. Bar No. 235960)
aspitzer@acludc.org
Scott Michelman (D.C. Bar No. 1006945)
smichelman@acludc.org
American Civil Liberties Union
  of the Nation's Capital
915 15th Street, N.W., Second Floor
Washington, D.C. 20005
Tel: 202-457-0800
Fax: 202-457-0805

Esha Bhandari
Naomi Gilens
Rachel Goodman
American Civil Liberties Union
  Foundation
125 Broad St., 18th Floor
New York, NY 10004
Tel: 212-549-2500
Fax: 212-549-2654
ebhandari@aclu.org
ngilens@aclu.org
rgoodman@aclu.org

*Attorneys for Plaintiffs*