*Sandvig v. Barr*

No. 1:16-cv-1368 (JDB)

# Plaintiffs' Exhibit 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHRISTIAN W. SANDVIG *et al.*,<br><br>                Plaintiffs,<br><br>v.<br><br>WILLIAM P. BARR, in his official capacity as Attorney General of the United States,<br><br>                Defendant. | Case No. 1:16-cv-1368 (JDB) |

# DECLARATION OF PLAINTIFF ALAN MISLOVE

1. I am an Associate Professor of Computer Science at Northeastern University.

2. I reside in West Roxbury, Massachusetts.

3. I hold a Ph. D. in Computer Science from Rice University.

4. My research investigates systems, networking, network measurement, and security and privacy issues associated with online social networks. Among other areas, I focus on auditing the algorithms of large-scale computer systems that Internet users interact with on a daily basis.

5. I have frequently collaborated on research with Christo Wilson. We work together at Northeastern University and have co-authored several papers measuring personalization and discrimination online. Part of our work involves using measured data to analyze and understand complex phenomena on the Internet. In many cases, we have used the knowledge gained from measurements of the Internet to build systems that improve security, privacy, and transparency for Internet users.

**Background**

1

6. Outcomes-based audit testing is a method of testing that examines the outputs or outcomes of decision-making systems governed by an algorithm.

7. Outcomes-based audit testing enables researchers to compare the content that is shown to different users online. Other types of outcomes-based audit testing may compare the decisions reached about website or platform users.

8. Outcomes-based audit testing is a way to determine whether users are experiencing discrimination in transactions covered by civil rights laws on the basis of their protected class status.

9. Without outcomes-based audit testing of certain online websites there may be no way to determine whether discrimination based on protected class status is occurring.

10. I intend to access or visit certain online hiring websites for purposes of conducting academic research regarding potential online discrimination.

11. I intend to study algorithmic discrimination in the employment context. Along with Professor Wilson, I have designed and intend to conduct a study that would determine if the algorithms used by some hiring websites produce results that discriminate against job seekers by race, gender, or other characteristics. I herein refer to this study as the "research plan."

**Research Plan**

12. Our research plan involves studying online hiring websites that advertise employment opportunities, allow users to apply for employment opportunities, or allow employers or recruiters to view potential job candidates.

13. Our research plan involves audit testing and related investigative work to determine whether online hiring websites' algorithms treat users differently based on characteristics, such as race or gender, that constitute a protected class status under civil rights laws. I herein refer to such differential treatment on the basis of protected class status as "online discrimination."

14. Online hiring websites may allow job seekers to create personal profiles, upload their resumes, and potentially apply for open positions. At the same time, companies and recruiters may post open positions onto these sites, and use the sophisticated tools the websites provide to screen candidates.

15. Some hiring websites provide recruiters with a search engine-like interface that allows recruiters to query, filter, and browse all of the job seekers on the website. Like any search engine, these recruiter tools frequently use proprietary algorithms to rank job seekers.

16. The order of the job seeker ranking may influence the next steps taken by the recruiter, including which job seekers are offered interviews or employment.

17. I seek to determine whether the ranking algorithms on online hiring websites produce discriminatory outputs by systematically ranking specific classes of people (e.g., people of color or women) below others. This could happen intentionally or inadvertently.

18. Our research plan will be an audit study that will test the hypothesis that hiring websites may produce discriminatory outputs by relying on data that includes real-world biases. For example, a hiring website could rank job candidates in search results in a racially disparate manner if the algorithm that determines which results are displayed takes into account factors—gleaned from a user's resume, browsing history, or social networking profiles—that correlate with race. An algorithm does not necessarily need to have detailed information about a user to result in biased outcomes. For example, where a user attended college may serve as a proxy for race in the case of certain colleges, and an algorithm that takes such information into account may therefore produce biased outcomes.

19. On each hiring website, Professor Wilson and I will investigate whether there are correlations between the rank ordering of job candidates in search results and race, gender, or age. If we observe that candidates with specific attributes are consistently ranked lower (when

controlling for other confounding variables), this may indicate that the algorithm is discriminatory.

20. To investigate online discrimination in the employment context online, we will create profiles for fictitious job seekers, post fictitious job opportunities, and compare our fictitious users' rankings in a list of candidates for the fictitious jobs. The goal of this audit study is to examine how the websites rank the fictitious candidates for the fictitious jobs, and whether such ranking is influenced by race, gender, age, or other attributes. Depending on the particular features available on the websites we study, the fictitious users may apply to our fictitious jobs in order to be ranked as job candidates.

21. We plan to create tester accounts reflecting fictitious users with varying attributes (e.g., race, gender, age). These accounts will always include one uniform, globally unique attribute (e.g., attendance at a fictitious high school) so that we can search for the fictitious users as distinct from genuine jobseekers. These tester accounts will then be used to search for fictitious jobs that we will post on the websites.

