*Sandvig v. Barr*

No. 1:16-cv-1368 (JDB)


# Plaintiffs' Exhibit 4

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
--------------------------------X
                                )
CHRISTIAN W. SANDVIG, et al.,   )
                                )
            Plaintiffs,         )
                                ) Case No.
v.                              )
                                ) 1:16-cv-1368(JBD)
JEFFERSON B. SESSIONS, III, in  )
his official capacity as        )
Attorney General of the United  )
States,                         )
                                )
            Defendant.          )
                                )
--------------------------------X
```

30(b)(6) Deposition of the UNITED STATES DEPARTMENT

OF JUSTICE, By And Through Its Representative,

JOHN T. LYNCH, JR., And In His Individual Capacity

Washington, D.C.

Friday, October 26, 2018 - 9:07 a.m.

Reported by:

Cindy L. Sebo, RMR, CRR, RPR, CSR,

Job no: 23337

1              30(b)(6) -- JOHN T. LYNCH, JR.

2    BY MS. BHANDARI:

3         Q.    So this is the statement of

4    Sujit Raman, Associate Deputy Attorney General,

5    Department of Justice, before the Subcommittee on

6    Crime and Terrorism, Committee on the Judiciary of

7    the United States Senate, presented on

8    August 21st, 2018.

9              Is that correct?

10        A.    That's correct.

11        Q.    Are you familiar with this document?

12        A.    I am.

13        Q.    And please take the time to review it,

14   but I'm going to specifically ask you to look at

15   Page 6.  And on Page 6, if you could look at the

16   paragraph beginning with, The CLOUD Act.

17             Do you see that?

18        A.    I do see that paragraph.

19        Q.    And I'm going to read a sentence from

20   within that paragraph, which says, The CFAA is the

21   primary Federal law against hacking.  It protects

22   the public against criminals who intrude into

23   computers to steal information, install malicious

24   software and delete files.  It was also intended

25   to criminalize malicious conduct by insiders who

1             30(b)(6) -- JOHN T. LYNCH, JR.

2    abuse their right to access to computer systems

3    and networks to commit online crime -- sorry.

4    That last sentence should be, It was also intended

5    to criminalize malicious conduct by insiders who

6    abuse their right of access to computer systems

7    and networks to commit online crime.

8                 Did I read that correctly?

9         A.    You did.

10        Q.    Is this an accurate statement of the

11   Department of Justice's position on what the CFAA

12   is intended to criminalize?

13                MR. SCHWEI:  Objection: that goes

14            outside the area of inquiry.  The purpose

15            of the CFAA is not one of the areas.

16                MS. BHANDARI:  Well, one of the

17            areas of inquiry is the Government's

18            interests in prosecutions under

19            Section 1030(a)(2)(C).

20                So I'm inquiring whether this is a

21            statement of the Department of Justice's

22            interests in the CFAA, including

23            Section 1030(a)(2)(C).

24                MR. SCHWEI:  He can answer.  But

25            the objection stands.

1          30(b)(6) -- JOHN T. LYNCH, JR.

2     BY MS. BHANDARI:

3          Q.    Okay.  Please answer.

4          A.    This is a statement of our interests.

5                I would not necessarily say that it is

6     the -- a comprehensive statement of all of our

7     interests in -- in enforcing the CFAA, but it's a

8     general -- it is a good general statement of our

9     purposes in -- in enforcing the Computer Fraud and

10    Abuse Act.

11         Q.    I want to ask you about

12    Section 1030(a)(2)(C) specifically.

13                Are there other interests, other than

14    those listed here, that the Department of Justice

15    has in enforcing Section 1030(a)(2)(C)?

16                MR. SCHWEI:  Objection: vague.

17          There's no -- you're asking him to

18          catalog the full range of possible

19          conduct that could possibly fall within

20          1030(a)(2)(C).

21                I don't think he should be expected

22          to -- to catalog every conceivable

23          interest.

24    BY MS. BHANDARI:

25         Q.    You can answer the question.

1          30(b)(6) -- JOHN T. LYNCH, JR.

2          A.    The -- in our interrogatories, we

3    stated -- my understanding is that we stated

4    several interests that were protected by

5    1030(a)(2)(C), both in our original and

6    supplemental responses to the interrogatories,

7    particularly Interrogatory 6 and 7.

8                MS. BHANDARI:  Okay.  So I will

9           enter those interrogatory responses as

10          Exhibit 3 since we are looking at them.

11                        -  -  -

12          (Deposition Exhibit Number 3,

13           Defendant's Supplemental Objection

14           and Response to Plaintiffs'

15           Interrogatory Number 6 and 7,

16           marked for identification, as of

17           this date.)

18                        -  -  -

19                MS. BHANDARI:  For the record,

20          Exhibit 3 is Defendant's Supplemental

21          Objection and Response to Plaintiffs'

22          Interrogatory Number 6 and 7.

23    BY MS. BHANDARI:

24          Q.    And if you could turn to Page 3 --

25    first of all, are you familiar with this document?

1            30(b)(6) -- JOHN T. LYNCH, JR.

2        A.    I am.

3        Q.    Page 3 and 4 have a list of six -- six

4    paragraphs that describe the interests of the

5    Department of Justice in enforcing

6    Section 1030(a)(2)(C); is that correct?

7                MR. SCHWEI:  Objection:

8            mischaracterizing the interrogatory.

9    BY MS. BHANDARI:

10        Q.    Could you please describe what these

11    six enumerated paragraphs in the

12    Defendant's response to Interrogatory Number 6

13    describe?

14        A.    Per the interrogatory, it is a list of

15    interests -- non -- nonexclusive list of interests

16    that are covered by the Computer Fraud and Abuse

17    Act.

18        Q.    When you say "nonexclusive," what

19    other interests are there that Department of

20    Justice has?

21        A.    I am simply saying that it says the

22    Department's interests include the following.

23    I'm -- so I was -- I'm just stating that these are

24    six and, as per our interrogatory response, there

25    may be others.  And these were the six that we

1          30(b)(6) -- JOHN T. LYNCH, JR.

2    listed.

3          Q.    Okay.  So is it your statement that

4    you cannot provide an exclusive list of interests

5    that the Department of Justice might have in

6    enforcing Section 1030(a)(2)(C)?

7               MR. SCHWEI:  Objection: again,

8          mischaracterizing the interrogatory.

9    BY MS. BHANDARI:

10         Q.    Well, the -- you can answer the

11   question.

12         A.    This is a list, I think, of our

13   primary interests in this -- in enforcing the

14   Computer Fraud and Abuse Act.  I'm simply

15   remaining within the interrogatory by noting that

16   it's a nonexclusive -- that it's non -- it's a

17   nonexclusive list.

18         Q.    Okay.  Are there other interests that

19   have not been listed in response to this

20   interrogatory that you can think of that the

21   Department of Justice has in enforcing

22   Section 1030(a)(2)(C)?

23               MR. SCHWEI:  Objection.  Again,

24          that's mischaracterizing the nature of

25          the interrogatory, what is called for in

1          30(b)(6) -- JOHN T. LYNCH, JR.

2          the response.

3     BY MS. BHANDARI:

4          Q.    You can answer the question, if there

5     are other interests that you can think of that the

6     Department of Justice has in enforcing

7     Section 1030(a)(2)(C).

8               MR. SCHWEI:  Objection: vague.

9               Are we talking about the full

10          interrogatory response or just the list

11          of six?

12               MS. BHANDARI:  I'm not asking about

13          the interrogatory response.  I'm asking

14          if the witness can think of other

15          interests that the Department of Justice

16          has in enforcing Section 1030(a)(2)(C).

