*Sandvig v. Barr*

No. 1:16-cv-1368 (JDB)

Plaintiffs' Exhibit 15



# HOUSING DISCRIMINATION AGAINST RACIAL AND ETHNIC MINORITIES 2012

PD&R

PID0967

U.S. Department of Housing and Urban Development  |  Office of Policy Development and Research

Visit PD&R's website
# www.huduser.org
to find this report and others sponsored by HUD's Office of Policy Development and Research (PD&R). Other services of HUD USER, PD&R's research information service, include listservs, special interest reports, bimonthly publications (best practices, significant studies from other sources), access to public use databases, and a hotline (800-245-2691) for help accessing the information you need.

PID0968

# HOUSING DISCRIMINATION AGAINST RACIAL AND ETHNIC MINORITIES 2012

Prepared for:
U.S. Department of Housing
and Urban Development
Washington, D.C.

Prepared by:
Margery Austin Turner
Rob Santos
Diane K. Levy
Doug Wissoker
Claudia Aranda
Rob Pitingolo
The Urban Institute

June 2013

PID0969

# CONTENTS

ACKNOWLEDGMENTS

EXECUTIVE SUMMARY ....................................................................................................................xi

I.   INTRODUCTION ......................................................................................................................1
    Background ....................................................................................................................................1
    Goals for the 2012 Housing Discrimination Study .......................................................................2
    Strengths and Limitations of Paired Testing...................................................................................3
    Organization of Report ..................................................................................................................4

II.  PAIRED TESTING PROTOCOLS AND FIELD MANAGEMENT ......................................5
    Rental Testing Protocols................................................................................................................6
    Sales Testing Protocols ..................................................................................................................8
    Data Collection Oversight, Management, and Quality Control....................................................9

III. SAMPLING AND ANALYSIS METHODS ............................................................................13
    Study Objectives..........................................................................................................................13
    Sample of Metropolitan Areas ...................................................................................................14
    Sampled Sites and Targeted Tests ...............................................................................................19
    Actual Tests Conducted ..............................................................................................................19
    Sampling Available Housing.......................................................................................................22
    Analysis Weights.........................................................................................................................24
    Measuring Differential Treatment...............................................................................................27
    Multivariate Analyses of the Correlates of Differential Treatment............................................34

IV.  INCIDENCE OF DISCRIMINATION ...................................................................................39
    Rental Market Discrimination ....................................................................................................39
    Sales Market Discrimination ......................................................................................................50

V.   VARIATIONS IN DISCRIMINATION ..................................................................................65
    Change in Discrimination Over Time ........................................................................................65
    Metropolitan Estimates of Discrimination and Tests for the Influence of Housing Market Conditions..........69
    Identifiability of Minority Homeseekers....................................................................................72
    Multivariate Analysis of Variations in Discrimination ..............................................................74

APPENDICES
    Appendix A: HDS2012 Local Testing Organizations.................................................................79
    Appendix B: Master List of Asian and Hispanic Subgroups .....................................................81
    Appendix C: Tester Characteristics ............................................................................................85
    Appendix D: Rental Forms..........................................................................................................89
    Appendix E: Sales Forms ..........................................................................................................115
    Appendix F: Metro-Specific Rental Estimates ........................................................................137

REFERENCES.....................................................................................................................................163

# EXECUTIVE SUMMARY

For much of the twentieth century, discrimination by private real estate agents and rental property owners helped establish and sustain stark patterns of housing and neighborhood inequality. Beginning in the late 1970s, the Department of Housing and Urban Development (HUD) has rigorously monitored trends in racial and ethnic discrimination in both rental and sales markets approximately once each decade through a series of nationwide paired-testing studies. This summary report presents findings from the fourth such study, which applied paired-testing methodology in 28 metropolitan areas to measure the incidence and forms of discrimination experienced by black, Hispanic, and Asian renters and homebuyers.[1]

When well-qualified minority homeseekers contact housing providers to inquire about recently advertised housing units, they generally are just as likely as equally qualified white homeseekers to get an appointment and learn about at least one available housing unit. However, when differences in treatment occur, white homeseekers are more likely to be favored than minorities. Most important, minority homeseekers are told about and shown fewer homes and apartments than whites (Exhibit ES-1).[2]



