*Sandvig v. Barr*

No. 1:16-cv-1368 (JDB)

# Plaintiffs' Exhibit 16



# AN ESTIMATE OF HOUSING DISCRIMINATION AGAINST SAME-SEX COUPLES

U.S. Department of Housing and Urban Development | Office of Policy Development and Research

PID1157

Visit PD&R's website

# www.huduser.org

to find this report and others sponsored by HUD's Office of Policy Development and Research (PD&R). Other services of HUD USER, PD&R's research information service, include listservs, special interest reports, bimonthly publications (best practices, significant studies from other sources), access to public use databases, and a hotline (800–245–2691) for help accessing the information you need.

PID1158

# AN ESTIMATE OF HOUSING DISCRIMINATION AGAINST SAME-SEX COUPLES

Prepared for

U.S. Department of Housing and Urban Development
Office of Policy Development and Research

Prepared by

Samantha Friedman
**University at Albany, SUNY**

Angela Reynolds
Susan Scovill
Florence R. Brassier
Ron Campbell
McKenzie Ballou
**M. Davis and Company, Inc.**
**Philadelphia, Pennsylvania**

June 2013

PID1159

# Introduction

This report presents the findings of the first large-scale, paired-testing study to measure treatment of same-sex couples in the electronically advertised rental housing market. The study, sponsored by the U.S. Department of Housing and Urban Development (HUD) and conducted by M. Davis and Company (MDAC), Inc., was developed to obtain a baseline national estimate of housing discrimination against same-sex couples at the initial stage of the search for rental housing. It builds on the well-established matched-pair testing method used in previous HUD housing discrimination studies (HDSs) examining racial and ethnic discrimination in the housing market. The in-person method was adapted to reflect the increased use of the Internet in the housing search. The results are based on 6,833 paired e-mail tests conducted in 50 metropolitan areas from June through October 2011.

This study examines the treatment of same-sex couples seeking rental housing, a subject not previously observed on a national scale. Although the federal Fair Housing Act does not include sexual orientation or gender identity among its protected classes, evidence suggests that discrimination on the basis of actual or perceived sexual orientation limits housing opportunities for gay men and lesbians. Studies of public perception and attitudes toward sexual minorities show prejudice and stigma against this community (Herek, 2009a, 2009b). Smaller scale testing projects and other studies, discussed in the following section, indicate that same-sex couples experience prejudice based on their sexual orientation and encounter discrimination in their search for housing. State and local jurisdictions are increasingly enacting legislation prohibiting discrimination on the basis of sexual orientation or gender identity. Based on the existing evidence of discrimination experienced by lesbian, gay, bisexual, and transgender (LGBT) people, HUD recently issued a final rule to ensure that its core programs are open to all eligible individuals and families, regardless of sexual orientation or gender identity.[1]

In addition, recognizing the increasing use of the Internet to search for housing, this study uses Internet advertising and matched-pair e-mails—the threshold of the housing transaction—as the point of contact between the tester and the housing provider. In each paired test, the housing provider received two e-mails inquiring into an advertised rental unit: one from a self-identified same-sex couple and one from a self-identified heterosexual couple.

## Fair Housing Laws

The federal Fair Housing Act (Title VIII of the Civil Rights Act of 1968) prohibits discrimination in the sale, rental, and financing of housing or in other housing-related transactions on the basis of seven protected classes: race, color, religion, national origin, sex, familial status (the presence of children less than 18 years old, seeking custody of such people, or being pregnant), and disability. For example, housing providers are prohibited from considering these protected characteristics as the basis for rejecting or refusing to negotiate with individuals seeking housing or housing-related services, from misrepresenting or limiting housing opportunities based on these protected characteristics, or in setting different terms or conditions because of these protected characteristics.

