*Sandvig v. Barr*

No. 1:16-cv-1368 (JDB)

# Plaintiffs' Exhibit 17

# DISCRIMINATION IN METROPOLITAN HOUSING MARKETS:
# PHASE 2 - ASIANS AND PACIFIC ISLANDERS

PID0662

# Discrimination in Metropolitan Housing Markets: Phase 2 - Asians and Pacific Islanders

**Final Report**

**March 2003**

Prepared By:

Margery Austin Turner
Stephen L. Ross

with

Beata A. Bednarz
Carla Herbig
Seon Joo Lee


The Urban Institute
Metropolitan Housing and Communities Policy Center
2100 M Street, NW
Washington, DC  20037

Submitted To:

U.S. Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410


Contract No. C-OPC-21304
UI No. 06977-002-00

The nonpartisan Urban Institute publishes studies, reports, and books on timely topics worthy of public consideration.  The views expressed are those of the authors and should not be attributed to the Urban Institute, its trustees, or its funders.

PID0663

Discrimination in Metropolitan Housing Markets:  Phase 2 - Asians and Pacific Islanders

**EXECUTIVE SUMMARY**

This report presents results from the second phase of the latest national Housing Discrimination Study (HDS2000), sponsored by the Department of Housing and Urban Development (HUD) and conducted by the Urban Institute.  It is one of five related reports that will ultimately be produced from this major research effort:

- *Discrimination in Metropolitan Housing Markets: National Results from Phase I of HDS2000*

- *Discrimination in Metropolitan Housing Markets: Phase I - Supplement*

- *Discrimination in Metropolitan Housing Markets: Phase 2 - Asians and Pacific Islanders*

- *Discrimination in Metropolitan Housing Markets: Phase 3 - Native Americans*

- *Discrimination in Metropolitan Housing Markets: Phase 4 - Persons with Disabilities*

All of these reports present findings based upon rigorous paired tests, in which two individuals—one minority and the other white[1]—pose as otherwise identical homeseekers, and visit real estate or rental agents to inquire about the availability of advertised housing units.  This methodology provides direct evidence of differences in the treatment minorities and whites experience when they search for housing.

**Background**

Paired testing originated as a tool for fair housing enforcement, detecting and documenting individual instances of discrimination.  Since the late 1970s, this methodology has also been used to rigorously measure the prevalence of discrimination across the housing market as a whole.  When a large number of consistent and comparable tests are conducted for a representative sample of real estate and rental agents, the results control for differences between white and minority homeseekers, and directly measure patterns of adverse treatment based on a homeseeker's race or ethnicity.

HDS2000 is the third national paired-testing study sponsored by HUD to measure patterns of racial and ethnic discrimination in urban housing markets.  Its predecessors, the 1977 Housing Market Practices Study (HMPS) and the 1989 Housing Discrimination Study (HDS) found significant levels of racial and ethnic discrimination in both rental and sales markets of urban areas nationwide.  Enforcement tests conducted over the intervening decade

---

[1] For the study on persons with disabilities,  the treatment of a person with a disability is being compared to that of a similarly qualified person without a disability

i

have also uncovered countless instances of illegal discrimination against minority homeseekers. Housing discrimination raises the costs of housing search, creates barriers to homeownership and housing choice, and contributes to the perpetuation of racial and ethnic segregation.

HDS2000 will ultimately involve four phases of paired testing.  HUD's goals for the study include rigorous measures of change in adverse treatment against blacks and Hispanics nationwide, site-specific estimates of adverse treatment for major metropolitan areas and selected states, and new measures of adverse treatment against Asians and Pacific Islanders, American Indians, and persons with disabilities.  Phase I provided national estimates of adverse treatment against blacks and Hispanics and reported on changes in the incidence of differential treatment since 1989.  Phase II (with testing conducted in 2001) focuses on two major new goals: it provides the first national estimates of discrimination against Asians and Pacific Islanders, and an initial set of state estimates of discrimination against blacks and Hispanics that include small and medium-sized metropolitan areas as well as larger areas.

