*Sandvig v. Barr*

No. 1:16-cv-1368 (JDB)

# Plaintiffs' Exhibit 18

*The U.S. Equal Employment Opportunity Commission*

---

```
EEOC NOTICE
Number 915.002
Date 5-22-96
```

1.      SUBJECT: Enforcement Guidance:  Whether "testers" can
file charges and litigate claims of employment discrimination. 1

2.      PURPOSE: To set forth the Commission's position that
testers and organizations that send testers to respondents may
file charges and litigate their claims.

3.      EFFECTIVE DATE: Upon issuance.

4.      EXPIRATION DATE: As an exception to EEOC Order
205.001, Appendix B, Attachment 4, § a(5), this Notice will
remain in effect until rescinded or superseded.

5.      ORIGINATOR: Title VII/EPA Division, Office of Legal
Counsel.

6.      INSTRUCTIONS: File after § 605 of Volume II of
the Compliance Manual.

7.      SUBJECT MATTER:


I.  Introduction

     This document reiterates the Commission's view that testers
(persons who apply for employment for the purpose of testing for
discriminatory hiring practices, but do not intend to accept such
employment), and the organizations that send testers to
respondents, may challenge any discrimination to which they were
subjected while conducting the tests.  The document describes the
legal developments that have occurred since the issuance of the
1990 document on tester standing and discusses their impact on
the issue.

     The discussion focuses on Title VII of the Civil Rights Act
of 1964, 42 U.S.C. § 2000e et seq., because employment
testing to date has focused on race.   However, the analysis
applies to any basis covered by Title VII as well as to the
Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et
seq., which incorporates Title VII procedures and the Age
Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §
621 et seq., whose language is, in relevant part, virtually
identical to that of Title VII. 2

II.     Definition and Function of "Testers"


     Testers are individuals who apply for employment which they
do not intend to accept, for the sole purpose of uncovering
unlawful discriminatory hiring practices.  Testers are matched to
appear equally qualified with respect to their employment
histories, educational backgrounds, references, and other
relevant factors.  The basis being tested, e.g., race, national
origin, disability etc.,3 should be the only significant
difference between the testers.

     Matched testers apply for the same job[s] and their
treatment is compared at each stage of the application and
selection process.  In other words, the comparison is not limited
to whether the testers were ultimately offered jobs.  It also

includes whether, for example, each tester was given the same information about job availability or length of time before a selection decision would be made; whether interviews of the testers were comparable in duration and content; and how far in the hiring process each tester progressed. 4  If the testers are properly matched, unequal treatment of them will evidence discrimination.

Several sets of testers may be sent to the same employment provider to establish a pattern of discriminatory treatment and to assure that the different treatment was not an individual "fluke," oversight, or personality conflict. 5  Similarly, testers will make follow-up calls to receive updated information about the status of the vacancy to assure that discrimination is the likely explanation for any different treatment.  For example, a phone call could verify that a vacancy continued to exist after a Black applicant was told that the job had been filled.

III.     "Testers" Have Standing To Enforce Civil Rights Laws

   A. Individual Testers

The Commission concludes that individual testers who were subjected to employment discrimination have standing to seek both monetary and appropriate injunctive relief.  This conclusion is based on a considerable body of law addressing tester standing in a variety of contexts, on statutory construction and on sound enforcement policy.

1. Standing Is Broad Under Civil Rights Laws


Standing is generally interpreted broadly under employment discrimination laws to achieve the statutory goal of equal employment opportunity.  Hackett v. McGuire Bros., Inc., 445 F.2d 442, 3 EPD Par. 8,276 (3d Cir. 1971)("[t]he national public policy reflected . . . in Title VII . . . may not be frustrated by the development of overly technical judicial doctrines of standing or election of remedies"). 6  Cf. McKennon v. Nashville Banner Publishing Co., 115 S.Ct. 879, 885, 65 EPD Par. 43,368 (1995) (regarding the ADEA: "[t]he disclosure through litigation of incidents or practices which violate national policies respecting nondiscrimination in the work force is itself important, for the occurrence of violations may disclose patterns of noncompliance resulting from a misappreciation of the Act's operation or entrenched resistance to its commands, either of which can be of industry wide significance").

The civil rights movement has a long history of using testers to uncover and illustrate discrimination.  In Pierson v. Ray, 386 U.S. 547 (1967), the Supreme Court held that a group of Black clergymen who were removed from a segregated bus terminal in Jackson, Mississippi, had standing to seek redress under 42 U.S.C. § 1983.  The Court ruled that plaintiffs had been discriminated against by being ejected from the terminal, despite the fact that the plaintiffs' sole purpose was to test the law rather than to actually use the terminal.  Similarly, in Evers v. Dwyer, 358 U.S. 202 (1958), the Supreme Court recognized the standing of a Black plaintiff who sat in the White section of a Memphis bus and was removed from the bus by local authorities. The plaintiff had never before ridden a bus in Memphis and had done so solely for the purpose of testing the legality of the state's segregation laws.

Testers have most frequently been used to detect housing discrimination.  More than a decade ago, the Supreme Court held that a tester who was given inaccurate or incomplete information with respect to available housing had standing to sue the realtor under Section 804 of Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3604 et seq. 7  Havens Realty Corp. v. Coleman,