**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CHRISTIAN SANDVIG,
*et al.*,

          Plaintiffs,

   v.

WILLIAM P. BARR, in his official capacity
as Attorney General of the United States,

          Defendant.

Case No. 1:16-cv-1368 (JDB)

# <u>Defendant's Exhibit 8:</u>

Deposition Transcript of John T. Lynch, Jr.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
--------------------------------X
                                )
CHRISTIAN W. SANDVIG, et al.,   )
                                )
             Plaintiffs,        )
                                ) Case No.
v.                              )
                                ) 1:16-cv-1368(JBD)
JEFFERSON B. SESSIONS, III, in  )
his official capacity as        )
Attorney General of the United  )
States,                         )
                                )
             Defendant.         )
                                )
--------------------------------X
```

30(b)(6) Deposition of the UNITED STATES DEPARTMENT

OF JUSTICE, By And Through Its Representative,

JOHN T. LYNCH, JR., And In His Individual Capacity

Washington, D.C.

Friday, October 26, 2018 – 9:07 a.m.

Reported by:

Cindy L. Sebo, RMR, CRR, RPR, CSR,

Job no: 23337

```
 1          30(b)(6) Deposition of the UNITED STATES

 2     DEPARTMENT OF JUSTICE, by and through its

 3     representative, JOHN T. LYNCH, JR., and in his

 4     individual capacity, taken by the Plaintiffs, held

 5     at the Department of Justice, 1100 L Street,

 6     Northwest, Washington, D.C. 20005, before Cindy L.

 7     Sebo, Registered Merit Court Reporter, Certified

 8     Real-Time Reporter, Registered Professional

 9     Reporter, Certified Shorthand Reporter, Certified

10     Court Reporter, Certified LiveNote Reporter,

11     Real-Time Systems Administrator, LiveDeposition

12     Authorized Reporter and Notary Public in and for

13     the District of Columbia, beginning at

14     approximately 9:07 a.m., when were present on

15     behalf of the respective parties:

16

17

18

19

20

21

22

23

24

25
```

```
 1              A P P E A R A N C E S:

 2       Attorney for Plaintiffs:

 3              AMERICAN CIVIL LIBERTIES UNION

 4              ESHA BHANDARI, ESQUIRE

 5              RACHEL E. GOODMAN, ESQUIRE

 6              125 Broad Street, 18th Floor

 7              New York, New York 10004

 8              212.549.2663

 9              ebhandari@aclu.org

10              rgoodman@aclu.org

11

12       Attorney for Defendant:

13              U.S. DEPARTMENT OF JUSTICE

14              DANIEL SCHWEI, ESQUIRE

15              20 Massachusetts Avenue, Northwest

16              Washington, D.C. 20001

17              202.305.8693

18              daniel.s.schwei@usdoj.gov

19                          -and-

20              ERICA N. O'NEIL, ESQUIRE

21              1301 New York Avenue, Northwest

22              Suite 600

23              Washington, D.C. 20005

24              202.305.3813

25              erica.oneil@usdoj.gov
```

1                    INDEX OF EXAMINATION

2


3    JOHN T. LYNCH, JR.

4    EXAMINATION BY                              PAGE

5      Ms. Bhandari                          9,  158

6      Ms. Goodman                               91

7      Mr. Schwei                               156

8

9                        –  –  –

10                   INDEX TO EXHIBITS

11                        –  –  –

12   (Exhibits Attached to the Original Transcript.)

13    DEPOSITION
      EXHIBIT NUMBER   DESCRIPTION                PAGE
14
      Number 1         Notice of Deposition of United
15
                       States Department of Justice
16
                       through Designated Witnesses
17
                       Pursuant to Federal Rule of
18
                       Civil Procedure 30(b)(6)        12
19

20

21

22

23

24

25

```
 1                         -  -  -

 2             INDEX TO EXHIBITS  (Continued)

 3                         -  -  -

 4     DEPOSITION
       EXHIBIT NUMBER   DESCRIPTION                  PAGE
 5
       Number 2         Statement of Sujit Raman,
 6
                        Associate Deputy Attorney
 7
                        General, Department of
 8
                        Justice, Before the
 9
                        Subcommittee on Crime and
10
                        Terrorism, Committee on the
11
                        Judiciary, United States
12
                        Senate, August 21, 2018,
13
                        Bates stamped DOJ-00012
14
                        through DOJ-00025            25
15
16     Number 3         Defendants' Supplemental

17                      Objection and Response to

18                      Plaintiffs' Interrogatory

19                      Numbers 6 and 7             29

20

21

22

23

24

25
```

```
 1                         -   -   -

 2            INDEX TO EXHIBITS  (Continued)

 3                         -   -   -

 4      DEPOSITION
        EXHIBIT NUMBER   DESCRIPTION               PAGE
 5
        Number 4         Blog, Prosecuting Privacy
 6
                         Abuses by Corporate and
 7
                         Government Insiders, by
 8
                         Caldwell, March 16, 2015,
 9
                         Bates stamped DOJ-00315
10
                         through DOJ-00316            52
11
12      Number 5         Statement of Richard W.

13                       Downing, Acting Deputy

14                       Assistant Attorney General,

15                       Department of Justice, Before

16                       the Committee on the

17                       Judiciary, United States

18                       Senate, May 18, 2016, Bates

19                       stamped DOJ-00220 through

20                       DOJ-00230                    70

21
22      Number 6         Report of the Attorney

                         General's Cyber Digital Task
23
                         Force, Bates stamped
24
                         DOJ-00317 through DOJ-00472  78
25
```

```
 1                          -   -   -

 2              INDEX TO EXHIBITS  (Continued)

 3                          -   -   -

 4      DEPOSITION
        EXHIBIT NUMBER  DESCRIPTION                    PAGE
 5
        Number 7        Memorandum from the Attorney
 6
                        General, September 11, 2014    101
 7

 8      Number 8        Procedures for CCIPS

 9                      Consultations Regarding

10                      Charges under the Computer

11                      Fraud and Abuse Act, Revised:

12                      November 2016, Bates stamped

13                      DOJ-00007 through DOJ-00009    125

14
        Number 9        CFAA Consultation Request,
15
                        Bates stamped DOJ-00010
16
                        through DOJ-00011              135
17

