**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CHRISTIAN SANDVIG,
*et al.*,

               Plaintiffs,

      v.

WILLIAM P. BARR, in his official capacity
as Attorney General of the United States,

            Defendant.

Case No. 1:16-cv-1368 (JDB)

# Defendant's Exhibit 20:

Report of the Attorney General's Cyber Digital Task Force
(July 2, 2018), DOJ00317-00472



**U.S. Department of Justice**

# REPORT OF THE ATTORNEY GENERAL'S CYBER DIGITAL TASK FORCE

DOJ-00317



**U. S. Department of Justice**

Office of the Deputy Attorney General

---

The Deputy Attorney General                                    *Washington, D.C. 20530*

July 2, 2018

Dear Mr. Attorney General:

You have emphasized that "upholding the Constitution and protecting the rule of law is the foundation of everything we do" at the Department of Justice. Our important duties include keeping America safe by fighting crime and preserving the Nation's security.

As President Trump has observed, "The United States faces an extraordinarily dangerous world, filled with a wide range of threats that have intensified in recent years." Director of National Intelligence Dan Coats explained earlier this year that the cyber threat "is one of [our] greatest concerns and top priorities." The Department of Justice shares that assessment.

Every day, malicious cyber actors target our citizens, our businesses, our military, and all levels of our government. They cause billions of dollars in losses and attempt to undermine our democratic values. Combating cybercrime and cyber-enabled threats to our Nation's security must remain among the Department's highest priorities.

In February 2018, you directed the formation of a Cyber-Digital Task Force to undertake a comprehensive assessment of the Department's work in the cyber area, and to identify how federal law enforcement can even more effectively accomplish its mission in this vital and evolving area.

The initial assessment is complete. It is my privilege to present this report of the Attorney General's Cyber-Digital Task Force.

I hope this report will assist as all Americans keep moving forward to protect our people, promote our economy, and preserve our values.

Sincerely,

Rod J. Rosenstein
Deputy Attorney General

# REPORT OF THE ATTORNEY GENERAL'S CYBER DIGITAL TASK FORCE

DOJ-00319

United States Department of Justice
Office of the Deputy Attorney General
Cyber-Digital Task Force
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
https://www.justice.gov/cyberreport

# TABLE OF CONTENTS

LETTER FROM THE DEPUTY ATTORNEY GENERAL ............................. i

ATTORNEY GENERAL'S CYBER-DIGITAL TASK FORCE ...................... vii

INTRODUCTION ....................................................................... xi

CHAPTER 1
COUNTERING MALIGN FOREIGN INFLUENCE OPERATIONS ...................... 1

CHAPTER 2
CATEGORIZING SOPHISTICATED CYBER SCHEMES................................... 23

CHAPTER 3
DETECTING, DETERRING, AND DISRUPTING CYBER THREATS............... 49

CHAPTER 4
RESPONDING TO CYBER INCIDENTS ............................................... 83

CHAPTER
TRAINING AND MANAGING OUR WORKFORCE .......................................... 95

CHAPTER 6
LOOKING AHEAD ........................................................................109

APPENDICES
APPENDIX 1: MEMORANDUM ESTABLISHING THE TASK FORCE .......... 131
APPENDIX 2: RECENT SUCCESSFUL BOTNET DISRUPTIONS ................. 133
APPENDIX 3: RECENT SUCCESSFUL DARK WEB DISRUPTIONS ............ 137
APPENDIX 4: GLOSSARY OF KEY TERMS ...................................... 141

DOJ-00321



# ATTORNEY GENERAL'S CYBER-DIGITAL TASK FORCE

TASK FORCE MEMBERS

**Sujit Raman, Chair**
Associate Deputy Attorney General
*Office of the Deputy Attorney General*

**John P. Cronan**
Assistant Attorney General (Acting)
*Criminal Division*

**John C. Demers**
Assistant Attorney General
*National Security Division*

**Carl Ghattas**
Executive Assistant Director
*Federal Bureau of Investigation*

**John M. Gore**
Assistant Attorney General (Acting)
*Civil Rights Division*

**Andrew E. Lelling**
United States Attorney
*District of Massachusetts*

**David T. Resch**
Executive Assistant Director
*Federal Bureau of Investigation*

**Beth A. Williams**
Assistant Attorney General
*Office of Legal Policy*

**Peter A. Winn**
Chief Privacy & Civil Liberties Officer (Acting)
*Director, Office of Privacy & Civil Liberties*

TASK FORCE CONTRIBUTORS

Matthew J. Sheehan
Counsel to the Deputy Attorney General
*Staff Director*

| | | |
|---|---|---|
| Elizabeth Aloi | Brendan Groves | Richard Pilger |
| Leonard Bailey | Aarash Haghighat | Jason Poole |
| Michael F. Buchwald | William Hall | Andrew Proia |
| Mark Champoux | Christopher Hardee | Kimberley Raleigh |
| Thomas Dettore | Adam Hickey | Peter Roman |
| Richard Downing | Ray Hulser | Opher Shweiki |
| Benjamin Fitzpatrick | Anitha Ibrahim | Michael Stawasz |
| Lindsey Freeman | Matthew Kluge | AnnaLou Tirol |
| Tashina Gauhar | John T. Lynch, Jr. | Andrew Warden |
| Josh Goldfoot | Katrina Mulligan | J. Brad Wiegmann |
| Bonnie Greenberg | Sean Newell | Cory Wilson |
| | Erica O'Neil | |

*And representatives from:*

Bureau of Alcohol, Tobacco, Firearms, and Explosives Office of Strategic
  Intelligence & Information
Drug Enforcement Administration Office of Investigative Technology
Federal Bureau of Investigation Counterintelligence Division
Federal Bureau of Investigation Counterterrorism Division
Federal Bureau of Investigation Criminal Investigative Division
Federal Bureau of Investigation Cyber Division
Federal Bureau of Investigation Digital Transformation Office
Federal Bureau of Investigation Information Technology Branch
Federal Bureau of Investigation Office of Private Sector
Federal Bureau of Investigation Office of the Chief Information Officer
Federal Bureau of Investigation Office of the Director
Federal Bureau of Investigation Office of the General Counsel
Federal Bureau of Investigation Operational Technology Division
INTERPOL Washington, the U.S. National Central Bureau
Justice Management Division Office of the Chief Information Officer/
  Cybersecurity Services Staff
United States Marshals Service Investigative Operations Division
United States Marshals Service Judicial Security Division

DOJ-00323

# Chapter 1
## Countering Malign Foreign Influence Operations

Hostile foreign actors have long sought to influence, and to subvert, our Nation's democratic institutions. Modern technology—including the Internet and social media platforms—has both empowered and emboldened foreign governments and their agents in their attempts to affect U.S. attitudes, behaviors, and decisions in new and troubling ways.

