**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CHRISTIAN W. SANDVIG *et al.*,

        Plaintiffs,

v.

WILLIAM P. BARR, in his official capacity as
Attorney General of the United States,

        Defendant.

Case No. 1:16-cv-1368 (JDB)

**<u>PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 1

    I.   Plaintiffs have standing to challenge the constitutionality of the Access Provision........... 1

        a. Plaintiffs have demonstrated their intent to engage in constitutionally-protected
          speech that violates the Access Provision. ......................................................................... 1

        b. Plaintiffs face a credible threat of prosecution under the Access Provision. ..................... 5

    II.  Plaintiffs' claims are ripe for adjudication. ........................................................................ 10

    III.  As applied to Plaintiffs, the Access Provision is unconstitutional. .................................... 12

        a. The activity Plaintiffs seek to engage in is speech within the meaning of the First
          Amendment. ....................................................................................................................... 14

        b. The First Amendment applies where the government could prosecute Plaintiffs for
          engaging in speech restricted by private companies. ........................................................ 15

        c. The Access Provision is not immune from First Amendment scrutiny as a protection
          of private property rights. ................................................................................................... 18

        d. As applied to Plaintiffs, the Access Provision cannot survive any level of
          constitutional scrutiny. ...................................................................................................... 22

          i.   Strict scrutiny applies here. ....................................................................................... 23

          ii.  Applying the Access Provision to Plaintiffs' research fails even intermediate
             scrutiny because it is not narrowly tailored. .............................................................. 23

          iii.  The interests of third-party companies are not co-extensive with legitimate
             government interests for purposes of intermediate scrutiny. ...................................... 26

          iv.  Plaintiffs' research would cause no more than de minimis harm .............................. 28

          v.   Plaintiffs need not demonstrate that no alternatives to their research exist. .............. 31

CONCLUSION ..................................................................................................................... 32

# TABLE OF AUTHORITIES

**Cases**

*Act Now to Stop War & End Racism Coal. v. District of Columbia*,
  589 F.3d 433 (D.C. Cir. 2009) ................................................................. 2, 6

*Animal Legal Def. Fund v. Herbert*, 263 F. Supp. 3d 1193 (D. Utah 2017) ............................... 23

*Animal Legal Def. Fund v. Reynolds*, 297 F. Supp. 3d 901 (S.D. Iowa 2018) ........................... 23

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979) ............................... 2, 6, 8, 11

*Chamber of Commerce v. FEC*, 69 F.3d 600 (D.C. Cir. 1995) ............................................. 10, 11

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975) ................................................................. 17

*Desnick v. American Broad. Companies*, 44 F.3d 1345 (7th Cir. 1995) ............................... 21, 22

*Edwards v. District of Columbia*, 755 F.3d 996 (D.C. Cir. 2014) ............................................. 23

*Elonis v. United States*, 135 S. Ct. 2001 (2015) ................................................................. 28

*Fisher v. Biozone Pharm., Inc.*, No. 12-cv-03716-LB, 2017 WL 1097198 (N.D. Cal. 2017) ..... 16

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505 (4th Cir. 1999) ................................. 21

*Frisby v. Schultz*, 487 U.S. 474 (1988) ............................................................................. 20

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) .............................................................. 28

*Golan v. Holder*, 565 U.S. 302 (2012) ............................................................................. 19

*hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099 (N.D. Cal. 2017) ............................... 16

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ..................................................... 8, 15

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ................................................................. 2

*Musacchio v. United States*, 136 S. Ct. 709 (2016) ........................................................... 6

*N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126 (D.C. Cir. 2015) .................................. 2, 5

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964) .............................................................. 17, 27

*NAACP v. Button*, 371 U.S. 415 (1963) ........................................................................... 28

*Navegar, Inc. v. United States*, 103 F.3d 994 (D.C. Cir. 1997) ............................................. 10

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) ............................................... 13, 20, 23

*Reno v. ACLU*, 521 U.S. 844 (1997) ................................................................................................. 20

*Rowan v. U.S. Post Office Dep't*, 397 U.S. 728 (1970) ..................................................................... 20

*Snyder v. Phelps*, 562 U.S. 443 (2011) .............................................................................................. 17

*Steffel v. Thompson*, 415 U.S. 452 (1974) ...................................................................................... 9, 11

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) .......................................................................... 2

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ............................................................... 2, 9

*U.S. Telecomm. Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016) ............................................... 2, 3, 6, 8

*United States v. Aleynikov*, 737 F. Supp. 2d 173 (S.D.N.Y. 2010) ..................................................... 6

*United States v. Alvarez*, 567 U.S. 709 (2012) ..................................................................... 13, 19, 21

*United States v. Auernheimer*, No. 11-cr-470-SDW, 2012 WL 5389142 (D.N.J. Oct. 26, 2012).. 6

*United States v. Batti*, 631 F.3d 371 (6th Cir. 2011) .......................................................................... 6

*United States v. Cave*, No. 8:12-cr-417, 2013 WL 3766550 (D. Neb. July 16, 2013) .................... 6

*United States v. Drew*, 259 F.R.D. 449 (C.D. Cal. 2009) .................................................................... 6

*United States v. Lowson*, No. 10-cr-114 (KSH), 2010 WL 9552416 (D.N.J. Oct. 12, 2010)......... 7

*United States v. Roque*, 12-cr-540-KM, 2013 WL 2474686 (D.N.J. June 6, 2013) ........................ 6

*United States v. Willis*, 476 F.3d 1121 (10th Cir. 2007) .................................................................... 6

*Unity08 v. FEC*, 596 F.3d 861 (D.C. Cir. 2010) ............................................................................... 10

*Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001) ............................................... 14

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ....................................................................... 25

*Worth v. Jackson*, 451 F.3d 854 (D.C. Cir. 2006) .............................................................................. 3

## Statutes

18 U.S.C. § 1030(g) ........................................................................................................................... 17

47 U.S.C. § 230(c)(2)(A) .................................................................................................................. 18

**Other Authorities**

De Minimis, Black's Law Dictionary (10th ed. 2014) ................................................................. 28

Restatement (Third) of the Law, *Unfair Competition* § 20 ......................................................... 19

## INTRODUCTION

The government's motion for summary judgment rests on an extraordinary proposition about the scope of its authority to criminally prosecute those engaging in speech and expression. The government would have this Court hold that its interests in enforcing the Access Provision are co-extensive with private companies' interests in enforcing their own terms of service, and that the Constitution permits such interests to be considered legitimate government interests. Should the Court accept that argument, it would dramatically diminish constitutional protections for freedom of expression, with far-reaching implications for speech both online and off.

Plaintiffs seek to conduct research to test whether the algorithms that increasingly control access to employment and housing opportunities online discriminate against users on the basis of protected class status under civil rights laws. Such testing is of a piece with civil-rights testing that the government has, for decades, endorsed in the offline world. Plaintiffs intend to communicate false or misleading information to platforms not to cause harm or achieve any material gain, but to conduct scientifically rigorous audits for discrimination. To criminalize such speech where it causes no material harm runs counter to longstanding precedent and this nation's commitment to robust protections for speech. Accordingly, the government's motion for summary judgment should be denied and the Plaintiffs' motion for summary judgment should be granted.

