# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CHRISTIAN SANDVIG,
*et al.*,

       Plaintiffs,

    v.

WILLIAM P. BARR, in his official capacity
as Attorney General of the United States,

      Defendant.

Case No. 1:16-cv-1368 (JDB)

## DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

ARGUMENT ...............................................................................................................2

I.   At Summary Judgment, Plaintiffs Have Not Carried Their Heightened Burden of
     Establishing Standing.............................................................................................2

     A.  Plaintiffs Have No Concrete Plans for Their Research.......................................2

     B.  The Factual Record Confirms that Any Threat of Prosecution Is Speculative ..................4

     C.  Plaintiffs' Claims Are Not Sufficiently Ripe for Adjudication ...........................8

II.  The First Amendment Does Not Extend to Private Parties' Choices About Whom to
     Exclude from Private Property...............................................................................9

     A.  The Government May Enforce Private Parties' Choices About Whom to Exclude,
         Including Through Criminal Law .....................................................................10

     B.  Plaintiffs' Other Analogies Do Not Change the Analysis, Nor Do They Lessen the
         Practical Consequences of Plaintiffs' Approach................................................12

     C.  There Is No Expressive Activity in Plaintiffs' Conduct....................................15

III. The Access Provision Survives Intermediate Scrutiny ...........................................16

     A.  Strict Scrutiny Does Not Apply .....................................................................16

     B.  Plaintiffs Do Not Dispute the Importance of the Government's Interests Generally,
         or the Availability of Alternatives for Their Conduct .......................................17

     C.  The Access Provision is Narrowly Tailored to Advancing the Government's
         Interests, As Confirmed By the Factual Record................................................18

         1.  Plaintiffs Mischaracterize the "Narrow Tailoring" Inquiry ...........................18

         2.  The Factual Record Confirms that the Access Provision Furthers Significant
             Interests.................................................................................................19

         3.  Plaintiffs' Theory of Absurd Consequences is Incorrect .............................23

         4.  Although Not Relevant, Plaintiffs' Particular Conduct Is Not Limited to De
             Minimis Harm.........................................................................................24

CONCLUSION...........................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*ACLU of Fla. v. Miami-Dade Cty. Sch. Bd.*,
  557 F.3d 1177 (11th Cir. 2009) ................................................................ 3

*ANSWER Coal v. Dist. of Colum.*,
  589 F.3d 433 (D.C. Cir. 2009) ................................................................ 3

*Babbitt v. United Farm Workers National Union*,
  442 U.S. 289 (1979) ................................................................................ 3

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................ 5

*Cent. Hardware Co. v. NLRB*,
  407 U.S. 539 (1972) .............................................................................. 10

*Cohen v. Cowles Media Co.*,
  501 U.S. 663 (1991) .................................................................. 14, 15, 18

*Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz*,
  793 F. Supp. 2d 311 (D.D.C. 2011) ...................................................... 12

*Elonis v. United States*,
  135 S. Ct. 2001 (2015) .......................................................................... 19

*Emergency Coal. to Defend Educ. Travel v. Dep't of the Treasury*,
  545 F.3d 4 (D.C. Cir. 2008) .................................................................... 3

*Hudgens v. NLRB*,
  424 U.S. 507 (1976) ...................................................................... 1, 10, 11

*Indep. Settlement Servs., LLC v. Lewis*,
  296 F. Supp. 3d 194 (D.D.C. 2018) ........................................................ 5

*Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*,
  101 F.3d 145 (D.C. Cir. 1996) ................................................................ 5

*Johnson v. Perez*,
  823 F.3d 701 (D.C. Cir. 2016) .............................................................. 20

*Lloyd Corp. v. Tanner*,
  407 U.S. 551 (1972) .............................................................. 1, 10, 11, 24

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992)........................................................................................... 2, 3, 4

*Manhattan Cmty. Access Corp. (MCAC) v. Halleck,*
    No. 17-1702, 587 U.S. ___, 2019 WL 2493920 (June 17, 2019) ............................ 9, 11, 12, 15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)........................................................................................... 6

*Meeropol v. Meese,*
    790 F.2d 942 (D.C. Cir. 1986) ............................................................................ 6

*NAACP v. Button,*
    371 U.S. 415 (1962)........................................................................................... 19

*Navegar, Inc. v. United States,*
    103 F.3d 994 (D.C. Cir. 1997) ............................................................................ 8

*PruneYard Shopping Ctr. v. Robins,*
    447 U.S. 74 (1980)............................................................................................. 10

*Schlesinger v. Reservists Comm. to Stop the War,*
    418 U.S. 208 (1974)........................................................................................... 8

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009)........................................................................................... 3

*Thomas v. Anchorage Equal Rights Comm'n,*
    220 F.3d 1134 (9th Cir. 2000) ............................................................................ 3

*U.S. Telecom Ass'n v. FCC,*
    825 F.3d 674 (D.C. Cir. 2016) ............................................................................ 3

*United Pub. Workers of Am. (C.I.O.) v. Mitchell,*
    330 U.S. 75 (1947)............................................................................................. 3

*United States v. Albertini,*
    472 U.S. 675 (1985)........................................................................................... 18

*Virginia v. Hicks,*
    539 U.S. 113 (2003)........................................................................................... 15, 23

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989)........................................................................................... 19, 22

**Statutes**

18 U.S.C. § 1030(a)(2)................................................................................................. 23

18 U.S.C. § 1030(a)(2)(C) ............................................................................................. 1

**Rules**

Fed. R. Civ. P. 30(b)(6) ........................................................................................... 6, 20

Fed. R. Civ. P. 56(c) ................................................................................................... 20

Fed. R. Civ. P. 56(c)(2) ................................................................................................ 6

Fed. R. Civ. P. 56(e) ................................................................................................... 25

Fed. R. Civ. P. 56(e)(2) ............................................................................................... 20

Fed. R. Civ. P. 56(e)(3) ............................................................................................... 20

Fed. R. Civ. P. 65(d)(1)(A).......................................................................................... 9

## INTRODUCTION

Plaintiff's latest filing, *see* Pls.' Reply Br. in Supp. of Pls.' MSJ (ECF No. 54) [hereafter "Pls.' Reply"], underscores that Plaintiffs' sole remaining claim cannot proceed based on the factual record compiled in discovery. Plaintiffs' own testimony confirms their lack of standing, and Plaintiffs have adduced no evidence whatsoever disputing the Government's interests in enforcing the challenged provision of the Computer Fraud and Abuse Act (CFAA), *see* 18 U.S.C. § 1030(a)(2)(C) [hereafter the "Access Provision"]. Moreover, Plaintiffs fail to explain how their claim may proceed in light of Supreme Court precedent holding that the First Amendment does not extend to private decisions about whom to exclude from private property. For each of these three reasons, Defendant is entitled to summary judgment.

