
# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHRISTIAN W. SANDVIG *et al.*,<br><br>  Plaintiffs,<br><br>v.<br><br>WILLIAM P. BARR, in his official capacity as Attorney General of the United States,<br><br>  Defendant. | Case No. 1:16-cv-1368 (JDB) |

**PLAINTIFFS' MEMORANDUM IN RESPONSE TO COURT'S ORDER, ECF NO. 63**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

I. Plaintiffs' anticipated actions do not constitute accessing a computer "without authorization" because the statutory language should be construed to cover theft of information from a computer by an outsider. (Questions 1 and 2) ........................................ 1

II. This Court should interpret "exceeds authorized access" to exclude violations of website terms of service. (Questions 3, 4, and 5) ................................................................................ 3

## TABLE OF AUTHORITIES

**Cases**

*Hedgeye Risk Mgmt., LLC v. Heldman*,
  271 F. Supp. 3d 181 (D.D.C. 2017) ................................................................................... 4

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  938 F.3d 985 (9th Cir. 2019) ........................................................................................ 1, 2

*Packingham v. North Carolina*,
  137 S. Ct. 1730 (2017) ................................................................................................. 6, 7

*United States v. Nosal*,
  676 F.3d 854 (9th Cir. 2012) ............................................................................... 3, 4, 5, 6

*United States v. Valle*,
  807 F.3d 508 (2d Cir. 2015) .......................................................................................... 1, 4

**Statutes**

Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*. ...................................................... 1, 4

**Other Authorities**

H.R. Rep. No. 98-894 (1984) ..................................................................................................... 1

Orin S. Kerr, *Norms of Computer Trespass*, 116 Colum. L. Rev. 1143 (2016) ....................... 2, 3

S. Rep. No. 104-357 (1996) ....................................................................................................... 2

Plaintiffs' anticipated actions do not constitute accessing a computer "without authorization" under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*. ("CFAA"). Plaintiffs' anticipated actions would "exceed[] authorized access" under the CFAA if that language includes violations of website terms of service ("ToS"). If it does, the CFAA would be unconstitutional as applied to Plaintiffs' anticipated actions. But both "without authorization" and "exceeds authorized access" are properly understood to prohibit hacking to steal information, and this Court should therefore interpret the CFAA to exclude liability for ToS violations, including by applying constitutional avoidance. If this Court does so, Plaintiffs are still entitled to declaratory and injunctive relief to ensure that the government cannot prosecute their anticipated violations of website terms of service under the CFAA.

**I.     Plaintiffs' anticipated actions do not constitute accessing a computer "without authorization" because the statutory language should be construed to cover theft of information from a computer by an outsider. (Questions 1 and 2)**

The text, purpose, and legislative history of the CFAA show that 18 U.S.C. § 1030(a)(2)(C) is properly read to prohibit data theft. Congress initially meant to protect government and corporate computers against behavior that is analogous to breaking and entering and then stealing information—*i.e.*, hacking. *See* H.R. Rep. No. 98-894, at 20 (1984) (stating that "Section 1030 deals with an 'unauthorized access' concept of computer fraud rather than the mere use of a computer" such that "the conduct prohibited is analogous to that of 'breaking and entering' rather than using a computer (similar to the use of a gun) in committing the offense"); *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 1000 (9th Cir. 2019) ("The CFAA was enacted to prevent intentional intrusion onto someone else's computer—specifically, computer hacking."); *United States v. Valle*, 807 F.3d 508, 524–26 (2d Cir. 2015) (noting "statute's principal purpose of addressing the problem of hacking").