22. We will systematically conduct searches as the employers of the fictitious jobs we have posted (in other words, using tester employer accounts we have created), using the same keywords that were tested earlier, with the addition of a filter corresponding to the uniform attribute (e.g., the fictitious high school). This will ensure that the search results contain only the fictitious users. We will do this on websites that permit employers to search for potential job candidates, either when users have applied for open positions or when users have uploaded their resumes or profiles to the website.

23. By comparing the rankings of fictitious users with certain attributes to those without those attributes, we will be able to examine how specific user attributes such as race impact search rank.

24. We have designed our research plan to minimize any harm by limiting the number of concurrent tests that we run and deleting the job listings and job seeker accounts when we are done.

25. We have designed our research plan to minimize any effect on the target websites' operations by creating or using the minimum number of accounts necessary to conduct the study, including minimizing false accounts, and by avoiding sending too many service requests to a website or platform.

26. When we conduct an online study, we will typically rate limit our requests to a website to one every 10 to 30 seconds, to minimize any load on the website's servers.

27. We have designed our research plan to minimize any harm to third-party users of the websites by, among other things, making sure that real job seekers are unlikely to find, and discouraged from applying to, the fictitious jobs. We will also take steps to ensure our fictitious job seeker accounts are unlikely to appear in search results for real recruiters' reasonable search queries. For example, one method of discouraging interactions with real users is to state in any fictitious job posting, or in any fictitious job seeker profile, that the job or the job seeker is not real.

28. I intend to bring the results of this research to the public and to publish our findings in academic publications. I usually make my academic research available to the public, for free.

29. I have previously published the results of research into online discrimination in academic or conference papers.

30. Our research plan requires providing false information to the websites we study, including by making fictitious job postings.

31. Our research plan requires creating tester accounts using false or misleading information on the websites we study.

32. Creating tester accounts sometimes requires providing false information. Creating tester accounts sometimes does not require providing false information but may nonetheless constitute providing misleading information when it is in violation of website terms of service that require that anyone creating an account be a job seeker or an employer or be using the website only for the purpose of finding a job or recruiting candidates for a job.

33. The methodology we intend to use in our research plan is standard within our research community as a means of audit testing for discrimination.

34. Our research plan requires providing false information to websites about the qualifications of fictitious job applicants in order to isolate the effect of the characteristic being studied, such as race or gender. No adequate alternative exists where research seeks to isolate the impact of a single such characteristic.

35. I am aware that our research plan will violate target websites' terms of service prohibiting providing false information and/or creating accounts using false information.

36. I do not intend to seek permission from a target hiring website prior to conducting an algorithmic discrimination audit of that website.

37. Seeking permission from a target website prior to conducting an audit test for discrimination would affect the scientific validity of such research.

38. Once a company knows it is going to be audited or tested for potential discrimination, it can change its behavior for the time period of the test or research in a way that could affect the test or research findings.

39. The results of audit testing or academic research into online discrimination could expose a website to potential liability or embarrassment, and could require the company to spend money re-engineering its systems as a result.

40. The platforms and/or websites in the employment or hiring industry change rapidly, and the practicability of auditing them may also vary, such that I cannot now identify all such platforms and/or websites that I will access in the future for purposes of conducting the research plan.

41. Terms of service may be subject to change at any time, without notice to users, and without a record provided to users of what terms of service were operative on each and every visit they made to a website.

42. I do not have a record of the terms of service that were operative on each and every visit I made to a website during the course of my past research.

43. Professor Wilson and I have designed our research plan to have at most a *de minimis* impact, if any, on the target websites' operations.

44. Professor Wilson and I have designed our research plan to have at most a *de minimis* impact, if any, on third-party users.

45. We have designed our research plan such that any false or misleading speech during the course of creating fictitious accounts or postings will not cause material harm to the target websites' operations because it will have a *de minimis* impact, if any, on the target websites' operations.

46. My intention in providing false or misleading speech to websites I study as part of our research plan is to conduct academic research into online discrimination.

47. My intention in providing false or misleading speech to websites I study as part of our research plan is specifically to determine whether online hiring websites use algorithms whose results discriminate against job seekers by race, gender, or other protected class status under civil rights laws.

48. As part of our research plan, I do not intend to access any data or information on the websites I study that is not made available to the public or to any individual who creates an account on the site.

**Fear of Prosecution**

49. I am concerned that violating terms of service in the course of the research plan will subject me to criminal prosecution under the Computer Fraud and Abuse Act's Access Provision at 18 U.S.C. § 1030(a)(2)(C).

50. Many website or platform terms of service prohibit providing false or misleading information and/or creating tester accounts using false information.

51. I do not wish to be exposed to criminal prosecution as a result of conducting the research plan to study online discrimination.

52. I intend to engage in the research plan because I believe that it will have significant social value. First, individual algorithm audits may uncover harmful discriminatory practices that, once exposed, will force the relevant parties to change their behavior. This may also deter other organizations from using similar algorithms. Second, our research findings will aid academics and regulators who wish to expand on our findings or conduct their own audits. Finally, by educating computer scientists and the general public about the phenomenon of intentional or unintentional algorithmic discrimination, I hope to inform an important societal debate about the role and norms of algorithms in daily life.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 4, 2019

Boston, Massachusetts

Alan Mislove