17               MR. SCHWEI:  Objection: vague as to

18          what "other" is.

19     BY MS. BHANDARI:

20          Q.    You can answer the question.

21          A.    I can't think of specific things that

22     would not be in some way covered by one of these

23     topics, but -- at this moment.

24          Q.    I want to look at the testimony of

25     Sujit Raman.  That's Exhibit 2.  And at Page 7,

1          30(b)(6) -- JOHN T. LYNCH, JR.

2    "exceeds authorized access" prong in the CFAA to

3    makes relatively trivial conduct a Federal crime?

4               MR. SCHWEI:  Objection:

5          mischaracterizes the paragraph.

6    BY MS. BHANDARI:

7          Q.    You can answer.

8          A.    It is not a statement relating to the

9    scope of the crime.  It is a statement regarding

10   our interests in prosecution of those -- of

11   certain sorts of Computer Fraud and Abuse

12   Act violations.

13         Q.    Does the Department of Justice have

14   any interest in prosecuting -- I quote --

15   Relatively trivial conduct, under the CFAA?

16              MR. SCHWEI:  Objection: calls for

17         speculation.

18   BY MS. BHANDARI:

19         Q.    You can answer the question.

20         A.    I would just point to -- to the

21   statement, The Department of Justice has no

22   interest in prosecuting harmless violations of use

23   violations [sic] like these.

24         Q.    Okay.  And is that an accurate

25   statement of the Department of Justice's position?

1          30(b)(6) -- JOHN T. LYNCH, JR.

2          A.    It is -- the statement is the

3    statement of the Department of Justice, and it is

4    an accurate position -- it is an accurate

5    description of our interests in prosecuting

6    harmless violations of use restrictions.

7          Q.    Can you describe harmless violations

8    of use restrictions?

9               MR. SCHWEI:  Objection.  This goes

10              beyond the scope of the areas of inquiry

11              which asks about interests in terms of

12              service violations relating to --

13              relating to false or misleading

14              information or in creation of fictitious

15              user accounts, not cataloging all

16              possible interests in various types of

17              terms of service.

18              MS. BHANDARI:  I think that since

19              the Plaintiffs claim that their terms of

20              service violations are harmless or

21              trivial, it's within the areas of inquiry

22              to ask what the Department of Justice

23              considers harmless or trivial violations

24              of use restrictions or Web site terms of

25              service.

1          30(b)(6) -- JOHN T. LYNCH, JR.

2               I will read back my question.

3     BY MS. BHANDARI:

4          Q.   Can you describe harmless violations

5     of use restrictions?

6          A.   I am not able to catalog all harmless

7     violations of use restrictions.  One was obviously

8     given in the testimony that you read to me.  But

9     as a general matter, terms of use restrictions are

10    ones that do not necessarily have a connection to

11    access restrictions.  They're, instead, providing

12    rules about how the computer may be used, as

13    opposed to information that could be accessed on

14    the computer.

15               And, second, as stated in the -- as

16    the example shows, the relative loss to the

17    employer is minimal.  There's perhaps some loss of

18    employee time or, you know, use of resources, but,

19    in general, the employer doesn't suffer a mon -- a

20    significant monetary loss.  And so things like

21    check baseball scores or perhaps checking employee

22    e-mail or personal e-mail at -- during a lunch

23    break, there are maybe situations in which those

24    are prohibited activities, and there may be very

25    good reasons behind them.

1          30(b)(6) -- JOHN T. LYNCH, JR.

2              For example, I think the situation in

3    which maybe a Department of Justice employee or a

4    employee in a white-collar business, you know,

5    checks baseball scores from their terminal might

6    be considered relatively harmless.  If, for some

7    reason, a nuclear power plant employee were to

8    undertake the same activity from a nuclear control

9    terminal, that would probably be a much more

10   serious -- that would be probably a much more

11   serious restriction.  And, in general, employment

12   agreements and the -- the -- the enforcement of

13   such reflect the differences in those -- in those

14   situations.

15              So it's hard for me to say there is a

16   strict rule about baseball scores that would apply

17   in every employment context or every use context;

18   but, in general, there is a -- the Department has

19   stated that it -- that where it's sort of

20   incidental use, the use does not place the

21   employer's computer systems or networks into

22   significant jeopardy and it's a overall minimal

23   loss to the -- or the minimal imposition on the

24   employer, that those are not the kinds of things

25   that the Department is going to be concerned

1            30(b)(6) -- JOHN T. LYNCH, JR.

2     about.

3            Q.    So sticking with the baseball scores

4     example that you've been discussing and that's

5     mentioned in the testimony of Sujit Raman, when

6     the Department of Justice considers harmless

7     violations of use restrictions, there may be some

8     minimal loss to the employer included in that; is

9     that correct?

10           MR. SCHWEI:  Objection:

11           hypothetical; calls for speculation.

12     BY MS. BHANDARI:

13           Q.    So when you were describing minimal

14     loss to the employer, can you describe the types

15     of minimal loss that you were discussing?

16           A.    And this is -- this is, again, an

17     interest -- I'm speaking of our interests, not a

18     statement of the law, just to preface that --

19           Q.    I understand.

20           A.    -- my -- my -- my -- yes, if there is

21     a -- if the employer does not suffer significant

22     monetary loss or significant loss in time or have

23     their systems placed in significant risk of being

24     breached as a result of the conduct, first of all,

25     the Department probably isn't going to hear about

1          30(b)(6) -- JOHN T. LYNCH, JR.

2    it because that is usually handled internally by

3    the organization; and, second, if we did learn of

4    it, it would be unlikely that we would prioritize

5    that type of prosecution.

6          Q.    And why is that?  If an employer came

7    to you with a complaint about this type of minimal

8    loss that you're describing, why would the

9    Department not prioritize prosecuting that?

10         A.    Because we have limited resources and

11   we want to focus those resources on circumstances

12   where there is a significant loss to the victim or

13   where there is an important deterrence value from

14   the prosecution; you know, for example, in the

15   insider -- the insider prosecutions where an

16   insider, for example, disclosed or harmed their

17   employer's computer system through intentional

18   conduct or intentional access to information that

19   they were not authorized to access.

20         Q.    I want to ask about some language

21   later down in the same page, Page 7 of Exhibit 2.

22              In the following paragraph, it says,

23   Over the last several years, numerous Department

24   of Justice officials have called on Congress to

25   address this issue in a manner that would maintain

1        30(b)(6) -- JOHN T. LYNCH, JR.

2      A.    I am not going to be able to catalog

3 all possible violations, but Web sites often have

4 a number of rules in their terms of service about

5 how the -- the -- the site can be -- or can or

6 should be accessed. Some are -- some of them are

7 actual access restrictions that state you can't

8 access the system except if you are in a

9 particular category; for example, unless you are a

10 paying customer, you're not allowed to access --

11 access the Web site.

12        Relatively trivial violations might

13 include nonaccess restrictions; for example, a

14 Web site might have a -- a term of service that

15 says you must be civil and polite in your

16 discourse on this -- on this Web site, but that's

17 not in the access violation, but it may be a

18 violation of the terms of use if somebody is, in

19 the opinion of the Web site owner, not

20 sufficiently polite.

21        That would probably be not -- that

22 would be probably -- that would be an example of a

23 relatively trivial violation of a terms of use of

24 the -- of that particular Web site.

25      Q.    If a Web site has a term of service

1             30(b)(6) -- JOHN T. LYNCH, JR.