**Exhibit ES-1: Minority Homeseekers Told About and Shown Fewer Housing Units**

| **Renting** COMPARED TO WHITES | **Buying** COMPARED TO WHITES |
|---|---|
| **BLACKS** TOLD ABOUT 11.4% / SHOWN 4.2% … FEWER UNITS | **BLACKS** TOLD ABOUT 17% / SHOWN 17.7% … FEWER HOMES |
| **HISPANICS** TOLD ABOUT 12.5% / SHOWN 7.5% … FEWER UNITS | Differences favor neither whites nor Hispanics |
| **ASIANS** TOLD ABOUT 9.8% / SHOWN 6.6% … FEWER UNITS | **ASIANS** TOLD ABOUT 15.5% / SHOWN 18.8% … FEWER HOMES |

Although the most blatant forms of housing discrimination (refusing to meet with a minority homeseeker or provide information about any available units) have declined since the first national paired-testing study in 1977, the forms of discrimination that persist (providing information about fewer units) raise the costs of housing search for minorities and restrict their housing options. Looking forward, national fair housing policies must continue to adapt to address the patterns of discrimination and disparity that persist today.

---

[1] Based on standard U.S. Census Bureau practice, this report uses the term "Asian" to refer to all Asian and Asian American testers. In addition, the term "white" refers to non-Hispanic whites.

[2] All reported differences between minority and white treatment are statistically significant at the 0.90 level or higher. For specific tests of statistical significance, see the exhibits in Chapters IV and V.

There can be no question that the housing circumstances of whites and minorities differ substantially. Whites are more likely to own their homes, to occupy better quality homes and apartments, and to live in safer, more opportunity-rich neighborhoods. However, it is less obvious whether—or how much—these disparities result from current racial and ethnic discrimination in the housing market because whites and minorities differ systematically in employment, income, assets, and debts.

> **In this study…** More than 8,000 tests were conducted in a nationally representative sample of 28 metropolitan areas. In each test, two trained individuals—one white and the other black, Hispanic, or Asian—contacted a housing provider to inquire about a housing unit randomly selected from recently advertised homes and apartments. The two testers in each pair were matched on gender and age, and both presented themselves as equally and unambiguously well-qualified to rent or buy the advertised unit. Each tester independently recorded the treatment he or she experienced, including information about all the homes or apartments recommended and shown.

**Paired testing offers a uniquely effective tool for directly observing differential treatment of equally qualified homeseekers, essentially catching discrimination in the act**

In a paired test, two people, one white and the other minority, pose as equally qualified homeseekers and inquire about available homes or apartments. Researchers have adapted the tool to systematically measure how often discrimination occurs across housing markets and what forms it takes.[3]

Despite its power, paired testing cannot capture all forms of housing discrimination that might occur during a housing search. For example, it does not encompass differences in advertising practices that may limit a homeseeker's knowledge about available housing options. It cannot measure differences in treatment that might occur after the initial inquiry—when homeseekers submit applications, seek mortgage financing, or negotiate lease terms. Moreover, the results presented here do not reflect the experience of the average or typical minority homeseeker, because testers presented themselves as unambiguously well-qualified for the advertised homes and apartments about

> **Understanding the numbers…** Not every instance of white-favored treatment should be interpreted as systematic discrimination. In some tests, random factors may contribute to observed differences in treatment; in other tests, minorities may experience more favorable treatment than their white partners for systematic reasons. Therefore, we report the share of tests in which the white was favored over the minority, the share in which the minority was favored over the white, and the difference between the two. This difference—or net measure—provides a conservative, lower-bound estimate of systematic discrimination against minority homeseekers, because it not only subtracts random differences from the gross measure of white-favored treatment, but may also subtract some differences that reflect systematic reverse discrimination. Gross measures of discrimination receive less emphasis in this report than in past national studies because analysis over the past 25 years strongly suggests that they reflect a lot of random differences in treatment, and that net measures more accurately reflect the systematic disadvantages faced by minority homeseekers.

---

[3] This study focuses on differential treatment discrimination—when equally qualified homeseekers receive unequal treatment from housing providers. For methodological details, see Chapters II and III. Federal law also prohibits forms of treatment that may appear equal on their face but that have a disparate impact on minority homeseekers.

which they inquired.[4] Evidence from other research suggests that when testers pose as more marginally qualified homeseekers, more discrimination occurs (Hunter and Walker 1996). For all these reasons, results reported here probably understate the total level of discrimination that occurs in the marketplace.