Neither sexual orientation nor gender identity is a protected class under the federal Fair Housing Act, although some forms of such discrimination against LGBT people might be prohibited under currently protected classes: sex discrimination (for example, nonconformity with gender stereotypes), sexual harassment, or disability (such as a provider's perception that a gay applicant might have HIV/AIDS). An increasing number of states and local jurisdictions have enacted legislative protections against housing discrimination based on sexual orientation or gender identity. As of early 2012, 20 states and the District of Columbia have enacted legislation prohibiting housing discrimination based on sexual orientation or gender identity:[2]

| | |
|---|---|
| California | Nevada |
| Colorado | New Hampshire |
| Connecticut |     (sexual orientation only) |
| Delaware | New Jersey |
|     (sexual orientation only) | New Mexico |
| Hawaii | New York |
| Illinois |     (sexual orientation only) |
| Iowa | Oregon |
| Maine | Rhode Island |
| Maryland | Vermont |
|     (sexual orientation only) | Washington |
| Massachusetts | Washington, D.C. |
| Minnesota | Wisconsin |
| |     (sexual orientation only) |

---

[1] "Equal Access to Housing in HUD Programs Regardless of Sexual Orientation or Gender Identity." Final rule. *Federal Register* 77 (5662) February 3, 2012. Also available at http://portal.hud.gov/hudportal/documents/huddoc?id=12lgbtfinalrule.pdf.

[2] See HUD's Fair Housing Act LGBT web page at http://portal.hud.gov/hudportal/HUD?src=/program_offices/fair_housing_equal_opp/LGBT_Housing_Discrimination.

Several states and more than 240 local jurisdictions currently prohibit discrimination in employment and public accommodations on the basis of sexual orientation. Many of these local jurisdictions also prohibit discrimination in housing on the basis of sexual orientation, gender identity, or gender expression.

On February 3, 2012, HUD published its Final Rule, "Equal Access to Housing in HUD Programs Regardless of Sexual Orientation or Gender Identity," which prohibits making a determination of eligibility for HUD-assisted or HUD-insured housing on the basis of sexual orientation or gender identity. The rule applies to all HUD programs, including public housing, HUD-assisted or HUD-financed housing, and FHA-insured mortgage financing. The rule has four main provisions: It (1) requires providers assisted by HUD or insured by FHA to make housing available without regard to actual or perceived sexual orientation, gender identity, or marital status; (2) clarifies that the definitions of *family* and *household*, which are integral to determining who is eligible for HUD's core programs, includes people regardless of actual or perceived sexual orientation, gender identity, or marital status; (3) prohibits HUD-assisted and FHA-insured entities from inquiring about an applicant's or occupant's sexual orientation or gender identity for the purpose of determining eligibility or otherwise making housing available; and (4) prohibits FHA-approved lenders from basing eligibility determinations for FHA-insured loans on actual or perceived sexual orientation or gender identity.[3]

Although less than one-half of all states provide state-level protection against housing discrimination for LGBT people, the effect of this lack of legislation remains unknown. Although most information is anecdotal, some previous formal research studies, described in the following section, illuminate the issue of housing discrimination against LGBT people.

## Paired Testing and Previous Housing Discrimination Studies

*Testing* is an investigative technique used to observe the practices of housing providers. Testers, who pose as individuals seeking housing, contact housing providers in a variety of ways to inquire about housing opportunities. The origins of paired testing as a method of studying housing discrimination and identifying differential treatment lie in fair housing enforcement, and testing was originally used to identify individual housing providers who were violating housing discrimination laws. HUD has used testing for more than 40 years to investigate discriminatory housing practices, because testing is a powerful tool for directly observing differences in the treatment that homeseekers experience. When paired testing is applied to large, representative samples and implemented with rigorous controls, it provides reliable estimates of the differences in treatment among different populations.

HUD funded three national studies using the methodology of matched-pair testing to measure the levels of housing discrimination based primarily on race and ethnicity.

In 1977, HUD's Housing Market Practices Survey (HMPS1977) employed the *auditor technique* to observe differential treatment of Black and White homeseekers. The Black and White auditors were both male or both female and had approximately the same level of education, income, occupation, and family characteristics. Each member of the audit team responded separately to advertisements that were randomly selected from major newspapers, and then they recorded their treatment on standardized forms. In HMPS1977 1,609 rental and 1,655 sales audits were conducted in 40 metropolitan areas during May and June of 1977. The results revealed significant differences between the Black and White audits. The white auditor was favored 50.4 percent of the time in the sales market and 45.7 percent of the time in the rental market. The black auditor was favored only 19.7 and 17.9 percent of the time, respectively.