Phase I of HDS2000 found that significant discrimination against African American and Hispanic homeseekers still persists in both rental and sales markets of large metropolitan areas nationwide, but that its incidence has generally declined since 1989. Only Hispanic renters face no change in the incidence of consistent adverse treatment today than they did in 1989.  The discriminatory practices that African Americans and Hispanics face are serious, limiting their information and options and making it more difficult for them to find the housing they need.  Although the overall incidence of discrimination is generally falling, some forms of adverse treatment are rising.  Black homebuyers are more likely to be steered away from predominantly white neighborhoods than they were in 1989, and Hispanic homebuyers are more likely to be denied equal information and assistance with mortgage financing.  Finally, although patterns of differential treatment vary from one metropolitan area to another, only a few areas have overall levels that differ significantly from the national average, indicating that discrimination against African American and Hispanic homeseekers remains a national problems.

**The HDS2000 Methodology**

This study builds upon and refines the basic testing protocols that have been implemented in previous national studies and in Phase I of HDS2000.  Random samples of advertised housing units were drawn from multiple advertising sources in each site on a weekly basis, and testers visited the sampled offices to inquire about the availability of these advertised units.  Both minority and white partners were assigned income, assets, and debt levels to make them equally qualified to buy or rent the advertised housing unit.  Test partners were also assigned comparable family circumstances, job characteristics, education levels, and housing preferences.  They visited sales or rental agents, and systematically recorded the information and assistance they received about the advertised unit and/or other similar units, including location, quality and condition, rent or sales price, and other terms and conditions.  Test

partners did not compare their experiences with one another or record any conclusions about differences in treatment; each simply reported the details of the treatment he or she experienced as an individual homeseeker.[2]

The national results presented here for Asians and Pacific Islanders are based on a sample of 11 metropolitan areas that account for more than three quarters of all Asians and Pacific Islanders living in metropolitan areas nationwide.  America's Asian and Pacific Islander populations are tremendously diverse, and different ethnic sub-groups may face differing levels or forms of discrimination.  However, producing rigorous estimates of discrimination for each sub-group would be extremely costly.  HUD's goal for its first research effort focused on discrimination against Asians and Pacific Islanders was to produce rigorous national estimates for the populations as a whole.  Therefore, testers were recruited to represent the primary groups of Asians and Pacific Islanders living in each of the sampled metropolitan areas, including people who identify themselves as Chinese, Japanese, Korean, Fillipino, Vietnamese and other Southeast Asians, Native Hawaiian and other Pacific Islanders, and Asian Indians.[3]

**Summary of Findings**

Asians and Pacific Islanders face significant levels of discrimination when they search for housing in large metropolitan areas nationwide.  For renters, patterns of adverse treatment are mixed; Asians and Pacific Islanders appear to be systematically favored with respect to

---

[2] HDS2000 is designed to measure the extent to which minority homeseekers experience adverse treatment when they look for housing in urban areas nationwide.  The tests conducted for this study were not designed to assemble evidence of discrimination in individual cases.  The question of when differential treatment warrants prosecution and the related question of whether sufficient evidence is available to prevail in court can only be resolved on a case-by-case basis, which might also consider other indicators of treatment than those reported here.

[3] On October 30, 1997, the Office of Management and Budget (OMB) issued a notice that federal agencies separate Asians from Pacific Islanders and Native Hawaiians in their data collection. The information about the testers recruited for this study is more detailed than the OMB requirement, including information about which Asian, Native Hawaiian, or Pacific Islander subgroup they considered themselves to be a member (see Exhibit 2-2 in Chapter 2). In general, OMB believes that, "consistent with criteria for confidentiality and data quality, the tabulation procedures used by the agencies should result in production of as much detailed information on race and ethnicity as possible". In accordance with that guidance, the main report reflects the level of discrimination encountered by the combined Asian and Pacific Islander subgroups with breakouts in the annexes for individual subgroups for whom enough data are available to produce a reliable estimate.  Specifically, the combination of all Asian subgroups without Native Hawaiians and Pacific Islanders is large enough to provide reliable estimates and those results are reported in Annex 7. The sample for Native Hawaiians and Pacific Islanders alone is not large enough to provide a reliable estimate alone so those results are not presented separately. There are some Asian subgroups in metropolitan areas that enough data were collected to report separately, and those are shown in Annex 6. Specifically, Los Angeles metropolitan area estimates are provided for Chinese and Koreans, and Minneapolis metropolitan area estimates are provided for Southeast Asians.

housing inspections.  Overall, the level of *consistent adverse treatment* against Asian and Pacific Islander renters is 21.5 percent—about the same as the level for African American and Hispanic renters.  However, because of the mixed pattern of adverse treatment against Asians and Pacific Islanders, the lower-bound estimate of systematic discrimination is not significantly different from zero.  Asian and Pacific Islander homebuyers experience *consistent adverse treatment* 20.4 percent of the time,[4] with systematic discrimination occurring in housing availability, inspections, financing assistance, and agent encouragement.  This level of discrimination is comparable to the level experienced by African American homebuyers, and significantly higher than the level of discrimination against Hispanics.