18      Number 10       Defendant's Objections and

19                      Responses to Plaintiffs' First

20                      Set of Interrogatories         138

21
        Number 11       Memorandum Opinion             144
22

23      Number 12       Affidavit of John T. Lynch,

24                      Jr.                            147

25
```

1              30(b)(6) -- JOHN T. LYNCH, JR.

2                   P R O C E E D I N G S

3

4                   Washington, D.C.

5         Friday, October 26, 2018; 9:07 a.m.

6

7                       -  -  -

8              JOHN T. LYNCH, JR.,

9       after having been first duly sworn, was

10          examined and testified as follows:

11                      -  -  -

12            MS. BHANDARI:  Thank you very much.

13            My name is Esha Bhandari.  I'm here

14       with co-counsel, Rachel Goodman, from the

15       American Civil Liberties Union on behalf

16       of the Plaintiffs.

17            I don't know if counsel would like

18       to enter their appearance.

19            MR. SCHWEI:  Daniel Schwei from the

20       Department of Justice on behalf of

21       Defendant.  Joining me at the table is

22       Erica O'Neil, also from the Department of

23       Justice.

24

25

1          30(b)(6) -- JOHN T. LYNCH, JR.

2                      -  -  -

3       EXAMINATION BY COUNSEL FOR PLAINTIFFS

4                      -  -  -

5    BY MS. BHANDARI:

6          Q.    I will be conducting approximately the

7    first half of this deposition.  I will be asking

8    questions in your capacity as the designated

9    witness under Federal Rule of Civil Procedure

10   30(b)(6) for the Department of Justice.

11              And then Rachel Goodman will be

12   conducting approximately the second half of this

13   deposition; she will ask questions in your

14   capacity as the 30(b)(6) witness.  Also, she will

15   ask questions in your individual capacity, but

16   when she does so, she will make it very clear

17   she's asking you a question in your individual

18   capacity.

19         A.    I understand.

20         Q.    Okay.  Please state and spell your

21   name for the record.

22         A.    John, J-O-H-N; Thomas, T-H-O-M-A-S;

23   Lynch, L-Y-N-C-H, Jr.

24         Q.    Thank you.

25              And have you been deposed before?

1          30(b)(6) -- JOHN T. LYNCH, JR.

2    public, is that visitor considered an insider in

3    any way?

4               MR. SCHWEI:  Objection: vague.

5    BY MS. BHANDARI:

6         Q.    You can answer the question.

7         A.    To the best of my -- to the best of my

8    knowledge, when we talk about insiders, we are

9    typically not talking about members of the public

10   approaching a Web site that is otherwise generally

11   open to the public.

12              Usually, when we talk about

13   insiders -- and it's important to note that

14   "insiders" is not a defined term in the statute;

15   it's a term that we use to discuss different

16   classes of -- of individuals, generally

17   corresponding, but not entirely corresponding,

18   with the terms within the statute without access

19   and exceeding authorized access; the insider

20   problem is generally not what comes up when we

21   talk about Web site terms of service.

22        Q.    I want to look at another paragraph

23   later on Page 7, the same page.  This is the third

24   full paragraph.  I will read it now.  It says, The

25   narrow judicial interpretation of the term

1              30(b)(6) -- JOHN T. LYNCH, JR.

2      "exceeds authorized access" in the CFAA stems from

3      concerns that the statute potentially makes

4      relatively trivial conduct a Federal crime.  One

5      frequently cited hypothetical along these lines is

6      a theoretical threat of prosecution faced by an

7      employee who uses the Internet to check baseball

8      scores at lunchtime, in violation of his

9      employer's strict business-only Internet use

10     policy.  We understand the concerns of the courts,

11     and I would like to reiterate that the Department

12     of Justice has no interest in prosecuting harmless

13     violations of use restrictions like these.

14              Did I read that correctly?

15     A.    You did.

16     Q.    Is this an accurate statement of the

17     Department of Justice's position regarding the

18     scope of "exceeds authorized access" in the CFAA?

19              MR. SCHWEI:  Objection.

20              MS. BHANDARI:  I will rephrase

21     that.

22     BY MS. BHANDARI:

23     Q.    Is this an accurate -- sorry.

24              Is this an accurate statement of the

25     Department of Justice's interests in not using the

1            30(b)(6) -- JOHN T. LYNCH, JR.

2    "exceeds authorized access" prong in the CFAA to

3    makes relatively trivial conduct a Federal crime?

4              MR. SCHWEI:  Objection:

5         mischaracterizes the paragraph.

6    BY MS. BHANDARI:

7         Q.    You can answer.

8         A.    It is not a statement relating to the

9    scope of the crime.  It is a statement regarding

10   our interests in prosecution of those -- of

11   certain sorts of Computer Fraud and Abuse

12   Act violations.

13        Q.    Does the Department of Justice have

14   any interest in prosecuting -- I quote --

15   Relatively trivial conduct, under the CFAA?

16             MR. SCHWEI:  Objection: calls for

17        speculation.

18   BY MS. BHANDARI:

19        Q.    You can answer the question.

20        A.    I would just point to -- to the

21   statement, The Department of Justice has no

22   interest in prosecuting harmless violations of use

23   violations [sic] like these.

24        Q.    Okay.  And is that an accurate

25   statement of the Department of Justice's position?

1           30(b)(6) -- JOHN T. LYNCH, JR.

2           A.    It is -- the statement is the

3     statement of the Department of Justice, and it is

4     an accurate position -- it is an accurate

5     description of our interests in prosecuting

6     harmless violations of use restrictions.

7           Q.    Can you describe harmless violations

8     of use restrictions?

9                 MR. SCHWEI:  Objection.  This goes

10                beyond the scope of the areas of inquiry

11                which asks about interests in terms of

12                service violations relating to --

13                relating to false or misleading

14                information or in creation of fictitious

15                user accounts, not cataloging all

16                possible interests in various types of

17                terms of service.

18                MS. BHANDARI:  I think that since

19                the Plaintiffs claim that their terms of

20                service violations are harmless or

21                trivial, it's within the areas of inquiry

22                to ask what the Department of Justice

23                considers harmless or trivial violations

24                of use restrictions or Web site terms of

25                service.

1          30(b)(6) -- JOHN T. LYNCH, JR.

2              I will read back my question.

3    BY MS. BHANDARI:

4        Q.   Can you describe harmless violations

5    of use restrictions?

6        A.   I am not able to catalog all harmless

7    violations of use restrictions.  One was obviously

8    given in the testimony that you read to me.  But

9    as a general matter, terms of use restrictions are

10   ones that do not necessarily have a connection to

11   access restrictions.  They're, instead, providing

12   rules about how the computer may be used, as

13   opposed to information that could be accessed on

14   the computer.

15              And, second, as stated in the -- as

16   the example shows, the relative loss to the

17   employer is minimal.  There's perhaps some loss of

18   employee time or, you know, use of resources, but,

19   in general, the employer doesn't suffer a mon -- a

20   significant monetary loss.  And so things like

21   check baseball scores or perhaps checking employee

22   e-mail or personal e-mail at -- during a lunch

23   break, there are maybe situations in which those

24   are prohibited activities, and there may be very

25   good reasons behind them.

1          30(b)(6) -- JOHN T. LYNCH, JR.

2               For example, I think the situation in

3     which maybe a Department of Justice employee or a

4     employee in a white-collar business, you know,

5     checks baseball scores from their terminal might

6     be considered relatively harmless.  If, for some

7     reason, a nuclear power plant employee were to

8     undertake the same activity from a nuclear control

9     terminal, that would probably be a much more

10    serious -- that would be probably a much more

11    serious restriction.  And, in general, employment

12    agreements and the -- the -- the enforcement of

13    such reflect the differences in those -- in those

14    situations.

15               So it's hard for me to say there is a

16    strict rule about baseball scores that would apply

17    in every employment context or every use context;

18    but, in general, there is a -- the Department has

19    stated that it -- that where it's sort of

20    incidental use, the use does not place the

21    employer's computer systems or networks into

22    significant jeopardy and it's a overall minimal

23    loss to the -- or the minimal imposition on the

24    employer, that those are not the kinds of things

25    that the Department is going to be concerned