The Department of Justice plays an important role in protecting the Nation's democratic processes from malign foreign influence operations. While the States, under the Constitution, have primary jurisdiction over the administration of elections,[1] the Department for decades has enforced federal criminal laws involving certain forms of ballot fraud.[2] We will continue our traditional commitment to combating such frauds, including any that foreign governments or their agents may attempt to perpetrate. (*See* page 4).

Foreign cyber-enabled and other active efforts to influence our democratic processes, including our elections, demand an urgent response. In the following pages, we provide background on malign foreign influence operations generally; outline five distinct types of foreign influence operations aimed at our elections or at broader political issues in the United States; and describe the Department's protective efforts with respect to such operations, including efforts designed to protect the upcoming 2018 midterm elections. We also announce a Department policy regarding the factors to be considered in disclosing malign foreign influence operations to victims, other affected individuals, and the public. This policy provides guideposts for Department action to expose and thereby counter foreign influence threats—consistent with the fundamental principle that we always must seek to act in ways that are politically neutral, compliant with the First Amendment, and designed to maintain the public trust.

Ultimately, one of the most effective ways to counter malign foreign influence operations is to shine a light on the activity and raise awareness of the threat. In order to prevail against our adversaries, all of society must work together: from government at all levels; to social media providers and others in the private sector; to political candidates and organizations; to, perhaps most significantly, an active and informed citizenry.

### Malign Foreign Influence Operations

Foreign influence operations include covert actions by foreign governments intended to sow division in our society, undermine confidence in our democratic institutions, and otherwise affect political sentiment and public discourse to achieve strategic geopolitical objectives. Foreign influence operations can pose a threat to national security—and they can violate federal criminal law.[3] Operations

DOJ-00330

aimed at the United States are not new. These efforts have taken many forms across the decades, from funding communist newspapers and financing ostensibly independent non-profit groups to promote favored policies, to more recent efforts at creating and operating false U.S. personas on Internet sites designed to attract U.S. audiences and spread divisive messages. The nature of the problem, however—and how the U.S. government must combat it—is changing, as advances in technology allow foreign actors to reach unprecedented numbers of Americans covertly and without setting foot on U.S. soil. Fabricated news stories and sensational headlines like those sometimes found on social media platforms are just the latest iteration of a practice foreign adversaries have long employed in an effort to discredit and undermine individuals and organizations in the United States. Although the tactics have evolved, the goals of these activities generally remain the same: to spread disinformation and to sow discord on a mass scale in order to weaken the U.S. democratic process, and ultimately to undermine the appeal of democracy itself.

Malign foreign influence operations need not favor one political figure, party, or point of view. Foreign adversaries can take advantage of social media platforms to send contrary (and sometimes false) messages simultaneously to different groups of users based on those users' political and demographic characteristics, with the goal of heightening tensions between different groups in our society. By exacerbating and inflaming existing divisions, foreign-promoted narratives seek to spread turmoil, mistrust, and acrimony. For example, Russian-affiliated social media activities have been detected promoting content on multiple sides of controversial issues including race relations and gun control.

As one component of this strategy, foreign influence operations have targeted U.S. elections. Elections are a particularly attractive target for foreign influence campaigns because they provide an opportunity to undermine confidence in a core element of our democracy: the process by which we select our leaders. As explained in a January 2017 Intelligence Community Assessment published by the Office of the Director of National Intelligence ("ODNI") addressing Russian interference in the 2016 U.S. presidential election, Russia has had a "longstanding desire to undermine the U.S.-led liberal democratic order," and that nation's recent election-focused "activities demonstrated a significant escalation in directness, level of activity, and scope of effort compared to previous operations."[4] Russia's foreign influence campaign, according to this assessment, "followed a longstanding Russian messaging strategy that blends covert intelligence operations—such as cyber activity—with overt efforts by Russian Government agencies, state-funded media, third-party intermediaries, and paid social media users or 'trolls.'" [5]

Malign foreign influence operations did not begin in 2016, but the Internet-facilitated operations in that year were unprecedented in scale. The threat such operations pose to our society is unlikely to diminish. As the Director of National Intelligence recently observed, "Influence operations, especially through cyber means, will remain a significant threat to U.S. interests as they are low-cost, relatively low-risk, and deniable ways to retaliate against adversaries, to shape foreign

perceptions, and to influence populations."[6] "Russia probably will be the most capable and aggressive source of this threat in 2018, although many countries and some nonstate actors are exploring ways to use influence operations, both domestically and abroad."[7] These actions require a strong and sustained response.

## Types of Foreign Influence Operations Targeting Democratic and Electoral Processes

In advance of the 2018 midterm elections, the Department is mindful of ODNI's assessment that "Moscow will apply lessons learned from its campaign aimed at the U.S. presidential election to future influence efforts in the United States and worldwide, including against U.S. allies and their election processes."[8] The Intelligence Community ("IC") has recently assessed that Russia views the 2018 midterm elections as a potential target for continued influence operations.[9] Rus-

sia's strategy for conducting foreign influence operations against the United States, which may well inspire other countries to pursue similar operations, includes a broad spectrum of activity targeting U.S. democratic and electoral processes. We categorize such activity as follows:

*1. Cyber operations targeting election infrastructure.* Cyber operations could seek to undermine the integrity or availability of election-related data. For example, adversaries could employ cyber-enabled or other means to target election-associated infrastructure, such as voter registration databases and voting machines, or to target the power grid or other critical infrastructure in order to impair an election. Operations aimed at removing otherwise eligible voters from the rolls or attempting to manipulate the results of an election (or even simply spreading disinformation suggesting that such manipulation has occurred) could undermine the integrity and legitimacy of our free and fair elections, as well as public confidence in elec-



### Identifying Potential Targets of Election Interference

Potential Targets Related to Voter Influence | Potential Targets Related to Campaigns | Potential Targets Related to Political Entities | Potential Targets Related to Elections Infrastructure

*Credit:* Cyber Threat Intelligence Integration Center

**Foreign adversaries could target these categories of potential targets—or others—to interfere in U.S. elections through cyber operations.**

## DEPARTMENT OF JUSTICE PROGRAM FOR COMBATING BALLOT FRAUD

"Every voter in a federal . . . election, . . . whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States,* 417 U.S. 211, 227 (1974). The Department has a longstanding program for predicating, investigating, and prosecuting ballot fraud schemes—which may overlap with a criminal or national security investigation into a foreign influence operation. The Department's ballot fraud program brings together several components, including the Federal Bureau of Investigation ("FBI"); the Criminal Division's Public Integrity Section ("PIN"); United States Attorney's Offices around the nation; the Civil Rights Division ("CRT"); and the Department of Homeland Security ("DHS"). (Each component's specific role in the program is described in the endnotes.[16])

In the weeks and months leading up to the 2018 midterm elections, these components will plan responses to election-related issues and identify lines of coordination and communication. On Election Day, they and a commissioner from the U.S. Election Assistance Commission will arrange regular secure video teleconferences with Department leadership and other agencies, including the National Security Council. Other PIN and CRT managers and personnel also will be available throughout the period to answer telephone calls about suspected ballot fraud activity and to respond to questions from federal prosecutors and law enforcement agents, who in turn will be in close communication with state and local partners.

tion results. To our knowledge, no foreign government has succeeded in perpetrating ballot fraud, but the risk is real.