## ARGUMENT

I.   **Plaintiffs have standing to challenge the constitutionality of the Access Provision.**

a.   **Plaintiffs have demonstrated their intent to engage in constitutionally-protected speech that violates the Access Provision.**

Plaintiffs have sufficiently demonstrated their intent to engage in their research plan. The D.C. Circuit has repeatedly emphasized that "the courts' willingness to permit pre-enforcement

review is 'at its peak' when claims are rooted in the First Amendment." *N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1135 (D.C. Cir. 2015) (citation omitted); *see also* Mem. Op. on Def. Mot. to Dismiss, ECF No. 24 ("MTD Op."), at 13. Accordingly, "[p]re-enforcement review, particularly in the First Amendment context, does not require plaintiffs to prove that they 'will in fact' violate the regulation in order to demonstrate an injury." *U.S. Telecomm. Ass'n v. FCC*, 825 F.3d 674, 739 (D.C. Cir. 2016) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014)). Where a plaintiff challenges a law that burdens expressive rights, a "credible statement by the plaintiff of intent to commit violative acts" is all that is required for plaintiffs to establish that intention for standing purposes. *U.S. Telecomm. Ass'n*, 825 F.3d at 739 (quoting *Act Now to Stop War & End Racism Coal. v. District of Columbia*, 589 F.3d 433, 435 (D.C. Cir. 2009)). Indeed, in *Babbitt v. United Farm Workers National Union*, the Supreme Court held that the plaintiffs sufficiently established "injury-in-fact" to challenge a law that proscribed "dishonest, untruthful, and deceptive publicity" where the plaintiffs intended to engage in consumer publicity campaigns in the future, even though the plaintiffs professed *no intent* to propagate untruths whatsoever, but merely contended that "erroneous statement is inevitable in free debate." 442 U.S. 289, 301–02 (1979).

The government nonetheless asserts that a "lack of concrete plans is fatal at the summary-judgment stage," without reference to the well-established caselaw involving burdens on speech. Def. Mem. in Support of Cross-Mot. for Sum. Judgment, ECF No. 51 ("Def. Br."), at 1. Two of the three cases on which the government relies, *see id.* at 10–11, were environmental challenges, in which the plaintiffs either professed no intent or only a vague intent to some day visit the affected location. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992). The third was a race- and gender-discrimination claim in

which the D.C. Circuit noted that although the plaintiff's assertion that he "intend[ed] to apply

for new positions and promotions at [the U.S. Department of Housing and Urban Development]

on a regular basis in the future" might not normally suffice for standing purposes, the plaintiff

*did* in fact have standing under "an exception . . . for plaintiffs bringing facial challenges to race-

conscious set-aside programs." *Worth v. Jackson*, 451 F.3d 854, 858 (D.C. Cir. 2006).

Like the plaintiff in *Worth*, Plaintiffs here and in other free speech challenges need not

offer evidence of "concrete plans," as the government would have it. Rather, to establish that

they intend to violate the challenged provision, Plaintiffs need only offer a credible statement of

that intent, *see U.S. Telecomm. Ass'n*, 825 F.3d at 739, which Plaintiffs here have done.

The government makes much of the Plaintiffs' use of the word "concrete" in connection

with their research, but the Plaintiffs' testimony that they have no "concrete" plans does not

mean that they do not have specific plans or an intent to conduct such research. On the same

pages of the deposition testimony cited by the government, *see* Def. Br. at 11, Plaintiff Mislove

contextualizes his understanding of the word "concrete" with respect to research. Asked whether

there was any "future research [he] intend[ed] to conduct regarding discrimination by websites

where the research involves creation of fictitious user accounts in violation of terms of service,"

Plaintiff Mislove responded: "I do have specific research plans or specific platforms that we are

studying, yes, and . . . this is an area of my research that [I] intend to conduct working in." The

question immediately following this testimony asked whether, setting aside a specified research

project, Plaintiff Mislove "ha[d] concrete plans for any of that other future research," to which

Plaintiff Mislove answered "no." *See* Mislove Depo. at 46–47 (Def. Ex. 3, ECF No. 53-3).

Similarly, Plaintiff Wilson's use of the word "concrete" must be understood in context.

Plaintiff Wilson testified that he has received Institutional Review Board ("IRB") approval for

research involving "controlled experiments with fake user accounts and fictitious job postings" in which researchers would post a job on a hiring platform, and test how the algorithms sort the individuals who apply and whether discrimination "could creep in." Wilson Depo. at 195 (Pl. Ex. 19). Plaintiff Wilson contextualized his use of the word "concrete" by noting with respect to certain research that it was in "preliminary phases" and therefore the target platforms were not "concretely identified." Wilson Depo. at 61 (Def. Ex. 4, ECF No. 53-4). Plaintiff Wilson further testified, with respect to certain research, that he could identify "[s]ome, but not all" of the target platforms, *id*. at 61, and that he would say that he "intend[s] to access them in the future for purposes of conducting academic research regarding potential online discrimination," *id*. at 62, and described this as a situation where there were "not concrete plans," *id*. He also testified, "When I said I don't have concrete plans, what I meant was we don't have software, we don't have a timeframe. There is no students assigned to it. . . . It is not happening now. But I do plan to conduct[] it in the future." Wilson Depo. at 215–16 (Pl. Ex. 19). When asked, "[A]s of today, have you taken any concrete steps to undertake that research?" Plaintiff Wilson testified that "the most concrete step is that I applied and received [] funding, applied and received IRB for those designs. I would say that is pretty concrete. . . . [B]ut am I implementing it right now, no." *Id*. at 217 (Pl. Ex. 19). When asked, "Do you have concrete plans to implement it?" Plaintiff Wilson testified, "Yes. I fully intend to do that research." *Id*.

Nonetheless, using cherry-picked quotations, the government suggests that Plaintiffs never stated in their depositions that they intend to violate the Access Provision. Def. Br. at 10–12. The government goes so far as to accuse Plaintiffs of filing "sham affidavit[s]" in an "improper . . . attempt now to resurrect their standing" by stating that "they 'intend' to conduct research involving creating fake accounts and/or providing misleading information in violation

of websites' [terms of service]." Def. Br. at 11–12. The government argues that these affidavits "contradict[]" Plaintiffs' prior sworn testimony. *Id*. at 12. As a more complete look at the deposition testimony makes clear, however, each Plaintiff testified in his deposition that he intends to conduct research that involves the creation of fictitious user accounts and/or job postings on online hiring websites. *See* Pl. Resp. to Def. Statement of Material Facts Not in Dispute ("Pl. Resp. SOF"), at ¶¶ 6–7.[1] Thus, contrary to the government's characterization, each Plaintiff's deposition testimony supports his intent to conduct research in violation of the Access Provision and is consistent with the Plaintiffs' declarations.

To establish standing, Plaintiffs' statements need not be "concrete," but merely "credible." The Court need not rely only on the fact that Plaintiffs have testified as to their intention under oath. Plaintiffs also have a proven history of performing and publishing algorithm-auditing research in the area of hiring, among others, *see* Def. Statement of Material Facts Not in Dispute in Support of Cross-Mot. for Sum. Judgment, ECF No. 51-1 ("Def. SOF"), at ¶¶ 1–4, and Plaintiff Wilson has obtained grant funding specifically to continue with his algorithm-auditing research on hiring websites. *See* Wilson Dec. at ¶¶ 40–42 (Pl. Ex. 1, ECF No. 48-1). The government offers no basis to impugn the credibility of Plaintiffs' statements of intent, having chosen instead to incorrectly assert that Plaintiffs never made any such statements at all.