First, Plaintiffs have not carried their burden of establishing standing. With respect to the research plan that is the subject of this lawsuit, Plaintiffs testify as to a general "intent" to undertake the research at some point in the future. *See* Pls.' Reply at 2-5. But abstract intent—without concrete plans—is not enough to establish standing. Additionally, the factual record confirms that Plaintiffs' claimed fear of prosecution is wholly speculative. Plaintiffs' claim is also not sufficiently ripe, because their research plan contains too many unknowns regarding key facts.

Second, because the Access Provision only enforces private parties' decisions about whom to exclude from private property, Plaintiffs' First Amendment claim fails. *See Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972); *Hudgens v. NLRB*, 424 U.S. 507 (1976). Plaintiffs wholly fail to address these critical Supreme Court decisions. And Plaintiffs' theory—that private choices about whom to exclude implicate the First Amendment when the Government enforces them through criminal prosecution—is contrary to those same Supreme Court decisions, which allow exactly that in the context of trespass. Plaintiffs' theory is thus not only contrary to precedent, but would have far-ranging consequences by essentially requiring that any commercial establishment or

website comply with the First Amendment before excluding a user or patron.  Moreover, Plaintiffs'

claim independently fails at the threshold because their conduct is not expressive activity.

Third and finally, even if some degree of First Amendment scrutiny were appropriate for

the Access Provision, at most it would be intermediate scrutiny.  Plaintiffs here challenge only one

element of intermediate scrutiny—whether the Access Provision is narrowly tailored.  On that

issue, the factual record is uncontroverted: testimony from DOJ officials and private companies

confirm that enforcement of the Access Provision furthers several significant governmental

interests.  Because Plaintiffs fail to meaningfully dispute that evidence, Defendant is entitled to

summary judgment even if the Court were to reach the merits.

## ARGUMENT

## I.   AT SUMMARY JUDGMENT, PLAINTIFFS HAVE NOT CARRIED THEIR HEIGHTENED BURDEN OF ESTABLISHING STANDING

### A.   Plaintiffs Have No Concrete Plans for Their Research

The Government previously demonstrated that Plaintiffs have no concrete plans for

research involving the creation of fake accounts and/or provision of misleading information.  *See*

Def.'s Br. in Supp. of Cross-MSJ (ECF No. 50-1) at 10-12 [hereafter "D-MSJ Br."].  Plaintiffs

respond that they do not need to establish "concrete plans" but only need to offer "a credible

statement" of their "inten[t] to violate the challenged provision."  Pls.' Reply at 3.  But this

argument conflates the standard for pre-enforcement review with the distinct question of what

evidentiary requirements a plaintiff must satisfy to establish standing at summary judgment.  The

cases that Plaintiffs rely on address only the former question, *see* Pls.' Reply at 2-3, whereas the

Government's authority addresses the latter.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564

(1992) ("Such 'some day' intentions—without any description of concrete plans, or indeed even

any specification of *when* the some day will be—do not support a finding of the actual or imminent

injury that our cases require."); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

Notably, Plaintiffs cite no authority for their argument that the Article III requirements of *Lujan* and *Summers* apply only in the environmental context. *See* Pls.' Reply at 2-3. To the contrary, the D.C. Circuit and other courts routinely apply the "concrete plans" requirement outside the environmental context, including when evaluating standing to bring a First Amendment claim. *See Emergency Coal. to Defend Educ. Travel v. Dep't of the Treasury*, 545 F.3d 4, 9-10 (D.C. Cir. 2008) (applying *Lujan*'s "some day intentions" standard in evaluating standing to bring a First Amendment claim); *ANSWER Coal. v. Dist. of Colum.*, 589 F.3d 433, 436 (D.C. Cir. 2009) (similar); *see also ACLU of Fla. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1196 (11th Cir. 2009); *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139-40 (9th Cir. 2000) (en banc); *cf. United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 90 (1947).

Indeed, even in Plaintiffs' cited cases, the courts made clear that they were examining the factual record to ensure that the plaintiffs had adequately demonstrated their future plans to engage in the relevant conduct. *See U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 740 (D.C. Cir. 2016) (evaluating whether the plaintiff's affidavit "adequately manifested" the plaintiff's intent to engage in future conduct); *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 301 (1979) ("The record shows that the UFW has actively engaged in consumer publicity campaigns in the past in Arizona, and appellees have alleged in their complaint an intention to continue to engage in boycott activities in that State."). Nothing about Plaintiffs' cited cases suggests, therefore, that the "concrete plans" standard of *Lujan* and *Summers* is displaced in the First Amendment context.

Here, Plaintiffs do not appear to dispute that, assuming *Lujan*'s "concrete plans" requirement applies, Plaintiffs fail to meet that standard. *See* Pls.' Reply at 5. Nonetheless, Plaintiffs spend significant time seeking to "contextualize" their prior deposition testimony. *See*

Pls.' Reply at 3-4.  To the extent Plaintiffs are contending that such testimony establishes *concrete plans* to engage in research relevant to their sole remaining claim, that is incorrect.  Both Plaintiffs offered unequivocal testimony that they lack concrete plans for such research.  Although Plaintiff Mislove testified that "this is an area of my research that [I] intend to conduct working in," Mislove Depo. Tr. (Revised Exh. 3, attached hereto) at 47, immediately afterwards he was asked whether, setting aside a research project not at issue in this case, he has "concrete plans for any of that other future research," to which he responded "No."  *Id.*  Similarly, Plaintiff Wilson testified "I fully intend to do that research," Wilson Depo. Tr. at 217, but he repeatedly made clear that he has no concrete plans for any such research.  *See* D-MSJ Br. at 10-11; *see also* Wilson Depo. Tr. (Revised Exh. 4, attached hereto) at 61, 62, 195-96, 215-16.  Regardless of Plaintiffs' efforts to muddy the waters, *see* Pls.' Reply at 3-4, they cannot overcome this unequivocal testimony.[1]  Plaintiffs' abstract intent to pursue their research—without "any description of concrete plans, or indeed even any specification of *when* the some day will be"—is fatal to their standing.  *Lujan*, 504 U.S. at 564.

### B.    The Factual Record Confirms that Any Threat of Prosecution Is Speculative

Even apart from a lack of concrete plans, Plaintiffs also lack standing because there is no credible threat of prosecution for their conduct.  On this issue, Plaintiffs largely ignore the factual record compiled in discovery, and merely restate this Court's prior analysis from its motion to dismiss opinion (ECF No. 24).  *See* Pls.' Reply at 5-9.

---

[1] Moreover, many of Plaintiffs' quotations from Plaintiff Wilson's testimony are about potential research projects other than the research plan that is the subject of this lawsuit.  *Compare* Wilson Decl. (ECF No. 48-1) ¶¶ 15-23 (describing the research plan as focusing on how fictitious user accounts are ranked when recruiters search for prospective applicants on a website), *with* Wilson Depo. Tr. at 59-63 (discussing potential research into "gig economy platforms"), *and id.* at 195 (discussing IRB approval for potential research into how fictitious users are ranked when they *apply* for jobs).  Even if concrete plans existed for those potential projects, therefore, it still would not support standing for the research plan that is the subject of this lawsuit.