1

When enacted, the CFAA applied to only "a narrow range of computers—namely, those containing national security information or financial data and those operated by or on behalf of the government." *hiQ Labs*, 938 F.3d at 1001. In 1996, Congress expanded the CFAA to cover "protected computer[s]." S. Rep. No. 104-357, at 2 (1996). Interpreting "protected computer" over time to cover websites designed for public interaction on the Internet has unmoored the CFAA from its purpose and has resulted in interpretative difficulties that have split courts. *See generally* Orin S. Kerr, *Norms of Computer Trespass*, 116 Colum. L. Rev. 1143, 1154 (2016) ("*Norms*") (noting the CFAA interpretive problems stemming from the fact that the "Internet and its technologies are new"). As a statute created to prohibit theft from computers and back-end closed systems, the CFAA has become a poor fit for exchanges of information over the Internet. Accordingly, the Ninth Circuit has held that it is a "serious question" whether access to public information on a website can ever be "without authorization." *hiQ Labs*, 938 F.3d at 1000 ("The 1984 House Report on the CFAA explicitly analogized the conduct prohibited by section 1030 to forced entry."); *see also Norms*, 116 Colum. L. Rev. at 1164 ("[A] website owner necessarily assumes the risk that information published on the Web will be found.").

The analysis does not change when a user must create an account—*i.e.* create or generate a username and password—to obtain information over the Internet. While *bypassing* the username and password requirement or using stolen credentials might be analogized to breaking and entering or picking a lock, creating and using a username and password cannot be, and therefore does not constitute access "without authorization." *See* Mem. Op., ECF No. 24, at 37–38 ("It is difficult to argue that trespass or theft concerns can justify restricting—or even apply to—viewing information that a website makes available to anyone who chooses to create a username and password."); *Norms*, 116 Colum. L. Rev. at 1164, 1171 (arguing that

"unauthorized access requires bypassing authentication" such as "using stolen credentials or bypassing security flaws to circumvent authentication"). None of Plaintiffs' proposed actions constitute access "without authorization," because Plaintiffs do not intend to access any data or information on a website that is not made available to the public or to anyone who creates an account on the site, *see* Pl. Ex. 1, ECF No. 48-1, at ¶ 51; Pl. Ex. 2, ECF No. 48-2, at ¶ 48, meaning that they do not intend to bypass any requirement to sign in via the login credentials that they themselves create through tester accounts. *See* Pl. Ex. 21 at ¶ 6; Pl. Ex. 22 at ¶ 6.

II. **This Court should interpret "exceeds authorized access" to exclude violations of website terms of service. (Questions 3, 4, and 5)**

Plaintiffs' proposed actions would "exceed[] authorized access" if the statutory language prohibits violations of website ToS. Because the U.S. Department of Justice considers violations of website ToS to constitute CFAA violations, the Plaintiffs seek relief from prosecution for violating ToS prohibiting false information in the course of their research.

Interpreting "exceeds authorized access" to cover violations of website ToS is contrary to Congress's purpose and raises serious constitutional concerns, including Plaintiffs' as-applied claim that the First Amendment protects their harmless falsehoods and misrepresentations in the course of civil rights testing and research.[1] The language is meant to cover situations where an "insider," such as an employee, has access to certain information but improperly accesses other information through behavior that constitutes hacking to steal information—which could include bypassing authentication requirements or using someone else's authentication credentials. For

---

[1] Plaintiffs raised other constitutional challenges to the "exceeds authorized access" language, *see* Mem. Op., ECF No. 24, at 29–33, which this Court dismissed by applying constitutional avoidance and narrowly interpreting the statute. The Ninth Circuit noted the constitutional due process problems if ToS violations are rendered criminal, including lack of adequate notice to website users. *See United States v. Nosal*, 676 F.3d 854, 860–62 (9th Cir. 2012) (en banc).

the same reasons that the phrase "without authorization" is about hacking, "exceeds authorized access" is about hacking. Similarly, "not entitled so to obtain" in the definition of "exceeds authorized access," 18 U.S.C. § 1030(e)(6), means "not entitled to steal," concomitant with the understanding of "authorized" in Section 1030. *See Hedgeye Risk Mgmt.*, *LLC v. Heldman*, 271 F. Supp. 3d 181, 194–95 (D.D.C. 2017) (the "most 'sensible reading of "entitled" is as a synonym for "authorized"'") (quoting *United States v. Nosal*, 676 F.3d 854, 858 (9th Cir. 2012) (en banc)). The Second Circuit, in *Valle*, quoted the Ninth Circuit in *Nosal* and stated "it is possible to read [Section 1030] as applying to hackers: 'Without authorization' would apply to *outside* hackers (individuals who have no authorized access to the computer at all) and 'exceeds authorized access' would apply to *inside* hackers (individuals whose initial access to a computer is authorized but who access unauthorized information or files)." 807 F.3d at 524.