2     that says you can't provide any false information

3     on the Web site, is that a relatively trivial

4     violation?

5             MR. SCHWEI:  Objection:

6             hypothetical; and vague.

7             MS. BHANDARI:  The question about

8             whether terms of service prohibiting

9             false information is trivial or not is at

10            the heart of the Government's interests

11            in prosecuting such violations.

12    BY MS. BHANDARI:

13        Q.    So you can answer the question.

14        A.    The answer to the question

15    specifically with regard to false information is

16    going to depend on the type of Web site and the --

17    and the terms of use of a particular Web site.

18            Some Web sites that have very

19    relatively lax restrictions on providing false

20    information, perhaps dating Web sites or Twitter,

21    in some cases might be; I think those would be

22    considered to be in the more trivial category.

23            You may have other Web sites, for

24    example, Web sites for which you are interacting

25    with a bank and the bank has to know your customer

1        30(b)(6) -- JOHN T. LYNCH, JR.

2    for -- for false information to be placed on them

3    and different expectations by the public for which

4    false information might be presented.

5            I think both the Department and, in

6    some cases, courts have recognized that there

7    are -- that, for example, on a dating Web site,

8    somebody might not be 100 percent truthful about

9    facts about themselves.  In some -- I think in

10   most cases, those would be considered harmless.

11   If you, for example, said you weighed 220 pounds

12   and you, in fact, weighed 250 pounds, somebody

13   might -- that might be considered within sort of

14   the realm of -- of acceptable false information.

15           Again, there are other types of --

16   there are other circumstances in which false

17   information may be presented to a different sort

18   of Web site where the presentation of false

19   information may be very significant, for example,

20   employment or banking or financial records in

21   which accuracy is more important.

22           And there are, I think, a wide range

23   of Web sites out there, and I was just giving you

24   an example of a couple of Web sites where there

25   seemed to be more -- both a tolerance by the

```
 1              30(b)(6) -- JOHN T. LYNCH, JR.
 2    company up until now and the public for a certain
 3    amount of false information.
 4         Q.    So taking the example of the type of
 5    lie that someone might make on a dating Web site,
 6    is it the Department of Justice's position that
 7    that is relatively harmless, even though other
 8    users of the dating Web site might be aggrieved by
 9    those violations of terms of service?
10              MR. SCHWEI:  Objection: vague;
11         hypothetical; and outside the areas of
12         inquiry.
13    BY MS. BHANDARI:
14         Q.    I'll rephrase the question.
15              When you're giving your example of the
16    type of lie that someone might commonly engage in
17    on a dating Web site, are there potential harms to
18    other users of the Web site who interact with the
19    lying user?
20              MR. SCHWEI:  Objection --
21              THE WITNESS:  Yes --
22              MR. SCHWEI:  -- hypothetical.
23    BY MS. BHANDARI:
24         Q.    You can answer the question.
25         A.    -- yes, there are potential harms to
```

1            30(b)(6) -- JOHN T. LYNCH, JR.

2      someone who is interacting with the -- with the

3      user.  Those can range from relatively minor:

4      They are upset with the Web site, that -- that the

5      Web site is not presenting accurate profiles of

6      individuals, or they may decide not to use that

7      Web site anymore.

8            It can go all the way over into fairly

9      serious conduct in which somebody believes they're

10     meeting with a person with one name and they're,

11     in fact, meeting with someone else.  And if there

12     is, for example, stalking behavior that results

13     from that, it may make it harder for the person to

14     identify the person that is now stalking them,

15     having met them through the Web site.

16           So there's going to be, even within a

17     dating Web site, a range of conduct and a range of

18     dangers from the presentation of false

19     information.

20      Q.    And how would the Department of

21     Justice go about evaluating whether the range of

22     harm falls on the side of relatively trivial

23     violations of a Web site terms of service versus

24     not?

25           MR. SCHWEI:  Objection.  That's

1            30(b)(6) -- JOHN T. LYNCH, JR.

2     restriction to report, say, illegal conduct by

3     their employer, how would the Department of

4     Justice weigh the reputational harm in deciding

5     whether that is something worth prosecuting?

6                MR. SCHWEI:  Objection.  That's

7           asking how the Department would weigh

8           something in its decision about whether

9           to bring charges, which is deliberative.

10               So I would instruct the witness not

11          to answer.

12    BY MS. BHANDARI:

13         Q.    So one of the interests identified in

14    the Defendant's interrogatory responses is

15    preventing economic harm.

16               That's on Page 3 of Exhibit 3.

17         A.    Okay.  I see that, yes.

18         Q.    Is that correct?

19         A.    Yes.

20         Q.    And another interest is on Page 4,

21    Paragraph 5, Protecting the integrity of data,

22    Web sites and platforms, which says, Fake accounts

23    dilute the integrity of a Web site, which, as

24    mentioned above, can result in economic harm to

25    the Web site owner.

1              30(b)(6) -- JOHN T. LYNCH, JR.

2              Is that correct?

3       A.    That's correct.

4       Q.    So I want to ask, If someone violates

5  a Web site's terms of service and does so in a way

6  that harms the reputation of the Web site, how is

7  that harm weighed in the -- is that harm

8  considered minimal by the Department of Justice or

9  not minimal?

10             MR. SCHWEI:  Again, objection:

11        asking how and to what extent the

12        Department weighs certain factors in

13        deciding whether to bring a prosecution

14        is deliberative.

15             So I would instruct the witness not

16        to answer.

17  BY MS. BHANDARI:

18      Q.    So you -- you have mentioned that you

19  would weigh minimal harm and, you know, the

20  Department is not typically going to charge

21  harmless or trivial violations of terms of

22  service; is that correct?

23      A.    That is correct.

24      Q.    And my question is, Is reputational

25  harm from truthful information about a Web site --

1          30(b)(6) -- JOHN T. LYNCH, JR.

2          we'll go back to asking you questions in

3          your capacity as the designated witness

4          under 30(b)(6).

5               THE WITNESS:  So you are going to

6          (indicating) -- Rachel Goodman is going

7          to begin by having me as a 30(b)(6)

8          witness, is my understanding.  That's

9          correct?

10                         -  -  -

11               EXAMINATION (CONTINUED)

12               BY COUNSEL FOR PLAINTIFFS

13                         -  -  -

14     BY MS. GOODMAN:

15          Q.    The same rules.  I'll be asking you

16     30(b)(6) questions unless I specifically clarify

17     at the beginning of the question or for a

18     section of the deposition that we're speaking in

19     your personal capacity.

20          A.    Thank you.

21          Q.    Good morning.  I'm Rachel Goodman,

22     picking up where my co-counsel left off and still

23     in your 30(b)(6) capacity.

24               Mr. Lynch, which prosecutors within

25     district offices can initiate prosecutions under

1           30(b)(6) -- JOHN T. LYNCH, JR.

2      1030(a)(2)(C)?

3               MR. SCHWEI:  Objection: vague as to

4          "district offices."  I assume you mean

5          U.S. attorneys' offices.

6               MS. GOODMAN:  Apologies.  Yes.

7               In some documents, they're used

8          interchangeably, but, yes.

9               MR. SCHWEI:  I also object, along

10         the lines of the interrogatory, about the

11         distinction between actually initiating

12         charges to the -- whether a prosecutor by

13         themselves can do that or whether that

14         requires a grand jury, or something along

15         those lines.

16              MS. GOODMAN:  I'll apologize at the

17         beginning for my lack of familiarity with

18         the Federal criminal prosecutorial

19         terminology.

20              So would you mind phrasing that

21         question for me in the way that you think

22         it is appropriately phrased?