**People of color still face discrimination when they search for housing today**

Each paired test in this study compares the treatment of whites and minorities at three critical steps in the search for housing:

1. First, testers attempted (by telephone or e-mail) to **make appointments** for in-person visits.

2. If successful, they used the **in-person visit** to learn about available homes or apartments.

3. Finally, if told about at least one available housing unit, testers sought to **inspect homes or apartments**.

The discussion and exhibits that follow summarize the main findings at each of these three steps, first for renters and then for homebuyers.

**Discrimination against minority renters.** Minority renters who call to inquire about recently advertised homes or apartments are rarely denied appointments that their white counterparts are able to make. In the vast majority of tests, if one tester is able to make an appointment, then both are. The very small treatment differences favor neither whites nor minorities (Exhibit ES-2).

### Exhibit ES-2: Call for Rental Appointment

**MAKE AN APPOINTMENT** Almost every time one tester can make an appointment, both can.



| BLACKS | HISPANICS | ASIANS |
|---|---|---|
| 1% white favored — 98.4% Equal treatment — 0.6% black favored | 0.4% white favored — 99.4% Equal treatment — 0.2% Hispanic favored | 0.4% white favored — 99.5% Equal treatment — 0.1% Asian favored |
| Differences favor neither whites nor blacks | Differences favor neither whites nor Hispanics | Differences favor neither whites nor Asians |

When renters meet in person with housing providers, they are almost always told about at least one available unit. However, Hispanic renters are slightly more likely than equally qualified whites to be told that no homes or apartments are available (1.8 percentage points). Moreover, in about half of all in-person visits, one tester is told about more available units than the other, with whites significantly

---

[4] All testers were assigned financial characteristics that qualified them for the housing units about which they were inquiring. Therefore, the assigned income levels varied widely, matching the variation in advertised rents and home prices in the sampled metropolitan areas. However, in most metropolitan areas, average incomes among black, Hispanic, and Asian households are lower than the average incomes assigned to testers.

In some parts of the country, high unemployment might have contributed to very weak rental markets as well, with property owners eager to find tenants. But in many others, an increase in rental housing seekers due to foreclosures and barriers to mortgage lending appears to have produced very tight market conditions, requiring rapid-response rental inquiry protocols. HDS2012 sampling procedures and testing protocols were adapted to reflect variations in market conditions across the country, the continuously updated pool of online rental advertisements, and the need for rapid response to rental ads, especially in tight markets.

**Strengths and Limitations of Paired Testing**

The paired-testing methodology originated as a tool for fair housing enforcement, detecting and documenting individual instances of discrimination. Since the late 1970s, paired testing has also been used to rigorously measure the prevalence of discrimination across the housing market. When large numbers of consistent and comparable tests are conducted for a representative sample of housing units, they directly measure patterns of adverse treatment based on race or ethnicity.

Although research testing shares common origins with enforcement testing, it differs in important ways. Because its goal is to measure the prevalence of discrimination across the market as a whole, research testing usually covers a *representative sample* of available homes and apartments, rather than targeting properties or communities where discrimination is suspected. In addition, to produce *generalizable results,* research testing requires a fairly large number of tests covering many different housing providers, rather than multiple tests, to clearly establish discrimination by a single provider. To generate results that can be *aggregated* across many tests, research protocols have to be rigidly consistent for every test, whereas the best enforcement protocols are flexible enough to respond to circumstances that arise in particular tests. Finally, research testing report forms require predefined, closed-ended responses that can be compared consistently across many tests, rather than detailed and nuanced narratives that convey exactly what happened in an individual test.

Paired testing has tremendous power and potential, but the methodology also has limitations. For practical reasons, paired testing cannot be applied to some of the important stages in a rental or sales transaction. For example, third-party testing protocols cannot legitimately involve the formal submission of fraudulent information in a signed rental or loan application, so it is not possible to capture discrimination that might occur at the final stage of a rental or sales transaction. Also, discrimination against established tenants or homeowners (such as in lease renewals or property maintenance) cannot be captured through paired testing because the housing provider already knows the details of consumers' actual characteristics. As a consequence, the estimates of discrimination reported here do not capture all the forms of discriminatory treatment that minority homeseekers may experience, only those that occur during the initial inquiry and information gathering.