HUD built on the HMPS1977 experience 10 years later by launching a second national audit study, the 1989 Housing Discrimination Study (HDS1989). This study involved 3,800 paired tests for discrimination against Black and Hispanic homeseekers. As in HMPS1977, both rental and sales markets were tested in a random sample of 25 major metropolitan areas. Black-White tests were conducted in 20 of these sites and Hispanic-non-Hispanic White tests were conducted in 13 sites. The HDS methodology also involved expanded sample sizes in 5 metropolitan areas, which supported in depth analysis of variations in patterns of discrimination within urban areas (Fix and Turner, 1998).

In HDS1989, Black renters faced a 10.7-percent chance of being excluded altogether from housing made available to comparable White renters and a 23.5-percent chance of learning about fewer apartments. Real estate brokers were also much more likely to offer financial advice to White than to Black customers.

In HUD's third national study, *Discrimination in Metropolitan Housing Markets* (HDS2000), the results were based on 4,600 paired tests conducted in 23 metropolitan areas nationwide during the summer and fall of 2000.

---

[3] http://portal.hud.gov/hudportal/documents/huddoc?id=12lgbtfinalrule.pdf.

HDS2000 Phase I was designed to provide updated national estimates of adverse treatment against Black and Hispanic homeseekers and to measure change in the incidence of differential treatment since 1989. In addition, Phase I provided estimates of adverse treatment against Black and Hispanic homeseekers in 20 individual metropolitan areas and exploratory estimates of adverse treatment against Asian (in 2 metropolitan areas) and Native American (in 1 metropolitan area) homeseekers. The basic testing protocols replicated those implemented in HDS1989. Random samples of advertised housing units were drawn weekly from major metropolitan newspapers, and testers visited the sampled offices to inquire about the availability of these advertised units. Both minority and White partners were assigned incomes, assets, and debt levels to make them equally qualified to buy or rent the advertised housing unit. Test partners were also assigned comparable family circumstances, job characteristics, education levels, and housing preferences. They visited sales or rental agents and systematically recorded the information and assistance they received about the advertised unit or similar units, including location, quality, condition, rent or sales price, and other terms and conditions. Test partners did not compare their experiences with one another or record any conclusions about differences in treatment; each simply reported the details of the treatment he or she experienced as an individual homeseeker.

As reported in the *Discrimination in Metropolitan Housing Markets: National Results from Phase I HDS 2000 Final Report* (HUD, 2002), researchers found that discrimination persisted in both rental and sales markets of large metropolitan areas nationwide but that its incidence had generally declined since 1989. African Americans still faced discrimination when they searched for rental housing in metropolitan markets nationwide. White renters were consistently favored over Black renters in 21.6 percent of the tests (the net measure, at 2.3 percent, was much lower). In particular, White renters were more likely to receive information about available housing units and had more opportunities to inspect available units. Discrimination against Black renters declined between 1989 and 2000 but was not eliminated. The overall incidence of consistent White-favored treatment dropped by 4.8 percentage points, from 26.4 percent in 1989 to 21.6 percent in 2000.

Hispanic renters nationwide also faced significant levels of discrimination. Non-Hispanic White renters were consistently favored in 25.7 percent of tests (the net measure was 6.1 percent). Specifically, non-Hispanic White renters were more likely to receive information about available housing and opportunities to inspect available units than were Hispanic renters. Discrimination against Hispanic renters appeared to have remained essentially unchanged since 1989, and Hispanic renters appeared to face a greater incidence of discrimination than Black renters.

## Previous Research on Discrimination Against LGBT People

None of the previous HUD housing discrimination studies included observation of the differential treatment of homeseekers on the basis of sexual orientation, and little empirical research has focused on housing discrimination against the LGBT community.

In community-based surveys conducted during the 1980s and 1990s with nonprobability samples, many lesbians and gay men reported that they had experienced some form of housing discrimination. For example, in a statewide survey of Pennsylvania lesbians and gay men conducted by the Philadelphia Lesbian and Gay Task Force, housing discrimination was reported by between 9 and 16 percent of males (depending on race) and between 5 and 11 percent of females (Gross and Aurand, 1996).