Because the composition and history of Honolulu's Asian and Pacific Islander populations differs quite substantially from metro areas in the mainland U.S.[5], we explored the possibility that levels or patterns of discrimination might be different when Honolulu was excluded from the analysis.  In general, however, estimates are the same for the mainland metro areas as for the nation as a whole.  In addition, estimates of discrimination against Asians and Pacific Islanders seeking housing in California are comparable to estimates for the nation as a whole.

To explore variations in discrimination for different segments of the Asian and Pacific Islander populations, we compared estimates of adverse treatment for light-skinned Asians and Pacific Islanders to estimates for dark-skinned people.[6]  In addition, because Phase II of HDS2000 expanded the sample of advertised sources, we tested for differences between units advertised in major metropolitan newspapers and those advertised in other sources.  Based upon these comparisons, we conclude that:

- There is little consistent evidence that dark-skinned Asians and Pacific Islanders experience higher levels of adverse treatment than light-skinned Asians and Pacific Islanders.  Differences are statistically significant for only a few individual treatment indicators, however, and these results suggest that dark-skinned renters face a greater disadvantage than homebuyers with comparable skin tone.

---

[4] The lower-bound estimate of systematic discrimination in sales is 19.6 percent.

[5] In Honolulu, Asian subgroups constitute the majority race, that is they make up 55 percent of the population.  Since HDS is designed to assess differences in the treatment of Asians and Pacific Islanders relative to whites, it was hypothesized that the Honolulu findings might mask the level of discrimination against Asians and Pacific Islanders on the mainland U.S.

[6] Local testing organizations provided photographs for all testers participating in HDS2000.  Based on these photographs, each tester's skin tone was rated on a scale of one to five (palest to darkest) by at least two independent coders.

- Discrimination against Asians and Pacific Islanders seeking rental housing does not vary significantly by type of advertising source.  However, Asian and Pacific Islander homebuyers appear to face a significantly higher level of discrimination when they inquire about units advertised in sources other than major metropolitan newspapers.

Experience from this research effort also suggests that the recruitment and retention of Asians and Pacific Islanders as testers may present special challenges for local fair housing organizations.  Some local testing organizations that did not have already established pools of Asian and Pacific Islander testers found it difficult to recruit testers because they were unable to make inroads into the various service organizations, associations, and other networks that serve the Asian and Pacific Islander community.   In addition, for some ethnic sub-groups, particularly those who are newer immigrants to the U.S., cultural issues proved to be a barrier to completing tests and retaining testers.  For example, conducting sales tests was particularly daunting for testers from groups who have little homebuying knowledge or experience in the United States.

**Measurement Issues**

A paired test can result in any one of three basic outcomes for any measure of treatment:  1) the white tester is favored over the minority; 2) the minority tester is favored over the white; or 3) both testers receive the same treatment (which may be either favorable or unfavorable).  The simplest measure of adverse treatment is the share of all tests in which the white tester is favored over the minority.  Because there are also tests in which minority testers receive better treatment than their white partners, we report both the incidence of white-favored treatment and the incidence of minority-favored treatment.

***Gross and Net Measures.***  Although these simple *gross measures* of white-favored and minority-favored treatment are straightforward and easily understandable, they almost certainly overstate the frequency of systematic discrimination.[7]  Specifically, differential treatment may occur during a test not only because of differences in race or ethnicity, but also because of random differences in the circumstances of their visits to the real estate agency.  For example, in the time between two testers' visits, an apartment might have been rented, or the agent may have been distracted by personal matters and forgotten about an available unit.  Gross

---

[7] We use the term "systematic discrimination" to mean differences in treatment that are attributable to a customer's race or ethnicity, rather than to any other differences in tester characteristics or test circumstances.  This term is not the same as "intentional" discrimination, nor is it intended to mean that these differences would necessarily be ruled as violations of federal fair housing law.