```
1              30(b)(6) -- JOHN T. LYNCH, JR.
2      about.
3           Q.    So sticking with the baseball scores
4      example that you've been discussing and that's
5      mentioned in the testimony of Sujit Raman, when
6      the Department of Justice considers harmless
7      violations of use restrictions, there may be some
8      minimal loss to the employer included in that; is
9      that correct?
10              MR. SCHWEI:  Objection:
11          hypothetical; calls for speculation.
12     BY MS. BHANDARI:
13          Q.    So when you were describing minimal
14     loss to the employer, can you describe the types
15     of minimal loss that you were discussing?
16          A.    And this is -- this is, again, an
17     interest -- I'm speaking of our interests, not a
18     statement of the law, just to preface that --
19          Q.    I understand.
20          A.    -- my -- my -- my -- yes, if there is
21     a -- if the employer does not suffer significant
22     monetary loss or significant loss in time or have
23     their systems placed in significant risk of being
24     breached as a result of the conduct, first of all,
25     the Department probably isn't going to hear about
```

1            30(b)(6) -- JOHN T. LYNCH, JR.

2      it because that is usually handled internally by

3      the organization; and, second, if we did learn of

4      it, it would be unlikely that we would prioritize

5      that type of prosecution.

6            Q.   And why is that?  If an employer came

7      to you with a complaint about this type of minimal

8      loss that you're describing, why would the

9      Department not prioritize prosecuting that?

10           A.   Because we have limited resources and

11     we want to focus those resources on circumstances

12     where there is a significant loss to the victim or

13     where there is an important deterrence value from

14     the prosecution; you know, for example, in the

15     insider -- the insider prosecutions where an

16     insider, for example, disclosed or harmed their

17     employer's computer system through intentional

18     conduct or intentional access to information that

19     they were not authorized to access.

20           Q.   I want to ask about some language

21     later down in the same page, Page 7 of Exhibit 2.

22                In the following paragraph, it says,

23     Over the last several years, numerous Department

24     of Justice officials have called on Congress to

25     address this issue in a manner that would maintain

1          30(b)(6) -- JOHN T. LYNCH, JR.

2     the law's key privacy-protecting function while

3     ensuring that trivial violations of things, like a

4     Web site's terms of service, do not constitute

5     Federal crimes.

6               Did I read that correctly?

7        A.    You did.

8        Q.    Is that an accurate statement of the

9     Department of Justice's position?

10              MR. SCHWEI:  Objection: vague.

11    BY MS. BHANDARI:

12       Q.    You can answer.

13       A.    It is a -- it is a statement -- it is

14    a correct statement of the Department of Justice's

15    statements to Congress relating to potential

16    amendments of the Computer Fraud and Abuse Act,

17    yes.

18       Q.    Can you describe what is meant in this

19    sentence by "trivial violations of things, like a

20    Web site's terms of service"?

21              MR. SCHWEI:  Objection: vague; and

22         calls for him to catalog every possible

23         example.

24    BY MS. BHANDARI:

25       Q.    You can answer the question.

1          30(b)(6) -- JOHN T. LYNCH, JR.

2          A.    I am not going to be able to catalog

3    all possible violations, but Web sites often have

4    a number of rules in their terms of service about

5    how the -- the -- the site can be -- or can or

6    should be accessed.  Some are -- some of them are

7    actual access restrictions that state you can't

8    access the system except if you are in a

9    particular category; for example, unless you are a

10   paying customer, you're not allowed to access --

11   access the Web site.

12              Relatively trivial violations might

13   include nonaccess restrictions; for example, a

14   Web site might have a -- a term of service that

15   says you must be civil and polite in your

16   discourse on this -- on this Web site, but that's

17   not in the access violation, but it may be a

18   violation of the terms of use if somebody is, in

19   the opinion of the Web site owner, not

20   sufficiently polite.

21              That would probably be not -- that

22   would be probably -- that would be an example of a

23   relatively trivial violation of a terms of use of

24   the -- of that particular Web site.

25         Q.    If a Web site has a term of service

1              30(b)(6) -- JOHN T. LYNCH, JR.

2     that says you can't provide any false information

3     on the Web site, is that a relatively trivial

4     violation?

5              MR. SCHWEI:  Objection:

6              hypothetical; and vague.

7              MS. BHANDARI:  The question about

8              whether terms of service prohibiting

9              false information is trivial or not is at

10             the heart of the Government's interests

11             in prosecuting such violations.

12    BY MS. BHANDARI:

13         Q.   So you can answer the question.

14         A.   The answer to the question

15    specifically with regard to false information is

16    going to depend on the type of Web site and the --

17    and the terms of use of a particular Web site.

18              Some Web sites that have very

19    relatively lax restrictions on providing false

20    information, perhaps dating Web sites or Twitter,

21    in some cases might be; I think those would be

22    considered to be in the more trivial category.

23              You may have other Web sites, for

24    example, Web sites for which you are interacting

25    with a bank and the bank has to know your customer

1          30(b)(6) -- JOHN T. LYNCH, JR.

2     requirements, and so providing false information

3     in that context would probably be analyzed

4     differently in that.

5               But there are definitely -- there is

6     definitely, in the Department's analysis of where

7     to place its priorities, some analysis of the type

8     of Web site and the -- and the context in which

9     false information might be given before we

10    were -- before we would make a prosecution

11    decision in that -- in that respect.

12    Q.     Why would a false information

13    prohibition on a Web site, such as Twitter or a

14    dating Web site, be relatively trivial?

15               MR. SCHWEI:  Objection: vague;

16          hypothetical; and going outside the areas

17          of inquiry.

18               MS. BHANDARI:  The question about

19          what makes terms of service prohibiting

20          false information trivial or not is at