*2. Cyber operations targeting political organizations, campaigns, and public officials.* Cyber operations could also seek to compromise the confidentiality or integrity of targeted groups' or targeted individuals' private information. For example, adversaries could conduct cyber or other operations against U.S. political organizations and campaigns to steal confidential information and use that information, or alterations thereof,

to discredit or embarrass candidates, undermine political organizations, or impugn the integrity of public officials. The IC has assessed that, during the 2016 election cycle, "Russia's intelligence services conducted cyber operations against targets associated with the 2016 U.S. presidential election, including targets associated with both major U.S. political parties."[10]

*3. Covert influence operations to assist or harm political organizations, campaigns, and public officials.* Adversaries could also conduct covert influence operations to pro-

COUNTERING MALIGN FOREIGN INFLUENCE OPERATIONS

vide assistance that is prohibited from foreign sources to American political organizations, campaigns, and government officials. These operations might involve covert offers of financial, logistical, or other campaign support to—or covert attempts to influence the policies, positions, or opinions of—unwitting politicians, party leaders, campaign officials, or the public. For example, a federal grand jury indictment in February 2018 of thirteen Russian nationals recounts, among other things, instances in which Russians allegedly provided covert assistance and financial support to unwitting U.S. persons, unwitting individuals associated with a presidential campaign, and other unwitting political activists seeking to coordinate political activities.[11] The indictment also alleges that the Russians sought to discourage some Americans from voting in the 2016 presidential election, and denigrated certain candidates while supporting others. Russian actors also allegedly staged political rallies inside the United States while posing as U.S. grassroots entities and organized rallies inside the United States *after* the presidential election, both in protest of the election results and in support of the results.[12] Such covert influence operations could be reinforced by the use of "bots," which are automated programs that can expand and amplify social media messaging and bolster desired narratives. These operations can also be amplified by stolen information illicitly acquired through illegal cyber operations targeting government institutions, media, and political organizations or campaigns. Foreign agents could then use this stolen information to reinforce divisive narratives through systematic, controlled leaks timed to maximize political damage.

***4. Covert influence operations, including disinformation operations, to influence public opinion and sow division.*** Using false U.S. personas, adversaries could covertly create and operate social media pages and other forums designed to attract U.S. audiences and spread disinformation or divisive messages. This could happen in isolation or in combination with other operations, and could be intended to foster specific narratives that advance foreign political objectives, or could be intended simply to turn citizens against each other. These messages need not relate directly to political campaigns. They could seek to depress voter turnout among particular groups, encourage third-party voting, or convince the public of widespread voter fraud to undermine confidence in election results. These messages could target discrete U.S. populations based on their political and demographic characteristics. They may mobilize Americans to sign online petitions and join issue-related rallies and protests, or even to incite violence. For example, advertisements from at least 2015 to 2017 linked to a Russian organization called the Internet Research Agency focused on divisive issues, including illegal immigration and gun rights, among others, and targeted those messages to groups most likely to react.

***5. Overt influence efforts, such as the use of lobbyists, foreign media outlets, and other organizations, to influence policymakers and the public.*** Finally, adversaries could use state-owned or state-influenced media outlets, or employ lobbyists or lobbying firms, to reach U.S. policymakers or the public. Foreign governments can disguise these efforts as independent while using them to promote

DOJ-00334

divisive narratives and political positions helpful to foreign objectives. Overt influence efforts by foreign governments—including by our adversaries—may not be illegal, provided they comply with the Foreign Agents Registration Act ("FARA"),[13] and with Federal Communications Commission regulations. However, the American people should be fully aware of any foreign government source of information so they can evaluate that source's credibility and significance for themselves.

## The Department of Justice's Role in Countering Malign Foreign Influence Operations

The Department of Justice has a significant role in investigating and disrupting foreign government activity in the United States that threatens U.S. national security. In particular, the Department has an important role in identifying and combating malign foreign influence operations, and in enforcing federal laws that foreign agents may violate when engaging in such operations.

Consistent with its longstanding mission, the Department has broad authorities in this area that encompass both its law enforcement and counterintelligence responsibilities:

• The FBI is the primary investigative agency of the federal government and is authorized to investigate all violations of federal laws that are not exclusively assigned to another federal agency. *See* 28 U.S.C. § 533. In addition, 28 C.F.R. § 0.85(d) designates the FBI to take charge of investigative work in matters relating to espionage, sabotage, subversive activities, and related matters.

• Various federal statutes authorize the FBI to conduct investigations of federal crimes, make seizures and arrests, and serve warrants, both under national security authorities (title 50 of the U.S. Code) and law enforcement authorities (title 18 of the U.S. Code). For example, the FBI has primary investigative authority for all computer network intrusions relating to threats to national security, including "cases involving espionage, foreign counterintelligence, [and] information protected against unauthorized disclosure for reasons of national defense or foreign relations . . ." 18 U.S.C. § 1030(d)(2).

• Executive Order ("E.O.") 12333, as amended, establishes the FBI as the lead counterintelligence agency within the United States, and authorizes the FBI to conduct counterintelligence activities, collect foreign intelligence, or support foreign intelligence collection requirements of other agencies within the IC, and produce and disseminate foreign intelligence and counterintelligence. *See* E.O. 12333, § 1.7(g).

• These lead responsibilities are also reflected in presidential policies, such as Presidential Policy Directive ("PPD")-41 and PPD-21.

Working closely with our IC partners, the Department uses these authorities to identify, analyze, and disrupt the most significant threats from foreign influence operations. As explained below, the Department can act against these threats in several ways, either using its own authorities or supporting the

DOJ-00335

COUNTERING MALIGN FOREIGN INFLUENCE OPERATIONS

actions of other agencies. The Department also uses its investigative authority to develop information that can inform private sector efforts to guard against or deter foreign influence operations.