### b.  Plaintiffs face a credible threat of prosecution under the Access Provision.

In light of the courts' "special solicitude to pre-enforcement challenges brought under the First Amendment," *N.Y. Republican State Comm.*, 799 F.3d at 1135, Plaintiffs need not show

---

[1] A full accounting of why the government's claim that Plaintiffs have filed "sham affidavits" is insupportable is provided in Plaintiffs' Response to Defendant's Statement of Material Facts Not in Dispute, filed concurrently with the instant Memorandum. *See* Pl. Resp. SOF at ¶¶ 6–7.

that they are certain or even likely to be prosecuted in order to establish a credible threat of prosecution. The law is clear: where plaintiffs bringing a First Amendment claim have established their intent to violate the challenged statute, the standing requirement is satisfied by the "conventional background expectation that the government will enforce the law." *U.S. Telecomm. Ass'n*, 825 F.3d at 739 (quotation mark omitted) (quoting *Act Now*, 589 F.3d at 435). This is particularly so where the government "has not disavowed any intention of invoking" the challenged statute against the plaintiff. *Babbitt*, 442 U.S. at 302. As this Court has noted, under this "low standing bar," the D.C. Circuit has even found standing without inquiring into whether the government has ever enforced the challenged restriction. MTD Op. at 19–20 (citing *U.S. Telecomm. Ass'n*, 825 F.3d at 739–40); *see also Babbitt*, 442 U.S. at 302 (holding that plaintiffs had standing even where the challenged provision "has not yet been applied and may never be applied" to plaintiffs' intended conduct).

There is no dispute that the government has enforced the Access Provision in the past. *See* MTD Op. at 20 & n.6 (listing *Musacchio v. United States*, 136 S. Ct. 709, 713 & n.1 (2016); *United States v. Batti*, 631 F.3d 371, 372 (6th Cir. 2011); *United States v. Willis*, 476 F.3d 1121, 1124 (10th Cir. 2007); *United States v. Cave*, No. 8:12-cr-417, 2013 WL 3766550, at *1 (D. Neb. July 16, 2013); *United States v. Roque*, 12-cr-540-KM, 2013 WL 2474686, at *1 (D.N.J. June 6, 2013); *United States v. Auernheimer*, No. 11-cr-470-SDW, 2012 WL 5389142, at *1 (D.N.J. Oct. 26, 2012), *rev'd*, 748 F.3d 525 (3d Cir. 2014); *United States v. Aleynikov*, 737 F. Supp. 2d 173, 190 (S.D.N.Y. 2010)). Moreover, the government has brought prosecutions under the Access Provision for terms of service ("ToS") violations specifically. *See United States v. Drew*, 259 F.R.D. 449 (C.D. Cal. 2009) (prosecuting defendant for violating Myspace's ToS by lying about her age to create a fake account, bringing not only a felony charge for violating the

Access Provision in furtherance of a tortious act, but also a separate misdemeanor count for the ToS violation alone); *United States v. Lowson*, No. 10-cr-114 (KSH), 2010 WL 9552416 (D.N.J. Oct. 12, 2010) (prosecuting individuals for violating Ticketmaster's ToS, and for violating code-based restrictions on website); *see also* MTD Op. at 21 (noting that "prosecutions have stemmed from close enough facts that it would be credible to fear a future prosecution for [Plaintiffs'] own activities").

In concluding that "there are sufficient indications of a credible threat to enforce the Access Provision, both in general and as applied to plaintiffs' activities," MTD Op. at 20, this Court relied not only on the law described above but also on the fact that "the government does not know whether prosecutors may have employed the Access Provision to obtain plea agreements in which defendants admitted to harmless ToS violations," *id.* at 21. The record only further confirms this fact: indeed, the U.S. Department of Justice ("DOJ") admitted that, despite the guidance of a 2014 Attorney General memorandum asking U.S. Attorneys to consult with the DOJ Criminal Division before making CFAA charging decisions, the DOJ Criminal Division does not in fact know of each and every time that U.S. Attorneys bring such charges or threaten such charges to obtain a plea agreement. *See* Suppl. Lynch Dec. at ¶¶ 5–6 (Def. Ex. 9, ECF No. 53-9) (noting that the records held by the DOJ Criminal Division are not "fully comprehensive" because there are "situations where consultations . . . did not occur prior to charges being filed").

The government states that it has determined that no charges have been filed under the Access Provision based on ToS violations since June 29, 2015. Def. Br. at 16. The Plaintiffs dispute the accuracy of such a determination. *See* Pl. Resp. SOF at ¶¶ 33–39. But even assuming the government is correct, the government cites no case suggesting that courts impose a limited lookback period in determining whether the "conventional background expectation that the

government will enforce the law" applies. *See U.S. Telecomm. Ass'n*, 825 F.3d at 739. The possibility of enforcement of the Access Provision by U.S. Attorneys is part and parcel of the credible threat of enforcement, and further chills the exercise of constitutionally-protected First Amendment rights where such exercise would violate a website's ToS.

In addition, the Court, in denying Defendant's motion to dismiss as to Plaintiffs' remaining claim, emphasized that the government had not expressly disavowed any intent to prosecute Plaintiffs. MTD Op. at 22. Here, too, the record provides confirmation. Not only has the government failed, in the face of repeated opportunities, to offer any "explicit statement 'that plaintiffs will not be prosecuted'" of the kind that courts require "to disprove an otherwise credible threat of prosecution," MTD Op. at 22 (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16 (2010)), but the Chief of the Computer Crime and Intellectual Property Section of the DOJ Criminal Division has in fact admitted that he does not believe it is "impossible" for the DOJ to bring a prosecution against someone in Plaintiffs' position. *See* Def. Resp. to Pl. Statement of Material Facts Not in Dispute, ECF No. 51-2, at ¶ 20 (arguing that deposition testimony means that DOJ has the "ability" to prosecute); *contra Babbitt*, 442 U.S. at 302 (finding standing where the government "has not disavowed any intention of invoking" the challenged statute against the plaintiff even though the statute "has not yet been applied and may never be applied" to the plaintiff's intended conduct).

Despite this Court's clear prior ruling on this point, *see* MTD Op. at 22, the government incorrectly asserts a different legal standard: that if Plaintiffs themselves do not subjectively fear prosecution, "[that] fact alone should defeat Plaintiffs' standing." Def. Br. at 12–13. As a factual matter, the government selectively quotes from Plaintiffs' depositions to suggest that they do not have such a subjective fear. Plaintiff Mislove's deposition testimony was that "you are

essentially relying on prosecutorial discretion about whether or not to bring charges" and "while I don't think it is likely, it is something I think about and it does affect my sort of thinking on a lot of this" and that "it really weights heavily on my mind . . . am I exposing my students to criminal—to potential criminal prosecution or the risk." Mislove Depo. at 147 (Def. Ex. 3, ECF No. 53-3); *see also* Mislove Dec., ECF No. 48-2, at ¶¶ 49, 51. Plaintiff Wilson explained that he is a plaintiff in this lawsuit because he believes that it is "very important" to "bring[] clari[t]y to the work *so that we can conduct it*." Wilson Depo. at 152 (Pl. Ex. 19) (emphasis added).

But even setting aside the factual question of Plaintiffs' subjective fear of prosecution, the government offers no caselaw to support the argument that by having previously engaged in conduct that is prohibited by the CFAA, or by not having "forego[ne]" research in the past out of concern for liability, the Plaintiffs do not have standing to bring a pre-enforcement challenge for future conduct that violates the Access Provision. *See* Def. Br. at 13. Nothing in *Driehaus*, 573 U.S. 149, or *Steffel v. Thompson*, 415 U.S. 452 (1974), supports this argument. Furthermore, it does not matter whether Plaintiffs themselves have ever been threatened with arrest or prosecution, as the government claims, *see* Def. Br. at 13, under the "credible threat of enforcement" standard. In *Driehaus*, 573 U.S. at 159, the Supreme Court described the credible threat of enforcement in *Steffel* as stemming from the petitioner's "companion's prosecution" under the same law and reiterated that "it is not necessary that petitioner first expose himself to actual arrest or prosecution" to have standing. Similarly, here, Plaintiffs are not required to wait to be prosecuted before challenging the Access Provision's constitutionality.