Specifically, Plaintiffs first discuss how "[t]here is no dispute that the government has enforced the Access Provision in the past." Pls.' Reply at 6-7 (citing cases). But Plaintiffs wholly ignore the Government's argument that, under Article III principles, Plaintiffs cannot rely on past prosecutions generally to establish standing for their as-applied claim here. *See* D-MSJ Br. at 14-15. And none of those past prosecutions involved conduct similar to Plaintiffs' claimed conduct here. *See id.* at 15; *see also* Pls.' Resp. to D-SMF (ECF No. 54-1) ¶¶ 30, 32.[2]

Plaintiffs also reprise their argument that the Government does not know whether the Access Provision may have been used "'to obtain plea agreements in which defendants admitted to harmless ToS violations.'" Pls.' Reply at 7 (quoting MTD Op. at 21). Even if that were relevant at the motion-to-dismiss stage, however, that is not how summary judgment works: Plaintiffs cannot survive summary judgment simply by arguing that the Government has failed to prove a negative. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."); *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 150 (D.C. Cir. 1996) ("Unless the opposing party points to 'affirmative evidence' showing disputed material facts, the court shall enter summary judgment, if appropriate, against the adverse party."); *Indep. Settlement Servs., LLC v. Lewis*, 296 F. Supp. 3d 194, 198 (D.D.C. 2018) (Bates, J.).

Indeed, Plaintiffs would be required to point to affirmative record evidence even if the Government's motion had presented no evidence of its own. *See Celotex Corp.*, 477 U.S. at 322-24. Here, however, the Government's cross-motion was supported by ample evidence

---

[2] In addition to responding to Defendant's Statement of Material Facts, Plaintiffs also filed a "reply" in support of their Statement of Material Facts. *See* ECF No. 54-2. This "reply" is not contemplated by Local Civil Rule 7(h)(1), and thus the Court should disregard it.

demonstrating the absence of any such prosecutions:  prosecutions of harmless ToS violations are

unlikely in light of DOJ's Principles of Federal Prosecution and other charging policies; the

Computer Crime and Intellectual Property Section—the office within DOJ's Criminal Division

most likely to be involved in CFAA prosecutions—has reviewed its own reasonably

comprehensive records and is unaware of any such prosecutions; DOJ also reviewed independent

data from the Executive Office of United States Attorneys (EOUSA) regarding past CFAA

prosecutions, and EOUSA's data likewise did not reveal any such prosecutions; and collectively,

DOJ believes it "has reviewed the most comprehensive records with respect to past charges" and

has identified no such prosecutions.  Suppl. Lynch Decl. (ECF No. 53-9) ¶ 10; *see also* D-SMF

¶¶ 14-22, 24-25, 33-41.[3]  Plaintiffs had the full tools of civil discovery available to them, and if

they believed DOJ's efforts to locate such past prosecutions were insufficient, they could have

pursued the matter on their own.  Having failed to do so, Plaintiffs cannot now avoid summary

judgment by speculating about the possibility of past prosecutions involving harmless ToS

violations.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)

("When the moving party has carried its burden under Rule 56(c), its opponent must do more than

simply show that there is some metaphysical doubt as to the material facts."); *cf. Meeropol v.*

*Meese*, 790 F.2d 942, 953-54 (D.C. Cir. 1986) (affirming the grant of summary judgment because

"speculative assertions" that files exist "are insufficient to raise material questions of fact," and

---

[3] In their Response to Defendant's Statement of Material Facts, Plaintiffs quibble with Mr. Lynch's personal knowledge regarding EOUSA's data.  *See, e.g.*, ECF No. 54-1, ¶ 35.  But Mr. Lynch's supplemental declaration was made in his official capacity on behalf of DOJ as a whole, *see* ECF No. 53-9 ¶ 2, and thus is no different than his testimony pursuant to Fed. R. Civ. P. 30(b)(6).  At a minimum, his declaration sets forth facts that would be admissible if presented in a different form.  *Cf.* Fed. R. Civ. P. 56(c)(2).

the government is not required to "prove a negative—that the files in question do not exist").[4]

Next, Plaintiffs criticize the Government for not "expressly disavow[ing] any intent to prosecute Plaintiffs." Pls.' Reply at 8. But they fail to respond to the Government's argument that standing does not exist simply because the Government has not proven that Plaintiffs face zero risk of potential prosecution. *See* D-MSJ Br. at 17. And here, given the inchoate and indefinite nature of Plaintiffs' potential future research, *see* Part I.C, *infra*, it would be irresponsible for DOJ to definitively disavow any possibility of prosecution. It is sufficient to defeat standing in these circumstances for the undisputed record to reflect that DOJ does *not* expect to bring a prosecution against Plaintiffs' conduct as described. *See* Pls.' Resp. to D-SMF ¶ 25 (undisputed fact).

Finally, Plaintiffs seek to downplay their prior testimony that they do not actually fear prosecution under the CFAA. *See* Pls.' Reply at 8-9. Notwithstanding Plaintiffs' efforts, Plaintiff Mislove clearly testified that he believes his own prosecution is "unlikely." Mislove Depo. Tr. at 146-47. Although he is concerned about "exposing [his] students to . . . potential criminal prosecution," he immediately made clear that he is bringing this lawsuit only on his own behalf— not on behalf of his students. *Id.* As for Plaintiff Wilson, there is no dispute that during his deposition he never once mentioned a fear of prosecution as his motivation for bringing this lawsuit. *See* D-MSJ Br. at 13. The most Plaintiffs can point to is a single ambiguous remark: "[T]o the extent that terms of service muddies the waters here, I am bringing clari[t]y to the work so that we can conduct it." Wilson Depo. Tr. at 152. Of course, that statement—offered in

---

[4] Plaintiffs also criticize the Government's review of past charges for extending back only to June 29, 2015. *See* Pls.' Reply at 7-8. But that was the date *Plaintiffs chose* for their inquiries on this topic. *See* Suppl. Lynch Decl. ¶ 4; Lynch Depo. Tr. (ECF No. 53-8) at 137. In any event, the record here is undisputed that, regardless of time limit, neither Plaintiffs nor the Department of Justice are aware of any past prosecutions involving algorithm audits or based on harmless ToS violations. *See* Pls.' Resp. to D-SMF ¶¶ 24, 26, 29 (each one is undisputed).

response to a question about why Plaintiff Wilson considers filing this lawsuit to be "a notable achievement," *id.*—says nothing about fearing criminal prosecution, and is fully consistent with Plaintiff Wilson's other testimony that he filed this lawsuit based on his policy disagreements with the CFAA. *See* Wilson Depo. Tr. at 127-28, 142, 147, 149-51. Even if not dispositive, Plaintiffs' lack of a subjective fear of prosecution should be part of this Court's "factual and case-specific" analysis of Plaintiffs' claimed standing. *Navegar, Inc. v. United States*, 103 F.3d 994, 999 (D.C. Cir. 1997). Based on this record, Plaintiffs face, at most, only a speculative threat of prosecution.