Accordingly, the proper understanding of the statute, aligned with its purpose, excludes website ToS violations because the statute is about hacking to steal information. The federal Courts of Appeals are split on whether ToS violations constitute "exceed[ing] authorized access," and the D.C. Circuit has not yet weighed in. *See* Mem. Op., ECF No. 24, at 25 & n.9 (collecting cases). However, several district courts in this Circuit, including this Court in prior proceedings, have considered a related question and concluded that "exceed[ing] authorized access" applies only to unauthorized access, and not to unauthorized use of properly accessed information, with some noting the grave concerns associated with interpreting the CFAA to criminalize violations of computer use policies. *See*, *e.g.*, *Hedgeye*, 271 F. Supp. 3d at 194–95. The Ninth Circuit emphasized that "if Congress wants to incorporate misappropriation liability into the CFAA, it must speak more clearly,"*Nosal*, 676 F.3d at 863, and that the CFAA is not a "sweeping Internet-policing mandate," *id.* at 858.

4

Nor should the analysis with respect to ToS violations change because a website requires visitors to create an account. For this reason, Plaintiffs respectfully disagree with this Court's prior determination, Mem. Op., ECF No. 24, at 32, that some subset of ToS violations are "access" as opposed to "use" violations. The *Nosal* court spoke in terms of "computer use" restrictions but its concern was with interpreting the CFAA to cover the whole host of written ToS that websites might impose—including ToS restrictions that might actually constitute access restrictions. *Nosal*'s examples of ToS restrictions that should *not* be considered CFAA violations included Google's ToS prohibiting minors from using its services (a restriction on *who* may access a site), Facebook's ToS prohibiting account-holders from allowing others to log into their accounts (a restriction on *who* may access certain information), and dating websites' ToS that prohibit inaccurate or misleading information. *See* 676 F.3d at 861. Indeed, the government's examples of potentially "trivial" ToS violations are the provision of certain false information on dating websites, or on Twitter. Pl. Ex. 4, ECF No. 48-4, at 46–50. But dating websites generally require users to create accounts to post and view dating profiles, and Twitter also requires account creation to post content. The CFAA should not be read to criminalize ToS violations in the course of account creation (such as providing a false name while registering) or of posting content on websites that require accounts, but to permit other ToS violations not involving accounts. In neither instance is the violation of website ToS equivalent to hacking. Furthermore, *Nosal* noted due process concerns regarding notice to users of which conduct is criminal if ToS violations are covered, *see* 676 F.3d at 861, and any distinction based on account creation that is not rooted in the text or purpose of the CFAA would exacerbate such constitutional concerns.

Lastly, there is nothing in the language or purpose of the CFAA suggesting that liability for violating ToS turns on whether one pays to create an account or pays for certain services after

creating an account. The *Nosal* examples of websites with ToS that should not be enforced through the CFAA included a dating website, eHarmony, that, like many other dating websites, includes subscription services.[2] The government has never suggested in this case or in public discussion of the CFAA that an otherwise "trivial" ToS violation on a dating website would hold a different legal status if the user had paid for a subscription-based account. Nor do commercial and non-commercial sites differ as to constitutional avoidance. While the Supreme Court in *Packingham v. North Carolina* did not consider the CFAA, it did consider a First Amendment claim regarding a law that explicitly restricted access to "commercial" social networking sites that were defined as "operated by a person who *derives revenue from membership fees*, advertising, or other sources related to the operation of the Web site." 137 S. Ct. 1730, 1733–34 (2017) (emphasis added). The Court struck down the law with respect to all such commercial sites, and suggested no distinction with respect to payment. Indeed, Justice Alito's concurrence pointed to the Washington Post's website as an example of a website to which a criminal access restriction would implicate First Amendment rights. *See id.* at 1742 (Alito, J., concurring).[3] But it is commonly understood that many news sites charge for access, perhaps after a user has viewed

---

[2] *See* eHarmony, Terms and Conditions of Service, https://www.eharmony.com/termsandconditions/ (last visited Dec. 13, 2019) (stating that "[b]y registering to use … the Singles Service, you represent and warrant that you are single or (if legally married) separated" and noting various free and payment-based registration options).