23              MR. SCHWEI:  I guess I don't recall

24         the exact question, but -- so the point

25         is, a prosecutor, him or herself, does

1              30(b)(6) -- JOHN T. LYNCH, JR.

2         not issue an indictment.

3              MS. GOODMAN:  I'm using the phrase

4         "initiate prosecution" to mean

5         information, complaint, however you

6         initiate a prosecution.

7              I'm happy to use a different term

8         if that's more clear.

9              MR. SCHWEI:  I defer to --

10             THE WITNESS:  I believe that I can

11        answer the question, and I will try to do

12        so as completely as I can.

13   BY MS. GOODMAN:

14        Q.    Great.

15        A.    There's a term of art, "indictment,"

16   that requires presentation for felony to a grand

17   jury?  So when I say "indictment," I mean a

18   prosecutor has gone to a grand jury and has -- and

19   has presented that, and the grand jury has -- will

20   have had to -- in order to present a true bill,

21   to -- to vote by a majority to -- to indict.

22             There's also a term of art called an

23   "information" that can be -- that can be used

24   without a grand jury under the Constitution, it

25   can't support charges unless the -- the right to

1             30(b)(6) -- JOHN T. LYNCH, JR.

2      be indicted has been waived by the Defendant, but

3      that is sometimes done in plea agreement cases.

4      So somebody may be charged by information and then

5      immediately plead guilty.

6             An information might also be used

7      as a -- temporarily to charge someone or to charge

8      somebody with a misdemeanor, something that there

9      is no constitutional right to a -- to a grand

10     jury.

11            There's also a complaint which is

12     issued by a judge or a -- a Federal district judge

13     or a magistrate judge, typically in the Federal

14     system, which is based upon sworn testimony of an

15     officer, and that can charge somebody with a

16     felony, but it is not a document upon which you

17     are required -- that a defendant would be required

18     to go to trial.

19            So those are the three general

20     categories.  There are small -- there are small

21     exceptions and -- and -- in those.  So I -- I --

22     I'd refer you to Federal -- the -- but I am trying

23     to just be as clear as possible in these things.

24     Q.   So can we agree that if I use the

25     phrase "initiate prosecution" --

1          30(b)(6) -- JOHN T. LYNCH, JR.

2       A.    I -- yeah, if you mean "initiate

3   prosecution," I will take it to mean the people in

4   the Department of Justice who can go to a grand

5   jury and present a prosecute -- a -- present a

6   document that would be the basis for a felony -- a

7   felony prosecution.  And when I'm saying other

8   than that, I will try to be as clear as possible.

9       Q.    Okay.  I'd like to find a term that

10  means to -- to be the prosecutor involved in any

11  of those three processes that you just named.

12            So I intended to use --

13      A.    That would be "charge" -- we can use,

14  probably, the term "charge" in that case --

15      Q.    Okay.  Great.

16      A.    -- and understanding that in some

17  cases, the prosecutor can't initiate it on their

18  own; they must go to a grand jury or to a judge

19  to -- to get those charges.  So we'll talk about

20  charges in -- in that case.

21      Q.    Understood.  Okay.

22      A.    Charges are brought under the

23  authority of Department of Justice officials.  The

24  primary -- the primary Federal prosecution entity

25  in each of the 94 districts of the United States

1          30(b)(6) -- JOHN T. LYNCH, JR.

2     is the United States Attorney.  That's a

3     presidentially appointed, generally, position, and

4     that person has overall authority to -- to bring

5     prosecutions within a given district.

6               Charging authority also resides

7     ultimately with the Assistant Attorney General of

8     the Criminal Division, the Assistant Attorney

9     General of the National Security Division for

10    criminal cases within their jurisdiction.

11              Other parts -- and this is a smaller

12    set, but other divisions have certain relatively

13    circumscribed charging authority.  Tax division,

14    for example, can prosecute tax offenses;

15    environmental can prosecute environmental

16    offenses; Civil Division has some consumer

17    protection offenses.  So the Assistant Attorney

18    General for those entities could bring Federal

19    charges.

20              They typically do not, as I think was

21    stated in our interrogatory, bring -- the major

22    charging authorities under the Computer Fraud and

23    Abuse Act are United States Attorneys' offices,

24    the Criminal Division and the National Security

25    Division.

1            30(b)(6) -- JOHN T. LYNCH, JR.

2        Q.    And what is the role of the CHIP

3    coordinator in that process -- in a U.S.

4    Attorney's office?

5        A.    In a U.S. Attorney's office, the CHIP

6    coordinator is an individual who has been

7    designated by their office to be a specialist in

8    the prosecution of computer hacking or charges

9    under the Computer Fraud and Abuse Act and related

10   charges in electronic evidence and intellectual

11   property offenses.  There may be more than one

12   CHIP in a district; a big district may have

13   several.

14            In a small district, it may not

15   be -- the person may not be exclusively a CHIP;

16   they may be a CHIP and also maybe handle child

17   exploitation prosecutions.  So it's not -- it's

18   not necessarily exclusive.  But that person is

19   subject to the authority of the United States

20   Attorney in the district.  That person can -- can

21   assist in bringing the prosecute -- or bringing

22   charges.  Ultimately, they're responsible to their

23   U.S. Attorney, and the -- and the sort of power

24   flows from -- or -- is delegated from -- from

25   that, and the CHIP has that role.

1          30(b)(6) -- JOHN T. LYNCH, JR.

2               So it's both an advisory role and,

3     also, it's more likely that, but by no means a

4     requirement, that the CHIP is going to be involved

5     in computer hacking or prosecutions or Computer

6     Fraud and Abuse Act prosecutions.

7          Q.    And is the CHIP program run or

8     coordinated through CCIPS in some way?

9          A.    CCIPS helps to administer the program.

10    The program technically is a program of the --

11    technically is a program of the Executive Office

12    of U.S. Attorneys, which is sort of a -- sort of,

13    umbrella organization for you -- for

14    U.S. Attorneys offices, but CCIPS provides

15    information to the CHIPs; we train them on a

16    yearly basis, and we provide advice and guidance

17    to them on a regular basis.

18               So CCIPS has a regular contact with

19    the -- with the CHIP network through various

20    means, including training.

21         Q.    And within -- within main Justice, you

22    mentioned CCIPS and the National Security Division

23    as the primary entities that would bring CFAA

24    prosecutions?

25         A.    Criminal Division -- I mentioned

1            30(b)(6) -- JOHN T. LYNCH, JR.

2    Criminal Division and -- of which CCIPS is a

3    component part -- and the National Security

4    Division as the sort of two main Justice entities

5    that would be most likely to bring CFAA charges.

6    And within the Criminal Division, CCIPS would be

7    the most likely to bring and handle charges under

8    the CFAA, but there have been charges brought by

9    other parts of the Criminal Division, sometimes in

10   partnership with us.

11           Sometimes, you know, it may be an

12   incidental charge to -- it may be a fraud, and,

13   you know, they -- and the fraud section may have

14   the overall case and may have a Computer Fraud and

15   Abuse Act violation as part of that, or Organized

16   Crime and Gangs may have an organized crime case

17   that has a Computer Fraud and Abuse Act component.

18           So, again, we are the most likely

19   place for that, but we're not the absolute

20   exclusive place for prosecutions under the

21   Computer Fraud and Abuse Act -- for initiating

22   prosecutions under the Computer Fraud and Abuse

23   Act.

24       Q.   And in a case like you described where

25   the Fraud section or another section had primary

1         30(b)(6) -- JOHN T. LYNCH, JR.