Moreover, the results presented here do not reflect the experience of the average or typical minority homeseeker, because testers presented themselves as unambiguously well-qualified for the homes and apartments about which they inquired. In most metropolitan areas, average incomes among black, Hispanic, and Asian households are lower than the average incomes assigned to testers. Evidence from other research on mortgage lending discrimination suggests that when testers pose as more marginally qualified homebuyers, differential treatment occurs more frequently (Hunter and Walker 1996). Therefore, results reported here probably understate the total level of discrimination that occurs in the marketplace.

I. INTRODUCTION

Paired testing is explicitly designed to control for all relevant differences between testers so differences in treatment can be attributed to discrimination based on protected class. Nonetheless, random as well as systematic factors may contribute to observed differences, and some tester attributes or behaviors may not be fully controlled or observed. Therefore, not every instance of white-favored treatment should be interpreted as systematic discrimination. In some tests, random factors may contribute to observed differences in treatment; in other tests, minorities may experience more favorable treatment than their white partners for systematic reasons. Therefore, we report the share of tests in which the white was favored over the minority, the share in which the minority was favored over the white, and the difference between the two. This difference—or net measure—provides a conservative, lower-bound estimate of systematic discrimination against minority homeseekers, because it not only subtracts random differences from the gross measure of white-favored treatment, but may also subtract some differences that reflect systematic reverse discrimination. Gross measures of discrimination receive less emphasis in this report than in the prior national study, HDS2000. Analysis over the past 25 years strongly suggests that gross measures reflect a lot of random differences in treatment, and that net measures more accurately reflect the systematic disadvantages faced by minority homeseekers.

Critics of paired testing have raised ethical and legal objections, arguing that the methodology deceives or entraps research subjects, imposes costs (of interacting with a fictitious customer), and may invade the privacy rights of the person or office being tested (see Edley 1993). However, a convincing argument can be made that paired testing is often the only feasible strategy for detecting and measuring discrimination, and that the benefits far outweigh the drawbacks.[8] These studies provide no lure or incentive for sales or rental agents to act any differently from the way they would otherwise act. Moreover, responsible testing studies intentionally involve as limited an intrusion as possible, taking up the minimum amount of time necessary. They also involve responding to offers (for homes and apartments) that are publicly advertised and subject to laws or regulations barring discrimination (Fix and Struyk 1993).

**Organization of Report**

The remainder of this report details the methods and results of HDS2012. Chapter II describes the paired-testing protocols and the procedures implemented to manage the nationwide data collection effort and ensure quality control. Chapter III documents sampling and statistical methods. Chapter IV presents national estimates of discrimination against blacks, Hispanics, and Asians in both rental and sales markets. Chapter V presents and discusses additional study findings, including local estimates of discrimination against minority renters for a small number of major metropolitan areas, analysis of variations in levels of discrimination, and estimates of change in discrimination since HDS2000.

---

[8] In *Havens Realty Corp. v. Coleman* (1982), the Supreme Court held, "A tester who has been the object of a misrepresentation made unlawful… has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing to maintain a damages claim…. That the tester may have approached the real estate agent fully expecting that he would receive false information, and without any intention of buying or renting a home, does not negate the fact of injury."

# II. PAIRED TESTING PROTOCOLS AND FIELD MANAGEMENT

The paired-testing protocols for HDS2012 were designed to support research rather than enforcement. Differences between the two types of testing encompass the number of tests to conduct, the selection of properties to test, how testing protocols are used, and the type of data collected. Research testing requires completing a large number of tests that will support statistical analysis of the collected data. Tests are based on housing ads selected at random from publicly available ad sources; there is no attempt to test a particular housing provider or housing unit. In contrast, enforcement tests target housing providers suspected of discriminating against certain homeseekers. Fair housing organizations often initiate tests after receiving complaints of unfair treatment. If an initial test suggests a difference in treatment between paired testers, the organization may conduct additional tests of the same provider to confirm results and compile evidence of discrimination.

Tests conducted for research must produce consistent and comparable data that can be aggregated for analysis. Consequently, research testing protocols are inflexible; testers in all study sites must conduct tests in the same way. Enforcement protocols, in contrast, need to be flexible to respond to the circumstances of a particular case. Enforcement also collects more detailed, nuanced information on each test, whereas information collected for research comes from tester responses to mostly close-ended questions about their experience. The more highly structured, inflexible protocols of research testing allow analysts to control for differences in treatment between white and minority homeseekers and directly measure patterns of adverse treatment based on race and ethnicity.