In a 2000 Kaiser Family Foundation survey, 11 percent of the lesbian, gay, and bisexual respondents said they had personally experienced discrimination in renting an apartment or buying a home. Another 35 percent said they had not personally experienced such discrimination but knew someone else who had (Kaiser Family Foundation, 2001).

In a 2005 national survey of lesbian, gay male, and bisexual adults (Herek, 2009a), approximately 4 percent of respondents reported they had experienced some form of housing discrimination because of their sexual orientation. Such discrimination was more common among gay men (reported by 6.5 percent) and lesbians (5.1 percent) than among bisexual men (nearly 2 percent) and bisexual women (1.3 percent).

When interpreting these figures, it is important to remember that many lesbian, gay male, and bisexual people refrain from revealing their sexual orientation in a variety of social situations as a way of avoiding stigma (Herek, 2009b). For this reason, evaluating the prevalence of housing discrimination would be facilitated by knowledge of the extent to which sexual minority adults have concealed their sexual orientation from potential landlords and real estate agents.

A survey of more than 6,000 transgender people by the National Center for Transgender Equality and the National Gay and Lesbian Task Force Foundation (NCTE and NGLTFF, 2011) indicated significant levels of housing instability for

transgender people. Of the respondents, 26 percent reported having to find alternative places to sleep for short periods of time, 11 percent reported having been evicted, and 19 percent reported becoming homeless because of bias.

Although stigma and prejudice based on sexual orientation are widespread, and employment discrimination against LGBT individuals has been well documented, little empirical research has examined housing discrimination against the LGBT community in the United States. The only published studies on housing discrimination against gay men and lesbians were conducted in Sweden (Ahmed, Andersson, and Hammarstedt, 2008; Ahmed and Hammarstedt, 2009) and Canada (Lauster and Easterbrook, 2011). Ahmed and Hammarstedt (2009) e-mailed landlords who had advertised an available apartment on an Internet service comparable to the service used for this study. The e-mails were ostensibly sent by either a gay male couple or by an otherwise comparable heterosexual couple. The study found that the heterosexual couple was significantly more likely than the gay male couple to receive a response to the e-mail, to be asked to provide further information, and to be invited to an immediate showing of the apartment. Regarding a gross measure of adverse treatment, Ahmed and Hammarstedt (2009) found that heterosexual couples were favored over gay male couples in getting an e-mail response in 12.3 percent of the correspondence tests (not matched pairs); the net measure was 11.4 percentage points and was the only dimension of adverse treatment that was statistically significant. No disparities emerged in invitations to contact the provider or to a showing of the unit. Ahmed, Andersson, and Hammarstedt (2008) did not find comparable differences between the responses to a lesbian couple and a heterosexual couple. Lauster and Easterbrook (2011) also found no disparity between lesbian and heterosexual couples but found that gay male couples were less likely than heterosexual couples to receive positive responses from housing providers.

The Fair Housing Centers of Michigan, which comprises four local fair housing organizations, conducted a testing audit of housing discrimination based on sexual orientation (FHC of Michigan, 2007) that found disparate treatment in 32 out of 120 (27 percent) fair housing tests it conducted. Testers posing as gay male or lesbian homeseekers received unfavorable treatment regarding whether housing was available, the amount of rent, application fees, and levels of encouragement compared with the treatment of testers posing as heterosexual homeseekers. The gay male and lesbian testers also were subjected to offensive comments.

For each study area, a new scrape file was loaded to the Access database from the Internet listing service each day (for 6 days of a given week). The sampling of landlords took place during a 14-week period to allow for a comprehensive representation of landlords and available one-bedroom rental units within each metropolitan area. Manual processing of Internet listings in Access took place 6 days a week, although scraping took place 7 days a week (two scrape files were loaded each Monday).