21          the heart of the issue in this case.

22    BY MS. BHANDARI:

23    Q.     You can answer the question.

24    A.     Those were by way of example, but

25    different Web sites have different tolerances

1          30(b)(6) -- JOHN T. LYNCH, JR.
2    for -- for false information to be placed on them
3    and different expectations by the public for which
4    false information might be presented.
5               I think both the Department and, in
6    some cases, courts have recognized that there
7    are -- that, for example, on a dating Web site,
8    somebody might not be 100 percent truthful about
9    facts about themselves.  In some -- I think in
10   most cases, those would be considered harmless.
11   If you, for example, said you weighed 220 pounds
12   and you, in fact, weighed 250 pounds, somebody
13   might -- that might be considered within sort of
14   the realm of -- of acceptable false information.
15              Again, there are other types of --
16   there are other circumstances in which false
17   information may be presented to a different sort
18   of Web site where the presentation of false
19   information may be very significant, for example,
20   employment or banking or financial records in
21   which accuracy is more important.
22              And there are, I think, a wide range
23   of Web sites out there, and I was just giving you
24   an example of a couple of Web sites where there
25   seemed to be more -- both a tolerance by the

1            30(b)(6) -- JOHN T. LYNCH, JR.

2    company up until now and the public for a certain

3    amount of false information.

4        Q.    So taking the example of the type of

5    lie that someone might make on a dating Web site,

6    is it the Department of Justice's position that

7    that is relatively harmless, even though other

8    users of the dating Web site might be aggrieved by

9    those violations of terms of service?

10            MR. SCHWEI:  Objection: vague;

11        hypothetical; and outside the areas of

12        inquiry.

13    BY MS. BHANDARI:

14        Q.    I'll rephrase the question.

15            When you're giving your example of the

16    type of lie that someone might commonly engage in

17    on a dating Web site, are there potential harms to

18    other users of the Web site who interact with the

19    lying user?

20            MR. SCHWEI:  Objection --

21            THE WITNESS:  Yes --

22            MR. SCHWEI:  -- hypothetical.

23    BY MS. BHANDARI:

24        Q.    You can answer the question.

25        A.    -- yes, there are potential harms to

1          30(b)(6) -- JOHN T. LYNCH, JR.

2    someone who is interacting with the -- with the

3    user.  Those can range from relatively minor:

4    They are upset with the Web site, that -- that the

5    Web site is not presenting accurate profiles of

6    individuals, or they may decide not to use that

7    Web site anymore.

8               It can go all the way over into fairly

9    serious conduct in which somebody believes they're

10   meeting with a person with one name and they're,

11   in fact, meeting with someone else.  And if there

12   is, for example, stalking behavior that results

13   from that, it may make it harder for the person to

14   identify the person that is now stalking them,

15   having met them through the Web site.

16              So there's going to be, even within a

17   dating Web site, a range of conduct and a range of

18   dangers from the presentation of false

19   information.

20        Q.   And how would the Department of

21   Justice go about evaluating whether the range of

22   harm falls on the side of relatively trivial

23   violations of a Web site terms of service versus

24   not?

25              MR. SCHWEI:  Objection.  That's

1          30(b)(6) -- JOHN T. LYNCH, JR.

2               For example, a limitation could be put

3      into the CFAA making clear that in order to

4      constitute a crime under the new insider

5      provision, not only must an offender access a

6      protected computer in excess of authorization and

7      obtain information, but the information must be

8      worth 5,000 or more, the access must be in

9      furtherance of a separate felony offense or the

10     information must be stored on a Government

11     computer.

12               Did I read that correctly?

13     A.     You did.

14     Q.     And is this an accurate statement of

15     what the Department of Justice is proposing to

16     reform 1030(a)(2)(C) as?

17               MR. SCHWEI:  Objection.

18               MS. BHANDARI:  Scratch that.  I'll

19          reword it.

20     BY MS. BHANDARI:

21     Q.     Is this an accurate statement of the

22     Department of Justice's current position on how

23     Section 1030(a)(2)(C) should be amended?

24     A.     It's a statement of the Department of

25     Justice's position on how it could be amended and

1           30(b)(6) -- JOHN T. LYNCH, JR.

2    one possible -- one possible mechanism for

3    accounting for the legitimate current concerns

4    that have been raised by and are discussed above

5    in this testimony.

6           And so it is one -- it is one possible

7    means for -- it is one possible means for amending

8    the -- the statute and one that I think I can say

9    that we are -- we have stated that we would be

10   willing to explore with Congress as part of an

11   overall package of amendments.

12       Q.   And has this proposed list of

13   amendments been suggested because the Department

14   of Justice doesn't have an interest in

15   prosecutions under Section 1030(a)(2)(C) that

16   don't meet these requirements?

17           MR. SCHWEI:  Objection.  It's

18           asking for the motivation of the

19           Department of Justice in making

20           legislative recommendations, which would

21           be deliberative.

22           So I instruct the witness not to

23           answer.

24   BY MS. BHANDARI:

25       Q.   Are there any other proposed

1          30(b)(6) -- JOHN T. LYNCH, JR.

2    amendments that the Department of Justice has

3    publicly stated regarding Section 1030(a)(2)(C)?

4          A.    Yes.  This testimony, itself,

5    describes potential changes to the law that would

6    clarify that -- the definition of "exceeds

7    authorized access."

8               I think this statement at -- that you

9    just read relating to the limitation would be a

10   countervailing potential legislative change, and

11   so I think that when you read the testimony and

12   put it all together, it would -- it would not be

13   a -- it should not be looked at as individuated,

14   that we would be very happy if only one or was --

15   was -- was put in.

16              But we've identified a problem with

17   our prosecution that has come from Court

18   decisions, and the problem is stated -- the

19   problem for the Department is stated in the top of