First, the Department's investigations may reveal conduct that warrants criminal charges. Criminal charges not only are a tool the Department uses to pursue justice, but also can help deter similar conduct in the future. We will work with our international partners to obtain custody of foreign defendants whenever possible. Those who seek to avoid justice in U.S. courts will find their freedom of travel significantly restricted. Criminal charges also provide the public with information about the illegal activities of foreign actors we seek to hold accountable.

Second, in some cases, the Department's investigations can support other U.S. government agencies' actions, such as financial sanctions or diplomatic and intelligence efforts. After a federal grand jury indicted thirteen Russians in connection with their alleged influence activities, for example, the Secretary of the Treasury imposed financial sanctions against those individuals under an executive order that authorizes sanctions for malicious cyber-enabled activity. The Department of the Treasury's actions blocked all property and interests in property of the designated persons subject to U.S. jurisdiction, and prohibited U.S. persons from engaging in transactions with the sanctioned individuals. In addition, the State Department often uses information from our investigations and criminal indictments in diplomatic efforts to attribute malign conduct to foreign adversaries, to build consensus with other nations to condemn such activities, and to build coalitions to counter such activities. Likewise, we work closely with DHS to share information about foreign influence operations in furtherance of DHS's election security mission.

Third, the Department's investigations produce information about threats and vulnerabilities that we can share with State and local election officials, political organizations, and other potential victims. Because these entities lack the FBI's investigative resources and legal authorities, sharing investigative information about the nature of the threat posed by foreign influence operations can help these entities detect and prevent operations that target them.

Fourth, the Department maintains strategic relationships with social media providers that reflect the private sector's critical role in addressing this threat. Social media providers have unique insight into their own networks and bear the primary responsibility for securing their own products, platforms, and services. The FBI can assist the providers' voluntary efforts to identify foreign influence activity and to enforce terms of service that prohibit the use of their platforms for such activities. This approach is similar to the Department's recent approaches in working with providers to address terrorist use of social media, and more traditional collaboration to combat child pornography, botnets, Internet fraud, and other misuse of digital infrastructure. By providing information about potential threats, the Department can help social media providers respond to malign use of their platforms, identify foreign influence

DOJ-00336

operations on those platforms, share information across diverse products and services, and better ensure their users are not exposed to unlawful foreign influence.

Finally, information developed in our investigations can be used—either by the Department or in coordination with the Intelligence Community and other government partners—to help protect the public by exposing the nature of the foreign influence threat. The Department may alert victims or targets about foreign influence operations consistent with its longstanding policies and practices. As discussed below, in certain circumstances, public disclosure and attribution can also be an important means of countering the threat and rendering those operations less effective.

## The Department of Justice's Framework to Counter Malign Foreign Influence Operations

The Department is preparing ahead of the 2018 midterm elections to ensure that we address as effectively as possible the five distinct types of foreign influence operations described above. To underscore this priority, the FBI in November 2017 established the Foreign Influence Task Force ("FITF"), which serves as the central coordinating authority within the FBI for investigations concerning foreign influence operations. The FITF integrates the FBI's cyber, counterintelligence, counterterrorism, and criminal law enforcement resources to ensure that the Department better understands the threat presented by malign foreign influence operations. An important part of the FITF's responsibility is coordinating the Department's counter-foreign influence efforts with other federal agencies, including DHS, the State Department, the National Security Agency, and the Central Intelligence Agency. The FBI is also responsible for developing strategic relationships with state and local authorities, international partners, and the private sector, including social media and other technology companies, as part of a comprehensive approach to combating the foreign influence problem.

Armed with a deeper understanding of our foreign adversaries' operational methods and committed to leveraging the full range of our authorities, the Department has developed a strategic framework for countering foreign influence operations. *See* **Fig. 1**. This framework seeks to employ the Department's longstanding authorities proactively to pursue aggressive countermeasures—using traditional law enforcement tools, sharing information with potential victims and the private sector where appropriate, and exposing and attributing foreign influence operations where doing so is in the national interest. The Department's strategy aims to increase the resilience of democratic and election processes against the foreign influence threat, while recognizing that we cannot expect to eliminate those activities unless the responsible foreign governments alter their behavior.

*1. Cyber operations targeting election infrastructure.* Although the States are responsible for administering elections, and DHS has the federal government lead for assisting election officials in securing their systems, the FBI has the primary responsibility for investigating our foreign adversaries'

**Figure 1:**



**Department of Justice Framework to Counter Malign Foreign Influence Operations**

| Cyber operations targeting election infrastructure (integrity and availability of data) | Cyber operations targeting political parties, campaigns, and public officials (confidentiality of data) | Covert influence operations to assist or harm political organizations, campaigns and public officials | Covert influence operations to influence public opinion and sow division | Overt influence efforts to influence policymakers and the public |
|---|---|---|---|---|
| **DOJ and FBI Actions**<br>• Identify threats and warn potential targets (state officials), with DHS.<br>• Investigate and disrupt intrusions and attacks, alerting victims consistent with applicable guidance.<br>• Prosecute where possible.<br>• Respond to reports of election day crimes (e.g. voter suppression, computer intrusions). | **DOJ and FBI Actions**<br>• Identify threats and warn potential targets, with DHS.<br>• Investigate and disrupt intrusions and attacks, alerting victims consistent with applicable guidance.<br>• Prosecute where possible.<br>• Raise awareness about malicious cyber operations, mitigation, and maintaining "cyber hygiene." | **DOJ and FBI Actions**<br>• Investigate and disrupt activity by unregistered foreign agents.<br>• Brief potential targets, consistent with applicable guidance.<br>• Prosecute where possible.<br>• Raise awareness about malicious cyber operations, mitigation, and maintaining "cyber hygiene." | **DOJ and FBI Actions**<br>• Investigate and, as appropriate, disrupt foreign influence operations.<br>• Attribute and expose activity, consistent with applicable guidance.<br>• Prosecute where possible.<br>• Notify social media, other providers of foreign influence operations and other abuse of their platforms. | **DOJ and FBI Actions**<br>• Investigate possible FARA violations.<br>• Prosecute where possible.<br>• Compel registration as appropriate. |
| **Other Agencies and Their Activities**<br>• IC produces intelligence on malicious cyber operations.<br>• DHS shares intelligence (warnings) and best practices with victims and assists with recovery efforts *after* an intrusion (if requested).<br>• Possible diplomatic, financial, or operational responses. | **Other Agencies and Their Activities**<br>• IC produces intelligence on malicious cyber operations.<br>• DHS shares intelligence (warnings) and best practices with victims and assists with recovery efforts *after* an intrusion (if requested).<br>• Possible diplomatic, financial, or operational responses. | **Other Agencies and Their Activities**<br>• IC produces intelligence on foreign influence efforts, goals.<br>• DHS and State Dept. conduct outreach on trends in influence operations to domestic and foreign audiences.<br>• Possible diplomatic, financial, or operational responses. | **Other Agencies and Their Activities**<br>• DHS and State Dept. conduct outreach on trends in influence operations to domestic and foreign audiences.<br>• DHS provides tools to private industry to protect against malign influence.<br>• Possible diplomatic, financial, or operational responses. | **Other Agencies and Their Activities**<br>• DHS and State Dept. conduct outreach on trends in influence operations to domestic and foreign audiences.<br>• State Dept. responds to violations of norms by foreign actors. |
| **Key Considerations**<br>• States own the election systems and are responsible for their administration and security. | **Key Considerations**<br>• Private parties own systems and data and are responsible for their security.<br>• Limited ability to protect against misuse of stolen information. | **Key Considerations**<br>• May require cooperation of affected individuals and organizations to counter the threat.<br>• Many engagements with foreign governments are legitimate. | **Key Considerations**<br>• Technology companies bear primary responsibility for securing their own products, platforms, and services. | **Key Considerations**<br>• Open communications by registered foreign media may be lawful. |