Given the Plaintiffs' intent to violate the Access Provision and the government's failure to disavow prosecution, Plaintiffs have standing.

## II.      Plaintiffs' claims are ripe for adjudication.

Like the standing analysis, the ripeness inquiry is at its most liberal in the First

Amendment context. *See Navegar, Inc. v. United States*, 103 F.3d 994, 999 (D.C. Cir. 1997);

*Unity08 v. FEC*, 596 F.3d 861, 865 (D.C. Cir. 2010). Ripeness and standing overlap in substance

as well: in deciding whether a case is ripe for adjudication, courts in this circuit consider (1) "the

hardship to the parties of withholding court resolution (a factor that overlaps with the 'injury in

fact' facet of standing doctrine)," and (2) "the fitness of the issues for judicial decision (a factor

that resembles the prudential concerns applied in the standing context)." *Navegar*, 103 F.3d at

998. A pre-enforcement challenge satisfies the second prong of the analysis where it presents a

"relatively pure legal issue." *See Chamber of Commerce v. FEC*, 69 F.3d 600, 603–04 (D.C. Cir.

1995). The government argues that Plaintiffs do not satisfy this second prong, offering two

reasons why the issues presented are not fit for judicial decision. Both are misguided.

First, the government contends that without identifying the specific websites Plaintiffs

intend to access for their research, it is "impossible" to know what those websites' terms of

service will be at the time of Plaintiffs' research. Def. Br. at 18–19. But it is undisputed that

terms of service may be subject to change at any time, without notice to users. *See* Pl. Reply to

Def. Resp. to Pl. Statement of Material Facts Not in Dispute at ¶ 95.[2] For that reason, in any pre-

enforcement challenge to the Access Provision, it will always be "impossible" to know with

certainty what any given website's ToS will be at a future date, or, as Defendant terms it,

"whether those ToS will *condition access* on compliance sufficient to implicate the Access

---

[2] The Plaintiffs' Reply to Defendant's Response to Plaintiffs' Statement of Material Facts Not in Dispute is being filed concurrently with the instant Memorandum.

Provision." Def. Br. at 18.[3] If the Court followed the government's logic, it could never consider

a pre-enforcement challenge on behalf of Plaintiffs or those similarly situated with respect to

ToS violations under the Access Provision. Instead, Plaintiffs would have to actually undertake

the research—taking note of the ToS actually in effect at the time and exposing themselves to

criminal liability—in order to challenge the Access Provision's application to them. The First

Amendment does not countenance such a result. *See Babbitt*, 442 U.S. at 298 ("[I]t is not

necessary that the plaintiff first expose himself to actual arrest or prosecution to be entitled to

challenge the statute that he claims deters the exercise of his constitutional rights." (alterations

and quotation marks omitted) (quoting *Steffel*, 415 U.S. at 459)).

Second, the government suggests that Plaintiffs' claims are not fit for judicial resolution

because Plaintiffs do not now know the "exact steps" they will take in conducting their research,

including the "number of fictitious accounts or postings that will be necessary or how long each

account or posting will exist." Def. Br. at 19 (citation omitted). But the *amount* of false speech in

which Plaintiffs may engage has no bearing on the legal issue that is before this Court. *See*

*Chamber of Commerce*, 69 F.3d at 603–04.

The government appears to mount one additional, cursory argument: that Plaintiffs'

claims are unripe because of Plaintiffs' purported "inability to request more specific relief" than

authorization to conduct the research "described in Plaintiffs' Complaint and Plaintiffs'

Declarations." Def. Br. at 19–20. But Plaintiffs' Complaint and declarations are hardly abstract.

Rather, they contain comprehensive descriptions of Plaintiffs' research goals, methodologies,

---

[3] The government attempts to argue that Plaintiffs cannot challenge the Access Provision
because it is possible that some website ToS prohibiting false information may not constitute
genuine access restrictions. *See* Def. Br. at 18 n.3. This Court already determined that creating
fictitious user accounts in violation of ToS would violate the Access Provision. *See* MTD Op. at
32–33.

and precautionary procedures to mitigate potential harm. The government's true complaint, it

seems, is that Plaintiffs merely referred to the complaint and declarations in their proposed order,

rather than explicitly importing the details from those documents into the proposed order. This

argument plainly has no bearing on the fitness of the issues in this case for adjudication. Should

the Court enter summary judgment on behalf of Plaintiffs, Plaintiffs could submit a revised

proposed order if necessary, and the Court could craft an appropriate injunction.

### III.      As applied to Plaintiffs, the Access Provision is unconstitutional.

The government's arguments on the merits proceed from a fundamental misapprehension

of the nature of Plaintiffs' claims. The government argues that the Access Provision can be

applied to prohibit Plaintiffs' proposed false speech without any First Amendment scrutiny

because the Access Provision only "enforces private parties' choices about whom to exclude"

from their websites. *See* Def. Br. at 20–29, 33. The government makes much of the implications

of treating private websites as "public forums." *See id*. at 20–27. But while the government is

strictly limited in how it can regulate speech on its own property when that property is a public

forum, Plaintiffs do not claim that the First Amendment in any way limits how private websites

can regulate false speech on their own platforms, as the government mistakenly seems to believe.

*See* Def. Br. at 32 n.6. Critically, Plaintiffs claim only that the First Amendment limits the

government's ability to criminally prosecute them for communicating such speech to a company

during the process of creating an account, or by communicating it in the form of a false posting

to test the effects of the website's ranking algorithm. *See* Pl. Mem. in Support of Mot. for Sum.

Judgment, ECF No. 48, at 4–6, 10. In that regard, the Plaintiffs' claim is no different than any

similar claim in the offline world—they might equally claim the ability to misrepresent

themselves to a company in the physical world in the course of testing for discrimination. *See id*.

at 4–6 (describing false information that is provided to target companies during offline testing for

discrimination). In that circumstance, any government prosecution of such false speech would be subject to scrutiny for its constitutionality. *See generally United States v. Alvarez*, 567 U.S. 709 (2012) (describing requirements for false speech to be regulated by the government).

Because of its misapprehension of Plaintiffs' position, the government's concerns about the implications of ruling in favor of the Plaintiffs miss the mark. The government asserts that a ruling for the Plaintiffs would require private websites "to comply in full with the strictures of the First Amendment" in their decisions about content regulation. Def. Br. at 32. But of course that would not follow from a ruling that the *government* cannot prosecute a person for speech or expressive activity without triggering First Amendment scrutiny. The Supreme Court's decision in *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017), is instructive. The *Packingham* Court struck down a state prohibition on registered sex offenders accessing social media websites, *see id*. at 1737–38, without concern for whether any given website might *itself* act to bar users who are registered sex offenders. As *Packingham* recognized, and this Court previously determined, given the nature of the Internet as a locus of communication and expressive activity, *state-imposed* restrictions on accessing the Internet are subject to First Amendment scrutiny regardless of whether an individual is seeking "access to particular websites, run by private companies." *See* MTD Op. at 8.

In fact, the government's argument that it can enforce the choices of private parties that run websites without First Amendment scrutiny proves too much. Private websites can, and do, remove large swathes of speech by users that they do not like—including such things as "political mis-information" or company reviews by employees that the website does not consider "authentic." *See* Def. SOF at ¶¶ 90, 92–95, 99–100. A website might choose to remove false or

exaggerated political rhetoric or disgruntled employee reviews with no state action being implicated.