### C.      Plaintiffs' Claims Are Not Sufficiently Ripe for Adjudication

Finally, Plaintiffs' claims are not ripe because it is unclear whether judicial resolution is even necessary for Plaintiffs to perform their research, and Plaintiffs' research methodology is too vague to allow the Government (and the Court) to evaluate their claim.

Plaintiffs do not deny that they have not yet identified the websites that they intend to access for their research, or that those websites' ToS at the time of research may actually allow Plaintiffs' intended activities. Instead, Plaintiffs contend that "it will always be 'impossible' to know with certainty what any given website's ToS will be at a future date," and therefore under the Government's logic courts "could never consider a pre-enforcement challenge . . . with respect to ToS violations under the Access Provision." Pls.' Reply at 10-11. Of course, "[t]he assumption that if [Plaintiffs] have no standing to sue, no one would have standing, is not a reason to find standing." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974). And in any event, Plaintiffs ignore the possibility of a pre-enforcement suit *after* the target websites have been identified and confirmed to have ToS prohibiting the relevant conduct. Here, Plaintiffs have not yet even reached that stage, and therefore their claim is not ripe.

Additionally, Plaintiffs do not deny that they have not yet defined the exact steps for their research, including the number of fictitious accounts or postings they will make. Plaintiffs contend

that "the *amount* of false speech in which Plaintiffs may engage" is irrelevant.  Pls.' Reply at 11.

But that is contrary to the undisputed record in this action, which is that "[e]valuating the ethics

and potential harm of a particular study requires a fact-specific, case-by-case analysis regarding

the details of the study and the platforms being studied."  Pls.' Resp. to D-SMF ¶ 47 (undisputed);

*see also id.* ¶ 91 (undisputed that "Plaintiff Mislove believes that if a platform is known to have

many fake resumes, that could impact the site or platform").  Given that the amount of false speech

(and other details regarding Plaintiffs' intended research) are indeed relevant to evaluating the

harms caused by such research, Plaintiffs' claims are not yet ripe.

Finally, Plaintiffs effectively concede that their proposed order violates Rule 65, and

suggest that they "could submit a revised proposed order if necessary[.]"  Pls.' Reply at 12.  But

this response overlooks the more fundamental point:  because Plaintiffs' proposed research is still

only abstract, it is impossible for this Court to craft an injunction that "state[s] its terms

specifically" and "describe[s] in reasonable detail . . . the act or acts restrained or required."  Fed.

R. Civ. P. 65(d)(1)(A), (C).  The inability to comply with Rule 65 is not merely a technical defect

but a fundamental flaw in the claim itself—highlighting the claim's lack of ripeness.

## II. THE FIRST AMENDMENT DOES NOT EXTEND TO PRIVATE PARTIES' CHOICES ABOUT WHOM TO EXCLUDE FROM PRIVATE PROPERTY

Plaintiffs do not dispute that private websites are not "public forums" under the First

Amendment, both as a matter of law and based on the factual record compiled here.  *See* D-MSJ

Br. at 20-29; *see also* Pls.' Resp. to D-SMF ¶¶ 49-60.  Indeed, a recent Supreme Court decision

effectively confirms as much.  *See Manhattan Cmty. Access Corp. (MCAC) v. Halleck*, No. 17-

1702, 587 U.S. ___, 2019 WL 2493920, at *5 (June 17, 2019) ("[W]hen a private entity provides

a forum for speech, the private entity is not ordinarily constrained by the First Amendment because

the private entity is not a state actor.  The private entity may thus exercise editorial discretion over

the speech and speakers in the forum."). Instead of "public forum" analysis, Plaintiffs rely on an alternative theory—that the CFAA's status as a criminal statute brings their claim within the First Amendment. *See* Pls.' Reply at 15-22. But this theory is also contrary to Supreme Court precedent, and would have adverse consequences for both the Internet and the physical world.

### A.     The Government May Enforce Private Parties' Choices About Whom to Exclude, Including Through Criminal Law

Plaintiffs' theory of the First Amendment appears to be built on two main ideas: (1) that courts may enforce purely private contracts without running afoul of the First Amendment; but (2) the First Amendment analysis changes when a criminal prohibition is involved. *See* Pls.' Reply at 15-18. These claimed principles, however, are both inaccurate and irrelevant here.

As the Government previously explained, the key cases here are the Supreme Court's decisions holding that the First Amendment does not restrict private parties' choices about whom to exclude from their private property, even when that property is generally open to the public. *See* D-MSJ Br. at 23-24, 30-33 (citing, *e.g.*, *Lloyd Corp.*, 407 U.S. 551; *Hudgens*, 424 U.S. 507; *Cent. Hardware Co. v. NLRB*, 407 U.S. 539 (1972); and *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980)). Plaintiffs wholly ignore these cases and offer no response to them.

Instead, Plaintiffs mischaracterize the Government's position as being based on some sort of contract theory. *See* Pls.' Reply at 17 ("The gravamen of the government's complaint appears to be that, because the Access Provision operates to incorporate terms of service—*i.e.* private agreements—it should not be subject to First Amendment scrutiny because it is merely enforcement of contractual terms."). But the Government's argument here is not tied to enforcement of websites' ToS as private contracts or agreements; rather, the argument is that because access decisions are made by private parties with respect to private property, those access decisions are not subject to First Amendment scrutiny.

Plaintiffs' supposed contract theory does not help distinguish the Supreme Court cases cited above.  When the handbillers in *Lloyd Corp.* were excluded from the shopping mall, it was not based on any sort of private agreement or contract between the mall and the handbillers; it was simply the mall exercising its right as owner of private property.  The Supreme Court nonetheless upheld the exclusion.  *See Lloyd Corp.*, 407 U.S. at 567-70.  Thus, Plaintiffs' first tenet—that courts can enforce private contracts without running afoul of the First Amendment—is irrelevant here, because the Government's argument is not based on principles of contract law but on private property rights.  *See also MCAC*, 2019 WL 2493920, at *6 (describing *Hudgens* as rooted in principles of "private ownership of property" and reaffirming the holding of *Hudgens*).

The Supreme Court's cases also contradict the second tenet of Plaintiffs' First Amendment theory—*i.e.*, that even though courts may enforce private agreements, the analysis is different if a criminal prohibition is involved.  *See, e.g.*, Pls.' Reply at 16-18.  Specifically, although *Lloyd Corp.* and *Hudgens* were filed as civil lawsuits, they arose in the context of individuals seeking prospective relief after being threatened with *criminal* enforcement of trespass statutes.  *See Lloyd Corp.*, 407 U.S. at 554, 556 (describing how "[s]ecurity guards informed the respondents that they were trespassing and would be arrested unless they stopped distributing the handbills within the Center," and noting that the security guards "have police authority" within the shopping mall); *Hudgens*, 424 U.S. at 508 (noting that the picketers "were threatened by an agent of the owner with arrest for criminal trespass if they did not depart").  Contrary to Plaintiffs' theory, therefore, enforcement of private choices through criminal law does not bring those private choices within the First Amendment's reach, as *Lloyd Corp.* and *Hudgens* confirm.  Indeed, courts have routinely concluded that the private choices underlying criminal enforcement of trespass statutes are not susceptible to First Amendment challenge.  *See* D-MSJ Br. at 33 (collecting cases).  Again,

Plaintiffs make no effort to explain how their theory is consistent with these cases.