[3] Some websites require payment per purchase or per service rendered rather than for account creation, such as employment websites that charge for job postings. *See* Pl. Ex. 21 at ¶ 4; Pl. Ex. 22 at ¶ 4. There is no reason to treat false discrimination-testing statements on such websites differently for purposes of the CFAA or constitutional avoidance. For example, in *Packingham,* Justice Alito pointed to Amazon.com as an example of a "commercial social networking website," because a person must purchase a product before being able to post a review. 137 S. Ct. at 1741 (Alito, J., concurring). A false statement in a product review on Amazon should no more be a CFAA violation than a false statement in a personal profile on a dating website.

a certain number of free articles.[4] There is no basis in the reasoning of *Packingham*, which specifically considered *commercial* websites, to assume that Justice Alito's concerns about criminal restrictions on access to news sites would be obviated if users must pay for access. Similarly, the language and purpose of the CFAA do not provide a reason to hold Internet users liable for violating ToS on websites that require payment when the violation does not consist of bypassing the payment requirement—such as harmless lies on a dating website or in creating a tester account for civil rights testing and research.[5] Given the variety of website business models—advertising revenue, payment for accounts, or payment for specific goods or services—it does not make sense to interpret the CFAA, or constitutional claims, to turn on the particular manner that a website chooses to earn revenue.

Dated: December 13, 2019                                  Respectfully submitted,

                                                          s/ *Esha Bhandari*
                                                          Esha Bhandari

---

[4] *See* The Washington Post, www.washingtonpost.com/subscribe (last visited Dec. 13, 2019); The New York Times, https://www.nytimes.com/subscription (last visited Dec. 13, 2019).

[5] Plaintiffs' statement at the November 15, 2019 hearing, that Plaintiffs "only intend to access parts of a website that are otherwise open to the public or available to anyone who creates a [username] and password" was not intended to refer to the question of payment, or indeed to the question of what is required to create a username and password. *See* Order, ECF No. 63, at 2. Counsel's statement referred to the testimony of each Plaintiff that, "[a]s part of our research plan, I do not intend to access any data or information on the websites I study that is not made available to the public or to any individual who creates an account on the site." Pl. Ex. 1, ECF No. 48-1, at ¶ 51; Pl. Ex. 2, ECF No. 48-2, at ¶ 48. This statement referred to the fact that Plaintiffs "do not intend to bypass any requirement to sign in via login credentials" that they generate when creating tester accounts. *See* Pl. Ex. 21 at ¶ 6; Pl. Ex. 22 at ¶ 6; *see also* Mem. Op., ECF No. 24, at 33 (discussing Plaintiffs' plan to create false accounts, allowing them to "access information on those sites that is both limited to those who meet the owners' chosen authentication requirements and targeted to the particular preferences of the user"). Furthermore, the *process* of creating an account, *i.e.*, creating a username and password, can involve providing false information to a website at registration, such as a fictitious name or company name, which is central to Plaintiffs' plans. *See* Pl. Ex. 1, ECF No. 48-1, at ¶¶ 20–22, 30–32, 35, 48; Pl. Ex. 2, ECF No. 48-2, at ¶¶ 20–22, 30–32, 35, 45; *see also* Pl. Ex. 21 at ¶¶ 2, 3; Pl. Ex. 22, at ¶ 2.

7

American Civil Liberties Union Foundation
125 Broad St., 18th Floor
New York, NY 10004
Tel: 212-549-2500; ebhandari@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the District of Columbia
915 15th Street, N.W., Second Floor
Washington, D.C. 20005
Tel: 202-457-0800; aspitzer@acludc.org

*Attorneys for Plaintiffs*