2    responsibility for prosecution involving the CFAA,

3    is CCIPS brought in to consult on those

4    prosecutions as a matter of policy?

5         A.    Generally, under the intake and

6    charging policy, CCIPS would be consulted under

7    those -- should be consulted under those -- under

8    that -- under that policy in the same way that we

9    would be consulted under -- by a U.S. Attorney's

10   office in that case.  CCIPS would have a

11   consultation role in those -- in those cases.

12        Q.    Are you aware of any instances since

13   the charging policy went into effect where that

14   consultation with CCIPS has not occurred?

15        A.    I am.  There have been times when both

16   U.S. Attorneys' offices, and there may have been a

17   time -- I don't recall specifically -- with a

18   Criminal Division component where somebody was not

19   aware of the policy and did not specifically

20   consult with us.  But as -- it is a policy, and it

21   is something that we encourage and have made known

22   to the -- to the community and continue to -- to

23   make known to the community so that we get kind of

24   consulted on -- on these -- as a regular matter.

25        Q.    Let's turn to that charging policy,

1           30(b)(6) -- JOHN T. LYNCH, JR.

2           foreclose -- it does not foreclose, by

3           its terms, prosecutions.  It simply

4           states a factor that should be considered

5           in the -- in the determination.  There is

6           no strict rule about it.

7    BY MS. GOODMAN:

8           Q.    Okay.  I'll direct your attention to

9    Page -- I'm going to direct your attention to

10   language on Page 5, but I'll flip back to Page 4

11   to read the caption there of that section, which

12   is Exceeding Authorized Access.  And then at the

13   top of Page 5, the last sentence of that Exceeding

14   Authorized Access section, On the other hand, if

15   the defendant exceeded authorized access solely by

16   violating an access restriction contained in a

17   contractual agreement or term of service with an

18   Internet service provider or Web site, Federal

19   prosecution may not be warranted.

20          How do you interpret -- did I read

21   that correctly?

22          A.    You did.

23          Q.    How do you interpret "may not be

24   warranted" there?

25                MR. SCHWEI:  Same objections as to

1                 30(b)(6) -- JOHN T. LYNCH, JR.

2            the earlier question.

3    BY MS. GOODMAN:

4            Q.    You can answer.

5            A.    I interpret it similarly to the

6    private -- the prior provision, that it is a -- it

7    is a statement of factors that should be weighed,

8    but it is not binding for closing prosecution

9    in -- in those cases.  It's -- it's simply a

10   statement of how that factor should be typically

11   weighted.

12           Q.    And, again, does it foreclose a

13   prosecution on that basis?

14           A.    It does not --

15                 MR. SCHWEI:  Same -- same

16           objections.

17                 THE WITNESS:  Sorry.

18   BY MS. GOODMAN:

19           Q.    You can answer.

20           A.    -- it does not foreclose -- it does

21   not, by its terms, foreclose a prosecution.

22           Q.    Does it indicate that the Department

23   of Justice interprets 1030(a)(2)(C) to prohibit

24   violations of access restrictions contained in

25   contractual agreements with ISPs or Web sites?

1          30(b)(6) -- JOHN T. LYNCH, JR.

2               MR. SCHWEI:  Can you restate that

3          question or reread it?

4     BY MS. GOODMAN:

5          Q.    Does it indicate that the Department

6     of Justice interprets 1030(a)(2)(C) to prohibit

7     violations of access restrictions contained in

8     contractual agreements with ISPs or Web sites?

9               MR. SCHWEI:  Objection to the form;

10         and vague as to -- as to what the word

11         "prohibit" in that question means; and,

12         if I understand it, I think it's calling

13         for a legal conclusion about when

14         1030(a)(2)(C) is or is not violated.

15              MS. GOODMAN:  I'm asking whether

16         the Department of Justice considers

17         violating an access restriction contained

18         in a contractual agreement or term of

19         service with an Internet service provider

20         or Web site to potentially be one of the

21         elements of a 1030(a)(2)(C) violation.

22              MR. SCHWEI:  So objection that it's

23         calling for a legal conclusion; and

24         the -- it doesn't accurately reflect all

25         of the elements of 1030(a)(2)(C).

1          30(b)(6) -- JOHN T. LYNCH, JR.

2               But I think you can otherwise

3          answer subject to those objections.

4               THE WITNESS:  My understanding of

5          this is that it indicates that violating

6          an access restriction could potentially

7          be a -- a -- a basis of a -- a

8          1030(a)(2)(C) charge, but it puts -- it

9          gives guidance to prosecutors on the

10         weight that should be given to that kind

11         of prosecution.

12    BY MS. GOODMAN:

13         Q.    Okay.  Is there any other Department

14    of Justice document that alters or amends this

15    charging policy memorandum?

16              MR. SCHWEI:  So -- sorry.

17              Go ahead.

18              THE WITNESS:  I'm aware of nothing

19         that specifically amends this document by

20         its terms.  There are other charging

21         policies that are more general, and there

22         are some specific in -- charging policies

23         that are contained in the United States

24         Attorneys' Manual, now referred to as the

25         Justice Manual, that may read on this,

1              30(b)(6) -- JOHN T. LYNCH, JR.

2         but there is -- there is no superseding

3         document that relates to this particular

4         memorandum.  But all of those policies

5         must be considered before bringing --

6         bringing that charge.

7    BY MS. GOODMAN:

8         Q.    With that understanding, does this

9    memorandum represent DOJ's current policy for

10   charging CFAA violations?

11        A.    Yes.

12        Q.    Does -- does the Attorney General have

13   the authority to withdraw or amend the memorandum?

14             MR. SCHWEI:  Objection: outside the

15        areas of inquiry; calls for a legal

16        conclusion.

17             But you can answer.

18             THE WITNESS:  My understanding is,

19        it is an Attorney General policy that

20        remains in effect until rescinded.  A

21        future Attorney General could choose to

22        rescind it.  To my knowledge, that has

23        not happened.

24   BY MS. GOODMAN:

25        Q.    I want to draw your attention to the

1          30(b)(6) -- JOHN T. LYNCH, JR.

2          charging consultation.  Because at that

3          point, in order to get a plea agreement,

4          there have to be charges brought in some

5          way against the -- the person.

6               So that would be -- I would just

7          answer that -- I -- that would be a point

8          at which I would expect a consultation,

9          but I would believe it would be a

10         Section 3 consultation rather than a

11         Section 2 consultation.

12    BY MS. GOODMAN:

13         Q.    That's helpful.  And we'll talk about

14    the charging consultation with CCIPS in a moment.

15              Just to clarify what you just said,

16    generally, before any proposed plea agreement,

17    the -- the charging consultation with CCIPS would

18    occur?

19         A.    As a general matter, that is my

20    understanding.

21         Q.    Okay.  Okay.

22              Does CCIPS obtain information from the

23    CHIP coordinators about each investigation or

24    investigative consulting?

25              MR. SCHWEI:  Objection: vague as to

1            30(b)(6) -- JOHN T. LYNCH, JR.

2       timing; it --

3            MS. GOODMAN:  I can rephrase on

4       that issue.

5            MR. SCHWEI:  Yeah.

6  BY MS. GOODMAN:

7       Q.   Do the district CHIP coordinators, at

8  any point in time, report up the investigations or

9  investigative consultations concerning the CFAA to

10 CCIPS?

11           MR. SCHWEI:  Sorry.

12           You can answer as sort of a general

13      matter without revealing anything about

14      the substance of CCIPS's internal

15      consultations.