The field implementation component of this study started with the protocols and processes used for HDS2000, modified to incorporate changes in rental and sales housing markets, and in housing search practices, over the past 10 years. Testing was managed centrally by a field director who oversaw Urban Institute (UI)- and field-based regional coordinators. UI contracted with local testing organizations, including fair housing groups and others capable of conducting this specialized work, in the study sites. See Appendix A for a list of participating organizations.

Local testing organizations recruited testers according to the types of tests a site was assigned to conduct. Their recruitment activities also were guided by information that UI provided on local community demographics. For example, a site conducting Asian/white tests would be provided recruitment targets for Asian subgroups based on census data for that metropolitan area. In a city with a significant number of Vietnamese and Laotian residents, an organization would attempt to recruit more testers from these groups than from other Asian subgroups. See Appendix B for a master list of Asian and Hispanic subgroups.[9] Organizations also attempted to ensure a reasonable distribution of testers by sex and age.

Minority and white testers were matched on age and gender. They were assigned income, assets, and debt levels to make both testers unambiguously *well qualified for the representative sample of advertised units* and to make the minority tester slightly better qualified. As a result of being assigned income that made testers well qualified relative to the income necessary to rent or buy a unit being tested, on average,

---

[9] Testers who identified as Hispanic and black but likely were perceived to be black participated as testers for black/white tests, changing their name if necessary.

## II. PAIRED TESTING PROTOCOLS AND FIELD MANAGEMENT

white and Asian testers were assigned a slightly higher income than the average white or Asian renter and a slightly lower income than the average white or Asian homebuyer. Black and Hispanic testers were assigned a higher income than the average black or Hispanic renter or homebuyer.[10] Test partners also were assigned comparable family circumstances, job characteristics, education levels, and housing preferences. (Appendix C outlines how tester characteristics were developed for sales tests.) Testers contacted and visited rental or sales agents and systematically recorded the information and assistance they received about the advertised unit and other units, including location, rent or sales price, quality and condition, and other terms and conditions. Testers were not told who their test partner was; partners did not compare their experiences with one another.

### Rental Testing Protocols

Protocols for rental tests were divided into eight steps. The first step in the process required making contact on each sampled advertisement before it could be assigned to testers. The advance contact confirmed details from an ad and collected additional information required to determine eligibility and assign tester characteristics. Second, a local test coordinator created a test assignment based on information collected from the sampled advertisement and the advance contact. Third, the coordinator met with each tester in the matched pair separately. During briefings, testers received and reviewed their assignment, reviewed test protocols, and discussed any questions or concerns with the coordinator.

Fourth, testers were assigned to visit the housing provider using one of two approaches: no appointment/drop-in, which was used when an advertisement provided information on location and office hours; or appointment, which was used when an advertisement provided insufficient information to allow a drop-in visit or the advance contact determined an appointment was necessary.[11] Testers were assigned a Google Voice number and a Gmail account, which they used to make appointments and to receive messages from housing providers. The use of Google Voice/Gmail helped streamline communication by allowing testers to use a phone number that was solely for use on the project and whose digital voicemail could be accessed online by test coordinators and/or transcribed to text. Because voicemail messages from housing providers appeared as a written record in the testers' assigned Gmail account and test coordinators received an e-mail alert when such messages were received, coordinators were able to monitor important and timely communication by forwarding messages received by tester accounts to a central e-mail account. When agents called to cancel or reschedule appointments, for example, test coordinators saw the message and alerted testers to take the appropriate next steps. Testers could make calls through the Google Voice system via a landline or their own cell phone (their Google number—not the number of the phone used to make the call—appeared on the housing provider's Caller ID). The appointment protocol directed testers to make contact by telephone unless an e-mail address was provided in an advertisement instead of a phone number. Appointment contacts were documented to allow analysis of treatment at this early stage of a test.

---

[10] For the rent tests, white testers' income was in the 59th percentile of actual white renters, black testers' income was in the 73rd percentile of actual black renters; Hispanic testers' income was in the 73rd percentile of actual Hispanic renters, and Asian testers' income was in the 54th percentile of actual Asian renters.

For the sales tests, white testers' income was in the 47th percentile, black testers' income was in the 60th percentile, Hispanic testers' income was in the 63rd percentile, and Asian testers' income was in the 46th percentile of actual homebuyers for the relevant racial or ethnic group.

[11] Testers sought to meet with a housing provider using the most efficient approach possible. About half of all rental tests were drop-ins. In 13 test sites, 75 percent or more of all rental tests were drop-ins.