## Conducting the E-mail Testing

### Overview

After the markets to be sampled were selected and advertisements were scraped, postings from each of those markets were loaded to the database and matched-pair e-mail testing commenced. During the 14-week data collection period, from June through October 2011, postings processed in the audit-level database were randomly assigned to matched pairs of e-mails from gay male and heterosexual couples or from lesbian and heterosexual couples. The procedures in the following list were used in executing the tests and in collecting the resulting data to minimize the risk of detection by housing providers involved in the correspondence tests.

### Procedures for Executing the E-mail Tests

**1. Names.** First names and e-mail accounts were created for the e-mails from prospective gay male, lesbian, and heterosexual renters. In addition, names were created for partners of the gay male and lesbian renters and for spouses of the heterosexual renters. Eight lists of names were created:

   a. Heterosexual renters inquiring about the unit who are **female**.
   b. Heterosexual renters inquiring about the unit who are **male**.
   c. Heterosexual renters' husbands.
   d. Heterosexual renters' wives.
   e. Lesbian renters inquiring about the unit.
   f. Lesbian renters' partners.
   g. Gay male renters inquiring about the unit.
   h. Gay male renters' partners.

The names appearing on these lists came from the Social Security Administration's website of popular baby girls' and boys' names.[7] The top 20 girls' names and the top 20 boys' names in the United States from 1970 through 1985 (between ages 25 and 40 at the time of the study; that is, individuals who were likely to be in the market for rental housing) were retrieved from this site. These boys' and girls' names were then consolidated into two master lists. The names on each of these master lists were then filtered to eliminate duplicates, gender-neutral names (for example, "Shannon"), and to include race-neutral names.

After the master lists of male and female first names were created, within each study area the two sets of 20 names (40 total names) were randomly divided into the eight conditions of a 2 (Gender) X 2 (Sexual Orientation) X 2 (e-mail sender/sender's partner) counterbalance. The result was eight lists of 5 names each, falling into the listed conditions, a through h, described in the preceding list. Appendix C provides the full list of male and female names.

**2. E-mail Accounts.** After the lists of names were completed, the e-mail addresses were developed. Each of the 20 names was randomly assigned to a Yahoo!, Hotmail, or Gmail e-mail address in each of the 50 study areas to create 1,000 unique e-mail addresses. Thus, in each study area, each name that was used to sign the e-mails from prospective renters had a unique e-mail account. We assigned an account that closely resembled the first name selected but made some modifications (for example, inserting numbers after the name) because of existing accounts. So, for example, the name "Jennifer" for heterosexual female renters could appear on the list for both the New York and Chicago metropolitan areas. Each of these Jennifers would be randomly assigned to a different e-mail account. For example, Jennifer in New York would have the e-mail account, jennifer312@gmail.com, but Jennifer in Chicago would be assigned jennifer65@yahoo.com. This one-time randomization of names to e-mail domains was critical to facilitating the tracking of e-mails that were sent to and received from housing providers.

**3. Randomization.** After the names were assigned to the e-mail domains on the four lists, tables were developed in the Access database to randomize each of the following necessary elements of all the tests to be conducted:

   a. The names given to the testers in each test.
   b. The names given to the partner referred to in each e-mail text. (Note: this one-time randomization meant that the names of the renter and partner/spouse were always paired together. This procedure made the inquiries more realistic and lessened the chances of detection.)
   c. The e-mail subject line and text (including the greeting and closing). Appendix D reproduces the e-mail subject lines and text.
   d. Which e-mail was sent first to the provider.

---

[7] http://www.ssa.gov/oact/babynames/state/index.html.

The e-mail text was developed to vary such that the wording realistically conveyed to the housing provider that the person inquiring about the unit came from a heterosexual, gay male, or lesbian couple. The remaining text in the e-mail inquiries and in the subject lines, however, was designed not to differ in any other significant ways. This methodology was employed as another way to reduce the potential for detection if a housing provider was accidentally sampled more than once. Randomizing the order in which the heterosexual and the same-sex couple e-mails were sent decreased the likelihood that the treatment of these couples was because of the order in which the e-mails were received.

**4. Preparing the e-mails to be sent.** Using a "mail merge" feature, all the randomized elements were combined into the messages sent to the housing providers. The text of the e-mails was constructed based on the components created in steps 2 and 3.