20   Page 7, one means of providing reassurance to

21   those who may be concerned about the Department's

22   enforcement under revised version of -- as we

23   suggest, in general terms at the top of Page 7,

24   would be stated in this possible limitation that

25   we state.

1          30(b)(6) -- JOHN T. LYNCH, JR.

2              So it is a testimonial statement of, I

3     think, both sides of that potential -- that

4     potential discussion.  And I don't think the

5     Department has proposed one without the other.

6          Q.   Okay.  I want to ask about, again, the

7     proposed amendment at the bottom of Page 7 and,

8     specifically, the suggestion that

9     Section 1030(a)(2)(C) could be amended to require

10    accessing a protected computer in excess of

11    authorization and obtaining information worth

12    5,000 or more.

13             How would the value of $5,000 worth of

14    information be calculated?

15             MR. SCHWEI:  Objection: calls for

16        speculation; hypothetical; going beyond

17        the areas of inquiry designated in the

18        30(b)(6) notice.

19             MS. BHANDARI:  I think the meaning

20        of the proposed amendment is relevant to

21        how the Department of Justice evaluates

22        harm stemming from 1030(a)(2)(C)

23        violations.

24    BY MS. BHANDARI:

25        Q.   You can answer the question.

1              30(b)(6) -- JOHN T. LYNCH, JR.

2      is not at risk of criminal prosecution.

3              I am asking whether some conduct of

4      security researchers is at risk of prosecution

5      under Section 1030(a)(2)(C).

6              MR. SCHWEI:  So objection: vague;

7          lack of foundation; and to the extent it

8          calls for a prediction of the likelihood

9          of prosecution as to hypothetical

10         security researchers, that's a

11         hypothetical, and also deliberative.

12             So I will instruct the witness not

13         to answer.

14     BY MS. BHANDARI:

15         Q.   So I'm not asking about charging

16     decision.  I'm just asking whether some security

17     researchers have to violate Web site terms of

18     service in the course of their research, in your

19     experience.

20             MR. SCHWEI:  Objection: vague;

21         hypothetical; and outside the areas of

22         inquiry; and calls for a legal

23         conclusion.

24     BY MS. BHANDARI:

25         Q.   Okay.  So I'm going to ask you this in

1              30(b)(6) -- JOHN T. LYNCH, JR.

2      your individual capacity.  So to be very clear

3      right now, not as a 30(b)(6) witness, but in your

4      individual capacity, based on your experience, do

5      some security researchers have to violate Web site

6      terms of service in the course of their research?

7                   MR. SCHWEI:  Objection: vague; and

8              lack of foundation -- he's not a security

9              researcher --

10     BY MS. BHANDARI:

11         Q.    You can answer --

12                  MR. SCHWEI:  -- and hypothetical.

13     BY MS. BHANDARI:

14         Q.    -- you can answer the question.

15         A.    As an answer, the -- I have concern

16     about the word "have to."  I think it is correct

17     that security researchers, to my knowledge -- to

18     my personal knowledge, have, in fact, violated the

19     Computer Fraud and Abuse Act in the course of

20     their research.

21              It's hard for me to say whether they

22     had to do so, because I don't know if there was an

23     alternate means of getting the information that

24     they were seeking or the research that they were

25     doing or whether that was even a proper research

1          30(b)(6) -- JOHN T. LYNCH, JR.

2    topic.

3               But I do know that there are computer

4    security researchers who have been concerned about

5    the violation of the Computer Fraud and Abuse Act

6    and some who have -- some people who have at least

7    called themselves security researchers who have

8    been prosecuted under the Computer Fraud and Abuse

9    Act.

10              But whether they had to do so, I

11   don't -- that -- that, I'm really unable to

12   speculate about that.

13        Q.    And did some of those security

14   researchers violate Web site terms of service?

15              MR. SCHWEI:  Objection.

16              Are we still in the individual

17        capacity?

18              MS. BHANDARI:  Yes.  I'll be clear.

19   BY MS. BHANDARI:

20        Q.    In your individual capacity -- in your

21   experience, have some security researchers

22   violated Web site terms of service?

23              MR. SCHWEI:  Objection: vague; and

24        lack of foundation.

25

1          30(b)(6) -- JOHN T. LYNCH, JR.

2    BY MS. BHANDARI:

3          Q.    You can answer the question.

4          A.    Okay.  I don't know specifically the

5    answer to the question.  I have read about cases

6    where security researchers have either been

7    prosecuted or have expressed concern about

8    prosecution, and one of the issues at -- that is

9    discussed in the press reporting of those cases is

10   the terms of -- the terms of service.  And I have

11   seen cases where people purporting to be security

12   researchers have -- where the terms of service of

13   the Web site have been at issue in the case.

14         Q.    And I want to return to asking you

15   questions in your capacity as the designated

16   witness under FRCP 30(b)(6).

17         A.    Yes.

18         Q.    Okay.  I'd like to turn to the report

19   of the Attorney General's Cyber-Digital Task

20   Force, which is Bates stamped DOJ-00317 to

21   DOJ-00471.

22              MS. BHANDARI:  And I'd like to

23         designate this as Exhibit 6, titled

24         Report of the Attorney General's

25         Cyber-Digital Task Force.

1            30(b)(6) -- JOHN T. LYNCH, JR.

2      BY MS. BHANDARI:

3            Q.   I'll ask you this in your individual

4      capacity.

5                 And based on your experience with the

6      Department of Justice, would -- would any of the

7      Government interests that are identified in

8      response to Interrogatory Number 6 be implicated

9      when a user creates a social media profile using

10     false information on a Web site, such as Twitter?

11               MR. SCHWEI:  Objection: vague;

12          hypothetical; and lack of foundation

13          about whether the situation you're

14          describing is even responsive to the

15          interrogatory.

16     BY MS. BHANDARI:

17          Q.   You can answer the question.

18          A.   Yes.  I think all or almost all of

19     these could be implicated by a parity account,

20     yes.

21          Q.   Okay.

22               MS. BHANDARI:  I will turn it over

23          to Rachel Goodman.

24               THE WITNESS:  Okay.

25               MS. BHANDARI:  Just to be clear,