efforts to target election infrastructure. In the event of a known or suspected cyber incident, the FBI will investigate the intrusion and will alert targets of the intrusions where appropriate. Prosecutors will follow the *Principles of Federal Prosecution*[14] in determining whether federal criminal charges are appropriate. The FBI also may identify threats and vulnerabilities to election infrastructure in the course of other criminal or intelligence investigations. Consistent with the Department's disclosure policy (described below), it will attempt to warn State and local officials who operate election systems about attempts to penetrate their systems and to share appropriate information about vulnerabilities they should patch or mitigate. In this regard, the FBI works closely with DHS and with the U.S. Election Assistance Commission, which certifies voting systems and establishes voting system guidelines.

To that end, in February 2018, the FBI, together with DHS and the IC, provided classified briefings to election officials from all 50 States to help increase awareness of foreign adversary intent and capabilities against the States' election infrastructure, as well as actions State and local officials can undertake to mitigate those threats. Establishing close relationships with those officials, in partnership with DHS, is critical because the Department's ability to identify and disrupt cyber actors who target election infrastructure requires the officials who operate that infrastructure to promptly share threat information with the FBI. The Department has emphasized the need for State and local officials promptly to share threat information with the FBI's National Cyber Investigative Joint Task Force ("NCIJTF"). NCIJTF includes over 20 partnering agencies from across law enforcement, the IC, and the Department of Defense, with representatives who are co-located and work jointly to accomplish the organization's mission from a whole-of-government perspective.

Establishing close relationships with State and local officials is also important to enable the Department to respond quickly to a major cyber intrusion before or during an election. The Department works closely with DHS in connection with such incidents. The Department will continue to work with DHS and State and local officials to plan what they should do, whom they should contact, and what assistance they may seek in the event of a significant intrusion into their systems. The FBI's general incident response activities are described in greater detail in Chapter 4.

**2. Cyber operations targeting political organizations, campaigns, and public officials.** The FBI investigates computer intrusions and attacks against U.S. victims, using its broad investigative authority and leveraging its close relationship with other IC agencies that have the authority to collect foreign intelligence outside the United States. Federal prosecutors may then charge the perpetrators, as appropriate. The FBI also alerts victims where possible and helps them respond to intrusions, often working closely with DHS, and provides threat information when necessary to address a specific threat or incident.

The FBI is working with DHS to ensure that political organizations and individuals within such organizations whom foreign adversaries may target are aware of the specific cyber

COUNTERING MALIGN FOREIGN INFLUENCE OPERATIONS

---

## DEPARTMENT OF JUSTICE POLICY REGARDING NON-INTERFERENCE WITH ELECTIONS

The Department of Justice has a strong interest in the prosecution of election-related crimes, such as those involving federal and State campaign finance laws, federal patronage laws, and corruption of the election process, and Department employees must safeguard the Department's reputation for fairness, neutrality, and non-partisanship.

Partisan political considerations must play no role in the decisions of federal investigators or prosecutors regarding any investigations or criminal charges. Law enforcement officers and prosecutors may never select the timing of investigative steps or criminal charges for the purpose of giving an advantage or disadvantage to any candidate or political party.

For further guidance, prosecutors and law enforcement officers may contact the Criminal Division's Public Integrity Section. More detailed guidance is also available in sections 1-4.000 and 9-85.000 of the United States Attorneys' Manual, and in a treatise published by the Department called FEDERAL PROSECUTION OF ELECTION OFFENSES (8th ed. 2017).[17]

---

threats and vulnerabilities we are monitoring. These efforts have included providing defensive briefings to major political organizations such as the Republican and Democratic National Committees.

**3. Covert influence operations to assist or harm political organizations, campaigns, and government officials.** The FBI counters the activities of foreign governments and their proxies by proactively investigating unregistered foreign agents in the United States, alerting these foreign agents' targets (or intended targets) where appropriate, and raising public awareness of foreign influence methods and effective countermeasures both through appropriate enforcement actions and through assistance to other federal agencies and State or local authorities with enforcement authority.

The Department will aggressively enforce federal laws that require foreign agents to register with the U.S. government and that prohibit foreign nationals from tricking unwitting Americans into participating in, or accepting support from, foreign influence efforts. Along those lines, the Department has stepped up enforcement efforts against individuals and entities that had not fulfilled their obligations under the Foreign Agents Registration Act ("FARA"), including by educating prosecutors and agents nationwide about the importance of the statute and how to investigate it; expanding our outreach to individuals and entities who may be required to register; and achieving the registrations of sophisticated individuals and entities that had not fulfilled their legal obligations, including the American agents of Russian state-funded media networks (RT and Sputnik). Going forward, we will increase FARA awareness and compliance through increased outreach,

11

by making additional advisory opinions public, and by issuing guidance if appropriate under Department policy. In addition, we will investigate and prosecute criminal violations of FARA and other laws that restrict the activities of foreign agents acting within the United States.

The Department also will seek to increase understanding of the foreign intelligence threat in order to reduce the effectiveness of covert activities and efforts to obscure the true motivation and origin of foreign influence operations. The FBI can provide defensive counterintelligence briefings to political organizations and campaigns as necessary to protect against and improve awareness of the foreign influence threat. In addition, the FBI continues to pursue criminal and traditional counterintelligence investigations to address the range of potential covert operations targeting political organizations.

*4. Covert influence operations, including disinformation operations, to influence public opinion and sow division.* Depending on the facts, a foreign government's efforts to use the Internet as part of a hostile effort to multiply its propaganda's malign influence on the American public may violate a number of federal laws on which the Department may base criminal investigations and prosecutions. The Department is also considering whether new criminal statutes aimed more directly at this type of activity are needed.