The Access Provision operates in an unusual manner: the CFAA's "exceeds authorized access" language does not on its face prohibit visiting a website and providing false information to it. But, critically, the *substance* of the Access Provision's criminal prohibitions is supplied by website terms of service, and as applied to the Plaintiffs' research, the relevant restriction contained in many websites is that Plaintiffs cannot provide false information to a website. *See* Pl. Statement of Undisputed Material Facts, ECF No. 47-2 ("Pl. SOF"), at ¶ 2; Def. Resp. to Pl. Statement of Material Facts Not in Dispute, ECF No. 51-2, at 3. Therefore, as applied to Plaintiffs, the relevant government restriction as enforced by the Access Provision is a restriction on their speech, and it is no less subject to scrutiny under the First Amendment than if the Access Provision restricted such speech *facially* as opposed to through its operation.

> **a. The activity Plaintiffs seek to engage in is speech within the meaning of the First Amendment.**

Despite the Court's prior ruling to the contrary, *see* MTD Op. at 36 n.14, the government argues that Plaintiffs intend to engage only in non-expressive conduct. Def. Br. at 38–39. This argument falls flat: criminal liability under the CFAA is triggered by violating ToS that prohibit submitting false information to a website. False information, like true information, is speech, and the act of submitting it is communication. *See, e.g.*, *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 446 (2d Cir. 2001) (noting that even "dry information devoid of advocacy, political relevance, or artistic expression" receives First Amendment protection). In making an account using information that is not entirely truthful, Plaintiffs are communicating a message to the website about who they are and that they are, for example, employers or job seekers. *See* MTD Op. at 36 n.14. And it is the content of those communications—namely, that Plaintiffs'

representations about their identity are false instead of true—that triggers liability under the

Access Provision. *Id.* Thus, this Court has already made clear that the conduct triggering

criminal liability consists of communicating a message. *See id.* (citing *Humanitarian Law*

*Project*, 561 U.S. at 28); *see also* MTD Op. at 36 n.14 (noting that Plaintiffs "would violate the

Access Provision 'because of the [false] content of [their] particular message.'" (alterations in

original) (quoting *Humanitarian Law Project*, 561 U.S. at 28)).

In addition to creating accounts using false information, Plaintiffs also risk liability under

the Access Provision by creating fictitious posts, such as a post on a hiring platform for a

jobseeker or a job that does not exist. The government argues that because Plaintiffs would not

want other users on the hiring platform to see such a posting, and would in fact take steps to

prevent others from seeing it, Plaintiffs are not engaging in speech. *See* Def. Br. at 39. But the

intended audience for such speech is not other users, but the platform itself: by creating the

fictitious post, Plaintiffs seek to communicate to the platform that such a post exists, so that they

can then test how the platform's algorithms respond to the content of that post. *See* Pl. SOF at

¶¶ 65–69, 71. The fact that the intended audience for Plaintiffs' communication is the platform

itself rather than third party users does not strip it of its communicative aspect. And there is no

question that a platform and the government could only determine if the Plaintiffs in fact

committed an Access Provision violation by first reading the content of the posting and then

determining if it is false. *See* MTD Op. at 36 n.14 (noting it is "the content of plaintiffs' speech

to the targeted websites . . . that triggers the sites' ToS").

### b.  The First Amendment applies where the government could prosecute Plaintiffs for engaging in speech restricted by private companies.

The government concedes that the initiation of a criminal prosecution under the CFAA

constitutes state action. *See* Def. Br. at 30. Its brief goes on to sketch a parade of horribles about

what would happen to speech on the Internet if the First Amendment were held to protect

Plaintiffs from prosecution based on violation of websites' terms of service. *Id.* at 30–35. This

argument, however, depends on the notion that criminal prosecution and all other forms of state

action are fungible for purposes of the First Amendment. As caselaw and logic make clear, that

notion is wrong.

While the action of a court adjudicating a lawsuit between private parties is certainly a

form of state action, it does not implicate the First Amendment in the same way as the state

action of criminal prosecution. For example, courts do enforce speech-restrictive contract terms,

like non-disparagement clauses, without triggering First Amendment scrutiny of the underlying

contract, because the underlying contract does not involve state action. *See, e.g.*, *Fisher v.*

*Biozone Pharm., Inc.*, No. 12-cv-03716-LB, 2017 WL 1097198, at *7 (N.D. Cal. 2017) (non-

denigration term in private settlement "does not implicate First Amendment rights").

No First Amendment problem arises if a court orders that an individual who violates such

a contract provision by, for example, disparaging a former employer, pay damages as outlined in

the contract (assuming that the contract is otherwise valid and enforceable). However, if a state

enacted a law that allowed the state to enforce such a non-disparagement clause through criminal

prosecution, such a law would be subject to First Amendment scrutiny, perhaps facially or as

applied. *See* MTD Op. at 16–17 (holding that "'a criminal prosecution under the CFAA would

undoubtedly constitute state action' because the government itself is policing website ToS

violations" (quoting *hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099, 1114 n. 12 (N.D.

Cal. 2017) (appeal docketed, No. 17-16783 (9th Cir. Sept. 6, 2017)). Even where First

Amendment scrutiny does not apply to judicial enforcement of purely private agreements, it does

apply, and in fact was intended especially to apply, when the state acts to restrict individuals'

liberty as a result of their speech. *See* Def. Br. at 30 (conceding that initiation of a criminal prosecution under the CFAA would constitute state action). Such a distinction between state enforcement of a law versus judicial enforcement of private agreements is well established.

The question of private civil enforcement of the CFAA, per 18 U.S.C. § 1030(g), is not before the Court in this matter. *See* Def. Br. at 31. Nonetheless, it is not a novel proposition that any laws and common-law torts that restrict speech, whether they are subject to civil enforcement by private parties or criminal enforcement, can trigger constitutional scrutiny and must be evaluated on their merits, and are regularly distinguished from the enforcement of private, contractual terms, for First Amendment purposes. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964) (noting that "[w]hat a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law"); *see also Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975) (holding that the First Amendment prohibits a state from creating civil cause of action for certain types of privacy invasions); *Snyder v. Phelps*, 562 U.S. 443, 451 (2011) (noting that "[t]he Free Speech Clause of the First Amendment . . . can serve as a defense in state tort suits").

The gravamen of the government's complaint appears to be that, because the Access Provision operates to incorporate terms of service—*i.e.* private agreements—it should not be subject to First Amendment scrutiny because it is merely enforcement of contractual terms. *See* Def. Br. at 31. But, as explained above, the Access Provision incorporates such private terms of service, rendering them criminal prohibitions no less subject to constitutional scrutiny than if the text of the terms of service had themselves been written into the Access Provision. It is no answer to say that if the Access Provision on its face prohibited providing false information, the Plaintiffs could claim constitutional protection from prosecution, but they are out of luck because

they face the exact same restriction—with the exact same government enforcement under the Access Provision—simply because it is *not* written in the text.

For this reason, a decision that the First Amendment protects Plaintiffs here would not affect the ability of a website to take down content violating its terms of service, and would not implicate the separate question of whether the government could force a website to host particular content—itself a form of state action. *See* Def. Br. at 32. Such a decision would not mean that "the First Amendment indeed applies to private websites," full stop, because the First Amendment always protects speech only against particular government intrusions. This Court can safely hold that the government cannot prosecute Plaintiffs without concern that its ruling would somehow put an end to websites' ability to control their own content or call into question the constitutionality of websites' immunity under the Communications Decency Act, 47 U.S.C. § 230(c)(2)(A). *See* Def. Br. at 34–35.