Plaintiffs' only response regarding trespass is to cite two decisions interpreting the scope of particular states' trespass statutes, which were held not to encompass obtaining entry via misrepresentation (at least with respect to the kinds of misrepresentations occurring in those cases). *See* Pls.' Reply at 21-22.  Those cases did not address the threshold First Amendment question at issue here, however, nor do those cases stand for the proposition that trespass can *never* apply to entry obtained via misrepresentations.   Indeed, another judge of this Court has interpreted the District of Columbia's trespass statute to prohibit entry via misrepresentation.   *See Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 345 (D.D.C. 2011). Accordingly, Plaintiffs' cited cases do not undermine the Government's key argument here:  just as with trespass statutes, the Access Provision does not implicate the First Amendment because it simply enforces private parties' choices about whom to exclude from private property.  *See MCAC*, 2019 WL 2493920, at *6 ("The Constitution does not disable private property owners and private lessees from exercising editorial discretion over speech and speakers on their property.").

**B.     Plaintiffs' Other Analogies Do Not Change the Analysis, Nor Do They Lessen the Practical Consequences of Plaintiffs' Approach**

Rather than squarely confront the Supreme Court authority arising in the trespass context, Plaintiffs instead focus on other contexts and analogies.  Plaintiffs discuss certain intellectual property examples—copyright and trademark—to contend that the First Amendment indeed applies to private choices.  *See* Pls.' Reply at 18-19.  But these examples are far less instructive than trespass.  Both the Access Provision and trespass are generally applicable statutes that prohibit unauthorized access to private property.  Thus, neither one directly relates to speech.  *Cf.* Parts II.C, III.C.3, *infra*.  In contrast, Plaintiffs' examples of copyright and trademark involve actual speech restrictions—*i.e.*, the unlawful action (unauthorized use of the work) is speech itself.  Thus, it

would make sense for the First Amendment to apply differently to those direct speech restrictions.

Additionally, Plaintiffs' argument establishes, at most, that *some* aspects of the copyright and trademark statutory schemes are subject to First Amendment challenge—*e.g.*, if copyright wholly failed to incorporate a "fair use" defense.  Even if *Congress's* decision about how to define the scope of the crime is subject to First Amendment scrutiny, however, that does not mean that *private parties'* decisions about who is authorized to use their work would be subject to the same scrutiny.  And here, Plaintiffs' remaining claim is not that Congress failed to define the crime appropriately in the CFAA—all of those types of claims have been dismissed.  *See* MTD Op. at 33-35, 38-44.  Instead, Plaintiffs are effectively challenging the decisions *by private parties* to exclude Plaintiffs from private websites—*i.e.*, challenging the CFAA as if "the text of the terms of service had themselves been written into the Access Provision."  Pls.' Reply at 17.  Nothing about Plaintiffs' copyright or trademark examples supports this type of claim, directly challenging the private parties' choices themselves.

Allowing First Amendment scrutiny of private parties' choices is not only legally incorrect but would have severely negative consequences.  *See* D-MSJ Br. at 30-35.  Plaintiffs try to downplay these practical consequences, but their responses are unpersuasive.  For example, Plaintiffs dispute the hypothetical about a host seeking police assistance in removing an unwelcome neighbor based on the neighbor's objectionable political statement.  *See* D-MSJ Br. at 32.  Plaintiffs contend that "a man's home is his castle," and thus "the First Amendment does not require that a host listen to a neighbor's unwanted speech within the host's own home."  Pls.' Reply at 20.  But this response is inadequate.  For one thing, Plaintiffs offer no explanation as to how police removal of the neighbor is consistent with their underlying First Amendment theory— because police enforcement of trespass law is still a criminal matter, not civil enforcement of a

purely private contractual term.  And even if this *ad hoc* exception for a person's home did not itself undermine Plaintiffs' theory, this exception would only be limited to a person's home.  Thus, all other locations—*i.e.*, commercial establishments—would still be required to comply with the First Amendment prior to excluding anyone.  *See* D-MSJ Br. at 26-27 & n.4; *MCAC*, 2019 WL 2493920, at *6 (noting that commercial establishments "often open their property for speech").

Additionally, under Plaintiffs' approach, private websites would themselves be required to comply with the First Amendment.  *See* D-MSJ Br. at 31-32.  Plaintiffs insist that a ruling in their favor would not "put an end to websites' ability to control their own content or call into question the constitutionality of websites' immunity under the Communications Decency Act." Pls.' Reply at 18.  But again, Plaintiffs make little effort to explain how that is consistent with their underlying legal theory.  *See* D-MSJ Br. at 32.  To the extent Plaintiffs are implicitly arguing that private websites could enforce their ToS without implicating the First Amendment because they would merely be seeking "judicial enforcement of purely private agreements," Pls.' Reply at 16, there are several problems with that argument.  For starters, it is not clear that a lawsuit seeking to enforce websites' ToS would be a purely contractual one, as opposed to a suit dependent on the CFAA or some other state-created cause of action—the latter of which would implicate the First Amendment even under Plaintiffs' approach.  *See* Pls.' Reply at 17 (agreeing that "any laws and common-law torts that restrict speech . . . can trigger constitutional scrutiny"); *cf. Cohen v. Cowles Media Co.*, 501 U.S. 663, 668 (1991) (state action includes "application of state rules of law").

Second, even if suits seeking to enforce ToS fell within Plaintiffs' exception for enforcement of "purely private agreements," unless Plaintiffs are willing to concede that ToS are valid and enforceable contracts, then this purported solution rings hollow—because Plaintiffs' framework would still leave websites powerless to enforce their ToS.  Moreover, if Plaintiffs *do*

concede that ToS are valid and enforceable contracts, then their claim here fails for a more straightforward reason: those ToS would be equally enforceable against Plaintiffs, which itself precludes a First Amendment claim. *See Cohen*, 501 U.S. at 671-72 (holding that there is no First Amendment problem with a law that "simply requires those making promises to keep them").  In short, Plaintiffs cannot have it both ways—either ToS are valid and enforceable contracts such that Plaintiffs likewise do not have a First Amendment right to disregard them, or Plaintiffs' claim would effectively require private websites to comply with the First Amendment's requirements *in toto*.  In either scenario, Plaintiffs' claims here fail. *See MCAC*, 2019 WL 2493920 at *7 (rejecting a First Amendment theory that would "eviscerate certain private entities' rights to exercise editorial control over speech and speakers on their properties or platforms").

### C.    There Is No Expressive Activity in Plaintiffs' Conduct

Finally, even if the First Amendment might otherwise apply to their claim, Plaintiffs have not satisfied the threshold requirement that their conduct be expressive. *See* D-MSJ Br. at 37-39. First, Plaintiffs wholly ignore the Government's legal argument—that because the CFAA criminalizes only unauthorized access, there is no expressive activity sufficient to invoke the First Amendment. *See id.* at 38 (citing *Virginia v. Hicks*, 539 U.S. 113, 123 (2003)); *see also Cohen*, 501 U.S. at 669 (a law of general applicability "do[es] not offend the First Amendment simply because [its] enforcement" has "incidental effects" on a party's speech).