16           THE WITNESS:  The -- there is no

17      requirement that CCIPS be told about

18      investigative consultations.  That is

19      handled at the district level.

20           The substance of the investigative

21      consultations is a potential, in some

22      cases, area of discussion when we get to

23      the charging consultation, because it

24      helps us -- it helps understand the path

25      the investigation took.

1              30(b)(6) -- JOHN T. LYNCH, JR.

2                    But, again, there's no requirement,

3         and I could not say that the substance or

4         the fact of investigative consultations

5         along the lines are uniformly reported to

6         CCIPS, even at the charging consultation

7         stage.

8                    So . . .

9    BY MS. GOODMAN:

10        Q.    So investigations in the

11   U.S. Attorneys' offices that do not get as far as

12   requiring a charging consultation would not

13   necessarily be reported to CCIPS?

14                   MR. SCHWEI:  Objection: calls for

15        speculation.

16                   THE WITNESS:  Could you -- I'm

17        sorry.  Could you repeat the question?

18   BY MS. GOODMAN:

19        Q.    Sure.

20                   So investigations begun in the

21   U.S. Attorneys' offices that don't progress as far

22   as the point that they would require a charging

23   consultation would not necessarily be brought to

24   CCIPS's attention?

25                   MR. SCHWEI:  So calls for

1         30(b)(6) -- JOHN T. LYNCH, JR.

2         speculation; and outside the areas of

3         inquiry.  But . . .

4              THE WITNESS:  Not necessarily.

5         That's correct.

6    BY MS. GOODMAN:

7         Q.    So let's move on to the charging

8    consultation described under Section 3 on Page 6

9    there.  I'll introduce the exhibit that gives a

10   bit more detail about what the charging

11   consultation consists of in a moment.

12             And you began to address my question a

13   moment ago, but at what point in an investigation

14   is a charging consultation required?

15        A.    Going to the -- to the language, it

16   says, With respect to charging decisions, this

17   would happen -- as we discussed at the beginning

18   of the discussion about what a charging document

19   was, it would happen -- the expectation would

20   happen before one of those charging documents was

21   prepared and filed.

22        Q.    I think you answered this question

23   before, but let me just clarify.

24             A charging consultation would occur

25   before the Department of Justice proposed a plea

1            30(b)(6) -- JOHN T. LYNCH, JR.

2       agreement?

3            A.    The expectation is, yes,

4       that that -- that that would be something that

5       would happen before -- before a plea agreement,

6       because a plea agreement, by its nature, requires

7       a charge and then an agreement to plead guilty to

8       that charge.

9            Q.    Are you aware of instances in which

10      the required charging consultation has not

11      happened by that point?

12           A.    I am not aware of -- I am aware of the

13      circumstances in which -- the policy where we

14      found that the policy did not -- was not followed

15      in a particular case, and they may come to us

16      postdoc or, you know, we may find out about it in

17      the newspaper, and -- and that might be the way

18      that we do an inquiry about it.

19                 You know -- as I stated before, we try

20      to emphasize the policy to CHIPs.  It is not --

21      and I think CHIPs uniformly follow it, and they're

22      aware of it, but there may be people who are

23      outside that community who may just not be aware

24      that this policy exists and err by not -- by not

25      consulting beforehand.

Page 125

1          30(b)(6) -- JOHN T. LYNCH, JR.

2          So I am aware of circumstances.  We

3    try to minimize them, but they have occurred, yes.

4          MS. GOODMAN:  I'm going to

5          introduce another exhibit here.  This

6          would be Exhibit 8.

7                    -  -  -

8          (Deposition Exhibit Number 8,

9           Procedures for CCIPS Consultations

10          Regarding Charges under the

11          Computer Fraud and Abuse Act,

12          Revised November 2016, Bates

13          stamped DOJ-00007 through

14          DOJ-00009, marked for

15          identification, as of this date.)

16                    -  -  -

17    BY MS. GOODMAN:

18      Q.    Exhibit 8 is entitled Procedures for

19    CCIPS Consultations Regarding Charges under the

20    Computer Fraud and Abuse Act, Revised:

21    November 2016.

22          Did I read that correctly?

23      A.    You did.

24      Q.    Are you familiar with this document?

25      A.    I am.

1           30(b)(6) -- JOHN T. LYNCH, JR.

2           Q.    Did you review it in preparation for

3      this deposition?

4           A.    I did.

5           Q.    Is this a document that was generated

6      within CCIPS?

7           A.    Yes.

8           Q.    The document says that it was revised

9      in November of 2016.

10               Was there a prior version in effect

11     from the inception of the 2014 charging policy?

12               MR. SCHWEI:  Objection: compound;

13          vague as to time.

14               MS. GOODMAN:  Sure.

15     BY MS. GOODMAN:

16          Q.    Was there a prior version that is

17     superseded in November of 2016?

18          A.    My understanding is yes.

19          Q.    Was there a prior version promulgated

20     at the time that the September 2014

21     Attorney General's memorandum was promulgated?

22          A.    I don't know that it was exactly the

23     same -- the same time, but it was shortly

24     thereafter so that we would have an organized

25     process for doing these consultations that the

1        30(b)(6) -- JOHN T. LYNCH, JR.

2    CHIPs would be aware of, but sitting here right

3    now, I don't remember exactly when -- when it came

4    out.

5        Q.    But, generally, CCIPS attempted to

6    systematize those requirements through a policy,

7    something like this, beginning --

8        A.    Through an internal policy, yes.

9        Q.    Which aspects of the policy were

10    revised in 2016?

11            I can start with a more specific

12    question, if that was overwhelming.

13            Was the recordkeeping requirement

14    described at the end of the policy -- it doesn't

15    have page numbers, but that's DOJ-9 -- was there

16    some version of the recordkeeping policy in effect

17    prior to November 2016?

18            MR. SCHWEI:  So objection as

19        outside the area of inquiry; lack of

20        foundation.

21            You can answer.

22            THE WITNESS:  My recollection is

23        that there was a -- a recordkeeping

24        aspect to the prior version.  This is

25        much more specific, once we had a little

1            30(b)(6) -- JOHN T. LYNCH, JR.

2            bit more experience with it, to make sure

3            that we were capturing as much as we

4            could of the consultations so that we

5            would have -- so that we would have an

6            understanding of what we had said and

7            what we had consulted on and that

8            would -- that that would assist us

9            in -- in our consultations going forward.

10    BY MS. GOODMAN:

11        Q.    On Page 1 of Exhibit 8, in the first

12    paragraph, describes the Attorney General's

13    memorandum and consultation requirement and says

14    that the consultation should occur, quote, Before

15    seeking charges for any violation of 18 U.S.C.

16    1030 (whether by complaint, information or

17    indictment), the prosecutor should contact CCIPS,

18    as described below.

19            Did I read that correctly?

20        A.    You did.

21        Q.    So according to this language, the

22    consultation should occur before there would be a

23    proposed plea agreement asking Defendants to admit

24    to violations of 1030(a)(2)(C)?

25        A.    By implication, yes, because the

1              30(b)(6) -- JOHN T. LYNCH, JR.

2    charging document would be the trigger, and the

3    charging document would have to be filed as -- as

4    part of the plea agreement package.

5         Q.    On the second page of that document --

6    that's DOJ-8, for clarity -- there is -- I'm

7    sorry.

8              I'm actually on Page 3 -- apologies --

9    DOJ-9.  There's a section on response time, and

10   describes the obligations to -- or the procedures

11   for responding to the prosecutor.