**5. Sending the e-mails.** Test administrator staff sent the e-mail inquiries to the landlord of the identified housing unit. The inquiries were made 1 day after the posting of the advertisement. In addition, the staff left about a 2-hour gap between the times when the e-mails were sent to the provider from each of the two parties in the matched-pair test. This procedure reduced the likelihood that landlords or housing providers would suspect that they were being tested. Initially, the software utility package called "Letter Me Later" was used by staff to automate the process, but it was later discontinued, and an add-on for Access with the same function was used instead. This software enabled the staff to schedule the e-mails to be sent at particular times and ensured that the order in which landlords received inquiries was properly varied, with each e-mail having a 50-50 chance of being sent first.

## Procedures for Coding the Data

The data coded for the project came from four sources: (1) the scraping tool, (2) items about the advertised unit or landlord that could not be gleaned from the scraping tool, (3) the process by which the correspondence test was conducted (the time of day the e-mail was sent, which couple sent their e-mail first, and so on), and (4) the response or nonresponse from the landlord. Also, the data gathered from sources 1 and 2 on the address of the unit were geocoded to the census tract level so that census data could be merged with the data collected in this study. Appendix E contains the complete data dictionary, and the following list presents each set of items in more detail.

1. The test administrator responsible for conducting the correspondence tests was also charged with coding the data for each test. The first set of data, on the housing unit and the landlord, came directly from the scraping tool. These data were included in an Access database for the geographic area in which the correspondence tests were conducted. Such data included the metropolitan area (area searched to find ad), subject line of the ad, posting ID, listing date, listing time, listing category (fee, no fee, by owner, "n/a"), monthly rent, size of largest image file (in number of pixels), site-specific e-mail (that is, reply-to e-mail), and information associated with the following Internet listing service tags (XXTAGS): "xstreet1" (that is, address or first cross street), "xstreet2" (that is, second cross street), "city," "state," "catsAreOK" (cats allowed), "dogsAreOK" (dogs allowed), "feedisclosure," and "company name."

2. The second set of data was coded based on other aspects of the advertisement or the landlord not directly available from the scraping tool: real estate or management company, agent name, name of owner, reference number, e-mail address (from body of text), phone numbers, street address, cross streets, city or town, ZIP code, state, additional unit information, broker fee, broker fee amount, application fee, security deposit, security deposit amount, other fee, other fee amount, rent discount offered, description of rent discount, lease in ad, lease term, equal opportunity statement, protected class restriction, links to external URLs, full text of listing, and the presence or absence of the following key words and phrases: "equal opportunity housing," "female," "senior," "section 8," "vacation," "per week," "weekly," "move in special," "immediately," and "before the first of the next month."

3. The test administrator coded data in the Access database about the process by which the correspondence tests were conducted. These data included the name of the prospective renters used in the test, the names of their spouses or partners, the sexual orientation depicted in the e-mail, the specific e-mail text, the subject line, the e-mail domain, the order in which the e-mails were sent (that is, whose e-mail was sent to the provider first), and the time and date when the e-mail was sent.

4. The final set of data that each test administrator coded into the Access database included the response that each test e-mail received (or did not receive) from the housing provider. After test administrators conducted the correspondence test, they coded the data from the housing provider responses

as they came into the prospective renters' e-mail inboxes during a 2-week period. The response was linked to the Access spreadsheet, and the content of the response was coded. The data collected on the responses included—

a. Whether each prospective renter received a response.

b. Whether they received more than one response.

c. Whether they were told the advertised unit is available.

d. Whether they were invited to inspect the unit.

e. Whether they were advised to call the housing provider.

f. Whether they were asked to provide additional information regarding their quality as an applicant (for example, their credit score or income).

g. Whether they were reminded about qualifications they must possess to rent the unit.

h. Whether they were given a reason for the unit not being available (if the unit was not available).

i. Whether they were sent an ambiguous sign of availability (for example, "The unit is technically available, but an application has been filled out and we're pretty sure it's going to go through").

j. Whether they were encouraged to look at a different unit owned by the same landlord (for example, "This unit actually isn't available, but I have another unit in the same building you might be interested in").