```
1              30(b)(6) -- JOHN T. LYNCH, JR.
2    responsibility for prosecution involving the CFAA,
3    is CCIPS brought in to consult on those
4    prosecutions as a matter of policy?
5         A.    Generally, under the intake and
6    charging policy, CCIPS would be consulted under
7    those -- should be consulted under those -- under
8    that -- under that policy in the same way that we
9    would be consulted under -- by a U.S. Attorney's
10   office in that case.  CCIPS would have a
11   consultation role in those -- in those cases.
12        Q.    Are you aware of any instances since
13   the charging policy went into effect where that
14   consultation with CCIPS has not occurred?
15        A.    I am.  There have been times when both
16   U.S. Attorneys' offices, and there may have been a
17   time -- I don't recall specifically -- with a
18   Criminal Division component where somebody was not
19   aware of the policy and did not specifically
20   consult with us.  But as -- it is a policy, and it
21   is something that we encourage and have made known
22   to the -- to the community and continue to -- to
23   make known to the community so that we get kind of
24   consulted on -- on these -- as a regular matter.
25        Q.    Let's turn to that charging policy,
```

1          30(b)(6) -- JOHN T. LYNCH, JR.

2          but there is -- there is no superseding

3          document that relates to this particular

4          memorandum.  But all of those policies

5          must be considered before bringing --

6          bringing that charge.

7    BY MS. GOODMAN:

8          Q.   With that understanding, does this

9    memorandum represent DOJ's current policy for

10   charging CFAA violations?

11         A.   Yes.

12         Q.   Does -- does the Attorney General have

13   the authority to withdraw or amend the memorandum?

14              MR. SCHWEI:  Objection: outside the

15         areas of inquiry; calls for a legal

16         conclusion.

17              But you can answer.

18              THE WITNESS:  My understanding is,

19         it is an Attorney General policy that

20         remains in effect until rescinded.  A

21         future Attorney General could choose to

22         rescind it.  To my knowledge, that has

23         not happened.

24   BY MS. GOODMAN:

25         Q.   I want to draw your attention to the

Page 123

1        30(b)(6) -- JOHN T. LYNCH, JR.

2        speculation; and outside the areas of

3        inquiry.  But . . .

4              THE WITNESS:  Not necessarily.

5        That's correct.

6    BY MS. GOODMAN:

7        Q.    So let's move on to the charging

8    consultation described under Section 3 on Page 6

9    there.  I'll introduce the exhibit that gives a

10   bit more detail about what the charging

11   consultation consists of in a moment.

12             And you began to address my question a

13   moment ago, but at what point in an investigation

14   is a charging consultation required?

15       A.    Going to the -- to the language, it

16   says, With respect to charging decisions, this

17   would happen -- as we discussed at the beginning

18   of the discussion about what a charging document

19   was, it would happen -- the expectation would

20   happen before one of those charging documents was

21   prepared and filed.

22       Q.    I think you answered this question

23   before, but let me just clarify.

24             A charging consultation would occur

25   before the Department of Justice proposed a plea

1          30(b)(6) -- JOHN T. LYNCH, JR.

2    agreement?

3          A.     The expectation is, yes,

4    that that -- that that would be something that

5    would happen before -- before a plea agreement,

6    because a plea agreement, by its nature, requires

7    a charge and then an agreement to plead guilty to

8    that charge.

9          Q.    Are you aware of instances in which

10   the required charging consultation has not

11   happened by that point?

12         A.    I am not aware of -- I am aware of the

13   circumstances in which -- the policy where we

14   found that the policy did not -- was not followed

15   in a particular case, and they may come to us

16   postdoc or, you know, we may find out about it in

17   the newspaper, and -- and that might be the way

18   that we do an inquiry about it.

19              You know -- as I stated before, we try

20   to emphasize the policy to CHIPs.  It is not --

21   and I think CHIPs uniformly follow it, and they're

22   aware of it, but there may be people who are

23   outside that community who may just not be aware

24   that this policy exists and err by not -- by not

25   consulting beforehand.

Page 125

1              30(b)(6) -- JOHN T. LYNCH, JR.

2              So I am aware of circumstances.  We

3    try to minimize them, but they have occurred, yes.

4              MS. GOODMAN:  I'm going to

5         introduce another exhibit here.  This

6         would be Exhibit 8.

7                   -  -  -

8              (Deposition Exhibit Number 8,

9              Procedures for CCIPS Consultations

10             Regarding Charges under the

11             Computer Fraud and Abuse Act,

12             Revised November 2016, Bates

13             stamped DOJ-00007 through

14             DOJ-00009, marked for

15             identification, as of this date.)

16                  -  -  -

17   BY MS. GOODMAN:

18        Q.   Exhibit 8 is entitled Procedures for

19   CCIPS Consultations Regarding Charges under the

20   Computer Fraud and Abuse Act, Revised:

21   November 2016.

22             Did I read that correctly?

23        A.   You did.

24        Q.   Are you familiar with this document?

25        A.   I am.

1            30(b)(6) -- JOHN T. LYNCH, JR.

2            Do the recordkeeping requirements here

3    give CCIPS a comprehensive record of CFAA charges

4    brought throughout DOJ?

5            MR. SCHWEI:  Objection: outside the

6        areas of inquiry; and lack of foundation.

7    BY MS. GOODMAN:

8        Q.    You can answer.

9        A.    Okay.

10            I guess I would not be able to say

11    that it is a comprehensive record because I am

12    not -- I'm aware that it is not -- as I testified

13    previously in this deposition, that I'm aware of

14    instances where consultations didn't occur; there

15    may be, also, charges where I haven't found out

16    yet that a consultation hadn't occurred.

17            So I wouldn't be able to say that this

18    is a comprehensive in the sense of every single

19    consultation that has taken place, but I think it

20    is a reasonable record of the consultations that

21    we have undertaken.

22        Q.    Would you say that since 2014, when

23    the memorandum and CCIPS's recordkeeping

24    requirements went into effect, you've had a much

25    more comprehensive or closer-to-comprehensive

1           30(b)(6) -- JOHN T. LYNCH, JR.

2     record than you did prior to the implementation of

3     those guidelines?

4               MR. SCHWEI:  Objection: outside the

5          areas of inquiry; calls for speculation;

6          lack of foundation.

7     BY MS. GOODMAN:

8          Q.   I'll ask you to answer in your

9     personal capacity.

10              MR. SCHWEI:  So same objections.

11              But go ahead.

12              THE WITNESS:  Prior to 2014, we

13         were often consulted on these matters,

14         and so we had a pretty good understanding

15         of what was happening before 2014, post

16         2014, because there was a procedure in

17         place.

18              I guess my personal experience has

19         been there has been -- that I'm -- it's

20         probably better and closer to

21         comprehensive, but I don't think either

22         were night and day.  I think that they

23         were -- we were consulted voluntarily on

24         a lot of things before 2014, and post

25         2014, we should be consulted on

1          30(b)(6) -- JOHN T. LYNCH, JR.

2     everything; but as I've said, I'm aware

3     of situations in which we haven't been

4     consulted.

5          MS. GOODMAN:  I'm about to

6     introduce another exhibit.  I just want

7     to back up for a second and say, it's

8     noon; my guess is that I have about

9     another hour; and there may be a little

10    bit of cleanup at the end.

11         I think our preference would be to

12    push through.

13         Is that okay with everyone

14    timing-wise, lunch-wise?

15         THE WITNESS:  That is -- that is

16    okay.  I want more water, though.

17         MS. GOODMAN:  Should we take a

18    break?

19         MR. SCHWEI:  Let's take a five-,

20    10-minute break.

21              -  -  -

22         (Whereupon, a recess was taken from

23          11:53 a.m. to 12:01 p.m.)

24              -  -  -

25         MS. GOODMAN:  I'm going to mark

1              30(b)(6) -- JOHN T. LYNCH, JR.

2     authorized access case is going to fit that

3     category, but I think this was intended to be sort

4     of a general jog, that it might be one of the

5     areas where there is answer -- because there's a

6     circuit split on -- on the question of exceeding

7     authorized access and -- and purpose-based

8     restrictions.

9              So this is something we try to look

10    for in -- as -- as a general matter of

11    consultation.

12        Q.    Put that exhibit away.

13              Now I want to discuss past charges

14    under 1030(a)(2)(C) a little bit.

15              Since June 29th, 2015, the date we've

16    agreed upon in the deposition notice, has DOJ

17    sought charges under 1030(a)(2)(C) for violation

18    of Web site or platform terms of service?

19              MR. SCHWEI:  Objection: vague; and

20         outside the areas of inquiry.

21              But you can answer.

22              MS. GOODMAN:  In what way is it

23         outside the areas of inquiry?

24              MR. SCHWEI:  I think the areas of

25         inquiry says "harmless terms of service

Page 138

1          30(b)(6) -- JOHN T. LYNCH, JR.

2          violations."  I think your question was

3          simply "terms of service."

4               MS. GOODMAN:  Okay.

5     BY MS. GOODMAN:

6          Q.    You can answer the question as I

7     originally phrased it.

8          A.    My -- my answer on this is, I'm going

9     to point to the statement in Interrogatory

10    Number 4 on Page 7, if you want to introduce that.

11               MS. GOODMAN:  We didn't introduce

12          those previously, I see.

13               THE WITNESS:  Not -- you introduced

14          something, I don't know.

15               MS. GOODMAN:  So we can mark this

16          as Exhibit 10.

17    BY MS. GOODMAN:

18          Q.    Mr. Lynch, would you mind handing your

19    copy over to be marked?

20          A.    Sure.

21                    -  -  -

22          (Deposition Exhibit Number 10,

23           Defendant's Objections and

24           Responses to Plaintiffs' First Set

25           of Interrogatories, marked for