The Department has crafted a strategy to counter each phase of the foreign malign influence campaign cycle. *See* **Fig. 2**. While the

success of a foreign influence campaign via the Internet and social media depends heavily on the adversary's ability to obscure the true motivation and origin of its activities—something the Internet can facilitate—the infrastructure of online accounts required to carry out such a campaign also provides the Department with opportunities for identification and disruption. For example, the FBI and IC partners may be able to identify and track foreign agents as they establish their infrastructure and mature their online presence, in which case authorities can work with social media companies to illuminate and ultimately disrupt those agents' activities, including through voluntary removal of accounts that violate a company's terms of service.

In addition to these activities, in some circumstances, public exposure and attribution of foreign influence operations, and of foreign governments' goals and methods in conducting them, can be an important means of countering the threat and rendering those operations less effective. Of course, partisan politics must play no role in the decision whether to disclose the existence of a foreign influence operation, and such disclosures must not be made for the purpose of conferring any advantage or disadvantage on any political or social group. In addition, the Department must seek to protect intelligence sources and methods and operational equities, and attribution itself may present challenges. It is also important not to take actions that merely exacerbate the impact of a foreign influence operation, or that re-victimize its victims. Given the competing in-

**Figure 2: The Malign Foreign Influence Campaign Cycle**



| | Research (Target Environment) | Position (Infrastructure + Networks) | Produce (Content) | Publish (Content Dissemination) | Amplify (Media Saturation) | Calibrate (Assessment + Retooling) |
|---|---|---|---|---|---|---|
| **Objectives** | Identify existing fissures Develop message themes | Establish infrastructure Mature online presence Develop, refine, grow networks | Obtain or create content (true, fake, or forged) | Inject content into media Obscure origin | Saturate environment Confuse public | Assess outcome Retool if needed |
| **Activities** | Collection Analysis Targeting | Infrastructure procurement Network development and growth Bona fides establishment | Hacking Composition | Publication via proxy/persona Dissemination via networks | Trolls, bots Overt messaging | Analysis Re-tasking |
| **Actors** | Gov't research institutes Intelligence services | Intelligence services Contractors, agents, assets | Intelligence services Contractors, agents, assets State media | Intelligence services Contractors, agents, assets State media | Contractors, agents, assets State media Unwitting audiences | Leadership/decision-makers Intelligence services |
| **Goals** | Short-term: Recognize Long-term: Address grievances | Identify and track Disrupt | Harden infrastructure Warn victims/targets | Provide context Enable scrutiny | Provide context Enable scrutiny | Raise costs Change calculus Increase deterrence |
| **Disruptive Options** | Identify, Prioritize, Publicize (gov't, academia, think tanks) | Identify and monitor (gov't, social media/tech) Coordinated action (gov't, social media/tech) Exposure (gov't, tech, researchers) | Cyber awareness/hygiene (everyone) Proactive notification (gov't, social media/tech) Confidence-building (gov't, election officials) | Media literacy education (academia, press, NGOs) Exposure of attribution (gov't, press, researchers) Preemption (gov't, press, researchers) | Media literacy education (academia, press, NGOs) Exposure of sponsorship (gov't, press, researchers) Selective fact-checking (press, researchers) | Direct messaging (gov't) Public awareness (public) |

ADVERSARY

DEFENDER

13

terests sometimes at stake, the Department has established a formal policy on the disclosure of foreign influence operations to guide its actions in this critically important area. That policy is found at pages 16–17.

**5. Overt influence efforts, such as the use of foreign media outlets to influence policymakers and the public.** Overt foreign government efforts to influence the American public or policymakers may be lawful so long as the relevant government complies with U.S. laws requiring public disclosure, along with other applicable laws. When foreign media outlets or lobbyists act as agents of foreign governments, they may be required to register as foreign agents under FARA. Media outlets with links to China, Japan, Russia, and South Korea have done so. Apart from enforcing such laws, the Department—in concert with the U.S. government as a whole, as well as with American society more broadly—can help increase public understanding of foreign influence operations.

## Conclusion

The nature of foreign influence operations will continue to change as technology and our foreign adversaries' tactics change. Our adversaries will persist in seeking to exploit the diversity of today's information space, and the tactics and technology they employ will continue to evolve.

The Department plays an important role in combating foreign efforts to interfere in our elections, but it cannot alone solve the problem. There are limits to the Department's role—and the role of the U.S. government—

in addressing foreign influence operations aimed at sowing discord and undermining our Nation's institutions. Combating foreign influence operations requires a whole-of-society approach that relies on coordinated actions by federal, State, and local government agencies; support from potential victims and the private sector; and the active engagement of an informed public.

Even so, investigating and prosecuting those who violate our laws, disrupting particular operations, and exposing covert foreign activities can be useful in defending against this threat. It is therefore critical that the Department consistently evaluate existing law and policy governing its actions, as well as its strategic approach to the problem. In the short term, the Department must use all current authorities to counter the foreign influence threat, working closely with the IC, DHS, State and local governments, and where appropriate, the private sector.

We also must ensure that we are sharing information about the threat with potential victims, other affected individuals, and the public, consistent with our policies and our national security interests. In the longer term, we must consider what additional authorities or policies would be useful and appropriate to enable us to respond as effectively as possible to the foreign influence threat.

\*    \*    \*

The story is told that a woman named Elizabeth Powel approached Benjamin Franklin when he was walking home after the Constitutional Convention in the summer of 1787. Powel asked Franklin what type of govern-

COUNTERING MALIGN FOREIGN INFLUENCE OPERATIONS

ment the Founders had created. Franklin replied: "A republic, madam, if you can keep it." Powel's question illustrates that it was not inevitable that our Nation would begin as a democratic republic. Franklin's answer reminds us that it is not inevitable that we will remain a democratic republic.[15]

Our Nation's democratic processes are strong. But the Constitution comes with a condition: we need to keep it. We are all keepers of the republic, and it is incumbent upon all of us, as a society, to counter the foreign influence threat. The Department of Justice will certainly play its part.

15

## DEPARTMENT OF JUSTICE POLICY ON DISCLOSURE OF FOREIGN INFLUENCE OPERATIONS

Foreign influence operations include covert actions by foreign governments intended to sow divisions in our society, undermine confidence in our democratic institutions, and otherwise affect political sentiment and public discourse to achieve strategic geopolitical objectives. Such operations are often empowered by modern technology that facilitates malicious cyber activity and covert or anonymous communications with U.S. audiences on a mass scale from abroad.