### c.  The Access Provision is not immune from First Amendment scrutiny as a protection of private property rights.

The government additionally contends that First Amendment rights are not implicated when the government enforces private parties' choices about whom to exclude from private property. Def. Br. at 30. This assertion is incorrect, because it sweeps too broadly. Just as the government can generally enforce private parties' agreements about speech through the adjudication of private lawsuits without implicating the First Amendment, *see supra* Part III.b., so it can generally enforce private parties' decisions about access to private property without implicating the First Amendment. But criminal prosecution is a different matter.

In any event, it is not the case that First Amendment rights are *never* implicated when the government enforces private parties' choices about whom to exclude from private property.

The government cites copyright enforcement as an example in its favor, but the First Amendment does limit how private copyright holders can enforce their intellectual property rights. Under the fair use doctrine—which the Supreme Court has termed the "built-in First Amendment accommodation[]" to copyright law—a copyright is unenforceable against a person who engages in certain "fair uses" of the copyrighted material, including "for purposes such as . . . scholarship[] or research," among others. *Golan v. Holder*, 565 U.S. 302, 328–29 (2012) (citations omitted). No matter how much the copyright holder may desire to exclude scholars or researchers, for example, from their private intellectual property, the government cannot enforce that choice where the scholar or researcher is engaging in fair use of the material.

So, too, in trademark. While federally-registered trademarks can be enforced against infringers in order to avoid confusion among potential customers, the Constitution limits the enforcement of trademarks against infringing speech that does not actually cause harm. *See Alvarez*, 567 U.S. at 735–36 (Breyer, J., concurring) (noting that "trademark statutes are focused upon commercial and promotional activities that are likely to dilute the value of a mark," and "typically require a showing of likely confusion, a showing that tends to ensure that the feared harm will in fact take place"); Restatement (Third) of the Law*, Unfair Competition* § 20 cmt. b (noting that in cases involving "expressions of noncommercial speech entitled to broad constitutional protection," courts "may require more substantial evidence of confusion").

Perhaps recognizing the weakness of its reliance on intellectual property rights, the government focuses the bulk of its argument, instead, on real property rights. The government analogizes to a hypothetical dinner party, in which the host's neighbor makes a political statement that the person finds objectionable, the host directs the neighbor to leave, and

ultimately calls for police assistance in removing the now-unwelcome neighbor. Def. Br. at 32. This analogy is entirely inapt.

First, a publicly-available website is not analogous to a home. *See* MTD Op. at 37–38 ("It is difficult to argue that trespass . . . concerns can justify restricting—or even apply to—viewing information that a website makes available to anyone who chooses to create a username and password."). It is one of the oldest tenets of our judicial system that "a man's home is his castle into which not even the king may enter." *Rowan v. U.S. Post Office Dep't*, 397 U.S. 728, 737 (1970) (quotation marks omitted). Although individuals may well be subject to objectionable speech outside the home, the Supreme Court has repeatedly held that "individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988); *see also Rowan*, 397 U.S. at 737. Thus, to the extent that the government may enforce the hypothetical dinner-party host's decision to expel a neighbor, the justification is not that the First Amendment ceases to apply where the government enforces a private party's decision. Rather, it is that the First Amendment does not require that a host listen to a neighbor's unwanted speech within the host's own home.

The better analogy is to another medium of communication, such as a newspaper, radio show, or broadcast channel. Websites function as a "category of communication," MTD Op. at 8 (quoting *Reno v. ACLU*, 521 U.S. 844, 870 (1997)), that today serve as "the most important place[]" for the exchange of views, MTD Op. at 8 (quoting *Packingham*, 137 S. Ct. at 1735). Both a privately-owned website and a privately-owned newspaper in the physical world may impose content-based restrictions on contributions from the public that they choose to publish. For example, just as a private website may prohibit users from falsely representing their identities to the platform when making a user account, a newspaper may require that individuals

truthfully identify themselves to the newspaper when submitting an op-ed or classified advertisement. And, just as a privately-owned website can choose to prohibit a user from posting on the platform, or remove a user's posts, a newspaper may also prohibit a particular person from submitting content, refuse to publish that person's submissions, or remove that person's submission from subsequent editions. But the government could not criminally prosecute a person who submitted an op-ed to a newspaper under an assumed identity, even in violation of the newspaper's submission rules, without being subject to meeting the constitutional requirements for criminalizing false speech laid out in *Alvarez*.

Moreover, even in traditional trespass law, courts have found that no claim for trespass will lie where the property owner gives consent to enter a space generally open to the public, even where that consent is obtained by misrepresentation, because such a claim would not further the interests underlying trespass law. In *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, for example, the Fourth Circuit overturned a jury's finding that two journalists had trespassed by submitting job applications to a grocery chain with false identities and references to fictitious local addresses. 194 F.3d 505 (4th Cir. 1999). The court explained that the interest underlying trespass law is an interest in "the ownership and peaceable possession of land," and that turning the defendants' successful misrepresentations into trespass would not further that interest. *Id.* at 518. Similarly, in *Desnick v. American Broadcasting Companies*, the Seventh Circuit held that journalists who had infiltrated a health care facility under false pretenses to test for medical malpractice were not trespassers, finding that the facility's consent was valid even though procured through misrepresentation. *See* 44 F.3d 1345, 1351 (7th Cir. 1995) (Posner, C.J.). This case, too, noted that the journalists' misrepresentation did not implicate the interests that trespass is designed to protect. *Id.* at 1352. It explained that the offices the test patients had entered "were

open to anyone expressing a desire for ophthalmic services," and that the testers had not caused "any invasion of a person's private space." *Id*. (quotation marks and alterations omitted). "There was no theft, or intent to steal, trade secrets; no disruption of decorum, of peace and quiet; no noisy or distracting demonstrations." *Id*. at 1353. Because there was no "interference with the ownership or possession of land," the entry was "not invasive in the sense of infringing the kind of interest . . . that the law of trespass protects." *Id*. If the private parties in these cases were unable to state a claim for trespass, it follows that the government would be similarly unable to criminally prosecute the same conduct as trespass.

Thus, even if the websites that Plaintiffs seek to access *were* analogous to real property, the law of trespass would be similarly inapplicable. Like the defendants in *Food Lion* and *Desnick*, Plaintiffs here seek only to access spaces that are generally held open to the public and they will not cause any material harm to their usual functioning. Prosecuting them under a theory of trespass would similarly fail to further the interests that trespass is designed to protect.

### d. As applied to Plaintiffs, the Access Provision cannot survive any level of constitutional scrutiny.

The Access Provision, as discussed above, incorporates within its prohibitions restrictions in websites' terms of service. As such, reading the Access Provision alone does not, and cannot, notify an individual as to what behavior is actually prohibited. To obtain such notice, the individual must additionally read the restrictions contained in each website's own terms of service. The Access Provision then converts each of those restrictions into a criminal prohibition. For that reason, the as-applied First Amendment analysis should turn on whether the criminal enforcement of the particular term of service at issue survives constitutional scrutiny. And, for the same reason, the level of constitutional scrutiny should turn on whether that term of service is content based.