Rather than directly disputing this argument, Plaintiffs instead contend that the Court has already decided that their conduct is expressive. *See* Pls.' Reply at 14 (citing MTD Op. at 36 n.14). But that was before there was a factual record and without fulsome briefing on the issue; there is no impediment to the Court reaching a different conclusion at this stage of the litigation.

As a factual matter, moreover, Plaintiffs do not dispute that they affirmatively do not intend their "speech" to be seen by any third-party users of websites. *See* D-MSJ Br. at 38-39.  Plaintiffs

-15-

instead contend that "the intended audience for such speech is not other users, but the platform itself[.]" Pls.' Reply at 15. But the record is equally clear on this point: Plaintiffs also do not intend for the platform to become aware of their fictitious user accounts. *See* Wilson Depo. Tr. at 99 ("We want to stay under the service's radar to the greatest extent possible."); Mislove Depo. Tr. at 118-19 ("[T]o make audits scientifically valid you need the auditee to be unaware that they are being audited[.]"); *see also* Pls.' Resp. to D-SMF ¶ 80 (undisputed that "Plaintiffs intend for their research activity to remain unknown to the website for the duration of the research activity").[5] Even with respect to the platform, therefore, Plaintiffs still intend for their accounts to be the proverbial "tree [that] falls in the woods and no one is around." Wilson Depo. Tr. at 92-93.

## III.   THE ACCESS PROVISION SURVIVES INTERMEDIATE SCRUTINY

### A.   Strict Scrutiny Does Not Apply

In a brief paragraph, Plaintiffs once again assert that the Access Provision should be evaluated under strict scrutiny. *See* Pls.' Reply at 23. Plaintiffs appear to abandon their prior arguments in favor of strict scrutiny, *see* Pls.' MSJ Br. at 12-15, and instead fall back on the idea that "[b]ecause the access restrictions at issue here prohibit communicating false information, they are plainly content-based restrictions on speech." Pls.' Reply at 23. But the Access Provision prohibits only unauthorized access; it does not itself prohibit any speech or any of the actions that private websites have chosen to prohibit through their ToS. *See* MTD Op. at 36; D-MSJ Br. at 35-37. Plaintiffs have again failed to cite any authority supporting their theory that the

---

[5] Although Plaintiffs assert that they "typically inform websites or platforms of their research findings prior to publication," Pls.' Resp. to D-SMF ¶ 80, those disclosures are irrelevant. The relevant claimed speech for Plaintiffs' claim here is the fictitious accounts. By the time Plaintiffs disclose their findings, the underlying accounts have already been deleted. *See* Pls.' Resp. to Interrog. No. 6 (ECF No. 53-6) at 6 ("Plaintiffs intend to minimize harm by . . . deleting the job listings and job seeker accounts when they are done[.]"). Thus, the underlying accounts are not intended to be viewed by any audience, including the platform itself.

constitutionality of the Access Provision should be evaluated as if "the text of the terms of service had themselves been written into the Access Provision." Pls.' Reply at 17; *see also id.* at 22.

The problem with such an approach is obvious: the applicability of the Access Provision does not turn on whether Plaintiffs' speech is true or false, or on any other particular ToS. The sole question is whether Plaintiffs' access is authorized or not, and the particular reason *why* their access is unauthorized is irrelevant. Just as when a homeowner excludes a guest, the reason *why* the homeowner has done so is irrelevant to the applicability of the trespass statute; the same is true here for the Access Provision. Again, Plaintiffs' preferred mode of First Amendment analysis runs headlong into practical consequences that they agree are untenable. If the Access Provision is evaluated based on "whether the criminal enforcement of the particular term of service at issue survives constitutional scrutiny," Pls.' Reply at 22, then similarly a homeowner (or other property owner) can exclude guests only if the owner's reasons for doing so are consistent with the First Amendment. Clearly that is incorrect, and the Access Provision is not subject to strict scrutiny.

**B.      Plaintiffs Do Not Dispute the Importance of the Government's Interests Generally, or the Availability of Alternatives for Their Conduct**

As this Court has previously noted, "[i]n order to survive intermediate scrutiny, a law must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternative channels for communication of the information." MTD Op. at 36 (citation omitted). Here, Plaintiffs do not meaningfully dispute two of these three requirements.

First, the Government previously explained the numerous governmental interests served by the Access Provision. *See* D-MSJ Br. at 40-42. Plaintiffs do not dispute that these interests are significant or appropriately considered with respect to the Access Provision. Accordingly, the first element of intermediate scrutiny—that a law serve significant governmental interests—is satisfied.

Additionally, with respect to leaving open alternatives, Plaintiffs offer a brief argument that

the alternatives identified by the Government are not Plaintiffs' preferred method of performing their research.  *See* Pls.' Reply at 31.  But Plaintiffs do not explain why these alternatives are *inadequate—i.e.*, would not enable them to perform meaningful anti-discrimination research regarding online hiring platforms.  Indeed, Plaintiffs affirmatively suggest that the Court need not base its decision on this element.  *See id.*  Thus, Plaintiffs do not contend that the Access Provision independently fails intermediate scrutiny based on a lack of alternatives.  The sole issue, then, is whether the Access Provision is sufficiently "narrowly tailored" to survive intermediate scrutiny.

### C.  The Access Provision is Narrowly Tailored to Advancing the Government's Interests, As Confirmed By the Factual Record

### 1.  Plaintiffs Mischaracterize the "Narrow Tailoring" Inquiry

Before discussing the specific reasons why the Access Provision survives narrow tailoring, it is first necessary to correct several legal errors occurring throughout Plaintiffs' reply.

First and most fundamentally, at several points Plaintiffs imply that the appropriate question on narrow tailoring is whether the Access Provision would further the Government's interests as enforced against *Plaintiffs' particular conduct*.  *See, e.g.*, Pls.' Reply at 23 ("[T]he Access Provision fails to pass constitutional muster as applied to Plaintiffs' intended research.").  But Plaintiffs wholly fail to respond to the Government's argument on this point—*i.e.*, that even for an as-applied claim, the narrow tailoring inquiry is still conducted with respect to the challenged law's "general effect."  *United States v. Albertini*, 472 U.S. 675, 689 (1985); *see* D-MSJ Br. at 42-45.  Plaintiffs have thus conceded that the Access Provision must be evaluated with respect to the full range of statutory interests, not only based on Plaintiffs' particular conduct.