12             Generally speaking, what does the

13   content of the CCIPS's response look like?

14             MR. SCHWEI:  Objection.  To the

15             extent it's asking for substance, that's

16             privileged.

17             So I would instruct the witness not

18             to answer anything about the substance of

19             CCIPS's consultation responses.

20   BY MS. GOODMAN:

21        Q.    I'm not asking about the substance.

22   I'm asking about -- you know, the 30(b)(6) topic

23   is about the role of CCIPS in charging practices,

24   and I'm asking generally, you know, what is it

25   that CCIPS is providing back when they're

1            30(b)(6) -- JOHN T. LYNCH, JR.

2      consulted.

3            A.    The form can be different forms: it

4      can be telephone conversation; it might be an

5      e-mail response relating to -- again, without

6      going into the substance, but it is essentially

7      advice regarding the -- the charge.  And it -- and

8      it doesn't take a, necessarily, specific form.

9      That may depend upon the urgency of the -- the

10     urgency of the request, the status of the case,

11     the difficulty of the -- the difficulty of the

12     1030 analysis that might be implicated.

13           Q.    Is part of the content and evaluation

14     of the extent to which the potential charges

15     comply with the policy set forth in the

16     Attorney General's memorandum?

17                 MR. SCHWEI:  You can answer.

18                 THE WITNESS:  Okay.

19                 The general -- as the -- as the --

20           going back to Exhibit 7, states that

21           the -- those are the -- and we're on

22           Page, I think, 6.  It states that The

23           consultation should be substantive in

24           nature.  It is meant to both assist the

25           prosecutor and promote consistency in the

1          30(b)(6) -- JOHN T. LYNCH, JR.

2          Department of a quickly -- in a quickly

3          evolving area of practice.

4               And it does state that The depth of

5          the consultation and degree of

6          information required will vary according

7          to the particular facts of the matter.

8               And that is, in sum and substance,

9          the -- the nature of the -- of the

10         consultation that we do.  It is

11         substantive.  I can't go into the

12         substance of particular matters, but it

13         is intended to be not merely a check as

14         to form but as -- also as to whether

15         it -- it is compliant with policy, with

16         prior prosecutions and -- and the policy

17         of the Attorney General and to provide

18         advice on that point.

19    BY MS. GOODMAN:

20         Q.   Are the U.S. Attorneys' offices bound

21    to follow the advice of CCIPS?

22         A.   They are not.

23         Q.   So moving down that page in DOJ-9 to

24    the recordkeeping requirement section that we

25    discussed briefly earlier.

1          30(b)(6) -- JOHN T. LYNCH, JR.

2                Do the recordkeeping requirements here

3     give CCIPS a comprehensive record of CFAA charges

4     brought throughout DOJ?

5                MR. SCHWEI:  Objection: outside the

6           areas of inquiry; and lack of foundation.

7     BY MS. GOODMAN:

8          Q.    You can answer.

9          A.    Okay.

10               I guess I would not be able to say

11    that it is a comprehensive record because I am

12    not -- I'm aware that it is not -- as I testified

13    previously in this deposition, that I'm aware of

14    instances where consultations didn't occur; there

15    may be, also, charges where I haven't found out

16    yet that a consultation hadn't occurred.

17               So I wouldn't be able to say that this

18    is a comprehensive in the sense of every single

19    consultation that has taken place, but I think it

20    is a reasonable record of the consultations that

21    we have undertaken.

22         Q.    Would you say that since 2014, when

23    the memorandum and CCIPS's recordkeeping

24    requirements went into effect, you've had a much

25    more comprehensive or closer-to-comprehensive

Page 133

1              30(b)(6) -- JOHN T. LYNCH, JR.

2      record than you did prior to the implementation of

3      those guidelines?

4                   MR. SCHWEI:  Objection: outside the

5              areas of inquiry; calls for speculation;

6              lack of foundation.

7      BY MS. GOODMAN:

8       Q.    I'll ask you to answer in your

9      personal capacity.

10                  MR. SCHWEI:  So same objections.

11                  But go ahead.

12                  THE WITNESS:  Prior to 2014, we

13              were often consulted on these matters,

14              and so we had a pretty good understanding

15              of what was happening before 2014, post

16              2014, because there was a procedure in

17              place.

18                  I guess my personal experience has

19              been there has been -- that I'm -- it's

20              probably better and closer to

21              comprehensive, but I don't think either

22              were night and day.  I think that they

23              were -- we were consulted voluntarily on

24              a lot of things before 2014, and post

25              2014, we should be consulted on

```
 1              30(b)(6) -- JOHN T. LYNCH, JR.
 2         everything; but as I've said, I'm aware
 3         of situations in which we haven't been
 4         consulted.
 5              MS. GOODMAN:  I'm about to
 6         introduce another exhibit.  I just want
 7         to back up for a second and say, it's
 8         noon; my guess is that I have about
 9         another hour; and there may be a little
10         bit of cleanup at the end.
11              I think our preference would be to
12         push through.
13              Is that okay with everyone
14         timing-wise, lunch-wise?
15              THE WITNESS:  That is -- that is
16         okay.  I want more water, though.
17              MS. GOODMAN:  Should we take a
18         break?
19              MR. SCHWEI:  Let's take a five-,
20         10-minute break.
21                        -  -  -
22              (Whereupon, a recess was taken from
23          11:53 a.m. to 12:01 p.m.)
24                        -  -  -
25              MS. GOODMAN:  I'm going to mark
```

1              30(b)(6) -- JOHN T. LYNCH, JR.

2         foreclose prosecutions based on

3         violations of Web sites' terms of

4         service, I think he can answer.  And I

5         think he has already answered that.

6              If the question is about continuing

7         conduct or similar conduct at issue to

8         what happened in Drew, I think that's

9         asking the Department to opine on the

10        likelihood, if any, of prosecution.

11             So I would instruct him not to

12        answer that question.

13             But if you want to ask does the AG

14        charging policy foreclose prosecutions of

15        violations of Web sites' terms of

16        service, I think he can answer that and

17        has already answered that.

18   BY MS. GOODMAN:

19        Q.   Okay.  I'll ask you to answer the

20   question posed by Mr. Schwei.

21             And just to repeat:  Does the

22   Attorney General's charging policy foreclose

23   prosecutions involving violations of Web sites'

24   terms of service?

25        A.   To the best of my knowledge, no, it

1               30(b)(6) -- JOHN T. LYNCH, JR.

2    does not absolutely foreclose them.

3         Q.    Okay.

4               MS. GOODMAN:  Let's move on, and

5          I'll introduce Exhibit 11.  And it is the

6          Court's decision on the motion to dismiss

7          in this case.

8                        -  -  -

9               (Deposition Exhibit Number 11,

10               Memorandum Opinion, marked for

11               identification, as of this date.)

12                        -  -  -

13   BY MS. GOODMAN:

14        Q.    So Exhibit 11 is a memorandum opinion

15   issued in the matter of Sandvig versus Sessions on

16   March 30th, 2018, and I'd like to draw your

17   attention to Page 21 of that opinion.

18               The very last sentence on Page 21, The

19   Government also does not know whether prosecutors

20   may have employed the access provision to obtain

21   plea agreements in which Defendants admitted to

22   harmless terms of service violations.

23               And then the opinion cites to the

24   transcript of the motion hearing.

25               Did I read that correctly?

1          30(b)(6) -- JOHN T. LYNCH, JR.