```
 1              30(b)(6) -- JOHN T. LYNCH, JR.

 2                   identification, as of this date.)

 3                      -  -  -

 4           THE WITNESS:  With respect to

 5        Exhibit 10, on Page 7, my -- my answer is

 6        that CCIPS has reviewed its records, and

 7        we did not identify any responsive

 8        documents to the question posed as

 9        Interrogatory Number 4, which asked for

10        Any and all indictments of any of the

11        individual's response -- identified in

12        the response to Interrogatory Number 3,

13        basically, Deponent Department of Justice

14        persons, issued for violation of what --

15        a Web site or platform or service.

16             That is the -- that is the

17        Department's answer on that and my answer

18        on that.

19   BY MS. GOODMAN:

20        Q.    Okay.  Just to clarify, the question

21   I'm asking here is slightly broader than the

22   question about indictments in the interrogatory.

23        A.    Okay.

24        Q.    And it may be that -- that you -- that

25   the answer is the same, but I'm asking with
```

1              30(b)(6) -- JOHN T. LYNCH, JR.

2      respect to the three categories that we discussed

3      at the beginning of my section of the deposition:

4      complaints, informations and indictments.

5           A.    Can I -- can I consult just to ensure

6      that as a 30(b)(6) matter, I present the

7      appropriate decision for -- or the interrogatory?

8                 MS. GOODMAN:  Sure.

9                 (Counsel and witness confer.)

10                THE WITNESS:  Thank you for the

11           opportunity to consult.

12                For Web site indictments,

13           informations and complaints, I'm unaware

14           of any indictments brought within the

15           relevant time period.

16     BY MS. GOODMAN:

17          Q.    Now I'm going to ask you some

18     questions about two past CFAA prosecutions from

19     before that time period, United States versus

20     Lowson and United States versus Drew.

21          A.    Okay.

22          Q.    So, first, with respect to Drew, did

23     the 1030(a)(2)(C) charge there involve a violation

24     of Web site terms of service?

25          A.    To the best of my understanding, it --

1            30(b)(6) -- JOHN T. LYNCH, JR.

2    stated before, you mean in our discussion of the

3    comprehensiveness of the recordkeeping

4    requirements?

5         A.    That -- that is correct.

6         Q.    Then I'll introduce as Exhibit 12 what

7    I expect you are familiar with, which is the

8    affidavit of John T. Lynch, Jr.

9                        -  -  -

10               (Deposition Exhibit Number 12,

11                Affidavit of John T. Lynch, Jr.,

12                marked for identification, as of

13                this date.)

14                        -  -  -

15    BY MS. GOODMAN:

16         Q.    So we're looking at the affidavit of

17    John T. Lynch, Jr., filed as ECF Number 21-1 in

18    this matter on October 27th, 2017.

19               Did you review the affidavit in

20    preparation for this deposition?

21         A.    I did.

22         Q.    Speaking in your capacity as a

23    representative of the Department of Justice, is

24    there any statement in this affidavit that you

25    wish to correct or withdraw?

1          30(b)(6) -- JOHN T. LYNCH, JR.

2               MR. SCHWEI:  Objection: outside the

3          areas of inquiry.

4               But you can answer.

5               THE WITNESS:  I have reviewed this.

6          I believed it was true at the time I

7          stated it.  I believe it is true now.

8          There's no statement that I would wish to

9          withdraw or correct.

10   BY MS. GOODMAN:

11        Q.    Let me draw your attention to

12   Paragraph 9 of the affidavit, which begins -- I'm

13   sorry -- the second sentence of that paragraph, I

14   am unaware of any Federal criminal prosecution

15   under the CFAA of conduct resembling the conduct

16   described in the Complaint that resulted in

17   similarly de minimis harm.  I do not expect that

18   the Department would bring a CFAA prosecution

19   based on such facts and de minimis harm.

20               Speaking in your capacity as a

21   representative of the Department of Justice today,

22   is this statement still true?

23               MR. SCHWEI:  Again, outside the

24          areas of inquiry.

25               But go ahead.

Page 149

1          30(b)(6) -- JOHN T. LYNCH, JR.

2               THE WITNESS:  I -- speaking as a

3          representative of the Department of

4          Justice, I believe this is still true

5          today.

6     BY MS. GOODMAN:

7          Q.    And does the phrase "Federal criminal

8     prosecution" in that sentence I just read refer

9     exclusively to filed charges, or does it include

10    instances in which plea agreements may have been

11    obtained before the filing of charges?

12              MR. SCHWEI:  Objection: vague,

13         because I think "charges" encompasses

14         plea agreements.

15              But the witness can explain his

16         understanding.

17              THE WITNESS:  If I can explain.

18    BY MS. GOODMAN:

19         Q.    Sure.

20         A.    A plea agreement would necessarily

21    require a charge.  And so in this sense, a Federal

22    criminal prosecution would include one which was

23    resolved immediately by plea agreement.

24              So I -- I would say that would be

25    encompassed within the -- both charges that

Page 152

1          30(b)(6) -- JOHN T. LYNCH, JR.

2     BY MS. GOODMAN:

3          Q.    You can answer.

4          A.    I understand them to have roughly the

5     same -- roughly the same meaning.  "Harmless" is a

6     none.  "De minimis," here, is somewhat broader

7     than none, but of the sort that -- of the sort

8     that would be considered to be minimal, and so

9     that -- that was the -- that was how I was

10    contemplating it.

11          So I think that the terms have rough

12    congruence, but "de minimus" might be slightly

13    broader than "harmless."  But I think that they're

14    in the same area.

15          Q.    Okay.  And then moving on to the final

16    sentence of that paragraph, which says, I do not

17    expect the Department would bring a CFAA

18    prosecution based on such facts and de minimis

19    harm.

20          Is that statement still true?

21          A.    It is true, yeah, it is -- my

22    expectation continues to be that, yes.

23          Q.    And while that statement is true, does

24    it foreclose the possibility that the Department

25    would bring such a prosecution?

1          30(b)(6) -- JOHN T. LYNCH, JR.

2    BY MS. GOODMAN:

3          Q.    Speaking in your personal capacity, do

4    you believe that it is impossible for the

5    Department to bring a CFAA prosecution based on

6    such facts and de minimis harm?

7          A.    No, I do not believe it's impossible.

8                I'm sorry.

9          Q.    I think the remainder of my questions,

10   which are just a few, will be all in your personal

11   capacity now.

12         A.    Okay.

13         Q.    Does that statement -- the sentence we

14   were just discussing -- when you say that you do

15   not expect the Department would bring a

16   prosecution, does that statement include your

17   consideration of the fact that -- of the fact of

18   the Plaintiffs' motives in conducting their

19   research?

20               MR. SCHWEI:  So I think the witness

21          can answer about what he considered.  I

22          don't think he can answer as to what the

23          Department or a prosecutor would

24          consider.

25

1          C E R T I F I C A T E

2   WASHINGTON, D.C.

3        I, Cindy L. Sebo, a Notary Public within and

4   for the Jurisdiction aforesaid, do hereby certify

5   that the foregoing deposition was taken before me,

6   pursuant to notice, at the time and place indicated;

7   that said witness was by me duly sworn to tell the

8   truth, the whole truth, and nothing but the truth;

9   that the testimony of said witness was correctly

10  recorded in machine shorthand by me and thereafter

11  transcribed under my supervision with computer-aided

12  transcription; that the deposition is a true record

13  of the testimony given by the witness; and that I

14  am neither of counsel nor kin to any party in said

15  action, nor interested in the outcome thereof.

16

17

18

19  _____

20          Cindy L. Sebo, RMR, CRR, RPR, CSR,

21             CCR, CLR, RSA, LiveDeposition

22       Authorized Reporter, and Notary Public

23

24

25