Our Nation's democratic processes and institutions are strong and must remain resilient in the face of this threat.  It is the policy of the Department of Justice to investigate, disrupt, and prosecute the perpetrators of illegal foreign influence activities where feasible.  It is also the Department's policy to alert the victims and unwitting targets of foreign influence activities, when appropriate and consistent with the Department's policies and practices, and with our national security interests.

It may not be possible or prudent to disclose foreign influence operations in certain contexts because of investigative or operational considerations, or other constraints. In some circumstances, however, public exposure and attribution of foreign influence operations can be an important means of countering the threat and rendering those operations less effective.

Information the Department of Justice collects concerning foreign influence operations may be disclosed as follows:

- To support arrests and charges for federal crimes arising out of foreign influence operations, such as hacking or malicious cyber activity, identity theft, and fraud.

- To alert victims of federal crimes arising out of foreign influence operations, consistent with Department guidelines on victim notification and assistance.[18]

- To alert unwitting recipients of foreign government-sponsored covert support, as necessary to assist in countering the threat.

- To alert technology companies or other private sector entities to foreign influence operations where their services are used to disseminate covert foreign government propaganda or disinformation, or to provide other covert support to political organizations or groups.

DOJ-00345

COUNTERING MALIGN FOREIGN INFLUENCE OPERATIONS

### DEPARTMENT OF JUSTICE POLICY ON DISCLOSURE OF FOREIGN INFLUENCE OPERATIONS, *Continued*

- To alert relevant Congressional committees to significant intelligence activities, consistent with statutory reporting requirements and Executive Branch policies.

- To alert the public or other affected individuals, where the federal or national interests in doing so outweigh any countervailing considerations.[19]

In performing these functions, the Department will be mindful of the following principles and policies:

- Partisan political considerations must play no role in efforts to alert victims, other affected individuals, or the American public to foreign influence operations against the United States.  Such efforts must not be for the purpose of conferring any advantage or disadvantage on any political or social group or any individual or organization.

- In considering whether and how to disclose foreign influence operations, or the details thereof, the Department will seek to protect intelligence sources and methods, investigations, and other U.S. government operations.

- Foreign influence operations will be publicly identified as such only when the Department can attribute those activities to a foreign government with high confidence.  Disinformation or other support or influence by unknown or domestic sources not acting on behalf of a foreign government is beyond the scope of this policy.

- Where a criminal or national security investigation during an election cycle is at issue, the Department must also be careful to adhere to longstanding policies regarding the timing of charges or taking overt investigative steps.[20]

The Department (including the FBI) will not necessarily be the appropriate entity to disclose information publicly concerning a foreign influence operation.  Where a Department component is considering whether to alert the general public to a specific foreign influence operation, consultation with the National Security Division is required.  Nothing in this policy is intended to impair information sharing undertaken by Department components for investigative or intelligence purposes.

DOJ-00346

## NOTES

[1] *See* U.S. Const. art. I, § 4 (Congressional elections) & art. II, § 4 (Presidential elections).

[2] The term "ballot fraud" in this context includes fraud in the processes by which voters are registered or by which votes are cast or tabulated.

[3] Foreign influence operations, while not always illegal, can implicate several U.S. federal criminal statutes, including (but not limited to): 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 951 (acting in the United States as an agent of a foreign government without prior notification to the Attorney General); 18 U.S.C. § 1001 (false statements); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. §§ 1030 (computer fraud and abuse); 18 U.S.C. §§ 1343, 1344 (wire fraud and bank fraud); 18 U.S.C. § 1519 (destruction of evidence); 18 U.S.C. § 1546 (visa fraud); 22 U.S.C. § 618 (Foreign Agents Registration Act); 52 U.S.C. §§ 30109, 30121 (soliciting or making foreign contributions to influence federal elections, or donations to influence State or local elections).

[4] OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, BACKGROUND TO "ASSESSING RUSSIAN ACTIVITIES AND INTENTIONS IN RECENT U.S. ELECTIONS": THE ANALYTIC PROCESS AND CYBER INCIDENT ATTRIBUTION ii (Jan. 2017) ("ODNI Report"), available at: https://www.dni.gov/files/documents/ICA_2017_01.pdf (last accessed June 29, 2018).

[5] ODNI Report at 2; *see also* U.S. HOUSE OF REPRESENTATIVES PERMANENT SELECT COMMITTEE ON INTELLIGENCE, REPORT ON RUSSIAN ACTIVE MEASURES viii (March 2018) ("In 2015, Russia began engaging in a covert influence campaign aimed at the U.S. presidential election. The Russian government, at the direction of Vladimir Putin, sought to sow discord in American society and undermine our faith in the democratic process."), available at: https://intelligence.house.gov/uploadedfiles/final_russia_investigation_report.pdf (last accessed June 29, 2018); MINORITY MEMBERS OF THE HOUSE PERMANENT SELECT COMMITTEE ON INTELLIGENCE, REPORT ON RUSSIAN ACTIVE MEASURES 12 (March 2018), available at: https://democrats-intelligence.house.gov/uploadedfiles/20180411_-_final_-_hpsci_minority_views_on_majority_report.pdf (last accessed June 29, 2018) (summarizing Russian covert cyber efforts and other intelligence and social media operations during the 2016 elections); U.S. SENATE SELECT COMMITTEE ON INTELLIGENCE, RUSSIAN TARGETING OF ELECTION INFRASTRUCTURE DURING THE 2016 ELECTION: SUMMARY OF INITIAL FINDINGS AND RECOMMENDATIONS 1 (May 2018) ("In 2016, cyber actors affiliated with the Russian Government conducted an unprecedented, coordinated cyber campaign against state election infrastructure . . . This activity was part of a larger campaign to prepare to undermine confidence in the voting process. The Committee has not seen any evidence that vote tallies were manipulated or that voter registration information was deleted or modified."), available at: https://www.burr.senate.gov/imo/media/doc/RussRptInstlmt1-%20ElecSec%20Findings,Recs2.pdf (last accessed June 29, 2018).

[6] Daniel R. Coats, Dir. of National Intelligence, "Statement for the Record: Worldwide Threat Assessment of the U.S. Intelligence Community," at 11 (Feb. 13, 2018), available at: https://www.dni.gov/files/documents/Newsroom/Testimonies/2018-ATA---Unclassified-SSCI.pdf (last accessed June 29, 2018).

[7] *Id.*

[8] ODNI Report at 5.

[9] Daniel R. Coats, Dir. of National Intelligence,

DOJ-00347

"Annual Threat Assessment: Opening Statement," *Worldwide Threats: Hearing Before the Senate Select Comm. on Intelligence*, 115TH CONG. (Feb. 13, 2018), at 18, available at: https://www.dni.gov/files/documents/Newsroom/Testimonies/ATA2018-asprepared.pdf (last accessed June 29, 2018).