### i. Strict scrutiny applies here.

Because the access restrictions at issue here prohibit communicating false information, they are plainly content-based restrictions on speech. As this Court has already stated, "it is the *content* of plaintiffs' speech to the targeted websites—that they represent their identities falsely or misleadingly instead of truthfully—that triggers the sites' ToS and, thereby, the criminal penalties of the CFAA." MTD Op. at 36 n.14 (noting also that Plaintiffs "would violate the Access Provision because of the *false content* of their particular message" (emphasis added) (alterations omitted)); *see also Animal Legal Def. Fund v. Herbert*, 263 F. Supp. 3d 1193, 1210 (D. Utah 2017) (holding that law discriminating between truthful and false speech was content based); *Animal Legal Def. Fund v. Reynolds*, 297 F. Supp. 3d 901, 919 (S.D. Iowa 2018) (same). As such, this Court should apply the strict scrutiny standard.[4]

### ii. Applying the Access Provision to Plaintiffs' research fails even intermediate scrutiny because it is not narrowly tailored.

Even if this Court applies intermediate scrutiny, the Access Provision fails to pass constitutional muster as applied to Plaintiffs' intended research. To survive intermediate scrutiny, speech restrictions must be narrowly drawn to further a substantial government interest. *Packingham*, 137 S. Ct. at 1736. The government's burden to show that the Access Provision is narrowly drawn to further its substantial interests "is not satisfied by mere speculation or conjecture." *Edwards v. District of Columbia*, 755 F.3d 996, 1003 (D.C. Cir. 2014). Rather, the government "must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id.* And because Plaintiffs seek an injunction only against

---

[4] For the reasons explained above, *see supra* Part III.b., if the government sought to enforce private non-disparagement agreements by criminally prosecuting alleged violators, such prosecutions would be subject to strict First Amendment scrutiny as content-based restrictions on speech.

activity that causes no more than de mininis harm, the government by definition cannot demonstrate that the harms it seeks to suppress are real.

And, in fact, the record is replete with evidence to the contrary. Instead of submitting evidence that prosecuting harmless false speech would help alleviate actual harms that the government seeks to avoid by a material degree, the government's evidence shows the opposite. Strenuously arguing that Plaintiffs have little reason to fear prosecution, the government emphasizes that "the *only* prosecutions" under the Access Provision involving ToS violations *did* involve harmful conduct, and that there has not been "a *single prosecution* under the Access Provision based on factual conduct similar to [Plaintiffs'] research." Def. Br. at 15 (emphases in original). The government further emphasizes that the Attorney General's *Intake and Charging Policy for Computer Crime Matters* "remains in effect and expressly cautions against prosecution based on ToS violations," offering evidence that "prosecution is especially unlikely under the policy if the conduct is genuinely harmless." Def. Br. at 16 (citations omitted). The Chief of the DOJ's Computer Crime and Intellectual Property Section has repeatedly submitted sworn testimony that he does "not expect that the Department would bring a CFAA prosecution based on" the conduct described in the complaint. Def. Br. at 17. And, the government makes clear, DOJ officials have not only stated that the agency "does not intend to prosecute harmless violations of contractual restrictions," but it has stated so "multiple times, across Administrations." *Id.* at 16–17.

While arguing that it has a strong interest in enforcing the Access Provision against even Plaintiffs' research, *see id*. at 45–49, the government emphasizes that "past DOJ legislative proposals that would narrow liability under the Access Provision . . . were part of a compromise package proposed by DOJ." *Id*. at 50. But earlier in its brief, the government argues the opposite.

With respect to whether Plaintiffs face a credible threat of prosecution, the government argues that although many of DOJ's statements that it does not intend to prosecute harmless ToS violations "were made in the context of proposing legislative changes to Congress, the statements about a lack of intent to prosecute *were not contingent* on Congress adopting any such legislative proposals." Def. Br. at 16–17 (citation omitted). The government cannot have it both ways: where it offers evidence that DOJ does not subjectively believe that prosecuting Plaintiffs' conduct would materially further important government interests, it cannot credibly assert, citing *no* evidence other than its own representations, that such a prosecution actually would materially advance its interests. And, indeed, the government's own evidence belies its litigation position that it has an interest in enforcing all violations of the Access Provision. *See* Def. SOF at ¶ 18 (noting the Justice Manual "includes a list of factors that DOJ attorneys should consider in assessing whether a 'substantial federal interest' exists, including the 'nature and seriousness of the offense'").

The government may be correct in the abstract that its interests would "be achieved less effectively absent the [Access Provision]." Def. Br. at 46 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)). But, as the Court made clear in *Ward*, that is a test that applies to "regulation of the time, place, or manner of protected speech." *Ward*, 491 U.S. at 798. Regulations of time, place, and manner must be content neutral. *See id*. There is no reason to import that test into this case, which involves a content-based regulation of speech: Plaintiffs' speech is subject to prosecution under the Access Provision only if it is false, regardless of the time, place, or manner of its submission to a website.

### iii. The interests of third-party companies are not co-extensive with legitimate government interests for purposes of intermediate scrutiny.

The government also offers testimony from third-party companies laying out the *companies'* interests in enforcing their own ToS. But this third-party testimony only underscores the common-sense reality that the government claims too much in arguing that its constitutional authority to police speech is identical to companies' interests in policing the use of their own platforms. Examples from the company's declarations highlight the absurd results of the government's suggested paradigm. Glassdoor, for example, explains that "[a]llowing or tolerating false, manufactured or artificially inflated reviews" by employees of their employers would compromise its reputation for trustworthiness and transparency. Glassdoor Dec. (Def. Ex. 13, ECF No. 53-13), at ¶ 21. The government argues that "[i]f Plaintiffs had a First Amendment right to create fake accounts and provide false information[] . . . that would necessarily undermine the Glassdoor platform by introducing incorrect data and/or reviews," as well as "harming real users who rely on Glassdoor for accurate information" and "the companies that have been reviewed dishonestly." Def. Br. at 47. Glassdoor, of course, may remove the posts of any person it chooses. But the paradigm that the government appears to be proposing is that it could therefore criminally prosecute any person who posted a false, manufactured, or "artificially inflated" review—regardless of whether any harm results. According to the government's logic, a disgruntled ex-employee who artificially exaggerates his complaints about his former employer, leading to no harm, could find himself not only barred from Glassdoor but also facing *criminal penalties* for that speech under the Access Provision—with no First Amendment defense.

Another example throws the implications of the government's position into even starker relief. Facebook explains that when "[b]ad actors use fake accounts to engage in harmful

conduct," such as by seeking to "manipulate and corrupt public debate," that conduct "harms the trust that people—and the broader world—have in Facebook." Facebook Dec. (Def. Ex. 12, ECF No. 53-12), at ¶ 11. Under the government's paradigm, its interests in preventing economic harm, protecting the national interest from misinformation, and more, would justify it in using the Access Provision to criminally prosecute *any* individual who writes a post about a political candidate, or on any political issue, using a pseudonymous or parody account—an exceedingly common occurrence on social media—if Facebook chose to take it down as a violation of its terms of service prohibiting false speech. Such a result would be antithetical to our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"—even where that debate "include[s] vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials" that "contain[] 'half-truths' and 'misinformation.'" *See Sullivan*, 376 U.S. at 270. The government's power to police such speech—only when it occurs online under the auspices of the Access Provision—would "dampen[] the vigor and limit[] the variety of public debate," *id*. at 279, by chilling would-be speakers from participating in that public debate, *id*. The First Amendment does not countenance such a regime.