Second, Plaintiffs contend that even if the Government's interests "would be achieved less effectively absent the Access Provision," that test applies only to "regulation of the time, place, or manner of protected speech" and not to "a content-based regulation of speech."  Pls.' Reply at 25

(modifications omitted).  But this argument is simply reprising their contention that strict scrutiny should apply.  As this Court has already noted, the standard for intermediate scrutiny is essentially the same as the standard for time, place, or manner restrictions.  *See* MTD Op. at 36 n.14; *see also* D-MSJ Br. at 39.  Thus, Plaintiffs' concession that "[t]he government may be correct in the abstract that its interests would be achieved less effectively absent the Access Provision," Pls.' Reply at 25 (modifications omitted), should be dispositive under intermediate scrutiny.  *See Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989).

Finally, Plaintiffs criticize the Government's argument as suggesting that "a prohibition on all false speech is necessary as a prophylaxis."  Pls.' Reply at 27.  But that is not the Government's argument.  Rather, the Government contends that the prohibition on *unauthorized access* furthers numerous important governmental interests even when the unauthorized access is caused by the provision of false information, *see* D-MSJ Br. at 45-49, and to the extent Plaintiffs contend that there should be an exception for harmless false information, that exception is unworkable, *see id.* at 44.  That argument is perfectly appropriate for a "narrow tailoring" inquiry.  Indeed, Plaintiffs' cited cases have nothing to do with narrow tailoring or even intermediate scrutiny—one case arose in the context of a vagueness challenge, *see NAACP v. Button*, 371 U.S. 415, 432 (1962), and the other was the opinion of a single Justice discussing the appropriate *mens rea* for a crime, *see Elonis v. United States*, 135 S. Ct. 2001, 2017 (2015) (Alito, J., concurring in part and dissenting in part).  Here, as long as the Access Provision "promotes a substantial government interest that would be achieved less effectively absent the regulation," *Ward*, 491 U.S. at 799, the statute must be upheld.

## 2.     The Factual Record Confirms that the Access Provision Furthers Significant Interests

It bears emphasizing that, in terms of evidence that the Access Provision furthers important government interests, the record here is entirely one-sided:  Plaintiffs have submitted nothing to

refute the Government's testimony.  *See* D-MSJ Br. at 45-49.  Indeed, in connection with Defendant's Statement of Material Facts explaining how the Access Provision furthers the Government's interests, Plaintiffs' response fails to cite any evidence whatsoever, and instead disputes each paragraph as "a self-serving and conclusory statement regarding what the Government's enforcement of the Access Provision accomplishes."  Pls.' Resp. to D-SMF ¶¶ 66-72.  But that is not a meaningful response, *cf.* Local Civil Rule 7(h)(1) (directing response statements to "include references to the parts of the record relied on"), and the D.C. Circuit has made clear that a party cannot survive summary judgment without actual evidence:  "[I]f one party presents relevant evidence that another party does not call into question factually, the court must accept the uncontroverted fact."  *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016).  Indeed, Plaintiffs' accusation that testimony is "self-serving" is clearly inadequate for avoiding summary judgment.  *See id.* at 710 ("[E]vidence a party proffers in support of its cause will usually, in some sense, be 'self-serving.'  It is nonetheless beyond question as a general proposition that parties, like other fact witnesses, are legally competent to give material testimony.").

Here, DOJ has presented substantial testimony that the Access Provision furthers important governmental interests.  *See* D-MSJ Br. at 40-53.  Plaintiffs deposed DOJ pursuant to Fed. R. Civ. P. 30(b)(6), yet Plaintiffs failed to uncover any basis for doubting DOJ's testimony regarding the Access Provision and its interests.  In these circumstances, there is no "genuine issue" and summary judgment is warranted.  *See* Fed. R. Civ. P. 56(c), (e)(2), (e)(3).

Plaintiffs' only attempt to grapple with DOJ's testimony is to misconstrue statements in the Government's filings and past DOJ statements made in the context of potential legislative changes. Plaintiffs recount the numerous DOJ statements and policies underscoring that Plaintiffs' claimed threat of prosecution is speculative, *see* Pls.' Reply at 24, and then construe these as suggesting

that "DOJ does not subjectively believe that prosecuting Plaintiffs' conduct would materially further important government interests," *id.* at 25.  As the Government previously explained, however, there is a difference between whether DOJ intends to *prosecute* conduct and the question whether important governmental interests are served by the conduct remaining illegal.  *See* D-MSJ Br. at 50.  The DOJ statements and policies address the former, whereas the evidence in this case addresses the latter.  Thus, there is no inconsistency, and the unqualified record here demonstrates that the Access Provision furthers important interests.[6]

Indeed, the evidentiary record here contains more than just testimony from DOJ officials; it also contains significant corroborating evidence from third-party companies themselves. Contrary to Plaintiffs' argument, the Government does not claim "that its interests in enforcing the Access Provision are co-extensive with private companies' interests in enforcing their own terms of service[.]"  Pls.' Reply at 1; *see also id.* at 26.  The Government's interests in enforcing the Access Provision are set forth in its testimony.  *See, e.g.*, Def.'s Suppl. Resp. to Pls.' Interrog. Nos. 6-7 (ECF No. 53-18).  Specifically, by enforcing the CFAA, the Government "protects the freedom of private parties to decide how to design their platforms, to exclude unauthorized users from their systems, and to prohibit the creation of fake accounts on their network."  *Id.* at 3.  To illustrate the strength of those interests—*e.g.*, to illustrate why it is important for private parties to have the freedom to design their networks as they choose, including prohibiting fictitious user

---

[6] Contrary to Plaintiffs' suggestion, *see* Pls.' Reply at 24-25, there is also no inconsistency in arguing (1) that DOJ officials' past statements regarding a lack of intent to prosecute harmless violations were not contingent on any legislative changes to the CFAA, but (2) when discussing the actual potential legislative changes, DOJ suggested those changes only as a comprehensive package.  *See* D-MSJ Br. at 16-17, 50.  If anything, it is Plaintiffs who are trying to "have it both ways" by asserting that DOJ has not sufficiently disavowed an intent to prosecute Plaintiffs, but then arguing that DOJ has conceded (through those same statements and policies) that prosecuting Plaintiffs' conduct would not advance any governmental interests.

accounts—it is useful to hear from the private companies directly.

Aside from invoking straw-man hypotheticals, *see* Part III.C.3, *infra*, Plaintiffs' only other response to the third-party companies' testimony is to cherry-pick quotations and imply that only *some* fake accounts pose harm to the companies. *See* Pls.' Reply at 29-30. The use of contingent language in the companies' declarations merely reflects the obvious truth that not all fake accounts implicate the full range of potential harms—*e.g.*, not every fake account involves a scheme to defraud users out of money and also the spread of political misinformation. Fairly read, however, the third-party companies' declarations clearly reflect that the mere presence of fake accounts causes them harm. *See, e.g.*, Rockwell Decl. (ECF No. 53-11) ¶ 8 ("Fake profiles are the root and starting point for many types of abuse on LinkedIn. They harm LinkedIn's business, brand, customers, and members."); O'Brien Decl. (ECF No. 53-13) ¶ 21 ("Allowing or tolerating false, manufactured or artificially inflated reviews directly contradicts [Glassdoor's] promise to users[.]"); Kardon Aff. (ECF No. 53-14) ¶ 2 (explaining that "Monster's business model requires such a prohibition" on "the creation of fictitious user accounts and/or providing false information"); *see also* Gleicher Decl. (ECF No. 53-12) ¶¶ 6, 9-11 (Facebook explaining that "[a]uthenticity is the cornerstone of our community" and the many negative impacts of allowing fake accounts). Indeed, if Plaintiffs were correct that only *some* fake accounts cause harm, these companies would not undertake such significant measures to prevent and disable the creation of the millions of fake accounts they face every year. *See* Pls.' Resp. to D-SMF ¶¶ 51-54, 73-75.