2      A.    You have read that correctly.

3      Q.    Is that statement correct?

4          MR. SCHWEI:  I'm going to object.

5      This is outside the areas of inquiry.  It

6      is a statement in a document that the

7      witness has not reviewed; it's a

8      statement from a judicial opinion that

9      characterizes what occurred in a court

10     proceeding; and it mis -- the question

11     mischaracterizes the meaning of what was

12     said in this judicial opinion at that

13     time.

14          And so the question is outside the

15     area of inquiry, and there's also a lack

16     of foundation about this witness's

17     ability to answer what the Court meant in

18     that -- in that sentence.

19          MS. GOODMAN:  I can rephrase the

20     question.

21  BY MS. GOODMAN:

22     Q.    Does the Government know whether

23  prosecutors may have employed the access provision

24  to obtain plea agreements in which Defendants

25  admitted to harmless terms of service violations?

1            30(b)(6) -- JOHN T. LYNCH, JR.

2                 MR. SCHWEI:  Objection to form

3            based on "may have."  And objection to --

4            yeah, objection: form, based on "may

5            have."

6    BY MS. GOODMAN:

7            Q.    Does the Government know whether

8    prosecutors have employed the access provision to

9    obtain plea agreements in which Defendants

10   admitted to harmless terms of service violations?

11                 MR. SCHWEI:  Objection to vague.

12           Objection: vague as to timing; and lack

13           of foundation.

14   BY MS. GOODMAN:

15           Q.    You can answer.

16           A.    For the reasons I stated before, I'm

17   not 100 percent sure that every -- that I know of

18   every single consultation and plea agreement.  But

19   I am unaware of prosecuting -- or prosecutors

20   employing the access provision to obtain plea

21   agreements for harmless terms of service

22   agreements.

23                 That's the extent that I can answer

24   that.

25           Q.    When you say for the reasons you

1          30(b)(6) -- JOHN T. LYNCH, JR.

2          THE WITNESS:  I -- speaking as a

3     representative of the Department of

4     Justice, I believe this is still true

5     today.

6  BY MS. GOODMAN:

7     Q.   And does the phrase "Federal criminal

8  prosecution" in that sentence I just read refer

9  exclusively to filed charges, or does it include

10  instances in which plea agreements may have been

11  obtained before the filing of charges?

12          MR. SCHWEI:  Objection: vague,

13     because I think "charges" encompasses

14     plea agreements.

15          But the witness can explain his

16     understanding.

17          THE WITNESS:  If I can explain.

18  BY MS. GOODMAN:

19     Q.   Sure.

20     A.   A plea agreement would necessarily

21  require a charge.  And so in this sense, a Federal

22  criminal prosecution would include one which was

23  resolved immediately by plea agreement.

24          So I -- I would say that would be

25  encompassed within the -- both charges that

1          30(b)(6) -- JOHN T. LYNCH, JR.

2    resulted in trial and charges that resulted in

3    plea agreement would be comprehended by Federal

4    criminal prosecution as I used it in the affidavit

5    at this time.

6          Q.    Okay.  And when you say "resembling

7    the conduct described in the Complaint" there,

8    what does that phrase refer to?

9          A.    It refers to the first sentence of

10   Paragraph 9, where I said I reviewed the Complaint

11   in this -- in this case, and that sets forth the

12   description of the conduct.  I applied some level

13   of abstraction to that so it wasn't just the -- a

14   specific conduct by a specific person.  But -- so

15   I tried to -- I tried to -- to look at what

16   similar conduct would be look -- look like with

17   the particular factors being de minimis, as also

18   stated in that paragraph.

19               And so "resembling the conduct" meant

20   that I wasn't limiting it to the exact specific

21   facts of the -- of the Plaintiffs' complaint, but

22   a somewhat broader -- somewhat broader range of

23   those.

24         Q.    And I'm trying to pin down a little

25   bit what you mean by "somewhat broader" means.

1          30(b)(6) -- JOHN T. LYNCH, JR.

2      A.    Okay.

3      Q.    Were you thinking about the research

4  methodologies that the Plaintiffs used or the fact

5  that they're conducting academic or journalistic

6  research with a certain purpose or some other

7  definition?

8      A.    When I was -- when I was contemplating

9  this, I was looking at the academic purpose and

10  the amount of harm that was -- that -- that was

11  alleged, and those were the points, for example,

12  on what -- that I was contemplating at the time I

13  wrote -- I wrote this paragraph.

14      Q.    And with respect to "de minimis harm,"

15  you spoke with my co-counsel a little bit earlier

16  about this notion of harmless terms of service

17  violations.

18          Are you -- do you understand

19  "de minimis harm" to have the same meaning here as

20  the Department used in its testimony and things

21  earlier when it discussed harmless violations?

22          MR. SCHWEI:  Objection: outside the

23          areas of inquiry; calls for speculation;

24          and lack of foundation.

25          THE WITNESS:  I can answer?

1    30(b)(6) -- JOHN T. LYNCH, JR.

2 BY MS. GOODMAN:

3    Q. You can answer.

4    A. I understand them to have roughly the

5 same -- roughly the same meaning.  "Harmless" is a

6 none.  "De minimis," here, is somewhat broader

7 than none, but of the sort that -- of the sort

8 that would be considered to be minimal, and so

9 that -- that was the -- that was how I was

10 contemplating it.

11    So I think that the terms have rough

12 congruence, but "de minimus" might be slightly

13 broader than "harmless."  But I think that they're

14 in the same area.

15    Q. Okay.  And then moving on to the final

16 sentence of that paragraph, which says, I do not

17 expect the Department would bring a CFAA

18 prosecution based on such facts and de minimis

19 harm.

20    Is that statement still true?

21    A. It is true, yeah, it is -- my

22 expectation continues to be that, yes.

23    Q. And while that statement is true, does

24 it foreclose the possibility that the Department

25 would bring such a prosecution?

1              30(b)(6) -- JOHN T. LYNCH, JR.

2              MR. SCHWEI:  Objection: vague.  I

3         think you can -- I think it's outside the

4         areas of inquiry, particularly because

5         we're now talking about the meaning of

6         his personal affidavit.

7              But I think you can answer the

8         question.

9              THE WITNESS:  It expresses my

10        expectation.  I believe that expectation.

11        But it does not foreclose the

12        possibility, because I have no ability to

13        directly control that.

14   BY MS. GOODMAN:

15        Q.   And just to be clear, because your

16   counsel makes a good point, let's state that

17   explicitly.  I'm asking you now in your personal

18   capacity, Does that statement mean that you

19   believe that the Department of Justice absolutely

20   could not bring a prosecution based on these

21   facts?

22              MR. SCHWEI:  Objection.

23              MS. GOODMAN:  I confused the

24        negatives.

25              Strike that.

1          30(b)(6) -- JOHN T. LYNCH, JR.

2    BY MS. GOODMAN:

3        Q.    Speaking in your personal capacity, do

4    you believe that it is impossible for the

5    Department to bring a CFAA prosecution based on

6    such facts and de minimis harm?

7        A.    No, I do not believe it's impossible.

8              I'm sorry.

9        Q.    I think the remainder of my questions,

10   which are just a few, will be all in your personal

11   capacity now.

12       A.    Okay.

13       Q.    Does that statement -- the sentence we

14   were just discussing -- when you say that you do

15   not expect the Department would bring a

16   prosecution, does that statement include your

17   consideration of the fact that -- of the fact of

18   the Plaintiffs' motives in conducting their

19   research?

20             MR. SCHWEI:  So I think the witness

21        can answer about what he considered.  I

22        don't think he can answer as to what the

23        Department or a prosecutor would

24        consider.

25