[10]   ODNI Report at 2.

[11]   Indictment in *United States v. Internet Research Agency*, et al., No. 18-cr-32-DLF (D.D.C. Feb. 16, 2018), available at: https://www.justice.gov/file/1035477/download (last accessed June 29, 2018).

[12]   *Id.*

[13]   22 U.S.C. § 611 *et seq.*

[14]   *See* "Principles of Federal Prosecution," U.S. ATTORNEYS' MANUAL, TITLE 9, SECTION 27.000, available at: https://www.justice.gov/usam/usam-9-27000-principles-federal-prosecution (last accessed June 29, 2018).

[15]   This story and its associated lessons are recounted in Rod J. Rosenstein, Deputy Attorney General, "Constitution Day Address," National Constitution Center (Sept. 18, 2017), available at: https://www.justice.gov/opa/speech/deputy-attorney-general-rod-j-rosenstein-delivers-constitution-day-address (last accessed June 29, 2018).

[16]   As part of the Department's ballot fraud program, the **FBI** must maintain an Election Crimes Coordinator ("ECC") in each of its Divisions. The ECCs are the Department's primary liaison with State and local police agencies, and election administrators, as well as with other federal agencies, in the field. They attend regular trainings, coordinate local task force communications with State and local counterparts during elections, and handle intake reporting of ballot fraud alle-

gations from non-government groups or individuals. The FBI then investigates properly-predicated ballot fraud cases, in coordination with a local **U.S. Attorney's Office ("USAO")**. The FBI and USAO are free to exercise their discretion to conduct a preliminary investigation after assessing the case and ensuring non-interference with the election process. They may pursue a full field and grand jury investigation, and seek charges, after consultation with the Criminal Division's **Public Integrity Section ("PIN")**. However, the FBI and other federal law enforcement agencies may not conduct investigations that would infringe the Department's non-interference with elections policy (*see* page 11), or that would unlawfully result in an armed federal presence at a polling site. *See* 18 U.S.C. § 592. For almost forty years, PIN has provided the field with an Election Crimes Branch Director. Pursuant to the United States Attorneys' Manual, the Director, assisted as needed by other managers and staff at PIN, functions as a mandatory consultant for the USAOs on all ballot fraud matters that progress beyond a preliminary investigation, see U.S.A.M. § 9-85.210, and as a subject matter expert available to provide advice and assistance to USAOs and the FBI. The Director coordinates and conducts mandatory live training with designated field personnel of the USAOs and FBI. The Director also leads an Election Day Watch program during federal election seasons to monitor and coordinate responses to election events while the polls are open on each federal election day. The Election Day Watch program is the Department's mechanism for ensuring consistent and efficient communication and coordination between interagency representatives, federal prosecutors and investigators in the field, and State and local partners. Each USAO must maintain a District Election Officer ("DEO") among its cadre of Assistant United States Attorneys. The DEOs are the Department's primary liaison with State and local counterparts in the field. They attend regular trainings, and as part of the Election Day

DOJ-00348

Watch program, coordinate local task force communications with State and local counterparts leading up to and during the elections. DEOs also coordinate press releases concerning election-day procedures to facilitate reporting to the federal government of ballot fraud allegations from non-government groups or individuals. The Voting Section and Criminal Section of the Department's **Civil Rights Division ("CRT")** coordinates regularly with PIN to ensure that ballot fraud allegations are routed to the best response entity. CRT maintains a hotline that operates all year, including throughout federal election days, to facilitate reporting of allegations of potential voting-related federal law violations. CRT's Voting Section also enforces the civil provisions of a wide range of federal statutes that protect the right to vote, including the Voting Rights Act; the National Voter Registration Act; the Uniformed and Overseas Citizens Absentee Voting Act; the Help America Vote Act; and the Civil Rights Act. CRT's Criminal Section enforces federal criminal statutes that prohibit voter intimidation and voter suppression based on race, color, national origin, or religion. Finally, the **Department of Homeland Security ("DHS")** recently has joined existing efforts to combat ballot fraud in the specific area of cyber threats. In particular, DHS provides advice and resources to State and local counterparts to assess the risks to their computer systems for voter registration, balloting, and tabulation. DHS also has certain resources for incident response, though the FBI has greater local resources and, under PPD-41, retains the lead on incident response.

17 This treatise is available online at: https://www.justice.gov/criminal/file/1029066/download (last accessed June 29, 2018). The most relevant discussion can be found at pages 84-85: "The Justice Department's goals in the area of election crime are to prosecute those who violate federal criminal law and, through such prosecutions, deter corruption of future elections. The Department

does not have a role in determining which candidate won a particular election, or whether another election should be held because of the impact of the alleged fraud on the election . . . . In investigating an election fraud matter, federal law enforcement personnel should carefully evaluate whether an investigative step under consideration has the potential to affect the election itself. Starting a public criminal investigation of alleged election fraud before the election to which the allegations pertain has been concluded runs the obvious risk of chilling legitimate voting and campaign activities. It also runs the significant risk of interjecting the investigation itself as an issue, both in the campaign and in the adjudication of any ensuing election contest . . . . Accordingly, overt criminal investigative measures ordinarily should not be taken in matters involving alleged fraud in the manner in which votes were cast or counted until the election in question has been concluded, its results certified, and all recounts and election contests concluded. Not only does such investigative restraint avoid interjecting the federal government into election campaigns, the voting process, and the adjudication of ensuing recounts and election contest litigation, but it also ensures that evidence developed during any election litigation is available to investigators, thereby minimizing the need to duplicate investigative efforts. Many election fraud issues are developed to the standards of factual predication for a federal criminal investigation during post-election litigation."

18 *See Attorney General Guidelines for Victim and Witness Assistance* (May 2012), available at: https://www.justice.gov/sites/default/files/olp/docs/ag_guidelines2012.pdf (last accessed June 29, 2018); *see also* 42 U.S.C. § 10607 (Victims' Rights and Restitution Act).

19 For example, there may be an important federal or national interest in publicly disclosing a foreign influence operation that threatens to un-

DOJ-00349

COUNTERING MALIGN FOREIGN INFLUENCE OPERATIONS

dermine confidence in the government or public institutions; risks inciting violence or other illegal actions; or may cause substantial harm, alarm, or confusion if left unaddressed. On the other hand, in some cases, public disclosure of a foreign influence operation may be counterproductive because it may amplify or otherwise ex-acerbate the foreign government's messaging, or may re-victimize the victim.

[20] *See,* e.g., U.S. DEPT. OF JUSTICE, FEDERAL PROSECUTION OF ELECTION OFFENSES 8-9, 84-85 (8th ed. 2017), quoted in *supra* note 17.

DOJ-00350