Indeed, much of the government's argument seems to be that a prohibition on all false speech is necessary as a prophylaxis. It contends, for example, that Plaintiffs' approach is "factually unworkable" because it would be too difficult for companies and the government to distinguish harmful fake accounts from socially beneficial fake accounts. Def. Br. at 44–45; *see also id.* at 48 (arguing that "[i]f academic researchers were granted an exception to prosecution, it would become harder for the Government to enforce the Access Provision against people who engage in harmful conduct but call themselves 'researchers,' as well as against non-researchers

who are (allegedly) engaging in similar First Amendment activity"). But it is a foundational tenet that "[b]road prophylactic rules in the area of free expression are suspect," and that "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP v. Button*, 371 U.S. 415, 438 (1963). The Constitution, in fact, requires the opposite of the government's preferred approach—not only does the First Amendment view prophylactic *prohibitions* on speech with skepticism, but it embraces prophylactic *protections* of speech, extending "'a measure of strategic protection' to otherwise unprotected false statements of fact in order to ensure enough 'breathing space' for protected speech." *Elonis v. United States*, 135 S. Ct. 2001, 2017 (2015) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974)).

### iv. Plaintiffs' research would cause no more than de minimis harm.

A de minimis harm is one that is "[t]rifling; negligible" or "so insignificant that a court may overlook it in deciding an issue or case." De Minimis, Black's Law Dictionary (10th ed. 2014). As a result, whether any harms that may be caused by the Plaintiffs' research would be significant or would be de minimis is a legal question, and is one that the Court can decide based on the undisputed facts now in the record.

First, Plaintiffs are well qualified to testify regarding the harm that their research will or will not cause to the targets of their research. *See* Pl. Resp. SOF at ¶¶ 114–115. The government does not dispute the fact that Plaintiffs' have conducted algorithm audits of websites in the past, *see* Def. SOF at ¶¶ 1–3, nor does it dispute the fact that Plaintiffs take into consideration the effect their research design will have on a website's operations, *see* Pl. Resp. SOF at ¶¶ 114–115 (responding to the government's statement that "*[a]side from the technical concepts associated with their research design (e.g.*, burden on the companies' servers, storage space, etc.), Plaintiffs can only speculate as to whether their conduct causes harm to companies *from the companies' perspective*" (emphases added)). The government attempts to manufacture a dispute over

Plaintiffs' ability to assess the harm from their research by suggesting that only a researcher who has "worked at an online employment company," "been privy to internal deliberations within an online employment company," or who can consider harm to a company "from the company's perspective" is qualified to make such an assessment. *See* Pl. Resp. SOF at ¶¶ 112, 113, 115. But, notably, the government does not provide evidence suggesting that such additional qualifications—of having internal familiarity with an online business—is necessary for researchers and academics with Plaintiffs' qualifications to assess the harm from their online research.

Second, Plaintiffs' testimony establishes that any harm that their research may cause to the targets of their research will be, at most, de minimis. The Plaintiffs' testimony explains in detail the steps they will take to minimize any harm to the targets of their research and to any third party users of websites, which steps include minimizing the number of accounts they create, making it unlikely that any real users would interact with any false postings, and deleting such accounts upon the completion of research. *See* Pl. SOF at ¶¶ 75–78. The government has provided no evidence that *Plaintiffs' research*, specifically, and the steps they will take to minimize harm, will in fact, or even will likely, result in harm that is greater than de minimis.

The government asserts, instead, as a general matter, that the "mere presence of fake accounts harms private platforms, regardless of the purpose for which the fake account was created or any subsequent actions taken by the fake accountholder." *See* Def. SOF at ¶ 88. It relies on testimony from third-party companies asserting that the creation of fake accounts causes harm to their property rights, to their real users, or to their profitability. *See* Def. Br. at 52. But the testimony of third-party companies that the government relies on for this assertion supports Plaintiffs' position that, in fact, any harm from fake accounts depends on the

circumstances. *See* Facebook Dec. (Def. Ex. 12, ECF No. 53-12), at ¶¶ 6, 10 (describing

Facebook's Community Standards, and noting that "the presence of fake accounts *can* create a

feeling of unease and wariness when using Facebook" and "*can* also feed into *potential* concerns

about unwanted contact, safety, and privacy when using Facebook" (emphases added));

Glassdoor Dec. (Def. Ex. 13, ECF No. 53-13), at ¶¶ 16, 20–21 (noting fake accounts "impact the

authenticity" of the website because they "*can* skew certain statistics and metrics . . . and *may*

contribute fake content . . . *that might* mislead Glassdoor users," that "[f]ake accounts could

*theoretically affect* Glassdoor's services in a number of ways," and additionally discussing

"false, manufactured or artificially inflated *reviews*" of employers that, if not monitored, could

"*theoretically*" lead to fewer Glassdoor users (emphases added)); Monster Aff. (Def. Ex. 14,

ECF No. 53-14), at ¶ 2 (discussing the harms to Monster specifically from Monster's own

business model because when users "create fictitious or false accounts," Monster "*then turn[s]

around*" and charges employers for viewing fictitious or false resumes that were, presumably,

uploaded by users after the fact of creating fictitious accounts (emphasis added)); *see also* Pl.

Resp. SOF at ¶¶ 88.

      Thus, this testimony does not contradict Plaintiffs' testimony that, under the

circumstances of their research, any harm will be de minimis. Accordingly, there is no genuine

dispute of fact about that issue, and the Court can properly conclude that, as a legal matter,

Plaintiffs' proposed research, including the steps they will take to minimize harm, will not result

in greater than de minimis harm. *See* MTD Op. at 37 (discussing the types of harms that would

implicate the government's interests in the case at bar as including "material harm to the target

websites' operations," fraud, or false speech used "to gain a material advantage").

### v. Plaintiffs need not demonstrate that no alternatives to their research exist.

Finally, the government's argument that the Access Provision leaves open ample alternatives for Plaintiffs' speech is both incorrect as a matter of fact and irrelevant as a matter of law. The government primarily argues that Plaintiffs could simply "pursue research into online discrimination that does not require the creation of fake or misleading accounts," or pursue research that does require the creation of fake accounts only on websites that do not condition access on the provision of truthful information. *See* Def. Br. at 53. In essence, then, the government's proposed alternative is that Plaintiffs could simply *not* conduct civil rights anti-discrimination testing on the platforms that they would have otherwise audited. The government also contends that Plaintiffs could simply rely on real-world individuals or obtain consent from the websites, *see* Def. Br. at 54–55, but cites as evidence Plaintiffs' own testimony which, in context, shows why such alternatives are not feasible and/or do not allow for the type of independent audit testing that controls for the variables Plaintiffs wish to test. *See* Pl. Resp. SOF at ¶¶ 118, 123–26.

Regardless, though the only evidence in the factual record supports Plaintiffs' position that even minimally-effective alternatives do not exist, there is no need for the Court to engage in this debate. Even applying intermediate scrutiny, the First Amendment requires that a prohibition on speech be narrowly tailored *and* leave ample open ample alternative channels for communication. *See* MTD Op. at 36. The claimed availability of alternatives cannot save the Access Provision as applied to Plaintiffs' proposed false speech, where that application is not narrowly tailored to advance the government's legitimate interests. *See supra* Part III.d.ii–iii.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the government's motion for summary judgment and grant summary judgment to Plaintiffs on their claim that the Access Provision violates the First Amendment as applied to their intended research.

Dated: May 20, 2019                    Respectfully submitted,

s/ *Esha Bhandari*
Esha Bhandari
Naomi Gilens
Rachel Goodman
American Civil Liberties Union
  Foundation
125 Broad St., 18th Floor
New York, NY 10004
Tel: 212-549-2500
Fax: 212-549-2654
ebhandari@aclu.org
ngilens@aclu.org
rgoodman@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the Nation's Capital
915 15th Street, N.W., Second Floor
Washington, D.C. 20005
Tel: 202-457-0800
Fax: 202-457-0805
aspitzer@acludc.org

*Attorneys for Plaintiffs*