In short, the factual record here contains substantial evidence both from DOJ and from third-party companies demonstrating that the Government's interests "would be achieved less effectively absent the" Access Provision. *Ward*, 491 U.S. at 799. Because Plaintiffs have failed to come forward with any contrary evidence of their own, summary judgment is warranted.

### 3.      Plaintiffs' Theory of Absurd Consequences is Incorrect

Rather than confront the factual record here, Plaintiffs assert that "the government's suggested paradigm" would lead to "absurd results."  Pls.' Reply at 26.  As an initial matter, it is unclear how this argument relates to the "narrow tailoring" inquiry for Plaintiffs' as-applied First Amendment claim.  Plaintiffs' argument, in essence, is that the Access Provision criminalizes too much speech.  *See id.* at 26-27.  But that was the basis for Plaintiffs' overbreadth claim, which has now been dismissed.  *See* MTD Op. at 33-35.  Thus, this line of argument is largely irrelevant.

In any event, Plaintiffs' argument is also incorrect.  Plaintiffs' examples of "absurd results" are "a disgruntled ex-employee who artificially exaggerates his complaints about his former employer" on Glassdoor, and an "individual who writes a post about a political candidate . . . using a pseudonymous or parody account" on Facebook.  Pls.' Reply at 26, 27.  Plaintiffs incorrectly assume, however, that the Access Provision automatically renders such conduct criminal.  The Access Provision contains multiple elements, all of which must be met before criminal liability exists.  For example, the Access Provision extends only to those who "*intentionally* access[] a computer without authorization," 18 U.S.C. § 1030(a)(2) (emphasis added), and therefore unwitting or even negligent violations of ToS are not criminal.  Moreover, this Court already concluded that the Access Provision only extends to genuine access restrictions—*i.e.*, "only those ToS that limit access to particular information."  MTD Op. at 34; *see also* D-MSJ Br. at 18 n.3.  In Plaintiffs' examples, it is not clear that the posting of such content would itself violate any genuine access restrictions and/or involve "obtain[ing] . . . information from a[] protected computer" sufficient to create criminal liability under the Access Provision.

Regardless, even if criminal liability were to exist in Plaintiffs' hypothetical situations, that is not a cause for concern.  The Access Provision would not be criminalizing Plaintiffs' *speech* as such, but rather Plaintiffs' *unauthorized access* onto a private platform.  *Cf. Hicks*, 539 U.S. at 123

("[I]t is Hicks' nonexpressive conduct—his entry in violation of the notice-barment rule—not his speech, for which he is punished as a trespasser."). Indeed, the situation in Plaintiffs' hypotheticals is no different than the one in *Lloyd Corp.*, where the handbillers wanted entry to the shopping mall for purposes of their political speech, *i.e.*, "to protest the draft and the Vietnam war." 407 U.S. at 572. Even though such speech would clearly be protected by the First Amendment if it occurred in public, the Supreme Court nonetheless held that the handbillers did not have a First Amendment right to communicate their speech on private property. The same is true here: although political speech is generally protected by the First Amendment, that does not mean there is a First Amendment right to engage in such political speech on Facebook in violation of Facebook's ToS governing access to the site. Even assuming the Access Provision extended to Plaintiffs' hypotheticals, therefore, that would not present any First Amendment concerns.

**4.    Although Not Relevant, Plaintiffs' Particular Conduct Is Not Limited to De Minimis Harm**

Finally, Plaintiffs continue to insist that their particular research activity would impose only *de minimis* harm. Once the narrow tailoring inquiry is properly defined, however, this issue becomes irrelevant—because the statute is examined based on its general effect, not solely with respect to Plaintiffs' particular conduct. *See* Part III.C.1, *supra*; D-MSJ Br. at 42-45. Nonetheless, Plaintiffs are also wrong that their activity poses only *de minimis* harm.

Plaintiffs now offer a definition of *de minimis* harm as involving only "trifling," "negligible," or "insignificant" harm. *See* Pls.' Reply at 28. Plaintiffs do not retract their prior testimony, however, discussing their rather broad view of the types of conduct that impose only *de minimis* harm. *See* D-MSJ Br. at 51. That is reason enough to decline to adjudicate Plaintiffs' claims as unripe—because if this Court authorizes Plaintiffs to engage in a research plan that is still undefined, the Court would essentially be deferring to Plaintiffs as the arbiters of what

constitutes *de minimis* harm, and the record here demonstrates the risks of such an approach.

Moreover, the record confirms that Plaintiffs themselves are not capable of determining the full range of harms associated with their conduct, particularly because Plaintiffs lack a proper foundation for testifying about how or whether third-party companies would suffer harms to their business models. *See* D-MSJ Br. at 51-52. Plaintiffs respond that "the government does not provide evidence suggesting that such additional qualifications . . . [are] necessary[.]" Pls.' Reply at 29. But it is *Plaintiffs'* burden to establish their personal knowledge for their testimony. *See* Fed. R. Civ. P. 56(e). Moreover, the detailed declarations from third-party companies underscore why internal familiarity with a business is necessary to evaluate the effect of fake accounts on things like a company's internal operations, business model, and profitability.

Finally, Plaintiffs do not respond to the Government's argument that their research would, at a minimum, transgress the private websites' property rights, negatively affect real users of the websites, and undermine the private websites' integrity and potential profitability by diluting them with fake accounts. *See* D-MSJ Br. at 52; D-SMF ¶¶ 65-72, 82-102. These harms are material; indeed, Plaintiffs do not dispute that avoiding these harms constitutes a significant governmental interest. *See* Part III.A, *supra*. Accordingly, even if it were relevant whether Plaintiffs' particular conduct would cause more than *de minimis* harm, the record here demonstrates that it would. Thus, even assuming Plaintiffs have standing and some degree of First Amendment scrutiny is warranted, the Access Provision is narrowly tailored and survives intermediate scrutiny.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' remaining claim for lack of subject-matter jurisdiction, or in the alternative enter summary judgment for Defendant.

Dated: June 17, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JOHN R. TYLER
Assistant Branch Director

*/s/ Daniel Schwei*
DANIEL SCHWEI (N.Y. Bar)
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12024
Washington, DC 20530
Tel.:      (202) 305-8693
Fax:      (202) 616-8460
E-mail:   daniel.s.schwei@usdoj.gov

Mailing Address:
Post Office Box 883
Washington, D.C. 20044

Courier Address:
1100 L Street NW, Room 12024
Washington, D.C. 20005

*Counsel for Defendant*