APPEAL,CLOSED,TYPE–L

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: <u>1:16–cv–01368–JDB</u>

SANDVIG et al v. SESSIONS

Assigned to: Judge John D. Bates

Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 06/29/2016

Date Terminated: 03/27/2020

Jury Demand: None

Nature of Suit: 440 Civil Rights: Other

Jurisdiction: U.S. Government Defendant

**Plaintiff**

**CHRISTIAN W. SANDVIG**

represented by **Arthur B. Spitzer**
AMERICAN CIVIL LIBERTIES UNION
OF THE DISTRICT OF COLUMBIA
915 15th Street, NW
2nd Floor
Washington, DC 20005
(202) 601–4266
Fax: (202) 457–0805
Email: artspitzer@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
AMERICAN CIVIL LIBERTIES UNION
OF THE DISTRICT OF COLUMBIA
915 15th Street, NW
2nd Floor
Washington, DC 20005
(202) 457–0800
Fax: (202) 457–0805
Email: smichelman@acludc.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esha Bhandari**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street
18th floor
New York, NY 10004
(212) 284–7369
Fax: (212) 549–2654
Email: ebhandari@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Naomi Gilens**
ACLU FOUNDATION

125 Broad Street
New York, NY 10004–2400
212–549–2500
Fax: 212–549–2654
*TERMINATED: 09/06/2019*
*PRO HAC VICE*

**Rachel Goodman**
PROTECT DEMOCRACY
115 Broadway
5th Floor
New York, NY 10006
202–997–0599
Email: rachel.goodman@protectdemocracy.org
*TERMINATED: 06/21/2019*
*PRO HAC VICE*

**Plaintiff**

**KYRATSO KARAHALIOS**                represented by   **Arthur B. Spitzer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esha Bhandari**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Naomi Gilens**
(See above for address)
*TERMINATED: 09/06/2019*
*PRO HAC VICE*

**Rachel Goodman**
(See above for address)
*TERMINATED: 06/21/2019*
*PRO HAC VICE*

**Plaintiff**

**ALAN MISLOVE**                represented by   **Arthur B. Spitzer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)

2

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esha Bhandari**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Naomi Gilens**
(See above for address)
*TERMINATED: 09/06/2019*
*PRO HAC VICE*

**Rachel Goodman**
(See above for address)
*TERMINATED: 06/21/2019*
*PRO HAC VICE*

**Plaintiff**

**CHRISTOPHER WILSON**                    represented by    **Arthur B. Spitzer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esha Bhandari**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Naomi Gilens**
(See above for address)
*TERMINATED: 09/06/2019*
*PRO HAC VICE*

**Rachel Goodman**
(See above for address)
*TERMINATED: 06/21/2019*
*PRO HAC VICE*

**Plaintiff**

**FIRST LOOK MEDIA WORKS, INC.**         represented by    **Arthur B. Spitzer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esha Bhandari**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Naomi Gilens**
(See above for address)
*TERMINATED: 09/06/2019*
*PRO HAC VICE*

**Rachel Goodman**
(See above for address)
*TERMINATED: 06/21/2019*
*PRO HAC VICE*

V.

**Defendant**

**LORETTA E. LYNCH**                    represented by   **John Russell Tyler**
*In her official capacity as Attorney*                   U.S. DEPARTMENT OF JUSTICE
*General of the United States*                           Civil Division
*TERMINATED: 08/18/2017*                                 20 Massachusetts Avenue, NW
                                                         Washington, DC 20001
                                                         (202) 514–2356
                                                         Fax: (202) 616–8470
                                                         Email: john.tyler@usdoj.gov
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Stephen J. Buckingham**
                                                         U.S. DEPARTMENT OF JUSTICE
                                                         National Security Division
                                                         950 Pennsylvania Ave. NW
                                                         Room 6535
                                                         Washington, DC 20530
                                                         (202) 532–0214
                                                         Fax: (202) 616–8470
                                                         Email: stephen.buckingham@usdoj.gov
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**JEFFERSON B. SESSIONS, III**          represented by   **Daniel Stephen Garrett Schwei**
*In his official capacity as Attorney*                   U.S. DEPARTMENT OF JUSTICE
*General of the United States*                           Civil Division, Federal Programs Branch
*TERMINATED: 11/14/2019*                                 P.O. Box 883
                                                         Washington, DC 20044

(202) 305–8693
Fax: (202) 616–8470
Email: daniel.s.schwei@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Russell Tyler**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Serena Maya Schulz Orloff**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
(202) 305–0167
Fax: (202) 616–8470
Email: serena.m.orloff@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen J. Buckingham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**WILLIAM P. BARR**                    represented by   **Daniel Stephen Garrett Schwei**
*Attorney General of the United States*                (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **John Russell Tyler**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Serena Maya Schulz Orloff**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Stephen J. Buckingham**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|------------|---|------|-------------|
| 06/29/2016 | 1 |      |             |

| | | | |
|---|---|---|---|
| | | | COMPLAINT against LORETTA LYNCH ( Filing fee $ 400 receipt number 0090–4585143) filed by CHRISTOPHER WILSON, CHRISTIAN W. SANDVIG, ALAN MISLOVE, KYRATSO KARAHALIOS, FIRST LOOK MEDIA WORKS, INC.. (Attachments: # 1 Civil Cover Sheet, # 2 Summons Summons to Defendant, # 3 Summons Summons to Attorney General, # 4 Summons Summons to U.S. Attorney)(Spitzer, Arthur) (Entered: 06/29/2016) |
| 06/29/2016 | 2 | | Corporate Disclosure Statement by FIRST LOOK MEDIA WORKS, INC., KYRATSO KARAHALIOS, ALAN MISLOVE, CHRISTIAN W. SANDVIG, CHRISTOPHER WILSON. (Spitzer, Arthur) (Entered: 06/29/2016) |
| 06/29/2016 | | | Case Assigned to Judge John D. Bates. (jd) (Entered: 06/30/2016) |
| 06/30/2016 | 3 | | SUMMONS (3) Issued Electronically as to LORETTA LYNCH, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Consent Form)(sb) (Entered: 06/30/2016) |
| 07/11/2016 | 4 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 7/8/2016. Answer due for ALL FEDERAL DEFENDANTS by 9/6/2016. (Attachments: # 1 Exhibit A – Certified Mail Card)(Spitzer, Arthur) (Entered: 07/11/2016) |
| 07/11/2016 | 5 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General July 8, 2016. (Attachments: # 1 Exhibit A – Certified Mail Card)(Spitzer, Arthur) (Entered: 07/11/2016) |
| 07/11/2016 | 6 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. LORETTA LYNCH served on 7/8/2016 (Attachments: # 1 Exhibit A – Certified Mail Card)(Spitzer, Arthur) (Entered: 07/11/2016) |
| 07/12/2016 | 7 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Esha Bhandari, :Firm– ACLU, :Address– 125 Broad St., 18th Fl. New York, NY 10004. Phone No. – (212) 549–2500. Fax No. – (212) 549–2654 Filing fee $ 100, receipt number 0090–4600485. Fee Status: Fee Paid. by FIRST LOOK MEDIA WORKS, INC., KYRATSO KARAHALIOS, ALAN MISLOVE, CHRISTIAN W. SANDVIG, CHRISTOPHER WILSON (Attachments: # 1 Declaration of Esha Bhandari in Support of Motion for Admission Pro Hac Vice, # 2 Text of Proposed Order)(Spitzer, Arthur) (Entered: 07/12/2016) |
| 07/12/2016 | 8 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Rachel Goodman, :Firm– ACLU, :Address– 125 Broad St., 18th Fl. New York, NY 10004. Phone No. – (212) 549–2500. Fax No. – (212) 549–2654 Filing fee $ 100, receipt number 0090–4600535. Fee Status: Fee Paid. by FIRST LOOK MEDIA WORKS, INC., KYRATSO KARAHALIOS, ALAN MISLOVE, CHRISTIAN W. SANDVIG, CHRISTOPHER WILSON (Attachments: # 1 Declaration of Rachel Goodman in Support of Motion for Admission Pro Hac Vice, # 2 Text of Proposed Order)(Spitzer, Arthur) (Entered: 07/12/2016) |
| 07/12/2016 | | | MINUTE ORDER: Upon consideration of 7 8 the motions for leave to appear pro hac vice on behalf of Esha Bhandari and Rachel Goodman, and the entire record herein, it is hereby ORDERED that the motions are GRANTED. Signed by Judge John D. Bates on 7/12/2016. (lcjdb2) (Entered: 07/12/2016) |

| 09/06/2016 | 9 | | NOTICE of Appearance by Stephen J. Buckingham on behalf of All Defendants (Buckingham, Stephen) (Entered: 09/06/2016) |
|---|---|---|---|
| 09/09/2016 | 10 | | MOTION to Dismiss by LORETTA E. LYNCH (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Text of Proposed Order)(Buckingham, Stephen) (Entered: 09/09/2016) |
| 09/12/2016 | 11 | | Unopposed MOTION for Extension of Time to File Response/Reply *to Defendant's Motion to Dismiss* by FIRST LOOK MEDIA WORKS, INC., KYRATSO KARAHALIOS, ALAN MISLOVE, CHRISTIAN W. SANDVIG, CHRISTOPHER WILSON (Attachments: # 1 Proposed Order)(Bhandari, Esha) (Entered: 09/12/2016) |
| 09/12/2016 | | | MINUTE ORDER: Upon consideration of 11 plaintiffs' motion for an extension of time, and the entire record herein, it is hereby ORDERED that the motion is GRANTED. Plaintiffs must file any opposition to 10 defendant's motion to dismiss by not later than October 7, 2016. SO ORDERED. Signed by Judge John D. Bates on 9/12/16. (lcjdb2) (Entered: 09/12/2016) |
| 09/13/2016 | | | Set/Reset Deadlines: Response to Dispositive Motions due by 10/7/2016. (tb) (Entered: 09/13/2016) |
| 09/19/2016 | 12 | | NOTICE of Appearance by John Russell Tyler on behalf of All Defendants (Tyler, John) (Entered: 09/19/2016) |
| 10/07/2016 | 13 | | Memorandum in opposition to re 10 MOTION to Dismiss filed by FIRST LOOK MEDIA WORKS, INC., KYRATSO KARAHALIOS, ALAN MISLOVE, CHRISTIAN W. SANDVIG, CHRISTOPHER WILSON. (Attachments: # 1 Text of Proposed Order Proposed Order)(Bhandari, Esha) (Entered: 10/07/2016) |
| 10/11/2016 | 14 | | Unopposed MOTION for Extension of Time to File Response/Reply as to 10 MOTION to Dismiss by LORETTA E. LYNCH (Attachments: # 1 Text of Proposed Order)(Buckingham, Stephen) (Entered: 10/11/2016) |
| 10/12/2016 | | | MINUTE ORDER: Upon consideration of 14 defendant's motion for an extension of time, and the entire record herein, it is hereby ORDERED that the motion is GRANTED. The government shall file its reply in support of the motion to dismiss by not later than October 24, 2016. Signed by Judge John D. Bates on 10/12/16. (lcjdb2) (Entered: 10/12/2016) |
| 10/12/2016 | | | Set/Reset Deadlines: Reply to Dispositive Motions due by 10/24/2016. (tb) (Entered: 10/12/2016) |
| 10/24/2016 | 15 | | REPLY to opposition to motion re 10 MOTION to Dismiss filed by LORETTA E. LYNCH. (Attachments: # 1 Exhibit)(Buckingham, Stephen) (Entered: 10/24/2016) |
| 04/25/2017 | 16 | | NOTICE of Appearance by Scott Michelman on behalf of All Plaintiffs (Michelman, Scott) (Entered: 04/25/2017) |
| 08/18/2017 | 17 | | ORDER setting motion hearing for October 20, 2017. See text for details. Signed by Judge John D. Bates on 8/18/17. (lcjdb2) (Entered: 08/18/2017) |
| 08/21/2017 | | | Set/Reset Hearings: A Motions Hearing is set for 10/20/2017 at 9:30 AM in Courtroom 30A before Judge John D. Bates. (jth) (Entered: 08/21/2017) |

| 09/08/2017 | 18 | | NOTICE OF SUPPLEMENTAL AUTHORITY by FIRST LOOK MEDIA WORKS, INC., KYRATSO KARAHALIOS, ALAN MISLOVE, CHRISTIAN W. SANDVIG, CHRISTOPHER WILSON (Bhandari, Esha) (Entered: 09/08/2017) |
|---|---|---|---|
| 10/06/2017 | 19 | | NOTICE of Appearance by Serena Maya Schulz Orloff on behalf of JEFFERSON B. SESSIONS, III (Orloff, Serena) (Entered: 10/06/2017) |
| 10/19/2017 | | | MINUTE ORDER: At the motions hearing scheduled for October 20, 2017, counsel should be prepared to discuss (1) what impact the U.S. Supreme Court's decision in Packingham v. North Carolina, 137 S. Ct. 1730 (2017), has on this case, and (2) how the statute at issue should be read as a matter of statutory interpretation, see, e.g., United States v. Nosal, 676 F.3d 864 (9th Cir. 2012); United States v. John, 597 F.3d 263 (5th Cir. 2010). SO ORDERED. Signed by Judge John D. Bates on 10/19/2017. (lcjdb2) (Entered: 10/19/2017) |
| 10/20/2017 | | | Minute Entry: Motion Hearing held on 10/20/2017 before Judge John D. Bates: re 10 MOTION to Dismiss filed by LORETTA E. LYNCH; motion heard and taken under advisement. Defendant shall notify the Court regarding the threat of prosecution by 10/27/2017. (Court Reporter Bryan Wayne) (tb) (Entered: 10/23/2017) |
| 10/25/2017 | 20 | | TRANSCRIPT OF MOTION HEARING before Judge John D. Bates, held on October 20, 2017. Page Numbers: 1–83. Date of Issuance: 10/25/2017. Court Reporter: Bryan A. Wayne. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.

**<span style="color:red">NOTICE RE REDACTION OF TRANSCRIPTS:</span>** <span style="color:red">The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.</span>

Redaction Request due 11/15/2017. Redacted Transcript Deadline set for 11/25/2017. Release of Transcript Restriction set for 1/23/2018.(Wayne, Bryan) (Entered: 10/25/2017) |
| 10/27/2017 | 21 | | NOTICE *of Filing of Affidavit in Support of Motion to Dismiss* by JEFFERSON B. SESSIONS, III (Attachments: # 1 Affidavit of John T. Lynch, Jr., in support of Defendant's Motion to Dismiss)(Orloff, Serena) (Entered: 10/27/2017) |
| 11/02/2017 | 22 | | RESPONSE re 21 Notice (Other) filed by FIRST LOOK MEDIA WORKS, INC., KYRATSO KARAHALIOS, ALAN MISLOVE, CHRISTIAN W. SANDVIG, CHRISTOPHER WILSON. (Bhandari, Esha) (Entered: 11/02/2017) |
| 03/30/2018 | 23 | | |

| | | | |
|---|---|---|---|
| | | | ORDER granting in part and denying in part <u>10</u> the government's motion to dismiss. A status conference in this matter is set for May 15, 2018, at 9:30 a.m. in Courtroom 30. See text of order and accompanying Memorandum Opinion for details. Signed by Judge John D. Bates on 3/30/2018. (lcjdb2) (Entered: 03/30/2018) |
| 03/30/2018 | <u>24</u> | | MEMORANDUM OPINION. Signed by Judge John D. Bates on 3/30/2018. (lcjdb2) (Entered: 03/30/2018) |
| 04/02/2018 | | | Set/Reset Deadlines/Hearings: Proposed Briefing Schedule due by 5/11/2018. Status Conference set for 5/15/2018 at 09:30 AM in Courtroom 30A before Judge John D. Bates. (tb) (Entered: 04/02/2018) |
| 04/10/2018 | <u>25</u> | | Unopposed MOTION for Extension of Time to File Answer by JEFFERSON B. SESSIONS, III (Attachments: # <u>1</u> Proposed Order)(Orloff, Serena) (Entered: 04/10/2018) |
| 04/11/2018 | | | MINUTE ORDER: Upon consideration of <u>25</u> defendant's unopposed motion for extension of time to file an answer, and the entire record herein, it is hereby ORDERED that the motion is GRANTED; it is further ORDERED that defendant shall file his answer to the complaint by not later than April 27, 2018. SO ORDERED. Signed by Judge John D. Bates on 4/11/2018. (lcjdb2) (Entered: 04/11/2018) |
| 04/11/2018 | | | Set/Reset Deadlines: Answer due by 4/27/2018. (tb) (Entered: 04/11/2018) |
| 04/27/2018 | <u>26</u> | | ANSWER to Complaint by JEFFERSON B. SESSIONS, III.(Orloff, Serena) (Entered: 04/27/2018) |
| 05/10/2018 | <u>27</u> | | Joint MOTION to Continue *Status Conference*, Joint MOTION for Extension of Time to *File Required Proposal* by FIRST LOOK MEDIA WORKS, INC., KYRATSO KARAHALIOS, ALAN MISLOVE, CHRISTIAN W. SANDVIG, CHRISTOPHER WILSON (Attachments: # <u>1</u> Text of Proposed Order)(Goodman, Rachel) (Entered: 05/10/2018) |
| 05/10/2018 | | | MINUTE ORDER: Upon consideration of <u>27</u> the joint motion to continue the status conference and for an extension of time to file proposed schedules, and the entire record herein, it is hereby ORDERED that the motion is GRANTED; it is further ORDERED that the status conference currently set for May 15, 2018 at 9:30 am is CONTINUED until further notice; and it is further ORDERED that the parties shall file joint or separate proposed schedules for further proceedings by not later than June 11, 2018. SO ORDERED. Signed by Judge John D. Bates on 5/10/2018. (lcjdb2) (Entered: 05/10/2018) |
| 05/10/2018 | | | Set/Reset Deadlines: Joint or Separate Proposed Briefing Schedule(s) due by 6/11/2018. (tb) (Entered: 05/10/2018) |
| 06/08/2018 | <u>28</u> | | Joint MOTION for Extension of Time to *File Proposals for Further Proceedings* by JEFFERSON B. SESSIONS, III (Attachments: # <u>1</u> Proposed Order)(Orloff, Serena) (Entered: 06/08/2018) |
| 06/08/2018 | | | MINUTE ORDER: Upon consideration of <u>28</u> the parties' joint motion for extension of time, and the entire record herein, it is hereby ORDERED that the motion is GRANTED; it is further ORDERED that the parties shall file joint or separate proposed schedules for further proceedings by not later than July 9, 2018. Signed by Judge John D. Bates on 6/8/2018. (lcjdb2) (Entered: |

| | | | |
|---|---|---|---|
| | | | 06/08/2018) |
| 06/08/2018 | | | Set/Reset Deadlines: Joint or Separate Proposed Briefing Schedule due by 7/9/2018. (tb) (Entered: 06/08/2018) |
| 07/09/2018 | 29 | | NOTICE of Appearance by Daniel Stephen Garrett Schwei on behalf of All Defendants (Schwei, Daniel) (Entered: 07/09/2018) |
| 07/09/2018 | 30 | | PROPOSED BRIEFING SCHEDULE *Plaintiffs' Proposal for Further Proceedings* by ALAN MISLOVE, CHRISTOPHER WILSON. (Bhandari, Esha) (Entered: 07/09/2018) |
| 07/09/2018 | 31 | | STATUS REPORT *Defendant's Statement and Proposal Regarding Further Proceedings* by JEFFERSON B. SESSIONS, III. (Schwei, Daniel) (Entered: 07/09/2018) |
| 07/13/2018 | 32 | | SCHEDULING ORDER. See text of order for further details. Signed by Judge John D. Bates on 7/13/2018. (lcjdb2) (Entered: 07/13/2018) |
| 07/16/2018 | | | Set/Reset Deadlines/Hearings: Amended Pleadings due by 7/27/2018. Discovery due by 12/13/2018. Dispositive Motions due by 1/21/2019. Response to Dispositive Motions due by 2/20/2019. Reply to Dispositive Motions due by 3/7/2019. Plaintiff Rule 26(a)(1) due by 7/27/2018. Defendant Rule 26(a)(1) due by 7/27/2018. Plaintiff Rule 26(a)(2) due by 11/7/2018. Defendant Rule 26(a)(2) due by 11/7/2018. Status Conference set for 12/17/2018 at 09:30 AM in Courtroom 30A before Judge John D. Bates. (tb) (Entered: 07/16/2018) |
| 08/03/2018 | 33 | | Joint MOTION for Protective Order *for Plaintiffs' Research Information* by JEFFERSON B. SESSIONS, III (Attachments: # 1 Text of Proposed Order, # 2 Exhibit A – Acknowledgment Form)(Schwei, Daniel) (Entered: 08/03/2018) |
| 08/06/2018 | 34 | | ORDER granting 33 the parties' joint motion for a protective order. See text of order for details. Signed by Judge John D. Bates on 8/6/2018. (lcjdb2) (Entered: 08/06/2018) |
| 10/12/2018 | 35 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Naomi Gilens, :Firm– ACLU Foundation, :Address– 125 Broad St., New York, NY 10004–2400. Phone No. – 212–549–2500. Fax No. – 212–549–2654 Filing fee $ 100, receipt number 0090–5736447. Fee Status: Fee Paid. by FIRST LOOK MEDIA WORKS, INC., KYRATSO KARAHALIOS, ALAN MISLOVE, CHRISTIAN W. SANDVIG, CHRISTOPHER WILSON (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Michelman, Scott) (Entered: 10/12/2018) |
| 10/15/2018 | 36 | | MINUTE ORDER: Upon consideration of 35 the motion for leave for Naomi F. Gilens to appear pro hac vice on behalf of all plaintiffs, and the entire record herein, and pursuant to Local Civil Rule 83.2(d), it is hereby ORDERED that the motion is GRANTED; and it is further ORDERED that the Clerk of Court shall enter the appearance of Naomi F. Gilens on behalf of plaintiffs. Signed by Judge John D. Bates on 10/15/2018. (lcjdb2) (Entered: 10/15/2018) |
| 10/25/2018 | 37 | | It is hereby ORDERED that the parties shall each file a memorandum, not to exceed four pages, containing their respective arguments concerning the instant discovery dispute; and it is further ORDERED that the parties shall attach to their respective memoranda all relevant discovery letters or other communications; and it is further ORDERED that the parties shall file their |

| | | |
|---|---|---|
| | | respective memoranda by not later than 12:00 p.m. on October 26, 2018. SO ORDERED. Signed by Judge John D. Bates on 10/25/2018. (lcjdb2) (Entered: 10/25/2018) |
| 10/25/2018 | | Set/Reset Deadlines: Memoranda due by 10/26/2018. (tb) (Entered: 10/25/2018) |
| 10/25/2018 | 38 | MEMORANDUM re 37 Order,, by JEFFERSON B. SESSIONS, III. (Attachments: # 1 Exhibit 1 – Defendant's Interrogs. Nos. 3, 5, and 6, # 2 Exhibit 2 – Plaintiffs' 2d Suppl. Resps. to Def.'s Interrogs., # 3 Exhibit 3 – Def.'s 1st Ltr. to Pls., # 4 Exhibit 4 – Pls.' 1st Ltr. to Def., # 5 Exhibit 5 – Def.'s 2d Ltr. to Pls., # 6 Exhibit 6 – Pls.' 2d Ltr. to Def., # 7 Exhibit 7 – CHI 2018 Paper, # 8 Exhibit 8 – CSCW 2017 Paper)(Schwei, Daniel) (Entered: 10/25/2018) |
| 10/26/2018 | 39 | MEMORANDUM re 37 Order,, by FIRST LOOK MEDIA WORKS, INC., KYRATSO KARAHALIOS, ALAN MISLOVE, CHRISTIAN W. SANDVIG, CHRISTOPHER WILSON. (Goodman, Rachel) (Entered: 10/26/2018) |
| 10/30/2018 | 40 | ORDER granting in part and denying in part 38 the government's motion to compel. See text of Order for details. Signed by Judge John D. Bates on 10/30/2018. (lcjdb2) (Entered: 10/30/2018) |
| 11/28/2018 | 41 | Consent MOTION for Extension of Time to Complete Discovery *for Thirty Days* by JEFFERSON B. SESSIONS, III (Attachments: # 1 Text of Proposed Order)(Schwei, Daniel) (Entered: 11/28/2018) |
| 11/28/2018 | 42 | Consent MOTION for Protective Order *for Third–Party Companies' Sensitive Information* by JEFFERSON B. SESSIONS, III (Attachments: # 1 Proposed Protective Order for Third–Party Companies' Sensitive Information, # 2 Exhibit A – Acknowledgment Form)(Schwei, Daniel) (Entered: 11/28/2018) |
| 11/28/2018 | | MINUTE ORDER: Upon consideration of 41 defendant's consent motion for extension of time to complete discovery, and the entire record herein, it is hereby ORDERED that the motion is GRANTED; AND it is further ORDERED that 32 the Court's scheduling order be, and is modified as follows: all discovery shall be completed by not later than January 14, 2019, the dispositive motions schedule in this case is VACATED, the parties shall file a joint status report setting forth an agreed upon dispositive motions schedule, or separate proposals if an agreement cannot be reached, by not later than January 15, 2019, and the December 17, 2018 status conference shall be RESCHEDULED to 9:45 a.m. on January 18, 2019. SO ORDERED. Signed by Judge John D. Bates on 11/28/2018. (lcjdb2) (Entered: 11/28/2018) |
| 11/28/2018 | | Set/Reset Deadlines/Hearings: Discovery due by 1/14/2019. Status Report due by 1/15/2019. Status Conference reset for 1/18/2019 at 09:45 AM in Courtroom 30A before Judge John D. Bates. (tb) (Entered: 11/28/2018) |
| 11/29/2018 | 43 | ORDER granting 42 the parties' joint motion for a protective order. See text of Order for details. Signed by Judge John D. Bates on 11/29/2018.(lcjdb2) (Entered: 11/29/2018) |
| 12/26/2018 | 44 | Unopposed MOTION to Stay *Discovery Deadlines in Light of Lapse of Appropriations* by JEFFERSON B. SESSIONS, III (Attachments: # 1 Text of Proposed Order)(Schwei, Daniel) (Entered: 12/26/2018) |

| 01/15/2019 | | | MINUTE ORDER: Upon consideration of 44 defendant's unopposed motion for a stay of pending deadlines in light of the lapse in appropriations, and the entire record herein, it is hereby ORDERED that the motion is GRANTED; it is further ORDERED that all pending deadlines in this action are stayed for the duration of the lapse; it is further ORDERED that the status conference currently scheduled for January 18, 2019 is CANCELLED; it is further ORDERED that the parties shall file a joint status report setting forth an agreed upon dispositive motions schedule (including proposed dates for a status conference), or separate proposals if an agreement cannot be reached, by not later than seven days after the lapse has ceased. SO ORDERED. Signed by Judge John D. Bates on 1/15/2019. (lcjdb2) (Entered: 01/15/2019) |
| 01/28/2019 | 45 | | Joint STATUS REPORT *Pursuant to Minute Order of Jan. 15, 2019* by JEFFERSON B. SESSIONS, III. (Schwei, Daniel) (Entered: 01/28/2019) |
| 02/14/2019 | 46 | | SCHEDULING ORDER. See text of Order for details. Signed by Judge John D. Bates on 2/14/2019. (lcjdb2) (Entered: 02/14/2019) |
| 02/15/2019 | | | Set/Reset Deadlines: Cross Motion due by 4/8/2019. Response to Cross Motion due by 5/6/2019. Reply to Cross Motion due by 5/27/2019. Summary Judgment motion due by 3/7/2019. Response to Motion for Summary Judgment due by 4/8/2019. Reply to Motion for Summary Judgment due by 5/6/2019. (tb) (Entered: 02/15/2019) |
| 03/07/2019 | 47 | | MOTION for Summary Judgment by FIRST LOOK MEDIA WORKS, INC., KYRATSO KARAHALIOS, ALAN MISLOVE, CHRISTIAN W. SANDVIG, CHRISTOPHER WILSON (Attachments: # 1 Text of Proposed Order, # 2 Statement of Facts)(Bhandari, Esha) (Entered: 03/07/2019) |
| 03/07/2019 | 48 | | MEMORANDUM re 47 MOTION for Summary Judgment filed by FIRST LOOK MEDIA WORKS, INC., CHRISTOPHER WILSON, ALAN MISLOVE, CHRISTIAN W. SANDVIG, KYRATSO KARAHALIOS by FIRST LOOK MEDIA WORKS, INC., KYRATSO KARAHALIOS, ALAN MISLOVE, CHRISTIAN W. SANDVIG, CHRISTOPHER WILSON. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18)(Bhandari, Esha) (Entered: 03/07/2019) |
| 03/29/2019 | 49 | | Unopposed MOTION for Extension of Time to File Response/Reply as to 47 MOTION for Summary Judgment by JEFFERSON B. SESSIONS, III (Attachments: # 1 Text of Proposed Order)(Schwei, Daniel) (Entered: 03/29/2019) |
| 04/01/2019 | | | MINUTE ORDER: Upon consideration of 49 defendant's unopposed motion for extension of time, and the entire record herein, it is hereby ORDERED that the motion is GRANTED; and it is further ORDERED that 46 the Court's scheduling order be, and is modified as follows: defendant shall file its consolidated opposition to plaintiffs' motion for summary judgment and cross−motion for summary judgment by not later than April 15, 2019; plaintiffs shall file their consolidated reply and opposition by not later than May 20, 2019; and defendant shall file its reply by not later than June 17, 2019. SO ORDERED. Signed by Judge John D. Bates on 4/1/2019. (lcjdb2) (Entered: |

| | | | |
|---|---|---|---|
| | | | 04/01/2019) |
| 04/02/2019 | | | Set/Reset Deadlines: Response to Cross Motion due by 5/20/2019. Reply to Cross Motion due by 6/17/2019. Response to Motion for Summary Judgment due by 4/15/2019. Reply to Motion for Summary Judgment due by 5/20/2019. (tb) (Entered: 04/02/2019) |
| 04/15/2019 | 50 | | Cross MOTION for Summary Judgment by JEFFERSON B. SESSIONS, III (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts, # 3 Response to Plaintiffs' Statement of Facts, # 4 Text of Proposed Order)(Schwei, Daniel) (Entered: 04/15/2019) |
| 04/15/2019 | 51 | | Memorandum in opposition to re 47 MOTION for Summary Judgment filed by JEFFERSON B. SESSIONS, III. (Attachments: # 1 Statement of Facts, # 2 Response to Plaintiffs' Statement of Facts, # 3 Text of Proposed Order)(Schwei, Daniel) (Entered: 04/15/2019) |
| 04/15/2019 | 52 | | SEALED DOCUMENT filed by JEFFERSON B. SESSIONS, III re 50 Cross MOTION for Summary Judgment (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit 1 – CSCW 2017 Paper (TaskRabbit and Fiverr), # 2 Exhibit 2 – CHI 2018 Paper (Impact of Gender on Resume Search Engines), # 3 Exhibit 3 – Mislove Depo Tr (excerpts), # 4 Exhibit 4 – Wilson Depo Tr (excerpts), # 5 Exhibit 5 – Pls' Resps to Def's RFAs, # 6 Exhibit 6 – Pls' Resps to Def's First Interrogs, # 7 Exhibit 7 – Def's Resps to Pls' First Interrogs, # 8 Exhibit 8 – Lynch Depo Tr (excerpts), # 9 Exhibit 9 – Lynch Suppl Decl, # 10 Exhibit 10 – Stmt of Sujit Raman, # 11 Exhibit 11 – Decl of Paul Rockwell (LinkedIn), # 12 Exhibit 12 – Decl of Nathaniel Gleicher (Facebook), # 13 Exhibit 13 – Decl of Thomas O'Brien (Glassdoor), # 14 Exhibit 14 – Aff of Leonard Kardon (Monster.com), # 15 Exhibit 15 – Wilson Emails (PID2185–88), # 16 Exhibit 16 – Wilson Emails (PID7243–46), # 17 Exhibit 17 – Wilson Emails (PID7237–38), # 18 Exhibit 18 – Def's Suppl Resp to Pls' Interrog Nos 6,7, # 19 Exhibit 19 – Pls' Resps to Def's Second Interrogs, # 20 Exhibit 20 – Report of AG's Cyber Digital Task Force (excerpts), # 21 Exhibit 21 – Wilson, You Are How You Click, # 22 Exhibit 22 – Wilson, Detecting and Characterizing Social Spam Campaigns, # 23 Exhibit 23 – Mislove, Towards Detecting Anomalous User Behavior in Online Social Networks, # 24 Exhibit 24 – Mislove, Exploring the Design Space of Social Network–Based Sybil Defenses, # 25 Exhibit 25 – Sandvig and Karahalios, Auditing Algorithms, # 26 Appendix Index of Exhibits)(Schwei, Daniel) (Entered: 04/15/2019) |
| 04/22/2019 | 53 | | NOTICE *of Filing Redacted Exhibits* by JEFFERSON B. SESSIONS, III (Attachments: # 1 Exhibit 1 – CSCW 2017 Paper (TaskRabbit and Fiverr), # 2 Exhibit 2 – CHI 2018 Paper (Impact of Gender on Resume Search Engines), # 3 Exhibit 3 – Mislove Depo Tr (excerpts), # 4 Exhibit 4 – Wilson Depo Tr (excerpts), # 5 Exhibit 5 – Pls' Resps to Def's RFAs, # 6 Exhibit 6 – Pls' Resps to Def's First Interrogs, # 7 Exhibit 7 – Def's Resps to Pls' First Interrogs, # 8 Exhibit 8 – Lynch Depo Tr (excerpts), # 9 Exhibit 9 – Lynch Suppl Decl, # 10 Exhibit 10 – Stmt of Sujit Raman, # 11 Exhibit 11 – Decl of Paul Rockwell (LinkedIn), # 12 Exhibit 12 – Decl of Nathaniel Gleicher (Facebook), # 13 Exhibit 13 – Decl of Thomas O'Brien (Glassdoor), # 14 Exhibit 14 – Aff of Leonard Kardon (Monster.com), # 15 Exhibit 15 – Wilson Emails (PID2185–88), # 16 Exhibit 16 – Wilson Emails (PID7243–46), # 17 Exhibit |

13

| | | |
|---|---|---|
| | | 17 – Wilson Emails (PID7237–38), # <u>18</u> Exhibit 18 – Def's Suppl Resp to Pls' Interrog Nos 6,7, # <u>19</u> Exhibit 19 – Pls' Resps to Def's Second Interrogs, # <u>20</u> Exhibit 20 – Report of AG's Cyber Digital Task Force (excerpts), # <u>21</u> Exhibit 21 – Wilson, You Are How You Click, # <u>22</u> Exhibit 22 – Wilson, Detecting and Characterizing Social Spam Campaigns, # <u>23</u> Exhibit 23 – Mislove, Towards Detecting Anomalous User Behavior in Online Social Networks, # <u>24</u> Exhibit 24 – Mislove, Exploring the Design Space of Social Network–Based Sybil Defenses, # <u>25</u> Exhibit 25 – Sandvig and Karahalios, Auditing Algorithms, # <u>26</u> Appendix Index of Exhibits)(Schwei, Daniel) (Entered: 04/22/2019) |
| 05/20/2019 | <u>54</u> | Memorandum in opposition to re <u>50</u> Cross MOTION for Summary Judgment filed by FIRST LOOK MEDIA WORKS, INC., KYRATSO KARAHALIOS, ALAN MISLOVE, CHRISTIAN W. SANDVIG, CHRISTOPHER WILSON. (Attachments: # <u>1</u> Statement of Facts Response to Def. SOF, # <u>2</u> Statement of Facts Reply ISO Pls. SOF, # <u>3</u> Exhibit 19, # <u>4</u> Exhibit 20)(Bhandari, Esha) (Entered: 05/20/2019) |
| 05/20/2019 | <u>55</u> | REPLY to opposition to motion re <u>47</u> MOTION for Summary Judgment filed by FIRST LOOK MEDIA WORKS, INC., KYRATSO KARAHALIOS, ALAN MISLOVE, CHRISTIAN W. SANDVIG, CHRISTOPHER WILSON. (Attachments: # <u>1</u> Statement of Facts Response to Def. SOF, # <u>2</u> Statement of Facts Reply ISO Pls. SOF, # <u>3</u> Exhibit 19, # <u>4</u> Exhibit 20)(Bhandari, Esha) (Entered: 05/20/2019) |
| 06/17/2019 | <u>56</u> | REPLY to opposition to motion re <u>50</u> Cross MOTION for Summary Judgment filed by JEFFERSON B. SESSIONS, III. (Attachments: # <u>1</u> Exhibit – Defendant's Revised Exhibit 3 (Mislove Depo Tr, all pages cited by parties) (REDACTED), # <u>2</u> Exhibit – Defendant's Revised Exhibit 4 (Wilson Depo Tr, all pages cited by parties) (REDACTED))(Schwei, Daniel) (Entered: 06/17/2019) |
| 06/17/2019 | <u>57</u> | SEALED DOCUMENT filed by JEFFERSON B. SESSIONS, III(This document is SEALED and only available to authorized persons.) (Attachments: # <u>1</u> Exhibit – Defendant's Revised Exhibit 3 (Mislove Depo Tr, all pages cited by parties) (Under Seal), # <u>2</u> Exhibit – Defendant's Revised Exhibit 4 (Wilson Depo Tr, all pages cited by parties) (Under Seal))(Schwei, Daniel) (Entered: 06/17/2019) |
| 06/21/2019 | <u>58</u> | NOTICE OF WITHDRAWAL OF APPEARANCE as to FIRST LOOK MEDIA WORKS, INC., KYRATSO KARAHALIOS, ALAN MISLOVE, CHRISTIAN W. SANDVIG, CHRISTOPHER WILSON. Attorney Rachel Goodman terminated. (Goodman, Rachel) (Entered: 06/21/2019) |
| 09/03/2019 | | MINUTE ORDER: It is hereby ORDERED that a hearing on <u>47</u> <u>50</u> the parties' cross−motions for summary judgment shall be held on November 5, 2019, at 9:30 a.m. in Courtroom 30A. Signed by Judge John D. Bates on 9/3/19. (lcjdb1) (Entered: 09/03/2019) |
| 09/04/2019 | | Set/Reset Hearings: Motion Hearing set for 11/5/2019 at 09:30 AM in Courtroom 30A before Judge John D. Bates. (tb) (Entered: 09/04/2019) |
| 09/05/2019 | <u>59</u> | ENTERED IN ERROR.....NOTICE OF WITHDRAWAL OF APPEARANCE as to FIRST LOOK MEDIA WORKS, INC., KYRATSO KARAHALIOS, ALAN MISLOVE, CHRISTIAN W. SANDVIG, CHRISTOPHER WILSON. |

| | | | |
|---|---|---|---|
| | | | Attorney Naomi Gilens terminated. (Bhandari, Esha); Modified on 9/6/2019 (ztth). (Entered: 09/05/2019) |
| 09/06/2019 | | | NOTICE OF CORRECTED DOCKET ENTRY: re 59 Notice of Withdrawal of Appearance was entered in error at the request of counsel. Said pleading was filed in the incorrect case. (tth) (Entered: 09/06/2019) |
| 09/06/2019 | 60 | | NOTICE OF WITHDRAWAL OF APPEARANCE as to FIRST LOOK MEDIA WORKS, INC., KYRATSO KARAHALIOS, ALAN MISLOVE, CHRISTIAN W. SANDVIG, CHRISTOPHER WILSON. Attorney Naomi Gilens terminated. (Bhandari, Esha) (Entered: 09/06/2019) |
| 10/09/2019 | 61 | | NOTICE by JEFFERSON B. SESSIONS, III (Schwei, Daniel) (Entered: 10/09/2019) |
| 10/18/2019 | | | MINUTE ORDER: It is hereby ORDERED that the motions hearing currently set for November 5, 2019, at 9:30 a.m. is RESCHEDULED for November 15, 2019, at 9:30 a.m. Signed by Judge John D. Bates on 10/18/2019. (lcjdb2) (Entered: 10/18/2019) |
| 10/21/2019 | | | Set/Reset Hearings: Motions Hearing reset for 11/15/2019 at 09:30 AM in Courtroom 30A before Judge John D. Bates. (tb) (Entered: 10/21/2019) |
| 11/15/2019 | | | Minute Entry: Motions' Hearing held on 11/15/2019 before Judge John D. Bates re 47 Motion for summary judgment filed by FIRST LOOK MEDIA WORKS, INC., CHRISTOPHER WILSON, ALAN MISLOVE, CHRISTIAN W. SANDVIG, KYRATSO KARAHALIOS and 50 Cross motion for summary judgment filed by JEFFERSON B. SESSIONS, III; motions heard and taken under advisement. (Court Reporter Bryan Wayne) (tb) (Entered: 11/15/2019) |
| 11/19/2019 | 62 | | TRANSCRIPT OF 11/15/19 MOTIONS HEARING, before Judge John D. Bates, held on November 15, 2019. Page Numbers: 1–79. Date of Issuance: November 19, 2019. Court Reporter: Bryan A. Wayne. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 12/10/2019. Redacted Transcript Deadline set for 12/20/2019. Release of Transcript Restriction set for 2/17/2020.(Wayne, Bryan) (Entered: 11/19/2019) |
| 11/26/2019 | 63 | | ORDER for clarification from the parties. See text of Order for details. Signed by Judge John D. Bates on 11/26/2019. (lcjdb2) (Entered: 11/26/2019) |

| 12/03/2019 | | | Set/Reset Deadlines: Memoranda clarifying respective interpretations of 18 U.S.C. § 1030(a)(2)(C) due by 12/13/2019. (tb) (Entered: 12/03/2019) |
|---|---|---|---|
| 12/13/2019 | 64 | | RESPONSE TO ORDER OF THE COURT re 63 Order filed by WILLIAM BARR. (Schwei, Daniel) (Entered: 12/13/2019) |
| 12/13/2019 | 65 | | MEMORANDUM re 63 Order by ALAN MISLOVE, CHRISTOPHER WILSON. (Attachments: # 1 Declaration Plaintiff Wilson, # 2 Declaration Plaintiff Mislove)(Bhandari, Esha) (Entered: 12/13/2019) |
| 03/27/2020 | 66 | | ORDER denying 47 plaintiffs' motion for summary judgment and denying 50 defendant's cross−motion for summary judgment. See text of Order and accompanying Memorandum Opinion for details. Signed by Judge John D. Bates on 03/27/2020. (lcjdb2) (Entered: 03/27/2020) |
| 03/27/2020 | 67 | | MEMORANDUM OPINION. Signed by Judge John D. Bates on 03/27/2020. (lcjdb2) (Entered: 03/27/2020) |
| 05/26/2020 | 68 | | NOTICE OF APPEAL TO DC CIRCUIT COURT re 23 Order and 66 Order by FIRST LOOK MEDIA WORKS, INC., KYRATSO KARAHALIOS, ALAN MISLOVE, CHRISTIAN W. SANDVIG, CHRISTOPHER WILSON. Filing fee $ 505, receipt number ADCDC−7161126. Fee Status: Fee Paid. Parties have been notified. (Bhandari, Esha) Modified text and added docket entry relationship at the request of counsel on 5/26/2020 (ztth). (Entered: 05/26/2020) |

CHRISTIAN W. SANDVIG *et al.*,

        Plaintiffs,

v.

WILLIAM P. BARR, in his official capacity
as Attorney General of the United States,

        Defendant.

Case No. 1:16-cv-1368 (JDB)

## PLAINTIFFS' NOTICE OF APPEAL

Plaintiffs Christian W. Sandvig, Kyratso Karahalios, Alan Mislove, Christopher Wilson, and First Look Media Works, Inc., hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the Order of this Court entered March 27, 2020, ECF No. 66, denying Plaintiffs' motion for summary judgment and dismissing their complaint, and from the Order of this Court entered March 30, 2018, ECF No. 23, dismissing the overbreadth claim in Plaintiffs' First Cause of Action, and dismissing their Second through Fourth Causes of Action.

May 26, 2020

Respectfully submitted,

*/s/ Esha Bhandari*
Esha Bhandari
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: 212-549-2500
Fax: 212-549-2654
ebhandari@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the District of Columbia

915 15th Street, N.W., Second Floor
Washington, D.C. 20005
Tel: 202-457-0800; aspitzer@acludc.org

*Attorneys for Plaintiffs*

CHRISTIAN W. SANDVIG, et al.,

     Plaintiffs,

         v.

WILLIAM P. BARR,[1] in his official
capacity as Attorney General of the United
States,

     Defendant.

Civil Action No. 16-1368 (JDB)

## MEMORANDUM OPINION

Plaintiffs are academic researchers who intend to test whether employment websites discriminate based on race and gender. In order to do so, they plan to provide false information to target websites, in violation of these websites' terms of service. Plaintiffs bring a pre-enforcement challenge, alleging that the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, as applied to their intended conduct of violating websites' terms of service, chills their First Amendment right to free speech. Without reaching this constitutional question, the Court concludes that the CFAA does not criminalize mere terms-of-service violations on consumer websites and, thus, that plaintiffs' proposed research plans are not criminal under the CFAA. The Court will therefore deny the parties' cross-motions for summary judgment and dismiss the case as moot.

---

[1] Pursuant to Fed. R. Civ. P. 25(d), William P. Barr, the current Attorney General of the United States, is automatically substituted as the defendant in this matter.

### A. Research Plans

Christopher Wilson and Alan Mislove are professors of computer science at Northeastern University. Decl. of Pl. Christopher "Christo" Wilson ("First Wilson Decl.") [ECF No. 48-1] ¶ 1; Decl. of Pl. Alan Mislove ("First Mislove Decl.") [ECF No. 48-2] ¶ 1. For their research, Wilson and Mislove "intend to access or visit certain online hiring websites for the purposes of conducting academic research regarding potential online discrimination." Pls.' Statement of Undisputed Material Facts ("SMF") [ECF No. 47-2] ¶ 61. Their plans include "audit testing" to examine whether various hiring websites' proprietary algorithms discriminate against online users "based on characteristics, such as race or gender, that constitute a protected class status under civil rights laws." Id. ¶¶ 64, 66. To conduct these audit tests, plaintiffs "will create profiles for fictitious job seekers, post fictitious job opportunities, and compare their fictitious users' rankings in a list of candidates for the fictitious jobs" in order to see "whether [the] ranking is influenced by race, gender, age, or other attributes." Id. ¶ 71.

Wilson and Mislove state that they will take steps to minimize the impact of their research both on the targeted websites' servers and on other users of those websites. Id. at ¶¶ 75–78. For instance, they will make it apparent to real job seekers and employers that their postings are fake by "stat[ing] in any fictitious job posting, or in any fictitious job seeker profile, that the job or the job seeker is not real." Id. at ¶¶ 75–78. Both researchers also intend to "comply with the payment requirement" of certain employment websites. Decl. of Pl. Christopher "Christo" Wilson ("Second Wilson Decl.") [ECF No. 65-1] ¶ 5; Decl. of Pl. Alan Mislove ("Second Mislove Decl.") [ECF No. 65-2] ¶ 5. But Wilson and Mislove acknowledge that their research plan will violate the target websites' terms of service prohibiting the provision of false information and/or creating fake

accounts.  SMF ¶ 86.

**B.  Procedural History**

In June 2016, Wilson and Mislove, as well as two other researchers (Christian W. Sandvig and Kyratso Karahalios) and the nonprofit journalism group First Look Media Works, Inc., brought a pre-enforcement constitutional challenge to a provision of the CFAA.  Compl. [ECF No. 1] ¶¶ 180–202.  The provision at issue, 18 U.S.C. § 1030(a)(2)(C), or the "Access Provision," makes it a crime to "intentionally access[] a computer without authorization or exceed[] authorized access, and thereby obtain[] . . . information from any protected computer."  Plaintiffs argue that this provision violates the First and Fifth Amendments.  Compl. ¶¶ 180–202.  Specifically, they claim that the Access Provision (1) is overbroad and chills their First Amendment right to freedom of speech; (2) as applied to their research activities, unconstitutionally restricts their protected speech; (3) interferes with their ability to enforce their rights and therefore violates the Petition Clause; (4) is void for vagueness under the Fifth Amendment Due Process Clause; and (5) unconstitutionally delegates lawmaking authority to private actors in violation of the Fifth Amendment Due Process Clause.  See id.  On March 30, 2018, this Court partially granted the government's motion to dismiss.  See Sandvig v. Sessions, 315 F. Supp. 3d 1, 34 (D.D.C. 2018).  The Court dismissed all but the as-applied First Amendment free speech claim brought by Wilson and Mislove.  Id.

Now before the Court are the parties' cross-motions for summary judgment.  Wilson and Mislove renew their pre-enforcement challenge to the Access Provision of the CFAA, alleging that it unconstitutionally restricts their First Amendment rights to free speech by criminalizing their research plans and journalistic activities that involve violating websites' terms of service.  Pls.' Mem. P. & A. in Supp. of Mot. for Summ. J. ("Pls.' Mem.") [ECF No. 48] at 1.  The government, for its part, argues that plaintiffs have failed to establish standing and that the First Amendment's

3

protections do not shield plaintiffs from private websites' choices about whom to exclude from their servers. Def.'s Mem. in Supp. of Cross-Mot. for Summ. J. & in Opp'n to Pls.' Mot. for Summ. J. ("Gov't's Opp'n") [ECF No. 50-1] at 1–4. The Court held a motions hearing on November 15, 2019, and subsequently ordered another round of briefing to clarify plaintiffs' specific research plans and both parties' understanding of particular terms within the CFAA. <u>See</u> November 26, 2019 Order [ECF No. 63] at 1–2. The parties each responded, <u>see</u> Def.'s Resp. to Court's Order for Clarification ("Def.'s Resp. for Clarification") [ECF No. 64]; Pls.' Mem. in Resp. to Court's Order [ECF No. 65], and the matter is now ripe for consideration.

**L<span style="font-variant:small-caps">EGAL</span> S<span style="font-variant:small-caps">TANDARD</span>**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . demonstrat[ing] the absence of a genuine issue of material fact." <u>Celotex Corp. v. Cartrett</u>, 477 U.S. 317, 323 (1986); <u>see</u> Fed. R. Civ. P. 56(c)(1)(A) (explaining that a moving party may demonstrate that a fact is undisputed or not by citing "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials").

In determining whether a genuine issue of material fact exists, the Court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the motion." <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007) (internal quotation marks and alteration omitted). But a non-moving party must establish more than the "mere existence of a scintilla of evidence" in support of its position. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986). To avoid summary judgment, "there must be evidence on which the jury could reasonably find for the [non-moving

4

party]." Id.

**ANALYSIS**

## I.    Jurisdictional Standing

To have Article III standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)).  This Court previously concluded that plaintiffs had plausibly alleged standing on their First Amendment claims at the motion-to-dismiss stage, Sandvig, 315 F. Supp. 3d at 16–22, but plaintiffs must now demonstrate standing "with specific facts set out by affidavit or other admissible evidence," In re Navy Chaplaincy, 323 F. Supp. 3d 25, 39 (D.D.C. 2018) (internal quotation marks omitted).

There are two ways in which litigants like plaintiffs here may establish the requisite ongoing injury when seeking to enjoin a statute alleged to violate the First Amendment.  First, plaintiffs may show that they intend "to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 159 (2014) (quoting Babbitt v. United Farm Workers Nat. Union, 442 U.S. 289, 298 (1979)).  Second, they may refrain from exposing themselves to sanctions under the statute, making a sufficient showing of self-censorship—i.e., they may establish a chilling effect on their free expression.  See Laird v. Tatum, 408 U.S. 1, 11–14 (1972).  In either case, a constitutionally affected interest and a credible threat of enforcement are required; without them, plaintiffs can establish neither a realistic threat of legal sanction for engaging in protected speech nor an objectively good reason for self-censoring by not conducting their planned research.  Here, plaintiffs take the first path and argue that they intend to engage in conduct

5

"arguably" proscribed by statute.

The government responds that plaintiffs lack standing for three reasons. First, regardless of whether the Department of Justice would prosecute their conduct, plaintiffs "lack any concrete plans for conducting future research covered by their as-applied claim, i.e., involving fake or misleading accounts." Gov't's Opp'n at 10. Second, assuming concrete research plans, "[p]laintiffs have not demonstrated a credible threat of prosecution for . . . such research." Id. And third, plaintiffs' "claims are too abstract to be evaluated and therefore are not ripe." Id. The government does not appear to dispute that, if plaintiffs can satisfy the injury-in-fact requirements, they can also meet the causation and redressability tests to establish standing. See Spokeo, 136 S. Ct. at 1547.

### A.     Concrete Plans

The government first argues that plaintiffs have failed to establish the existence of "any concrete plans for conducting further research covered by their as-applied claim." See Gov't's Opp'n at 10–11. To support this argument, the government quotes testimony from Wilson and Mislove that they have no "concrete plans" for research involving the provision of false information or the creation of fake accounts in violation of websites' terms of service. Id.

This framing—and selective quotation—of plaintiffs' testimony mischaracterizes the extent of their plans. "Pre-enforcement review, particularly in the First Amendment context, does not require plaintiffs to allege that they will in fact violate the regulation in order to demonstrate an injury." U.S. Telecom Ass'n v. FCC, 825 F.3d 674, 739 (D.C. Cir. 2016) (internal quotation marks omitted). "Standing to challenge laws burdening expressive rights requires only a credible statement by the plaintiff of intent to commit violative acts and a conventional background expectation that the government will enforce the law." Id. (emphasis added) (internal quotation marks omitted).

Plaintiffs here satisfy this standard. Wilson later clarified that, when he said he did not have

6

concrete plans, "what [he] meant was [they] don't have software, [they] don't have a timeframe. There [are] no students assigned to it." Oral Depo. of Christopher Wilson ("Wilson Depo.") [ECF No. 54-3] at 215:25–216:4. But Wilson has already "applied and received . . . funding" and approval from the Institutional Review Board ("IRB") for such projects. Id. at 217:15–18. Likewise, Mislove testified that he has "specific research plans [and] specific platforms that [his lab is] studying . . . in the sense that this is an area of [his] research that [he] intend[s] to conduct work[] in." Oral Depo. of Alan E. Mislove ("Mislove Depo.") [ECF No. 52-3] at 47:4–8. In response to the government's interrogatory asking for "any and all platforms and/or websites that Plaintiffs intend to access in the future for purposes" of research, plaintiffs identified specific websites, including LinkedIn, Monster, Glassdoor, and Entelo, and noted that they intended to conduct research that might violate these sites' terms of service by "creating accounts using false information and/or providing false or misleading information." Pls.' Third Suppl. Resps. & Objs. to Def.'s First Set of Interrogs. Nos. 2–3 [ECF No. 52-6] at 3–4.

The government argues in response that "'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the actual or imminent injury." Gov't Opp'n at 10–11 (quoting Defs. of Wildlife, 504 U.S. at 564). But unlike the amorphous "'some day' intentions" to visit endangered species on another continent at issue in Defenders of Wildlife, see 504 U.S. at 564, these researchers' plans are already in motion, even if the specifics of their study are still being developed. The fact that plaintiffs have secured funding and IRB clearance to engage in conduct covered by their as-applied challenge evinces a sufficient demonstration of injury in fact. Cf. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 183–84 (2000) (concluding that organizational plaintiffs' members suffered an injury in fact because they had "reasonable concerns" rising above the level of

7

"speculative some day intentions" that the discharge of pollutants would "directly affect[]" their "recreational, aesthetic, and economic interests" (internal quotation marks omitted)).

The government also argues that plaintiffs' two declarations, clarifying the meaning of their earlier statements about "concrete plans," must be disregarded under the so-called "sham affidavit rule." Gov't's Opp'n at 11–12; see also First Wilson Decl.; First Mislove Decl. This argument fails, however, because these affidavits' descriptions of plaintiffs' research plans merely clarify plaintiffs' prior answers and contextualize their use of the term "concrete." See Galvin v. Eli Lilly & Co., 488 F.3d 1026, 1030 (D.C. Cir. 2007). Mislove and Wilson said they have no "concrete" plans in order to explain that they are not currently implementing any of those research plans, notwithstanding their intent to do so in the future. Moreover, there is no indication that plaintiffs, in their earlier statements, intended to use the term "concrete plans" in its specific meaning as a legal term of art.

Finally, in its reply brief, the government states that the clearest examples of concrete steps taken by Wilson actually concern a different research project than the proposed discrimination project at issue in this case. Def.'s Reply Mem. in Supp. of Cross-Mot. for Summ. J. ("Gov't's Reply") [ECF No. 56] at 4 n.1. The government does not clearly articulate the distinction between the different research projects, however, and this Court has already recognized that Wilson and Mislove intend both to "create fake employer profiles" and to "create fictitious sock-puppet job seeker profiles" as part of the research at issue in this case. Sandvig, 315 F. Supp. 3d at 9–10.

### B. Credible Threat

Under their theory of standing, plaintiffs must show that they intend to engage in conduct arguably both protected by the First Amendment and proscribed by the statute they challenge, and that there is a "credible threat" that the statute will be enforced against them when they do so. See Driehaus, 573 U.S. at 158–63. The government argues that plaintiffs fail to establish a credible threat

8

of prosecution under the CFAA, contending that (1) plaintiffs' testimony shows that they do not fear prosecution (and, indeed, already have engaged in such research); (2) past CFAA prosecutions do not establish a credible threat that plaintiffs' proposed conduct will be prosecuted; and (3) the government's charging policies and public statements undercut plaintiffs' attempt to establish a credible threat of prosecution.  Gov't's Opp'n at 12–18.

"Standing to challenge laws burdening expressive rights requires only a credible statement by the plaintiff of intent to commit violative acts and a conventional background expectation that the government will enforce the law"  U.S. Telecom Ass'n, 825 F.3d at 739 (internal quotation marks omitted).  As previously noted, plaintiffs satisfy the first half of this test; the question thus becomes whether the "conventional background expectation" of criminal enforcement holds here.  Id.  Again, plaintiffs have the stronger arguments.

First, plaintiffs' testimony that they do not subjectively fear prosecution under this statute— and that they have even engaged in the allegedly "chilled" conduct previously—does not undermine their legal claim.  The question is whether there exists "a credible threat," which is an objective, rather than subjective, inquiry.  See id.  Mislove also testifies that he does subjectively fear facing criminal consequences for his future research.  See, e.g., Mislove Depo. at 147:12–19 ("[I]t really weigh[s] heavily on my mind . . . [that I am] exposing my students to criminal—to potential criminal prosecution or the risk.").

Second, even assuming the absence of prior prosecutions, but see Sandvig, 314 F. Supp. 3d at 19–20 (discussing two previous prosecutions under the Access Provision), plaintiffs still are not precluded from bringing this pre-enforcement action.  When constitutionally protected conduct falls within the scope of a criminal statute, and the government "has not disavowed any intention of invoking the criminal penalty provision," plaintiffs are "not without some reason in fearing

9

prosecution" and have standing to bring the suit.  Babbitt, 442 U.S. at 302.  Indeed, at the pleadings stage, the Court already rejected the contention that the lack of similar past CFAA prosecutions undermines a credible threat of prosecution now.  See Sandvig, 315 F. Supp. 3d at 18–21.

Third, the government points to guidance from the Attorney General that "expressly cautions against prosecutions based on [terms-of-service] violations," as well as statements to Congress by Department of Justice officials, as evidence that plaintiffs face no credible threat of prosecution.  Gov't's Opp'n at 16–17.  But the absence of a specific disavowal of prosecution by the Department undermines much of the government's argument.  See Babbitt, 442 U.S. at 302.  The government insists that it is not a defendant's burden to "come forward with proof of a non-existent threat of prosecution."  Gov't's Opp'n at 17.  But while the burden of demonstrating standing remains on the plaintiffs, this Court has previously ruled that in the absence of an "explicit statement" disavowing prosecution, these various advisory and non-binding statements and Department of Justice policies do not eliminate the reasonable fear of prosecution.  Sandvig, 315 F. Supp. 3d at 20–21.  Furthermore, as noted above the government has brought similar Access Provision prosecutions in the past and thus created a credible threat of prosecution.  Id. at 19–20.

Discovery has not helped the government's position.  John T. Lynch, Jr., the Chief of the Computer Crime and Intellectual Property Section of the Criminal Division of the Department of Justice, testified at his deposition that it was not "impossible for the Department to bring a CFAA prosecution based on [similar] facts and de minimis harm."  Dep. of John T. Lynch, Jr. [ECF No. 48-4] at 154:3–7.  Although Lynch has also stated that he does not "expect" the Department to do so, Aff. of John T. Lynch, Jr. [ECF No. 21-1] ¶ 9, "[t]he Constitution 'does not leave us at the mercy of noblesse oblige,'" Sandvig, 315 F. Supp. 3d at 21 (quoting United States v. Stevens, 559 U.S. 460, 480 (2010)).  Absent a specific disavowal or a clear indication that plaintiffs' conduct falls outside

10

the scope of the criminal provisions, plaintiffs adequately demonstrate a credible threat for standing purposes.

## C. Ripeness

The government also argues that plaintiffs' claims are not ripe for adjudication. "Plaintiffs have not yet identified the specific websites that they intend to access for their research," the government says, and hence it is "impossible to know what those websites' [terms of service] will be at the time of Plaintiffs' research"—or whether any violation of the terms of service will run afoul of the Court's narrow construction of the CFAA. Gov't's Opp'n at 18. Because plaintiffs do not know what their research will entail, the government argues, the Court cannot evaluate the potential harms caused by their hypothetical research. Id. at 18–19. Hence, according to the government, the Court cannot meaningfully examine plaintiffs' First Amendment claim on the merits and fashion a proper injunction under Rule 65 because it cannot "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Id. at 19 (quoting Fed. R. Civ. P. 65(d)(1)(B), (C)).

Plaintiffs respond first that, because terms of service are always subject to change, it will always be impossible to know what a website's exact terms of service will be in the future, or whether research violating those terms will implicate the Access Provision. Pls.' Mem. in Opp'n to Def.'s Mot. for Summ. J. & Reply in Supp. of Pls.' Mot. for Summ. J. ("Pls.' Reply") [ECF No. 54] at 10–11. Accordingly, "[p]laintiffs would have to actually undertake the research—taking note of the [terms of service] actually in effect at the time and exposing themselves to criminal liability—in order to challenge the Access Provision's application to them," a drastic and risky step that plaintiffs argue is not required by the First Amendment. Id. at 11. Next, plaintiffs say that how exactly they plan to carry out their research—for instance, the number of fictitious accounts or postings that will

11

be necessary or how long each account or posting will exist—is irrelevant to the First Amendment question.  Id.  Finally, plaintiffs argue that their complaint and declarations clarify in detail the research goals, methodologies, and precautions that will be taken to mitigate potential harm.  Id. at 11–12.

The question of ripeness presents a closer call than the previous two standing issues.  For instance, if this Court were to reach the First Amendment analysis urged by plaintiffs and evaluate the Access Provision under intermediate scrutiny, it would have to determine whether the government has "show[n] 'a close fit between ends and means'" such "that the regulation 'promotes a substantial government interest that would be achieved less effectively absent the regulation,'" and does "not 'burden substantially more speech than is necessary to further the government's legitimate interests.'"  A.N.S.W.E.R. Coal. v. Basham, 845 F.3d 1199, 1213–14 (D.C. Cir. 2017) (citations omitted); see also Sandvig, 315 F. Supp. 3d at 30.  Absent specific direction from plaintiffs, it will be difficult to engage in this analysis.  The Court is not well placed, for instance, to forecast what technological or security risks might be generated by permitting such research.

Still, based on the record before it, the Court concludes that the present dispute is ripe.  Plaintiffs listed several websites—LinkedIn, Monster, Glassdoor, and Entelo—that they plan to visit, and they described intending to violate these sites' terms of service by "creating accounts using false information and/or providing false or misleading information."  Pls.' Third Suppl. Resps. & Objs. to Def.'s First Set of Interrogs. No. 3, at 3–4.  Wilson and Mislove also both testified that their research plans were designed to have, at most, a de minimis effect on the targeted websites, further demonstrating that specific concrete steps have been taken in their research.  First Wilson Decl. ¶ 46; First Mislove Decl. ¶ 43.  The governments' own exhibits make clear the extent to which websites, like LinkedIn, both prohibit and attempt to eliminate false accounts.  See, e.g., Decl. of Paul Rockwell

12

("LinkedIn Decl.") [ECF No. 52-11] at 3–12; Decl. of Thomas O'Brien ("GlassDoor Decl.") [ECF No. 52-13] at 5–6; Affirmation of Leonard Kardon ("Monster Aff.") [ECF No. 52-14] at 1–2. These various pieces of evidence reveal a ripe dispute over whether criminally prosecuting plaintiffs under the CFAA for violations of public websites' terms of service runs afoul of the First Amendment.

*     *     *

Finally, the Court turns to the question of whether plaintiffs' "intended future conduct is 'arguably . . . proscribed by'" the CFAA. Driehaus, 573 U.S. at 162 (quoting Babbitt, 442 U.S. at 298). The government does not appear to question that plaintiffs plan to engage in proscribed conduct, but the Court has "an independent obligation to assure that standing exists." Summers v. Earth Island Inst., 555 U.S. 488, 499 (2009). The Court is also mindful that its ultimate interpretation of the CFAA, see infra, at 15–28, excludes plaintiffs' conduct from criminal liability and, at minimum, moots their First Amendment claim. Still, the question remains whether the Court's ultimate determination that the CFAA does not criminalize plaintiffs' intended conduct eliminates plaintiffs' injury-in-fact, see Driehaus, 573 U.S. 158–59, or merely moots the First Amendment dispute, see Powell v. McCormack, 395 U.S. 486, 496 (1969) ("[A] case is moot when the issues presented are no longer 'live' . . . .").

The resolution to this question turns on the meaning of Driehaus's holding that plaintiffs' intended conduct must be "arguably . . . proscribed by statute," Driehaus, 573 U.S. at 159; see also Woodhull Freedom Found. v. United States, 948 F.3d 363, 371 (D.C. Cir. 2020) (holding that courts should look to Driehaus's test for determining whether a plaintiff faces an "imminent threat" of prosecution in a pre-enforcement action). The Second Circuit has taken this standard to mean that, as long as plaintiffs propose a reasonable interpretation of the statute under which they credibly fear prosecution, then they satisfy the standing requirement. See Knife Rights, Inc. v. Vance, 802 F.3d

13

377, 384–86 (2d Cir. 2015) (holding that plaintiff had standing where, despite believing its knife design was not proscribed, plaintiff could not "confidently determine which such knives defendants will deem proscribed gravity knives").  This "reasonable interpretation" approach stems from a line of pre-Driehaus cases in which the Second Circuit was interpreting Babbitt, from which Driehaus borrowed the "arguably proscribed" standard.  See Vt. Right to Life Comm., Inc. v. Sorrell, 221 F.3d 376, 382 (2d Cir. 2000).  The Second Circuit understood Babbitt to require only that an interpretation proscribing plaintiffs' intended conduct be "reasonable enough that [they] may legitimately fear that [they] will face enforcement of the statute."  Id. at 383.

The D.C. Circuit's recent decision in Woodhull Freedom Foundation suggests a slightly different approach.  Although not as explicit as the Second Circuit in stating how plausible an interpretation needs to be to satisfy plaintiffs' standing requirements, the court engaged in considerable statutory construction before deciding that plaintiffs did, in fact, have standing.  See Woodhull Freedom Found., 948 F.3d at 371–73.  As Judge Katsas suggested in concurrence, a district court is first to decide the statute's meaning and then to decide if, arguably, the plaintiffs' conduct falls within its "[p]roperly construed" bounds.  Id. at 375 (Katsas, J., concurring).

Unlike in Woodhull Freedom Foundation, which concerned a plain-meaning interpretation relying on dictionaries and precedent, see id. at 372–73, Wilson and Mislove challenge an ambiguous statute that this Court has already deemed may apply to their conduct, see Sandvig, 315 F. Supp. 3d at 18.  As will be discussed below, substantive canons of interpretation, like the rule of lenity and constitutional avoidance, guide this Court's ultimate decision.  Under such circumstances, the Court concludes that plaintiffs' intended conduct is "arguably . . . proscribed by statute," Driehaus, 573 U.S. at 159.  To rule otherwise, and decide this complicated statutory matter under the rubric of standing, would risk converting the "arguably . . . proscribed by statute" standard of Babbitt and

14

<u>Driehaus</u> into one of certainty. <u>Cf.</u> <u>Hedges v. Obama</u>, 724 F.3d 170, 199 (2d Cir. 2013) (noting an unease with "allowing a preenforcement standing inquiry to become the vehicle by which a court addresses" important and complex matters of statutory interpretation).

## II. Interpreting the CFAA

Assuming, then, that plaintiffs have satisfied the injury-in-fact requirement, the Court nevertheless concludes that their First Amendment claim is moot. As will be discussed below, courts have disagreed as to the breadth of the CFAA's Access Provision. If this Court determines that the Access Provision does <u>not</u> actually criminalize plaintiffs' proposed conduct—namely, violating consumer websites' terms of service—then the Court need not dive, and judicial economy would advise against diving, into the First Amendment issue. <u>See</u> <u>Bond v. United States</u>, 572 U.S. 844, 855 (2014) ("[I]t is a well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case." (internal quotation marks omitted)). Rather, the Court concludes that the First Amendment claims plaintiffs "presented are no longer 'live'" and will dismiss the case as moot. <u>Powell</u>, 395 U.S. at 496.

### a. Accessing Without Authorization

The CFAA prohibits "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] . . . information from any protected computer." 18 U.S.C. § 1030(a)(2). The term "protected computer" refers to any computer "used in or affecting interstate or foreign commerce or communication," <u>Id.</u> § 1030(e)(2)(B), and no party disputes that the servers and other computers associated with the websites in question here, like LinkedIn, constitute "protected computer[s]."

Although the CFAA does not define "authorization," courts have found the term "clear" and

given it a "straightforward meaning." United States v. Nosal ("Nosal II"), 844 F.3d 1024, 1035 (9th Cir. 2016). The Ninth Circuit, for instance, has consistently interpreted "authorization" to mean "permission or power granted by an authority." LVRC Holdings LLC v. Brekka, 581 F.3d 1127, 1133 (9th Cir. 2009); see also hiQ Labs, Inc. v. LinkedIn Corp., 938 F.3d 985, 1000 (9th Cir. 2019) ("Authorization is an affirmative notion, indicating that access is restricted to those specially recognized or admitted." (internal quotation marks omitted)); Facebook, Inc. v. Power Ventures, Inc., 844 F.3d 1058, 1067 (9th Cir. 2016) ("[A] defendant can run afoul of the CFAA when he or she has no permission to access a computer or when such permission has been revoked explicitly."); Nosal II, 844 F.3d at 1033 ("Not surprisingly, there has been no division among the circuits on the straightforward 'without authorization' prong of [§ 1030(a)]."). At least the Second, Fourth, and Sixth Circuits have come to the same conclusion. See, e.g., United States v. Valle, 807 F.3d 508, 524 (2d Cir. 2015) ("[C]ommon usage of 'authorization' suggests that one 'accesses a computer without authorization' if he accesses a computer without permission to do so at all."); WEC Carolina Energy Sols. v. Miller, 687 F.3d 199, 204 (4th Cir. 2012) ("[B]ased on the ordinary, contemporary, common meaning of 'authorization,' . . . an employee is authorized to access a computer when his employer approves or sanctions his admission to that computer."); Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am., 648 F.3d 295, 303–04 (6th Cir. 2011) ("Commonly understood, . . . a defendant who accesses a computer 'without authorization' does so without sanction or permission.").

The statutory text is less clear, however, when it comes to the entire phrase "accesses a computer without authorization." The CFAA does not define this phrase, but "the wording of the statute, forbidding 'access[] . . . without authorization,' . . . suggests a baseline in which access is not generally available and so permission is ordinarily required." hiQ Labs, 938 F.3d at 1000. This

16

wording thus contemplates a view of the internet as divided into at least two realms—<u>public</u> websites (or portions of websites) where no authorization is required and <u>private</u> websites (or portions of websites) where permission must be granted for access. Because many websites on the internet are open to public inspection, a website or portion of a website becomes "private" only if it is "delineated as private through use of a permission requirement of some sort." <u>Id.</u> at 1001.[2]

Most courts agree with the <u>hiQ Labs</u> court's interpretation of "accesses . . . without authorization" as contemplating a "two-realm internet." <u>See, e.g.</u>, <u>WEC Carolina Energy Sols.</u>, 687 F.3d at 204 ("[A user] accesses a computer 'without authorization' when he <u>gains admission</u> to a computer without approval." (emphasis added)); <u>United States v. Nosal</u> ("<u>Nosal I</u>"), 676 F.3d 854, 858 (9th Cir. 2012) (en banc) ("'[W]ithout authorization' would apply to <u>outside</u> hackers (individuals who have no authorized access to the computer at all) and 'exceeds authorized access' would apply to <u>inside</u> hackers (individuals whose initial access to a computer is authorized but who access unauthorized information or files)."). Courts have interpreted this provision to involve transitioning from a public area of the internet to a private, permission-restricted area, often requiring some form

---

[2] The <u>hiQ Labs</u> court faced the additional wrinkle of whether sending a cease-and-desist letter to <u>specific</u> users, who were allegedly violating LinkedIn's terms of service, was enough to revoke authorization even for otherwise "public" parts of the website. <u>See</u> 938 F.3d at 999 ("The pivotal CFAA question here is whether once hiQ received LinkedIn's cease-and-desist letter, any further scraping and use of LinkedIn's data was 'without authorization' within the meaning of the CFAA and thus a violation of the statute."); <u>see also</u> <u>Craigslist Inc. v. 3Taps Inc.</u>, 964 F. Supp. 2d 1178, 1182 (N.D. Cal. 2013) (describing "the question here" as "whether Craigslist had the power to revoke, on a case-by-case basis, the general permission it granted to the public to access the information on its website"). Because no such letters have been sent in this case, the Court need not decide whether they would constitute a revocation of authorization and thereby make any further visits by the recipients to the otherwise public portions of LinkedIn a CFAA violation. <u>See also</u> Pet. for Writ of Cert. at 25, <u>LinkedIn Corp. v. hiQ Labs, Inc.</u>, No. 19-1116 (U.S. Mar. 9, 2020) ("Where a website owner sets up technical measures to deny a third-party scraper access to its website or sends a cease-and-desist letter, thereby putting the scraper indisputably on notice that access is not authorized, any further efforts to access that website are 'without authorization.'").

At the same time, the fact that receipt of a cease-and-desist letter might render the recipient's future visits to an otherwise public website "unauthorized" does provide one possible distinction between § 1605(a)(2) and § 1605(a)(3) that helps to give meaning to the term "nonpublic" in the latter provision. <u>Cf.</u> <u>3Taps</u>, 964 F. Supp. 2d at 1182–83 ("Congress apparently knew how to restrict the reach of the CFAA to only certain kinds of information, and it appreciated the public vs. nonpublic distinction—but § 1030(a)(2)(C) contains no such restrictions or modifiers.").

of authentication before a viewer is granted access. See, e.g., hiQ Labs, 938 F.3d at 1001 ("[A]uthorization is only required for password-protected sites or sites that otherwise prevent the general public from viewing the information."); Valle, 807 F.3d at 524 ("'[W]ithout authorization' most naturally refers to a scenario where a user lacks permission to access the computer at all.").

The statutory and legislative history of the CFAA support this public-private reading of the provision. Originally part of the Counterfeit Access Device and Computer Fraud and Abuse Act of 1984, Pub. L. No. 98-473, § 2102(a), 98 Stat. 2190, 2190–92, the CFAA "has been substantially modified" over the intervening decades. See Orin S. Kerr, Vagueness Challenges to the Computer Fraud and Abuse Act, 94 Minn. L. Rev. 1561, 1561 (2010). Throughout this history, however, Congress has consistently analogized violations of § 1030 to physical-world crimes. For example, "[t]he 1984 House Report on the CFAA explicitly analogized the conduct prohibited by section 1030 to forced entry." hiQ Labs, 938 F.3d at 1000. That Report notes that "[d]ifficulties in coping with computer abuse arise because much of the property involved does not fit well into categories of property subject to abuse or theft." H.R. Rep. No. 98-894, at *9 (1984) (emphasis added). Instead of focusing on what was stolen, the CFAA relied on "an 'unauthorized access' concept," wherein "the conduct prohibited is analogous to that of 'breaking and entering' rather than using a computer (similar to the use of a gun) in committing the offense." Id. at *20.

Likewise, when the CFAA was amended in 1996 to cover federal government computers and those in interstate commerce (i.e., "protected computers"), the Senate Report described the bill as "protect[ing] against the interstate or foreign theft of information by computer" (emphasis added), suggesting a comparison to the physical-world crime of theft. S. Rep. No. 104-357, at *7 (1996). This Report reveals that a central motivation behind these amendments was "to increase protection for the privacy and confidentiality of computer information," id., further suggesting that "access[ing]

18

a computer without authorization" involves "obtain[ing]" information from non-public websites, see 18 U.S.C. § 1030(a)(2).

This interpretation rooted in property norms also aligns with judicial readings of similar language in the Stored Communications Act.  See 18 U.S.C. § 2701(a) (criminalizing "intentionally access[ing] without authorization a facility through which an electronic communication service is provided" or "intentionally exceed[ing] an authorization to access [such a] facility"); see also Wachovia Bank v. Schmidt, 546 U.S. 303, 305 (2006) ("[U]nder the in pari materia canon, statutes addressing the same subject matter generally should be read as if they were one law . . . ." (internal quotation marks omitted)).  For example, interpreting the Act in light of the common law, the Ninth Circuit focused on "the essential nature" of the relationship between the computer owner and the accesser, and concluded that "[p]ermission to access a stored communication does not constitute valid authorization if it would not defeat a trespass claim in analogous circumstances."  Theofel v. Farey-Jones, 359 F.3d 1066, 1073 (9th Cir. 2004) (emphasis added).

Likewise, in amending 18 U.S.C. § 2510, the Patriot Act defined "computer trespasser" as "a person who accesses a protected computer without authorization and thus has no reasonable expectation of privacy in any communication transmitted to, through, or from the protected computer."  Pub. L. 107–56, 115 Stat. 272 (2001).  That the Patriot Act cites § 1030 for the definition of "protected computer" makes the connection between these two statutes all the clearer: "access[ing] a computer without authorization" is the computer equivalent of trespassing in the physical world.

Adopting the formulation of the Ninth Circuit in hiQ Labs, this Court will call the barriers between the public internet and private authorization-based computers "permission requirements." 938 F.3d at 1001.  Under this interpretation, the question becomes what sort of "permission

19

requirement" constitutes enough of a barrier to trigger criminal liability under § 1030(a)(2) if bypassed. The government suggests that such "permission requirements" can be minimal. See Tr. Mots. H'rg [ECF No. 62] at 54:15–56:17. An announcement on the homepage of a website that access to any further content is conditioned on agreeing to lengthy terms of service—or even one term of service—would, the government argues, constitute such a requirement. Id. at 54:22–24.

The Court concludes that agreeing to such contractual restrictions, although that may have consequences for civil liability under other federal and state laws, is not sufficient to trigger criminal liability under the CFAA. In other words, terms of service do not constitute "permission requirements" that, if violated, trigger criminal liability.

A number of considerations lead the Court to this conclusion. First, websites' terms of service provide inadequate notice for purposes of criminal liability. These protean contractual agreements are often long, dense, and subject to change. While some websites force a user to agree to the terms before access—so-called "clickwrap"—others simply provide a link at the bottom of the webpage, or place the terms, often in fine print, elsewhere on the page. "Significant notice problems arise if we allow criminal liability to turn on the vagaries of private polices that are lengthy, opaque, subject to change and seldom read." Nosal I, 676 F.3d at 860.

Second, although not a paradigmatic example of a "nondelegation" problem, enabling private website owners to define the scope of criminal liability does raise concerns for the Court. See The Vagaries of Vagueness: Rethinking the CFAA as a Problem of Private Nondelegation, 127 Harv. L. Rev. 751, 768–71 (2013). Previously, this Court determined that a narrow interpretation of the CFAA limited to "access restrictions" saved § 1030(a)(2) from becoming "a limitless, standardless delegation of power to individual websites to define crimes." Sandvig, 315 F. Supp. 3d at 33. The Court also concluded that merely "incorporat[ing] private parties' chosen restrictions, which are only

20

binding on those who interact with those parties' individual [websites]," did not necessarily constitute an improper delegation of legislative or regulatory authority. Id. at 33–34.

Upon further reflection, and now presented with additional evidence of the nature of the target websites' terms of service, the Court finds that it is necessary to answer another question: whether terms-of-service conditions, rather than authentication gates, constitute adequate "permission requirements" for criminal liability under the CFAA. Again, the Court concludes that the narrower interpretation is the wiser path. The government analogizes website owners to real property owners, who have historically been allowed to exclude whomever they choose from their private, non-commercial land, Gov't's Opp'n at 23–24, but the analogy between real property and the internet is not perfect. The internet is inherently open and public, see Reno v. Am. Civil Liberties Union, 521 U.S. 844, 880 (1997) (observing that "most Internet forums—including chat rooms, newsgroups, mail exploders, and the Web—are open to all comers"), and users constantly move from one website to another and navigate between various sections of a given website. Under such circumstances, the CFAA's prohibition on "access[ing] a computer without authorization," even though phrased "in the form of a general prohibition" that can often escape nondelegation worries, see Silverman v. Barry, 845 F.2d 1072, 1086 (D.C. Cir. 1988), becomes unworkable and standardless. Criminalizing terms-of-service violations risks turning each website into its own criminal jurisdiction and each webmaster into his own legislature. Such an arrangement, wherein each website's terms of service "is a law unto itself," Emp't Div., Dep't of Human Res. of Or. v. Smith, 494 U.S. 872, 890 (1990), would raise serious problems. This concern, then, supports a narrow interpretation of the CFAA.

Third, both the rule of lenity and the avoidance canon weigh in favor of this narrow interpretation as well. "When interpreting a criminal statute, we do not play the part of a mindreader." United States v. Santos, 553 U.S. 507, 515 (2008). If "a reasonable doubt persists about a statute's

intended scope even <u>after</u> resort to the language and structure, legislative history, and motivating policies of the statute," <u>Moskal v. United States</u>, 498 U.S. 103, 108 (1990) (internal quotation marks omitted), courts must adopt the narrower interpretation. See <u>Yates v. United States</u>, 135 S. Ct. 1074, 1088 (2015) ("[I]f . . . recourse to traditional tools of statutory construction leaves any doubt about the meaning of [a statutory term] . . . , we would invoke the rule that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." (internal quotation marks omitted)). Here, none of the traditional tools of statutory interpretation definitively resolves the question of what constitutes "access[ing] . . . without authorization," so the Court opts to interpret the provision narrowly and as not encompassing terms-of-service violations.

Likewise, constitutional avoidance weighs in favor of interpreting "accesses . . . without authorization" narrowly. If the Court were to conclude that plaintiffs' terms-of-service violations <u>do</u> violate the CFAA, then it would have to decide whether prosecuting them for such actions violates the First Amendment. As the Court previously observed, it "need not determine whether plaintiffs' constitutional arguments would actually win the day," but rather "whether one reading 'presents a significant risk that [constitutional provisions] will be infringed.'" <u>Sandvig</u>, 315 F. Supp. 3d at 25 (quoting <u>NLRB v. Catholic Bishop of Chi.</u>, 440 U.S. 490, 502 (1979)). Plaintiffs' First Amendment challenge raises such risks, see <u>Sandvig</u>, 315 F. Supp. 3d at 28–30, and thus weighs in favor of a narrow interpretation under the avoidance canon.

Given all these concerns, a user should be deemed to have "accesse[d] a computer without authorization," 18 U.S.C. § 1030(a)(2), only when the user bypasses an authenticating permission requirement, or an "authentication gate," such as a password restriction that requires a user to demonstrate "that the user is the person who has access rights to the information accessed," Orin S. Kerr, <u>Norms of Computer Trespass</u>, 116 Colum. L. Rev. 1143, 1147, 1164 (2016) (hereinafter

22

"Norms"). Although bypassing code-based restrictions, like a social-security-number or credit-card requirement, are paradigmatic examples of an "authentication gate," see Orin S. Kerr, Cybercrime's Scope: Interpreting "Access" and "Authorization" in Computer Misuse Statutes, 78 N.Y.U. L. Rev. 1596, 1664 (2003), "[t]he key point is not that some code was circumvented but rather that the computer owner conditioned access on authentication of the user and the access was outside the authentication," Norms at 1164.

Here, neither Wilson nor Mislove attempt to bypass an authentication gate. For websites requiring "login credentials—i.e., usernames and passwords"—Wilson and Mislove intend to provide the information that they "generated when [they] created tester accounts." Second Wilson Decl. ¶ 6; Second Mislove Decl. ¶ 6. And for websites that require payments, they intend to "comply with the payment requirement." Second Wilson Decl. ¶ 5; Second Mislove Decl. ¶ 5. None of their research plans, then, involve bypassing authenticating "permission requirements," and thus none of them when executed will constitute violations of the CFAA as interpreted herein.

The record does reflect that at least Wilson previously used borrowed business information for authentication purposes on CareerBuilder.com. See Wilson E-mails Regarding CareerBuilder Receipt, PID7243-46 (July 2016) [ECF No. 52-16] at 3. At the motions hearing, however, counsel for plaintiffs stated that "they only intend to access parts of a website that are otherwise open to the public or available to anyone who creates a [username] and password." Mots. Hr'g Tr. at 8:15–17. The Court asked for clarification, see Nov. 26, 2019 Order at 1–2, and declarations from both researchers now clarify that, although they may pay for access to some public employment websites, their future research plans entail no provision of "authenticating, real-world business information . . . , such as real-world business license information." Second Wilson Decl. ¶ 2; Second Mislove Decl. ¶ 2. The Court thus has no occasion to determine whether provision of either false or borrowed

23

real-world business information to access otherwise private portions of employment websites would violate the CFAA.

### b. Exceeding Authorized Access

Turning to the second part of the Access Provision, the CFAA prohibits "exceed[ing] authorized access, and thereby obtain[ing] . . . information from any protected computer." The CFAA defines "the term 'exceeds authorized access' [to] mean[] to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C § 1030(e)(6).

This language suggests that an individual cannot "exceed[] authorized access" without first legitimately passing through a "permission requirement." After all, the violator must "use such [authorized] access" in order to "obtain or alter information" to which the violator "is not entitled," implying that barriers are passed through permissibly. Id. (emphasis added). This interpretation aligns with the Ninth Circuit's distinction between "accesses . . . without authorization" applying to "outside hackers" and "exceeds authorized access" applying to "inside hackers." Nosal I, 676 F.3d at 858.

If bypassing a "permission requirement" is not the action that triggers criminal liability, however, then the question remains what type of conduct does constitute a criminal act. In other words, what distinguishes information that an authorized accesser is "entitled to obtain or alter" from information to which he is not entitled? Does plaintiffs' anticipated provision of false information to their target websites, in violation of these websites' terms of services, cross that line and "exceed[] authorized access"?

The resolution of this question turns, in part, on the meaning of "entitled" in the statutory definition of "exceeds authorized access" at § 1030(e)(6). The government argues that "entitled"

24

means "to furnish with a right," and "supports [a] broader interpretation of the phrase 'exceeds authorized access' . . . , in which all relevant facts (including policies set by the computer owners) may be considered in determining the scope of a person's authorized access." Def.'s Resp. for Clarification at 5–6. By this approach, the meaning of "exceeds authorized access" is context-dependent: "Because the computer owner furnishes an individual with the right to access its systems and obtain information from them, explicit policies restricting that right determines when an individual 'exceeds authorized access.'" Id. at 6. According to the government, such "explicit policies" include employers' computer-use policies and the terms of service of public websites. See id. at 6; Gov't's Opp'n at 53–54.

Plaintiffs seem to have agreed with this interpretation for much of the litigation and assumed that such terms-of-service violations do fall afoul of the CFAA. See Pls.' Mem. at 2–3, 9–11. Rather than interpreting the statute narrowly, they argued that their actions are protected by the First Amendment. But plaintiffs now suggest that they would be satisfied with "declaratory and injunctive relief" barring prosecution under the CFAA for violations of websites' terms of service—in other words, with a narrow interpretation of the CFAA that it does not encompass terms-of-service violations. See Pls.' Mem. in Resp. to Court's Order at 1.

Courts have come to a range of views on the best interpretation of "exceeds authorized access," and the circuits are currently divided on whether, in the employment context, an employee's violation of company policy constitutes a CFAA violation. The First, Fifth, Seventh, and Eleventh Circuits have concluded that a person with access to a computer for business purposes exceeds authorized access when the accesser "obtain[s] . . . information for a nonbusiness reason." United States v. Rodriguez, 628 F.3d 1258, 1263 (11th Cir. 2010); see also United States v. John, 597 F.3d 263, 272 (5th Cir. 2010) (concluding that an employee's "access[ing] account information for

25

individuals whose accounts she did not manage, remov[ing] this highly sensitive and confidential information from [the employer's] premises, and ultimately us[ing] this information to perpetrate fraud on [the employer] and its customers" constituted a CFAA violation); Int'l Airport Ctrs., L.L.C. v. Citrin, 440 F.3d 418, 420–21 (7th Cir. 2006) (similar); EF Cultural Travel BV v. Explorica, Inc., 274 F.3d 577, 582–83 (1st Cir. 2001) (similar).[3]  The Second and Fourth Circuits have come to the opposite conclusion.  See Valle, 807 F.3d at 512–13, 528 (applying the rule of lenity and not imposing liability for accessing a government database of personal information for no law enforcement purpose); WEC Carolina Energy Sols., 687 F.3d at 205–07 (refusing to impose liability when employees violated company policy).

Far fewer courts have weighed in on the facts before this Court: namely, whether violating the terms of service of consumer websites constitutes a criminal CFAA violation.  But the majority of courts that have examined this question has determined that there is no liability.  See, e.g., Facebook, 844 F.3d at 1067 ("[A] violation of the terms of use of a website—without more—cannot establish liability under the CFAA."); Bittman v. Fox, 107 F. Supp. 3d 896, 900–01 (N.D. Ill. 2015) (concluding that defendants did not "exceed[] authorized access" by creating "a fake social media account in violation of a social media company's terms of service"); United States v. Drew, 259 F.R.D. 449, 464–65 (C.D. Cal. 2009) (interpreting "exceeds authorized access" to exclude mere terms-of-service violations to avoid rendering the statute void for vagueness).  But see United States v. Lowson, Crim. No. 10-114 (KSH), 2010 WL 9552416, at *5 (D.N.J. Oct. 12, 2010) (not dismissing

---

[3] The First Circuit later extended its holding in Explorica, which was based upon confidentiality agreements signed by former employees, to Zefer, a third-party website.  See EF Cultural Travel BV v. Zefer Corp., 318 F.3d 58 (1st Cir. 2003).  Although the decision did suggest that terms of service may create CFAA liability by "say[ing] just what non-password protected access they purport to forbid," id. at 64, the First Circuit's holding relied upon the "relatively narrow grounds" that the injunction against Explorica applied to "anyone else with notice" and thus "precluded [Zefer] from acting to assist the enjoined party from violating the decree [and] from doing so on behalf of that party," id. at 61, 63.

a case wherein the defendants "implement[ed] 'hacks' and us[ed] 'backdoors' to enable automated programs to purchase tickets" from online vendors).

The Court agrees with the clear weight of relevant authority and adopts a narrow interpretation of "exceeds authorized access." Without weighing in on the circuit split over employers' computer-use policies, the Court concludes that violating public websites' terms of service, as Wilson and Mislove propose to do for their research, does not constitute a CFAA violation under the "exceeds authorized access" provision.

In coming to this determination, the Court is guided by many of the same reasons that led to a narrow interpretation of "accesses . . . without authorization" that excludes terms-of-service violations. See supra, at 20–22. First, consumer websites' terms of service do not provide adequate notice for purposes of criminal liability. See Drew, 259 F.R.D. at 464–66; see also United States v. Thomas, 877 F.3d 591, 596 (5th Cir. 2017) (recognizing that "a narrow reading of [§ 1030(a)(2)] avoids criminalizing common conduct—like violating contractual terms of service for computer use or using a work computer for personal reasons—that lies beyond the antihacking purpose of the access statutes"). Second, criminalizing violations of private websites' terms of service raises considerable nondelegation issues. See supra, at 20–21.

Third, the rule of lenity and the constitutional avoidance canon weigh against a broad interpretation of "exceeds authorized access" as encompassing terms-of-service violations. As noted above, courts have come to varying opinions on what type of conduct violates this provision. Compare Rodriguez, 628 F.3d at 1263; John, 597 F.3d at 272; Citrin, 440 F.3d at 420–21; Explorica, 274 F.3d at 582–83, with Valle, 807 F.3d at 512–13, 528; WEC Carolina Energy Sols., 687 F.3d at 205–07. Legislative history and statutory structure provide little guidance one way or the other. See, e.g., Valle, 807 F.3d at 526 (finding the legislative history inconclusive on whether a public employee

27

"exceed[ed] authorized access" in using government computers for personal ends). Because the traditional tools of statutory interpretation do not point definitively one way or the other for whether "exceeds authorized access" encompasses terms-of-service violations on public websites, the rule of lenity requires that the Court adopt the narrower construction. See id. at 526–28. And because this narrow interpretation obviates the need to engage with plaintiffs' thorny First Amendment concerns, constitutional avoidance, too, counsels in favor of this narrow reading. See Bond, 572 U.S. at 855.

Taken together, these considerations make clear that, even if reading "exceeds authorized access" to exclude terms-of-service violations on public websites is not the only reasonable interpretation, adopting the narrow approach is the wisest path forward. In agreement with the clear weight of relevant cases, then, the Court adopts this narrow interpretation of the CFAA and concludes that plaintiffs' proposed research plans do not violate either provision of § 1030(a)(2).

<h2 style="text-align:center">CONCLUSION</h2>

For the foregoing reasons, the Court concludes that plaintiffs' research plans do not violate the Access Provision of the CFAA. Because their actions are not criminal, the Court need not wade into the question whether plaintiffs' proposed conduct should receive First Amendment protection. Instead, the Court concludes that the parties' cross-motions for summary judgment are moot, and the case will be dismissed. A separate order will be issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: March 27, 2020

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **CHRISTIAN W. SANDVIG, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 16-1368 (JDB)** |
| **WILLIAM P. BARR,**[1] **in his official capacity as Attorney General of the United States,** | |
| **Defendant.** | |

## ORDER

Upon consideration of [47] plaintiffs' motion for summary judgment and [50] defendant's cross-motion for summary judgment, and the entire record herein, and for the reasons explained in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that [47] plaintiffs' motion for summary judgment is **DENIED**; it is further

**ORDERED** that [50] defendant's cross-motion for summary judgment is **DENIED**; and it is further

**ORDERED** that [1] plaintiffs' complaint is **DISMISSED**.

**SO ORDERED**.

_____/s/_____

JOHN D. BATES
United States District Judge

Dated:  March 27, 2020

---

[1] Pursuant to Fed. R. Civ. P. 25(d), William P. Barr, the current Attorney General of the United States, is automatically substituted as the defendant in this matter.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**CHRISTIAN W. SANDVIG, et al.,**

      **Plaintiffs,**

          **v.**

**JEFFERSON B. SESSIONS III, in his official capacity as Attorney General of the United States,**

      **Defendant.**

**Civil Action No. 16-1368 (JDB)**

## ORDER

Upon consideration of [10] the government's motion to dismiss, and the entire record herein, and for the reasons explained in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that [10] the government's motion to dismiss is **GRANTED IN PART AND DENIED IN PART**; it is further

**ORDERED** that the overbreadth claim in plaintiffs' First Cause of Action, as well as plaintiffs' Second through Fourth Causes of Action, are **DISMISSED**; and it is further

**ORDERED** that the parties shall meet and confer, and shall thereafter submit to the Court, by not later than May 11, 2018, either joint or separate proposals as to how the case should proceed, along with proposed schedules for any discovery or summary judgment briefing. A status conference is hereby set for May 15, 2018, at 9:30 a.m. in Courtroom 30.

      **SO ORDERED.**

/s/
JOHN D. BATES
United States District Judge

Dated: <u>March 30, 2018</u>

CHRISTIAN W. SANDVIG, et al.,

     Plaintiffs,

        v.                             Civil Action No. 16-1368 (JDB)

JEFFERSON B. SESSIONS III, in his
official capacity as Attorney General of the
United States,

     Defendant.

## MEMORANDUM OPINION

It's a dangerous business, reading the fine print. Nearly every website we visit features Terms of Service ("ToS"), those endless lists of dos and don'ts conjured up by lawyers to govern our conduct in cyberspace. They normally remain a perpetual click away at the bottom of every web page, or quickly scrolled past as we check the box stating that we agree to them. But to knowingly violate some of those terms, the Department of Justice tells us, could get one thrown in jail. This reading of federal law is a boon to prosecutors hoping to deter cybercrime. Yet it also creates a dilemma for those with more benign intentions. Plaintiffs in this case, for instance, are researchers who wish to find out whether websites engage in discrimination, but who have to violate certain ToS to do so. They have challenged the statute that they allege criminalizes their conduct, saying that it violates their free speech, petition, and due process rights. First, however, they must show that they have a sufficient injury to make it through the courthouse door, and that their suit is plausible enough to continue. For the following reasons, the Court finds that plaintiffs have standing, and that they can bring one (but not the rest) of their claims.

# I.  BACKGROUND

This case centers on a few sections of the Computer Fraud and Abuse Act (CFAA), a law dedicated to "deterring the criminal element from abusing computer technology."  H.R. Rep. No. 98–894, at 4 (1984).  Plaintiffs directly challenge one section, referred to here as the Access Provision, which sweeps in the greatest amount of conduct.  The Access Provision states that "[w]hoever . . . intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer . . . shall be punished as provided in subsection (c) of this section."  18 U.S.C. § 1030(a)(2)(C).  The CFAA defines "protected computer" to mean, among other things, "a computer . . . which is used in or affecting interstate or foreign commerce or communication."  Id. § 1030(e)(2)(B).  This definition encompasses just about all computers hooked up to the Internet—including computers that house website servers.  See, e.g., United States v. Nosal, 676 F.3d 854, 859 (9th Cir. 2012).  The statute also defines "exceeds authorized access" as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter."  18 U.S.C. § 1030(e)(6).  Thus, the Access Provision applies to anyone who purposely accesses an Internet-connected computer without authorization, or uses a legitimate authorization to receive or change information that they are not supposed to, and thereby obtains information from the computer.

The CFAA provides for a fine and/or imprisonment for up to one year upon a first violation of the Access Provision, or up to ten years for any further offenses.  Id. § 1030(c)(2)(A), (C).  However, the punishment for an initial violation rises to a sentence of up to five years' imprisonment if the offense (1) "was committed for purposes of commercial advantage or private financial gain," (2) was "in furtherance of any criminal or tortious act in violation of the

2

Constitution" or state or federal law, or (3) involved obtaining information valued at more than $5,000. Id. § 1030(c)(2)(B). Thus, meeting one of these three conditions makes a first violation a felony; if none are met, the first violation is a misdemeanor.

Plaintiffs in this case are four professors and a media organization: Christian W. Sandvig of the University of Michigan; Kyratso "Karrie" Karahalios of the University of Illinois; Alan Mislove of Northeastern University; Christopher "Christo" Wilson of Northeastern University; and First Look Media Works, Inc. ("Media Works"), which publishes the online news platform The Intercept. Compl. [ECF No. 1] ¶¶ 13–14, 16–17, 19. Plaintiffs are conducting studies to respond to new trends in real estate, finance, and employment transactions, which increasingly have been initiated on the Internet. Id. ¶¶ 15, 18, 55. Data brokers assemble consumers' information from myriad sources and place consumers into models that include racial, ethnic, socioeconomic, gender, and religious inferences about them. Id. ¶¶ 56–57. After brokers create consumer profiles, those profiles follow consumers around online through tracking technologies such as cookies. Id. ¶¶ 58–59. Tracking allows websites and advertisers to display content targeted at particular groups, based on consumers' inferred characteristics or the sorts of websites they visit. Id. ¶¶ 59–60. But plaintiffs are concerned, "[g]iven the . . . history of racial discrimination in housing and employment," that this technology may be "harnessed for discriminatory purposes." Id. ¶ 61. They are also concerned that, "when algorithms automate decisions, there is a very real risk that those decisions will unintentionally have a prohibited discriminatory effect." Id. ¶ 62.

One way to determine whether members of protected classes are being discriminated against is to engage in "outcomes-based audit testing." Id. ¶ 67. Such testing commonly involves accessing a website or other network service repeatedly, generally by creating false or artificial user profiles, to see how websites respond to users who display characteristics attributed to certain

3

races, genders, or other classes.  Id. ¶ 70.  This method is similar to classical paired testing procedures, in which multiple people—identical but for one legally protected trait—apply for the same house or job.  Such procedures are often used to uncover violations of housing and employment discrimination laws in the physical world.  Id. ¶¶ 41, 50, 52.

Plaintiffs plan to engage, and are engaging, in such audit testing.  Sandvig and Karahalios are investigating whether computer programs that decide what to display on real estate websites discriminate against users based on race or other factors.  Id. ¶ 82.  They are writing a computer program that will create bots—automated agents that will each browse the Internet and interact with websites as a human user might.  Id. ¶ 88.  Each bot will create a number of distinct user profiles, each of which is called a "sock puppet."  Id. ¶ 89.  Sandvig and Karahalios will program the bots to visit real estate websites and search for properties, while also engaging in behaviors correlated with members of a particular race.  Id. ¶¶ 90–91.  Sandvig and Karahalios will use an automatic data recording technique known as scraping to record the properties that each bot sees on the real estate sites.  Id. ¶¶ 90, 92.  They can then examine their data to determine whether race-associated behaviors caused the sock puppets to see different sets of properties.  Id. ¶ 93.

Similarly, Mislove and Wilson plan to conduct a study to see whether hiring websites' algorithms end up discriminating against job seekers based on protected statuses like race or gender.  Id. ¶ 107.  They will first use bots to crawl the profiles of a random selection of job-seekers to obtain baseline demographic data, then create fake employer profiles so that they can search for candidates and record how the algorithms rank those candidates.[1]  Id. ¶¶ 114–17.  They will also create fictitious sock-puppet job seeker profiles, and have the fictitious seekers—who

---

[1] This second step involves both crawling the profiles of ranked candidates to determine their demographic data and scraping to record the overall rankings.  Compl. ¶¶ 114–16.

4

will vary along different demographic axes—apply for fictitious jobs, to examine how the algorithms rank the candidates. Id. ¶¶ 118–19, 121–22. Mislove and Wilson will prevent real people from applying for the false jobs by giving them titles that say "[t]his is not a real job, do not apply," and will delete the fictitious accounts and jobs when they finish. Id. ¶ 120.

Media Works and its journalists seek to investigate online companies, websites, and platforms, including by examining any discriminatory effects of their use of algorithms. Id. ¶ 130.

Mislove and Wilson plan to publish their findings in academic papers, and to bring the results of their research to the public. Id. ¶ 123. Media Works intends to use the results of its journalistic investigations to inform the public about online business practices. Id. ¶ 132. Sandvig and Karahalios do not explicitly claim that they will publish their work, but state that their findings "would produce important new scientific knowledge about the operation of computer systems, discrimination, and cumulative disadvantage." Id. ¶ 94.

Plaintiffs are all aware that their activities will violate certain website ToS. Id. ¶¶ 95, 124, 131. All intend to use scraping to record data, which is banned by many of the websites plaintiffs seek to study. Id.; see id. ¶¶ 70–71. Many of the housing websites that Sandvig and Karahalios will study prohibit the use of bots. Id. ¶¶ 71, 95. All of the hiring websites that Mislove and Wilson will study prohibit the use of sock puppets, and most prohibit crawling. Id. ¶¶ 71, 124. Additionally, some websites control when and how visitors may speak about any information gained through the site—even in other forums—by including non-disparagement clauses in their ToS. Id. ¶ 72. Some sites also have ToS that require advance permission before using the sites for research purposes, which, plaintiffs allege, creates the possibility of viewpoint-discriminatory permission schemes. Id. ¶ 73. Aside from their ToS violations, plaintiffs' experiments will have at most a minimal impact on the operations of the target websites. Id. ¶¶ 96, 125. All plaintiffs

5

but Media Works have already begun some of the activities involved in their research plans, including activities that require violating websites' TOS. Id. ¶¶ 98, 126.

Plaintiffs claim that they must either refrain from conducting research, testing, and investigations that (they argue) constitute protected speech or expressive activity, or else expose themselves to the risk of prosecution under the Access Provision of the CFAA. Id. ¶ 137. Plaintiffs therefore filed this suit against the Attorney General, raising four causes of action: (1) a facial overbreadth and as-applied challenge under the Free Speech and Free Press Clauses of the First Amendment, id. ¶¶ 180–86; (2) a First Amendment Petition Clause challenge, ¶¶ 187–93; (3) a vagueness claim under the Fifth Amendment's Due Process Clause, id. ¶¶ 194–98; and (4) a claim of unconstitutional delegation to private parties under the Fifth Amendment, id. ¶¶ 199–202. The government has moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of standing and failure to state a claim. See Mot. to Dismiss [ECF No. 10].

## II. DISCUSSION

We begin with the familiar standards that govern Rule 12(b) analysis. When facing a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, a plaintiff "bears the burden of showing that he has standing." Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009). Just because a plaintiff makes it through the courthouse doors on one claim does not mean that other claims can tag along; rather, a plaintiff "must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." Town of Chester v. Laroe Estates, Inc., 137 S. Ct. 1645, 1650 (2017) (citation omitted). On a motion to dismiss, plaintiffs must plead facts that, taken as true, raise a plausible standing claim. See Humane Soc'y of the U.S. v. Vilsack, 797 F.3d 4, 8 (D.C. Cir. 2015). The Court must take all facts alleged in the complaint as true and make all reasonable inferences in plaintiffs' favor. See Gulf Coast Mar. Supply, Inc. v. United States, 867

6

F.3d 123, 128 (D.C. Cir. 2017). However, the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." Id.

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Plausibility does not mean certainty, or that a claim is more likely to succeed than not, but rather that the claim at issue rises "above the speculative level." Twombly, 550 U.S. at 555. In other words: if what plaintiffs lay out in the complaint actually happened, is it more than merely possible that the law has been violated? Plaintiffs cannot meet this standard through "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Iqbal, 556 U.S. at 678. Likewise, a court need not accept a plaintiff's legal conclusions, even if they are dressed up as factual allegations. See Sickle v. Torres Advanced Enter. Sols., LLC, 884 F.3d 338, 345 (D.C. Cir. 2018). However, courts must accept as true all facts stated in the complaint, making all reasonable inferences in plaintiffs' favor. Id.

## A. THE INTERNET AS PUBLIC FORUM

At the outset, it is necessary to answer a question that affects both the standing and the merits inquiries in this case: what is the First Amendment status of the Internet? And, more particularly, what powers does the government possess to regulate activity on individual websites?

The government bases much of its argument that plaintiffs do not have standing, and that they have not alleged a First Amendment violation, on the premise that this case is about "a private actor's abridgment of free expression in a private forum." Reply in Supp. of Def.'s Mot. to Dismiss ("Def.'s Reply") [ECF No. 15] at 2; see Mem. of P. & A. in Supp. of Def.'s Mot. to Dismiss ("Def.'s Mem.") [ECF No. 10-1] at 10–13, 22–24. This argument finds some support in Supreme

Court case law, which has rejected the First Amendment claims of individuals who wished to distribute handbills or advertise a strike in shopping centers against the wishes of the property owners. See Hudgens v. NLRB, 424 U.S. 507, 520 (1976); Lloyd Corp. v. Tanner, 407 U.S. 551, 567–68 (1972). Private property, the Court determined, does not "lose its private character merely because the public is generally invited to use it for designated purposes." Lloyd, 407 U.S. at 569. Why, then, would it violate the First Amendment to arrest those who engage in expressive activity on a privately owned website against the owner's wishes?

The answer is that, quite simply, the Internet is different. The Internet is a "dynamic, multifaceted category of communication" that "includes not only traditional print and news services, but also audio, video, and still images, as well as interactive, real-time dialogue." Reno v. Am. Civil Liberties Union, 521 U.S. 844, 870 (1997). Indeed, "the content on the Internet is as diverse as human thought." Id. (citation omitted). Only last Term, the Supreme Court emphatically declared the Internet a primary location for First Amendment activity: "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace . . . ." Packingham v. North Carolina, 137 S. Ct. 1730, 1735 (2017) (citation omitted).

With this special status comes special First Amendment protection. The Packingham Court applied public forum analysis to a North Carolina law that banned former sex offenders from using social media websites, employing intermediate scrutiny because the law was content-neutral. See id. at 1736. The fact that the statute restricted access to particular websites, run by private companies, did not change the calculus. Consider: on one of the sites the Court treated as an exemplar of social media, LinkedIn, "users can look for work, advertise for employees, or review tips on entrepreneurship," id. at 1735—the same activities in which Mislove and Wilson wish to

8

engage for their research. As the Court warned, the judiciary "must exercise extreme caution before suggesting that the First Amendment provides scant protection for access to vast networks in [the modern Internet]." Id. at 1736. The government's proposed public/private ownership distinction cannot account for the Court's determination in Packingham that privately-owned sites like Facebook, LinkedIn, and Twitter are part of a public forum, government regulation of which is subject to heightened First Amendment scrutiny. The Internet "is a forum more in a metaphysical than in a spatial or geographic sense, but the same principles are applicable." Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 830 (1995).

An analogy to the real world, while necessarily imperfect, may help illustrate the point. Stroll out onto the National Mall on any day with decent weather and you will discover a phalanx of food trucks lining the streets. Those food trucks are privately owned businesses. Customers interact with them for the private purpose of buying a meal. If they were a brick-and-mortar store on private property, they would encounter no First Amendment barrier to removing a patron who created a ruckus. Yet if a customer standing on a public sidewalk tastes her food and then yells at those in line behind her that they should avail themselves of the myriad other culinary options nearby, the truck could not call the police to arrest her for her comments. She is in a public forum, and her speech remains protected even when she interacts with a private business located within that forum.

It makes good sense to treat the Internet in this manner. "Each medium of expression . . . must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems." Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 557 (1975). Regulation of the Internet presents serious line-drawing problems that the public/private distinction in physical space does not. The decisions in Lloyd and Hudgens concerned "property privately owned and used

9

nondiscriminatorily for private purposes only." Lloyd, 407 U.S. at 568. It is difficult to argue that most websites readily meet this description. As the Supreme Court has recognized, the Internet "provides relatively unlimited, low-cost capacity for communication of all kinds." Reno, 521 U.S. at 870. Much of this communication takes place on websites that, in the physical world, would be seen solely as private, commercial spaces. Take Amazon.com. As a "popular retail website," Amazon undoubtedly has a private use "as a seller of products." Packingham, 137 S. Ct. at 1741 (Alito, J., concurring in the judgment). Yet the site also "facilitates the social introduction of people for the purpose of information exchanges," since it "allows a user to create a personal profile" and, "[w]hen someone purchases a product on Amazon, the purchaser can review the product and upload photographs, and other buyers can then respond to the review." Id. Conversely, Facebook—to which the Court pointed in Packingham as a quintessential site for protected First Amendment activity—allows users to buy and sell products in its Marketplace, and, like many social media sites, sells ads to make revenue.[2] Simply put: the public Internet is too heavily suffused with First Amendment activity, and what might otherwise be deemed private spaces are too blurred with expressive spaces, to sustain a direct parallel to the physical world.

At the same time, however, it would be ill-advised to "equate the entirety of the [I]nternet with public streets and parks." Id. at 1738 (emphasis added). To do so would "gloss[] over the dual public and private nature of digital arenas," and subject to heightened scrutiny regulations on even the Internet's most secluded nooks and crannies. Note, First Amendment-Freedom of Speech-Public Forum Doctrine-Packingham v. North Carolina, 131 Harv. L. Rev. 233, 238 (2017). Rifling through a business's confidential files is no less a trespass merely because those files are located in the cloud. A hacker cannot legally break into a Gmail account and copy the account-

---

[2] See Facebook, Facebook Ads, https://www.facebook.com/business/products/ads; Facebook, Marketplace, https://www.facebook.com/marketplace/learn-more.

holder's emails, just as a busybody cannot legally reach into someone else's mailbox and open her mail.  The First Amendment does not give someone the right to breach a paywall on a news website any more than it gives someone the right to steal a newspaper.

What separates these examples from the social media sites in Packingham is that the owners of the information at issue have taken real steps to limit who can access it.  But simply placing contractual conditions on accounts that anyone can create, as social media and many other sites do, does not remove a website from the First Amendment protections of the public Internet.  If it did, then Packingham—which examined a law that limited access to websites that require user accounts for full functionality—would have come out the other way.  137 S. Ct. at 1737; see also Orin S. Kerr, Cybercrime's Scope: Interpreting "Access" and "Authorization" in Computer Misuse Statutes, 78 N.Y.U. L. Rev. 1596, 1658 (2003) ("Applying a contract-based theory of authorization in a criminal context . . . may be constitutionally overbroad, criminalizing a great deal beyond core criminal conduct, including acts protected by the First Amendment.").  Rather, only code-based restrictions, which "carve[] out a virtual private space within the website or service that requires proper authentication to gain access," remove those protected portions of a site from the public forum.  Orin S. Kerr, Essay, Norms of Computer Trespass, 116 Colum. L. Rev. 1143, 1171 (2016).  Stealing another's credentials, or breaching a site's security to evade a code-based restriction, therefore remains unprotected by the First Amendment.

To return to the National Mall example, suppose that a food truck remains stationed on the Mall but boards up for the night, and the owner returns home.  By shutting the food in a truck, perhaps along with her cooking instructions, the owner has placed a barrier between that property and the public forum outside.  Thus, while the police could not arrest a customer for telling others in line that the food tastes terrible, or for reading the menu on the truck's exterior, they could arrest

11

that customer for breaking into the boarded-up truck seeking confidential culinary information. This is true even if the customer claimed she was doing so in order to broadcast to the world the truck's substandard ingredients and ill-conceived recipes. While the First Amendment has free rein on the Mall generally, it does not protect those who circumvent barriers that demarcate private areas, even if those private areas are surrounded by an otherwise public forum. This distinction guides the Court's analysis here.

## B. STANDING

Before reaching the merits of plaintiffs' claims, the Court must assure itself that they have standing—a sufficient stake to transform this dispute into one of the "Cases" or "Controversies" on which federal courts may pass judgment. U.S. Const. art. III, § 2. "The 'irreducible constitutional minimum of standing contains three elements': (1) injury-in-fact, (2) causation, and (3) redressability." Rainbow/PUSH Coal. v. FCC, 330 F.3d 539, 542 (D.C. Cir. 2003) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)). Plaintiffs must plead or prove each element of standing "with the manner and degree of evidence required at the successive stages of the litigation." Lujan, 504 U.S. at 561. Here, therefore, "general factual allegations of injury resulting from the defendant's conduct may suffice" to allege standing, "for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" Id. (alteration in original) (citation omitted). For any given claim or form of relief, "the presence of one party with standing is sufficient" to reach the issue. Rumsfeld v. Forum for Acad. & Institutional Rights, Inc., 547 U.S. 47, 53 n.2 (2006).

Because this is a pre-enforcement challenge, plaintiffs must meet more specific conditions to satisfy the injury-in-fact requirement. They must plausibly allege "an intention to engage in a course of conduct [1] arguably affected with a constitutional interest, but [2] proscribed by a

statute, and [3] [that] there exists a credible threat of prosecution thereunder." Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2342 (2014) (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)). The government argues that plaintiffs cannot meet this test. See Def.'s Mem. at 8–19. Plaintiffs contend that they do intend to engage in constitutionally protected speech, and that they have pled a credible threat of prosecution. See Pls.' Mem. of P. & A. in Opp'n to Def.'s Mot. to Dismiss ("Pls.' Mem.") [ECF No. 13] at 18–30. It is clear that any injury to plaintiffs is caused by the government's criminalization of websites' ToS, and that the declaratory and injunctive relief plaintiffs seek, see Compl. at 46–47, would redress the injury. Therefore, the question is whether plaintiffs allege a sufficient injury in the first place.

Generally speaking, a court's standing analysis must be "especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." Raines v. Byrd, 521 U.S. 811, 819–20 (1997). However, the D.C. Circuit has interpreted the Supreme Court's pre-enforcement standing doctrine broadly in the First Amendment sphere. Indeed, "the courts have shown special solicitude to pre-enforcement challenges brought under the First Amendment." N.Y. Republican State Comm. v. SEC, 799 F.3d 1126, 1135 (D.C. Cir. 2015). Therefore, the Circuit has found, "the courts' willingness to permit pre-enforcement review is 'at its peak' when claims are rooted in the First Amendment." Id. at 1135 (citation omitted). "Pre-enforcement review, particularly in the First Amendment context, does not require plaintiffs to allege that they 'will in fact' violate the regulation in order to demonstrate an injury." U.S. Telecom Ass'n v. FCC, 825 F.3d 674, 739 (D.C. Cir. 2016) (quoting Driehaus, 134 S. Ct. at 2345), reh'g en banc denied, 855 F.3d 381 (D.C. Cir.), cert. docketed, No. 17-504 (U.S. Oct. 3, 2017). Nor need they show that they are likely to be prosecuted. Rather, "[s]tanding 'to challenge laws burdening expressive rights requires only a

13

credible statement by the plaintiff of intent to commit violative acts and a conventional background expectation that the government will enforce the law.'" Id. (quoting Act Now to Stop War & End Racism Coal. v. District of Columbia (ANSWER I), 589 F.3d 433, 435 (D.C. Cir. 2009)).

1. "Arguably Affected With a Constitutional Interest"

Plaintiffs assert that their conduct falls within three categories of First Amendment-protected activity. Scraping data from their target websites, they allege, is subject to the First Amendment right to record or preserve information. Pls.' Mem. at 10–14. Moreover, employing bots and sock puppets and creating false user accounts constitute harmless false speech. Id. at 14–17. And their planned post-research activities are protected by the right to publish. Id. at 17–18. All of these claims are sufficiently plausible to conclude that plaintiffs' proposed conduct is "arguably affected with a constitutional interest." Driehaus, 134 S. Ct. at 2342.

First, scraping plausibly falls within the ambit of the First Amendment. "[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." First Nat. Bank of Boston v. Bellotti, 435 U.S. 765, 783 (1978). The Supreme Court has made a number of recent statements that give full First Amendment application to the gathering and creation of information.[3] Additionally, six courts of appeals have found that individuals have a First Amendment right to record at least some matters of public interest, in order to preserve and

---

[3] See Packingham, 137 S. Ct. at 1737 (holding that banning people from "gain[ing] access to information," "knowing current events," and "checking ads for employment" through social media inhibits "the legitimate exercise of First Amendment rights"); Sorrell v. IMS Health Inc., 564 U.S. 552, 570 (2011) ("This Court has held that the creation and dissemination of information are speech within the meaning of the First Amendment. Facts, after all, are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs." (citations omitted)); Brown v. Entm't Merchants Ass'n, 564 U.S. 786, 792 n.1 (2011) ("Whether government regulation applies to creating, distributing, or consuming speech makes no difference."); Citizens United v. FEC, 558 U.S. 310, 340 (2010) ("Laws enacted to control or suppress speech may operate at different points in the speech process . . . .").

14

disseminate ideas.[4]  That plaintiffs wish to scrape data from websites rather than manually record information does not change the analysis.  Scraping is merely a technological advance that makes information collection easier; it is not meaningfully different from using a tape recorder instead of taking written notes, or using the panorama function on a smartphone instead of taking a series of photos from different positions.  And, as already discussed, the information plaintiffs seek is located in a public forum.  Hence, plaintiffs' attempts to record the contents of public websites for research purposes are arguably affected with a First Amendment interest.

Second, plaintiffs have a First Amendment interest in harmlessly misrepresenting their identities to target websites.  The complaint alleges that plaintiffs' research requires them to create false employer and job-seeker profiles on employment websites, and to use sock puppets to make it appear to a number of housing and employment sites that multiple people are accessing the information they have made available.  Compl. ¶¶ 88–93, 114–21.  Because "some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation," and because "[t]he Government has not demonstrated that false statements generally should constitute a new category of unprotected speech," false claims that are not "made to effect a fraud or secure moneys or other valuable considerations" fall within First Amendment protection.  United States v. Alvarez, 567 U.S. 709, 718, 722–23 (2012).  Plaintiffs allege that their conduct will cause minimal, if any, harm to the targeted websites, and that they will take steps to avoid affecting third-party users of the website (such as informing job seekers that their fake

---

[4] See Gericke v. Begin, 753 F.3d 1, 7 (1st Cir. 2014); Fields v. City of Philadelphia, 862 F.3d 353, 359 (3d Cir. 2017); Turner v. Lieutenant Driver, 848 F.3d 678, 688–89 (5th Cir. 2017); ACLU of Ill. v. Alvarez, 679 F.3d 583, 595 (7th Cir. 2012); Animal Legal Def. Fund v. Wasden, 878 F.3d 1184, 1203 (9th Cir. 2018); W. Watersheds Project v. Michael, 869 F.3d 1189, 1195–97 (10th Cir. 2017); Smith v. City of Cumming, 212 F.3d 1332, 1333 (11th Cir. 2000); see also Rideout v. Gardner, 838 F.3d 65, 75 (1st Cir. 2016), cert. denied, 137 S. Ct. 1435 (2017) (stating that "[t]here are strong First Amendment interests" in photographically recording one's own completed ballot, because the "'use of illustrations or pictures . . . serves important communicative functions'" (citation omitted)).

15

positions are fake). Compl. ¶¶ 96, 120, 125. Thus, plaintiffs' harmless false or misleading speech to website owners is arguably affected with a constitutional interest.[5]

Third, plaintiffs contend that they have the right, and the desire, to publish the results of their research, and that some sites' ToS prohibit them from doing so without prior permission or else employ anti-disparagement clauses. Pls.' Mem. at 17. The Supreme Court has made very clear that the right to publish falls within the core of the First Amendment's protections. See, e.g., Bartnicki v. Vopper, 532 U.S. 514, 527 (2001) ("As a general matter, 'state action to punish the publication of truthful information seldom can satisfy constitutional standards.'" (quoting Smith v. Daily Mail Publishing Co., 443 U.S. 97, 102 (1979)). Applying criminal sanctions for publishing original material that uses publicly available information, or for making negative statements about a website, triggers First Amendment scrutiny.

The government raises two overarching objections to all of these alleged rights. It initially claims that the First Amendment does not regulate the decisions that private entities make about how to control access to their private websites—in other words, that there is no state action here. See Def.'s Mem. at 21–24; Def.'s Reply at 6–12; see also Columbia Broad. Sys., Inc. v. Democratic Nat. Comm., 412 U.S. 94, 114 (1973) ("[The First Amendment] is a restraint on government action, not that of private persons."). However, private speech prohibitions can still implicate the First Amendment when given the imprimatur of state protection through civil or criminal law. See, e.g., New York Times Co. v. Sullivan, 376 U.S. 254, 265 (1964). Moreover, plaintiffs claim injury from a potential criminal action against them—and "a criminal prosecution under the CFAA would undoubtedly constitute state action" because the government itself is

---

[5] The government counters that Alvarez and the cases that follow it do not "address facially neutral statutes of general applicability, such as the CFAA." Def.'s Reply at 10. However, that goes to the standard of review on the merits rather than to whether plaintiffs' activities are imbued with any First Amendment interest at all.

policing website ToS violations.  hiQ Labs, Inc. v. LinkedIn Corp., 273 F. Supp. 3d 1099, 1114 n.12 (N.D. Cal. Aug. 14, 2017), appeal docketed, No. 17-16783 (9th Cir. Sept. 6, 2017).

The government also claims that the First Amendment does not protect plaintiffs' conduct because, under Zemel v. Rusk, 381 U.S. 1, 16–17 (1965), and Houchins v. KQED, Inc., 438 U.S. 1, 10–11 (1978) (plurality opinion), the First Amendment does not create a right to acquire information in whatever manner one desires.  Def.'s Mem. at 10–12.  In Zemel, the Court held that the government did not implicate any First Amendment rights by refusing to issue the plaintiff a passport to visit Cuba, which the plaintiff claimed interfered with his ability to acquaint himself with the effects of the government's policies in relation to Cuba.  381 U.S. at 16.  The Court rejected the claim, stating that "[t]he right to speak and publish does not carry with it the unrestrained right to gather information."  Id. at 17.  Then, in Houchins, the Court held that journalists had no special First Amendment right to access inmates in a jail just because they sought to write stories about the jail; the Court rejected the "notion that the First Amendment confers a right of access to news sources."  438 U.S. at 11.  However, the Court did note that "[t]he right to receive ideas and information is not the issue in this case," and that "[t]he issue is a claimed special privilege of access."  Id. at 12.  Thus, "[t]here is an undoubted right to gather news 'from any source by means within the law,'" but the First Amendment does not "compel[] others—private persons or governments—to supply information."  Id. at 11.

Here, plaintiffs are not asking the Court to force private websites to provide them with information that others cannot get.  Instead, they seek only to prevent the government from prosecuting them for obtaining or using information that the general public can access—though they wish to do so in a manner that could have private consequences, such as a website banning them or deleting their accounts.  See Compl. ¶ 4 ("[Plaintiffs] have no intent . . . to access any data

17

or information that is not made available to the public."). Because plaintiffs neither want a special privilege of access nor seek to force websites to give them otherwise unobtainable information, the Zemel and Houchins line of cases is inapposite here. Plaintiffs therefore plausibly allege that their conduct is arguably affected with a constitutional interest.

2. "Proscribed by a Statute"

Under D.C. Circuit precedent, "at the motion to dismiss stage, a plaintiff's non-frivolous contention regarding the meaning of a statute must be taken as correct for purposes of standing." Info. Handling Servs., Inc. v. Def. Automated Printing Servs., 338 F.3d 1024, 1030 (D.C. Cir. 2003). Because plaintiffs' reading of the statute to encompass all ToS violations is not frivolous, and because plaintiffs allege that their conduct would violate websites' ToS, it is clear for standing purposes that their intended actions would violate the statute.

The government contests this conclusion in only one instance. In two sentences in its reply brief, the government claims that plaintiffs lack standing for any injuries relating to their ability to publish. As the government sees it, "[t]he Complaint contains no allegation that any website on which plaintiffs intend to conduct their activity contains" a restriction on future publication, "and plaintiffs lack standing to assert claims based on hypothetical circumstances." Def.'s Reply at 12.

This argument is unavailing. True, plaintiffs do not explicitly allege that their target websites restrict subsequent publication. But the complaint does allege that "[p]laintiffs wish to . . . report on their findings to the public," and that "[t]he research, testing, and investigative methods they have designed would, if carried out, violate the [Access] Provision, because they all require violating the [ToS] of the targeted website." Compl. ¶¶ 134–35 (emphasis added); see also id. ¶ 160 ("Plaintiffs wish to have the option of publishing the results of their research, including any findings of discrimination, even if a target website's ToS prohibit doing so."). "[O]n a motion

18

to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015) (second alteration in original) (citation omitted). Plaintiffs' allegations allow for the presumption that reporting on their research findings would violate some targeted websites' ToS. While far from the degree of proof necessary for summary judgment, see Lujan, 504 U.S. at 561, at this early stage plaintiffs have plausibly alleged that the CFAA prevents all of their conduct.

### 3. "Credible Threat of Prosecution"

Even if plaintiffs' intended conduct is arguably affected with a constitutional interest, and is prohibited by the CFAA, plaintiffs still must show that there is a credible threat of prosecution for that conduct under the statute. See Driehaus, 134 S. Ct. at 2342. The government asserts that plaintiffs cannot meet this test, because "plaintiffs make no allegation that the government has threatened them with CFAA enforcement," plaintiffs "cite no instances in which the government has enforced the challenged provision for harmless [ToS] violations," and DOJ "has expressly stated that it has no intention of prosecuting harmless [ToS] violations that are not in furtherance of other criminal activity or tortious conduct." Def.'s Reply at 13. The government is, for the most part, correct on the facts. The complaint does not allege that plaintiffs have actually been threatened with prosecution. The two cases plaintiffs cite to show that prosecutors have used the Access Provision to punish ToS violations did, in fact, involve harmful conduct. And DOJ's guidance to federal prosecutors does discourage them—though somewhat tepidly—from bringing CFAA cases based solely on harmless ToS violations. See U.S. Att'y Gen., Intake and Charging Policy for Computer Crimes Matters ("Charging Policy") (Sept. 11, 2014) [ECF No. 15–1] at 5.

However, both Supreme Court and D.C. Circuit precedent create a low standing bar in cases like this one. Because plaintiffs "challenge [a] law[] burdening expressive rights," and

19

because their complaint provides "a credible statement . . . of intent to commit violative acts," plaintiffs may rely on the "conventional background expectation that the government will enforce the law." U.S. Telecom Ass'n, 825 F.3d at 739 (citation omitted); accord Act Now to Stop War & End Racism Coal. v. District of Columbia (ANSWER II), 846 F.3d 391, 401–02 (D.C. Cir. 2017), cert. denied, 138 S. Ct. 334 (2017) (mem.).  Indeed, the D.C. Circuit has occasionally found standing without inquiring into whether the government has actually enforced the challenged restriction.  See U.S. Telecom Ass'n, 825 F.3d at 739–40.

Here, there are sufficient indications of a credible threat to enforce the Access Provision, both in general and as applied to plaintiffs' activities.  To begin with, the parties have sparred over whether DOJ has enforced the Access Provision specifically against harmless ToS violations.  See Compl. ¶ 31; Def.'s Mem. at 14–17; Pls.' Mem. at 3–4, 25.  Yet a number of cases have looked to whether the statutory provision as a whole—or at least the particular term being challenged—has been enforced through prosecutions, without asking whether the facts were similar to those the plaintiffs alleged.  See, e.g., Holder v. Humanitarian Law Project, 561 U.S. 1, 16 (2010); Babbitt, 442 U.S. at 302; N. Carolina Right to Life, Inc. v. Bartlett, 168 F.3d 705, 710 (4th Cir. 1999).  If one need only find a history of enforcement of the Access Provision generally, or enforcement of the "exceeds authorized access" language in particular, plaintiffs would have no trouble showing that there is a significant history.  Indeed, the Supreme Court decided a case just two years ago that involved a prosecution under the Access Provision, in part for exceeding authorized access. Musacchio v. United States, 136 S. Ct. 709, 713 & n.1 (2016).[6]

---

[6] For some other recent examples, see United States v. Batti, 631 F.3d 371, 372 (6th Cir. 2011); United States v. Willis, 476 F.3d 1121, 1124 (10th Cir. 2007); United States v. Cave, No. 8:12CR417, 2013 WL 3766550, at *1 (D. Neb. July 16, 2013); United States v. Roque, No. CRIM. 12-540 KM, 2013 WL 2474686, at *1 (D.N.J. June 6, 2013); United States v. Auernheimer, No. 11-CR-470 SDW, 2012 WL 5389142, at *1 (D.N.J. Oct. 26, 2012), rev'd, 748 F.3d 525 (3d Cir. 2014); United States v. Aleynikov, 737 F. Supp. 2d 173, 190 (S.D.N.Y. 2010).

Even looking more closely at similar factual scenarios, plaintiffs have shown that prosecutions have stemmed from close enough facts that it would be credible to fear a future prosecution for their own activities.  Plaintiffs cite two cases in which individuals were prosecuted under the Access Provision for violating ToS agreements: United States v. Lowson, No. 10-cr-114 (KSH), 2010 WL 9552416 (D.N.J. Oct. 12, 2010), and United States v. Drew, 259 F.R.D. 449 (C.D. Cal. 2009).  Compl. ¶ 31.  Lowson, as the government points out, did not solely involve violations of website ToS; it also involved ticket scalpers' attempts "to defeat code-based security restrictions" on Ticketmaster's website.  2010 WL 9552416, at *5.  However, the indictment alleged "both contract- and code-based violations," id. at *6, and laid out the websites' prohibitions that the defendants allegedly violated, see Superseding Indictment at 5–9, Lowson, 2010 WL 9552416 (No. 10-cr-114), ECF No. 10-2.  More directly on point is Drew, in which the government prosecuted a woman for lying about her age and creating a false account on Myspace in order to cyberbully her daughter's teenage classmate—thus violating Myspace's ToS in order to commit the tort of intentional infliction of emotional distress.  259 F.R.D. at 452.  Prosecutors included both a felony count under the Access Provision—because the violation was in furtherance of a tortious act—and a misdemeanor count for the standalone ToS violations.  Id. at 451.  The jury acquitted Drew on the felony count, id.; the court then dismissed the misdemeanor conviction, as coverage of ToS violations rendered the Access Provision unconstitutionally vague, id. at 467.

That the government brought the Drew case without enough evidence to ultimately prove the added harm required for a felony conviction, and chose to include a misdemeanor count for harmless ToS violations, lends some credibility to plaintiffs' fears of prosecution.  The government also does not know whether prosecutors may have employed the Access Provision to obtain plea agreements in which defendants admitted to harmless ToS violations.  See Tr. of Mot. Hr'g [ECF

21

No. 20] at 17:15–18:13.[7] These prior prosecutions, whether under the Access Provision generally or under related factual circumstances, provide "somewhat more than the 'conventional background expectation that the government will enforce the law.'" ANSWER I, 589 F.3d at 435 (citation omitted). Thus, even if more were necessary, plaintiffs have provided it.

Finally, the government has not expressly disavowed any intent to prosecute plaintiffs, which would defeat the normal expectation of enforcement. The government points to a 2014 memorandum that the Attorney General sent to United States Attorneys regarding charging policy under the CFAA, which the government claims is the current "binding guidance" on this issue. Def.'s Reply at 14. According to the government, plaintiffs' fear of prosecution is "implausible" because (1) the charging policy focuses on several factors that would not apply to harmless ToS violations, (2) prosecutions based solely on such violations are discouraged, and (3) attorneys must consult with the Criminal Division of DOJ before making CFAA charging decisions. Id. However, to disprove an otherwise credible threat of prosecution, courts have normally required an explicit statement "that plaintiffs will not be prosecuted if they do what they say they wish to do." Humanitarian Law Project, 561 U.S. at 16. The government has not made such a declaration. DOJ's charging policy states that, "if the defendant exceeded authorized access solely by violating an access restriction contained in a contractual agreement or [ToS] with an Internet service provider or website, federal prosecution may not be warranted." Charging Policy at 5 (emphasis added). This is a far cry from the sort of disavowal required by case law.[8]

---

[7] It also matters that the CFAA is a civil as well as a criminal statute. The possibility of administrative or private civil actions, even without a threat of criminal prosecution, may buttress—or perhaps independently provide—standing for pre-enforcement challenges. See, e.g., Babbitt, 442 U.S. at 302 n.13; Chamber of Commerce v. FEC, 69 F.3d 600, 603 (D.C. Cir. 1995).

[8] The government also offers the statement of the Deputy Assistant Attorney General for the Criminal Division before a congressional subcommittee in 2015, in which the DAAG stated that DOJ "has no interest in prosecuting harmless violations of use restrictions" and suggested amending the CFAA so that it would essentially only apply to the acts that currently give rise to a felony under the Access Provision. Statement of David M. Bitkower, Deputy Ass't Att'y Gen., Crim. Div., Dep't of Justice, Before the Subcomm. On Crime and Terrorism, S. Comm. on

22

In an attempt to provide such a disavowal, and at the Court's suggestion, the government filed an affidavit from John T. Lynch, Jr., Chief of the Computer Crime and Intellectual Property Section of the Criminal Division of DOJ. Aff. of John T. Lynch, Jr. [ECF No. 21-1]. He points to the charging factors mentioned above, id. at 2–3, and states that he "do[es] not expect that the Department would bring a CFAA prosecution based on such facts and de minimis harm," id. at 3. But many things that we do not expect in fact come to pass. An official's prognostication does not substitute for a declaration of non-prosecution. Moreover, even explicit disavowals are most valuable when they are made "on the basis of the Government's own interpretation of the statute and its rejection of plaintiffs' interpretation as unreasonable." Blum v. Holder, 744 F.3d 790, 798 (1st Cir. 2014). Here, the government has implicitly—and in past prosecutions, explicitly—read the Access Provision to include ToS violations. See Charging Policy at 4–5. "[T]o rely upon prosecutorial discretion to narrow the otherwise wide-ranging scope of a criminal statute's highly abstract general statutory language places great power in the hands of the prosecutor." Marinello v. United States, No. 16-1144, 2018 WL 1402426, at *6 (U.S. Mar. 21, 2018). The Constitution "does not leave us at the mercy of noblesse oblige," United States v. Stevens, 559 U.S. 460, 480 (2010), which is all the government ultimately offers.

One final point. Until now, this standing analysis has focused on plaintiffs' First Amendment challenge. But plaintiffs also bring due process claims. In Seegars v. Gonzales, 396 F.3d 1248 (D.C. Cir. 2005), the D.C. Circuit applied a more rigorous "imminence" standard for non-First-Amendment constitutional claims. But the court took pains to point out that it was forced to follow circuit precedent that conflicted with the Supreme Court's and the D.C. Circuit's own

the Judiciary (July 8, 2015) [ECF No. 10-3] at 6. However, this is no stronger a disavowal than is DOJ's statement in its charging policy. Moreover, Congress never adopted DOJ's proposed amendments.

23

laxer standing test for First Amendment pre-enforcement challenges. <u>See</u> <u>id.</u> at 1252–54. Subsequent cases have confirmed that the "more demanding standard" required by <u>Seegars</u> does not apply when challenging "laws burdening expressive rights." <u>ANSWER I</u>, 589 F.3d at 435. Here, plaintiffs' Fifth Amendment claims allege an injury-in-fact essentially identical to that alleged for their First Amendment claims. Pls.' Mem. at 23 n.2. Both the Supreme Court and the D.C. Circuit have upheld standing for dual First- and Fifth-Amendment pre-enforcement challenges, under a less rigorous imminence standard, without distinguishing between the two amendments for standing purposes. <u>See</u> <u>Humanitarian Law Project</u>, 561 U.S. at 11–12, 15–16; <u>ANSWER II</u>, 846 F.3d at 396, 401–02; <u>ANSWER I</u>, 589 F.3d at 434–35. Plaintiffs therefore have standing to bring their Fifth Amendment claims along with their First Amendment ones.

For the foregoing reasons, plaintiffs have plausibly pled standing at the motion to dismiss stage, and the government's Rule 12(b)(1) motion will be denied.

### C. INTERPRETING THE STATUTE

Plaintiffs allege only constitutional claims in this case. Likely because they are bringing a pre-enforcement challenge, they are not claiming that the statute, properly read, does not apply to them. However, nearly all of their claims require the Court to determine the reach of the Access Provision before deciding the constitutional question. Since the Court does not accept plaintiffs' legal conclusions as true for purposes of a motion to dismiss under Rule 12(b)(6), <u>see</u> <u>Doe v. Rumsfeld</u>, 683 F.3d 390, 391 (D.C. Cir. 2012), plaintiffs' reading of the statute to cover their conduct does not control. Instead, the Court must interpret the law.

Courts are split as to how to read the relevant provisions. The CFAA defines the phrase "exceeds authorized access" as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter."

24

18 U.S.C. § 1030(e)(6). The Second, Fourth, and Ninth Circuits have held that this language prohibits only unauthorized <u>access</u> to information. <u>See</u> <u>United States v. Valle</u>, 807 F.3d 508, 523–28 (2d Cir. 2015); <u>WEC Carolina Ener. Solutions LLC v. Miller</u>, 687 F.3d 199, 206 (4th Cir. 2012); <u>Nosal</u>, 676 F.3d at 863; <u>see also</u> <u>Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.</u>, 648 F.3d 295, 304 (6th Cir. 2011) (stating, based on Ninth Circuit precedent, that "an individual who is authorized to use a computer for certain purposes <u>but goes beyond those limitations</u> . . . has 'exceed[ed] authorized access'" (citation omitted) (alteration in original)). Meanwhile, the First, Fifth, and Eleventh Circuits have held that it also covers (at least in some instances) unauthorized <u>use</u> of information that a defendant was authorized to access only for specific purposes. <u>See</u> <u>EF Cultural Travel BV v. Explorica, Inc.</u>, 274 F.3d 577, 583 (1st Cir. 2001); <u>United States v. John</u>, 597 F.3d 263, 271 (5th Cir. 2010); <u>United States v. Rodriguez</u>, 628 F.3d 1258, 1263 (11th Cir. 2010); <u>see also</u> <u>Int'l Airport Centers, LLC v. Citrin</u>, 440 F.3d 418, 420–21 (7th Cir. 2006) (holding that an employee who deleted his employer's files in violation of his employment contract had terminated the agency relationship that authorized him to access the information). Courts have also split over whether violating a website's ToS exceeds authorized access for purposes of the CFAA.[9] The D.C. Circuit has never opined on either question. Several district judges in this

---

[9] <u>Compare</u> <u>Facebook, Inc. v. Power Ventures, Inc.</u>, 844 F.3d 1058, 1067 (9th Cir. 2016) ("[A] violation of the terms of use of a website—without more—cannot establish liability under the CFAA."), <u>cert. denied</u> 138 S. Ct. 313 (2017) (mem.); <u>Valle</u>, 807 F.3d at 528 (rejecting unauthorized use reading of "exceeds authorized access" because "the government's interpretation of 'exceeds authorized access' makes every violation of a private computer use policy a federal crime"); <u>WEC Carolina</u>, 687 F.3d at 206 (noting that the unauthorized use reading "would impute liability to an employee who with commendable intentions disregards his employer's policy against downloading information to a personal computer so that he can work at home"), <u>with</u> <u>EarthCam, Inc. v. OxBlue Corp.</u>, 703 Fed. App'x 803, 808 & n.2 (11th Cir. 2017) (stating that "one of the lessons from [circuit precedent] may be that a person exceeds authorized access if he or she uses the access in a way that contravenes any policy or term of use governing the computer in question," and noting the dissenting views of other circuits); <u>CollegeSource, Inc. v. AcademyOne, Inc.</u>, 597 Fed. App'x 116, 130 (3d Cir. 2015) (suggesting that defendants can be prosecuted under the CFAA if they "breach[ed] any technological barrier or contractual term of use"); <u>EF Cultural Travel BV v. Zefer Corp.</u>, 318 F.3d 58, 62 (1st Cir. 2003) ("A lack of authorization could be established by an explicit statement on the website restricting access. . . . Many webpages contain lengthy limiting conditions, including limitations on the use of scrapers.").

25

Circuit, however, have held that the provision only applies to unauthorized access to information, not to unauthorized use of properly accessed material. See Hedgeye Risk Mgmt., LLC v. Heldman, 271 F. Supp. 3d 181, 194–95 (D.D.C. 2017) (collecting cases).

At one point in their briefing, plaintiffs suggest a different dividing line: a limiting construction that carves out harmless ToS violations from the statute. Pls.' Mem. at 31–33, 35. However, "[t]he text will not bear such a reading." INS v. Yueh-Shaio Yang, 519 U.S. 26, 30 (1996). It is one thing to carve out such violations by determining that the statute is unconstitutional as applied, but the text of the statute itself—"exceeds authorized access"—and its statutory definition do not appear to allow for such a surgical slicing off of conduct. How does the text differentiate between ToS violations and violations of employers' computer use policies, for instance? And how does the text distinguish between "[ToS] violations alone," Pls.' Mem. at 35, and ToS violations that cause damage or involve fraud, which plaintiffs admit are covered by §§ 1030(a)(4) and (a)(5), id. at 31–32? One can just as easily "use [authorized] access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter," § 1030(e)(6), whether it is a website or some other entity that is doing the authorizing, and whether the violation is harmful or harmless.

The question thus remains whether "exceeds authorized access" refers to access alone or to access, use, and other violations. The Court finds the narrow interpretation adopted by the Second, Fourth, and Ninth Circuits—and by numerous other district judges in this Circuit—to be the best reading of the statute. First, the text itself more naturally reads as limited to violations of the spatial scope of one's permitted access. To "exceed[] authorized access," one must have permission to access the computer at issue, and must "use such access"—i.e., one's authorized presence on the computer—"to obtain or alter information in the computer." Id. Thus, unlike the

26

phrase "unauthorized access" used alongside it in several CFAA provisions, the phrase "exceeds authorized access" refers not to an outside attack but rather to an inside job. See, e.g., Nosal, 676 F.3d at 858. The rest of the definition requires that the information at issue be information "that the accesser is not entitled so to obtain or alter." Id. The key word here is "entitled." "And, in context, the most 'sensible reading of "entitled" is as a synonym for "authorized."'" Hedgeye, 271 F. Supp. 3d at 194 (quoting Nosal, 676 F.3d at 857). The focus is thus on whether someone is allowed to access a computer at all, in the case of "unauthorized access," or on whether someone is authorized to obtain or alter particular information, in the case of "exceeds authorized access." In neither instance does the statute focus on how the accesser plans to use the information.[10]

The statutory context buttresses this narrower reading of the text. Reading "exceeds authorized access" to turn on the accesser's purpose in seeking out the information would eliminate a major difference between the Access Provision—which has no purpose requirement—and other provisions that require intent to defraud. E.g., 18 U.S.C. § 1030(a)(4). It would also water down the difference between the misdemeanor penalty provisions and the felony provisions that enhance sentences for violations committed for fraud or financial gain. Id. § 1030(c)(2); see also S. Rep. No. 104-357, at 8 (1996) ("[T]he statutory penalties are structured to provide that obtaining information of minimal value is only a misdemeanor, but obtaining valuable information, or misusing information in other more serious ways, is a felony." (emphasis added)). After all, just about any attempt to use proprietary information to defraud or for personal or commercial gain would likely violate a computer use policy or website ToS. See Nosal, 676 F.3d at 858 n.4.

---

[10] Nor does the word "so," which has inspired a good deal of exegesis in prior opinions, see WEC Carolina, 687 F.3d at 205–06; Nosal, 676 F.3d at 857–58, meaningfully change this focus. Read in the context of the phrase "so to obtain or alter," "so" most naturally refers back to the earlier phrase "such access," emphasizing that the accesser must not have been entitled to obtain or alter that particular information through the particular authorization used— even if, theoretically, there were another way in which the accesser might legally obtain or alter the information.

Congress knew how to draft a specific intent requirement, and did so in these other sections of the CFAA. It would be rather odd, then, for Congress to also smuggle a specific intent factor into its definition of the actus reus of the offense. While this context is certainly not dispositive—Congress often drafts overlapping or even redundant provisions—it is best to avoid readings that "would render superfluous another part of the same statutory scheme." Marx v. Gen. Revenue Corp., 568 U.S. 371, 386 (2013).

Legislative history also points to an access-based, rather than an intended-use-based, reading of "exceeds authorized access." The Second Circuit has already canvassed in great detail the congressional intent and history behind the definition of "exceeds authorized access," see Valle, 807 F.3d at 525–26, and this Court will not repeat it here. This Court agrees with the Second Circuit, however, that "the legislative history consistently characterizes the evil to be remedied—computer crime—as 'trespass' into computer systems or data, and correspondingly describes 'authorization' in terms of the portion of the computer's data to which one's access rights extend." Id. at 525. Congress thus viewed exceeding authorized access as the digital equivalent of being allowed into a house but entering a room within it that the owner has declared to be off-limits. A sensible conception, particularly considering that the language at issue was written in 1986—before the World Wide Web or websites existed. See Kerr, Norms of Computer Trespass, supra, at 1161.

The amendment history of the definition supports this reading. The initial language of the CFAA applied to anyone who, knowingly "having accessed a computer with authorization, uses the opportunity such access provides for purposes to which such authorization does not extend, and thereby obtains information." Counterfeit Access Device and Computer Fraud and Abuse Act of 1984, Pub. L. No. 98-473, tit. II, ch. 21, § 2102(a), 98 Stat. 1837, 2190–91 (emphasis added).

28

In 1986, however, in a section entitled "Modification of Authorized Access Aspect of Offenses," Congress replaced this language with the phrase "exceeds authorized access," and, in a section entitled "Conforming Amendments to Definitions Provision," added the current definition of that phrase. See Computer Fraud and Abuse Act of 1986, Pub. L. No. 99-474, § 2(c), (g)(4), 100 Stat. 1213, 1215. It is not clear that Congress intended this language change to be substantive. See S. Rep. No. 99-432, at 9 (1986) ("The Committee intends this change to simplify the language in 18 U.S.C. 1030(a)(1) and (2), and the phrase 'exceeds authorized access' is defined separately in Section (2)(g) of the bill."); 132 Cong. Rec. 28,821 (1986) (statement of Rep. Hughes) (stating, as the chairman of the drafting subcommittee just before final passage, that "the basic thrust of this bill remains its three new offenses with some minor changes in the existing law"). Yet it is notable that Congress did not simply transpose the existing, purpose-oriented language into the definition section—which still would have simplified the language of § 1030(a), as desired—but instead replaced it with new language that focuses on authorization to access particular information. Indeed, if Congress did not think it was making a substantive change, the legislative history suggests that this was because Congress thought the initial language also was limited to access, since "when Congress referenced the user's 'purposes,' it spoke in terms of the particular computer files or data to which the user's access rights extended." Valle, 807 F.3d at 526.

Finally, plaintiffs raise numerous First and Fifth Amendment concerns with the Access Provision that would arise out of reading "exceeds authorized access" to include the purpose or use restrictions that appear in many ToS. When a court is "deciding which of two plausible statutory constructions to adopt," and when "one of them would raise a multitude of constitutional problems, the other should prevail." Clark v. Martinez, 543 U.S. 371, 380–81 (2005). This maxim holds doubly true for criminal statutes. See Marinello, 2018 WL 1402426, at *4 ("[Courts] have

29

traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress and out of concern that 'a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed.'" (citation omitted)). While the CFAA's text and legislative history point strongly toward an access-only interpretation of "exceeds authorized access," a broader reading is not entirely implausible; therefore, constitutional avoidance applies. Cf. Jennings v. Rodriguez, 138 S. Ct. 830, 842 (2018). In interpreting the statutory text, the Court need not determine whether plaintiffs' constitutional arguments would actually win the day. Rather, the Court undertakes "a narrow inquiry" into whether one reading "presents a significant risk that [constitutional provisions] will be infringed." NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 533 (1979).

Here, significant risks abound. By providing for both civil and criminal enforcement of websites' limitless ToS—including enforcement by the same entities that write the ToS—a broader reading of the CFAA "would appear to criminalize a broad range of day-to-day activity" and "subject individuals to the risk of arbitrary or discriminatory prosecution and conviction," raising Fifth Amendment concerns. United States v. Kozminski, 487 U.S. 931, 949 (1988); see Valle, 807 F.3d at 527–28; Nosal, 676 F.3d at 862. By incorporating ToS that purport to prohibit the purposes for which one accesses a website or the uses to which one can put information obtained there, the CFAA threatens to burden a great deal of expressive activity, even on publicly accessible websites—which brings the First Amendment into play. See Packingham, 137 S. Ct. at 1736. If "exceeds authorized access" is read broadly, plaintiffs claim, the Access Provision could even run afoul of the Fifth Amendment by delegating power to private parties to define restrictions "limitless in time and space," which can then operate as petty civil and criminal codes. Pls.' Mem. at 10; see Ass'n of Am. R.Rs. v. U.S. Dep't of Transp. (Ass'n of Am. R.Rs. II), 821 F.3d 19, 31

30

(D.C. Cir. 2016) ("[T]he Supreme Court has consistently concluded the delegation of coercive power to private parties can raise . . . due process concerns."); Note, The Vagaries of Vagueness: Rethinking the CFAA as a Problem of Private Nondelegation, 127 Harv. L. Rev. 751, 768–71 (2013) (arguing that a broadly-read CFAA violates the nondelegation doctrine). One need neither slay nor succumb to this Hydra-headed set of objections to acknowledge it as formidable.

All of these factors, therefore, lead the Court to adopt a narrow reading of the term "exceeds authorized access."[11] Just as an individual "accesses a computer 'without authorization' when he gains admission to a computer without approval," an individual "'exceeds authorized access' when he has approval to access a computer, but uses his access to obtain or alter information that falls outside the bounds of his approved access." WEC Carolina, 687 F.3d at 204.

This interpretation gets us far, but not all the way. At oral argument, both parties agreed that the Access Provision applies only to access restrictions. See Tr. of Mot. Hr'g at 19:17–20:3, 34:10–35:22. But they have very different ideas about what that means. The government treats this difference as a largely temporal one. It argues that "the moment the violation occurs is on access," so that subsequent usage of information lawfully obtained does not constitute a CFAA violation. Id. at 20:12–:18. But the government also claims that "it's appropriate to analyze the issue of whether access is authorized according to a broad context of background facts that could include limitations on the purpose for which information is accessed," such as "access restrictions that are contained in the [ToS] that the website itself has prepared." Id. at 19:21–20:2. Plaintiffs,

---

[11] A number of other courts have applied the rule of lenity to limit the scope of "exceeds authorized access." See Valle, 807 F.3d at 526; WEC Carolina, 687 F.3d at 204; Nosal, 676 F.3d at 363. The rule of lenity "requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." DePierre v. United States, 564 U.S. 70, 88 (2011) (citation omitted). However, lenity is to be used "only 'at the end of the process of construing what Congress has expressed' when the ordinary canons of statutory construction have revealed no satisfactory construction." Lockhart v. United States, 136 S. Ct. 958, 968 (2016) (citation omitted). Text, context, legislative history, congressional intent, and constitutional avoidance all point in one direction here. Because these tools "allow [the Court] to make far more than 'a guess as to what Congress intended,' the rule of lenity does not apply." DePierre, 564 U.S. at 89. If the question were closer, however, lenity would undoubtedly come to plaintiffs' aid.

on the other hand, argue that the distinction between access and use turns on the conduct being prohibited, rather than whether the website attempts to cast the conduct as related to access rather than use. Id. at 61:17–:23. Plaintiffs' reading is the more natural one, and better reflects the constitutional avoidance concerns that support the Court's interpretation of the statute. Therefore, the Court must make an objective inquiry into the conduct alleged to violate websites' ToS. The focus is on what information plaintiffs plan to access, not on why they wish to access it, the manner in which they use their authorization to access it, or what they hope to do with it.

Applying this standard, it becomes clear that most of plaintiffs' proposed activities fall outside the CFAA's reach. Scraping or otherwise recording data from a site that is accessible to the public is merely a particular use of information that plaintiffs are entitled to see. The same goes for speaking about, or publishing documents using, publicly available data on the targeted websites. The use of bots or sock puppets is a more context-specific activity, but it is not covered in this case. Employing a bot to crawl a website or apply for jobs may run afoul of a website's ToS, but it does not constitute an access violation when the human who creates the bot is otherwise allowed to read and interact with that site. See Kerr, Norms of Computer Trespass, supra, at 1170. The website might purport to be limiting the identities of those entitled to enter the site, so that humans but not robots can get in. See Star Wars: Episode IV – A New Hope (Lucasfilm 1977) ("We don't serve their kind here! . . . Your droids. They'll have to wait outside."). But bots are simply technological tools for humans to more efficiently collect and process information that they could otherwise access manually. Cf. Star Wars: Episode II – Attack of the Clones (Lucasfilm 2002) ("[I]f droids could think, there'd be none of us here, would there?").

Out of plaintiffs' proposed activities, then, only Mislove and Wilson's plan to create fictitious user accounts on employment sites would violate the CFAA. Unlike plaintiffs' other

32

conduct, which occurs on portions of websites that any visitor can view, creating false accounts allows Mislove and Wilson to access information on those sites that is both limited to those who meet the owners' chosen authentication requirements and targeted to the particular preferences of the user.[12]  Creating false accounts and obtaining information through those accounts would therefore fall under the Access Provision.  With that in mind, the Court must turn to the government's motion to dismiss plaintiffs' constitutional claims.

### D. FREEDOM OF SPEECH AND FREEDOM OF THE PRESS

Plaintiffs first claim that the Access Provision violates the First Amendment's guarantees of freedom of speech and of the press.[13]  They assert that the provision is both facially overbroad and unconstitutional as applied to their own conduct.  The Court will analyze these claims in turn.

### 1. Facial Overbreadth

Plaintiffs allege that the Access Provision "creates virtually limitless restrictions on speech and expressive activity," such that the statute "is unconstitutionally overbroad on its face."  Compl. ¶ 183.  In a typical facial challenge, plaintiffs must show "'that no set of circumstances exists under which [the Access Provision] would be valid,' . . . or that the statute lacks any 'plainly legitimate sweep.'"  Stevens, 559 U.S. at 472 (citations omitted).  However, First Amendment cases allow for "'a second type of facial challenge,' whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly

---

[12] Professor Kerr argues that "a website that appears to require a username and password to access the contents of the site, but that actually grants access for any username and password combination," should not be seen as creating an access restriction, because it "would appear to a user to regulate by code, but would actually work more like a system of regulation by contract."  Kerr, Cybercrime's Scope, supra, at 1646.  The distinction between code-based and contract-based barriers matters for First Amendment analysis, see supra Part II.A, but it does not quite line up with the Court's reading of the CFAA.  Social media sites like Facebook, for instance, grant access for any username and password combination, but they still allow those with accounts to access data that those who merely visit the site without signing up cannot.  Hence, conditions placed on account creation can still be access restrictions.

[13] Courts normally subject free speech and free press claims to the same level of scrutiny.  See, e.g., Citizens United, 558 U.S. at 352; McConnell v. FEC, 251 F. Supp. 2d 176, 234–35 (D.D.C.) (three-judge court) (per curiam), aff'd in part, rev'd in part, 540 U.S. 93 (2003).  The Court will thus treat the speech claim as a proxy for both.

legitimate sweep.'" Id. at 473 (citation omitted). This second, lower bar is the one against which plaintiffs—and the Court—measure their challenge.

The government argues that plaintiffs have failed to state a plausible overbreadth claim. See Def.'s Reply at 18–19. The Court agrees. "The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." United States v. Williams, 553 U.S. 285, 293 (2008). The Court has now done so. Plaintiffs have operated under the assumption that the Access Provision covers all ToS violations; but, properly read, the Access Provision incorporates only those ToS that limit access to particular information. This fact alone is enough to dispose of plaintiffs' overbreadth claim. "Invalidation for overbreadth is strong medicine," id. (citation omitted), to be "employed . . . sparingly and only as a last resort," Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973). A court should not invalidate a provision for overbreadth "when a limiting construction has been or could be placed on the challenged statute." Id.

Plaintiffs concede that a limiting construction would address their overbreadth concerns—though they contend that the Access Provision would need to be "construed not to reach [ToS] violations alone." Pls.' Mem. at 35. While the Court's reading of "exceeds authorized access" is not as narrow as the reading plaintiffs might prefer, it does eliminate many of the potentially unconstitutional applications of the Access Provisions. To be overbroad, a statute's unconstitutional scope must be "substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." Williams, 553 U.S. at 292. As purpose, use, or manner restrictions fall outside the Access Provision's reach, plaintiffs have not plausibly alleged that the provision's potentially unconstitutional applications are substantial relative to its legitimate ones. Moreover, plaintiffs also bring an as-applied claim, and facial challenges are disfavored when a

34

case "may be disposed of on narrower grounds." Texas v. Johnson, 491 U.S. 397, 403 n.3 (1989). Hence, Plaintiffs' overbreadth claim will be dismissed.

### 2. As-Applied Challenge

Plaintiffs allege that, "[a]s applied to the[m]," the Access Provision "unconstitutionally restricts their protected speech." Compl. ¶ 184. "[T]o prevail on an as-applied First Amendment challenge," plaintiffs "must show that the [Access Provision is] unconstitutional as applied to their particular speech activity." Edwards v. District of Columbia, 755 F.3d 996, 1001 (D.C. Cir. 2014). "'[T]he distinction between facial and as-applied challenges . . . goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint.' . . . The substantive rule of law is the same for both challenges." Id. (citations omitted).

Aside from the overarching objections that the Court has already rejected, the government's primary response to plaintiffs' as-applied claim is that the Access Provision regulates conduct, rather than speech, and is therefore subject to limited scrutiny. See Def.'s Mem. at 21, 27. But even if a law "says nothing about speech on its face," it is "subject to First Amendment scrutiny" if "it restricts access to traditional public fora." McCullen v. Coakley, 134 S. Ct. 2518, 2529 (2014). As the Access Provision both limits access to and burdens speech in the public forum that is the public Internet, see supra Part II.A, heightened First Amendment scrutiny is appropriate. "In particular, the guiding First Amendment principle that the 'government has no power to restrict expression because of its message, its ideas, its subject matter, or its content' applies with full force in a traditional public forum." Id. (citation omitted). Content- or viewpoint-based restrictions receive strict scrutiny. See Reed v. Town of Gilbert, 135 S. Ct. 2218, 2226 (2015); Rosenberger, 515 U.S. at 829. On the other hand, if a statute is content-neutral and only "impose[s] reasonable restrictions on the time, place, or manner of protected speech," McCullen,

35

134 S. Ct. at 2529, it is subjected to intermediate scrutiny. "In order to survive intermediate scrutiny, a law must be 'narrowly tailored to serve a significant governmental interest,'" Packingham, 137 S. Ct. at 1736 (citation omitted), and must "leave open ample alternative channels for communication of the information," McCullen, 134 S. Ct. at 2529.[14]

Plaintiffs claim that the Access Provision allows websites to impose direct speech restrictions, including content-based restrictions, and that it is therefore subject to strict scrutiny. Pls.' Mem. at 34–35. However, the statute itself does not target speech, or impose content-based regulations, on its face. Nor have plaintiffs plausibly alleged that the government's purpose is to restrict speech based on its content or viewpoint. Indeed, while the government has not yet been able to proffer much evidence of the purposes behind the provision, the legislative history indicates that Congress was interested in passing the Access Provision to prevent the digital equivalent of theft. See S. Rep. 104–357, at 7 ("The proposed subsection 1030(a)(2)(C) is intended to protect against the interstate or foreign theft of information by computer. . . . This subsection would ensure that the theft of intangible information by the unauthorized use of a computer is prohibited in the same way theft of physical items are protected [sic].").  Therefore, strict scrutiny does not apply. See Pursuing America's Greatness v. FEC, 831 F.3d 500, 509 (D.C. Cir. 2016) (stating that courts must determine content neutrality based on text, and then purpose).

---

[14] The standard that governs expressive conduct prohibitions with "incidental limitations on First Amendment freedoms," see United States v. O'Brien, 391 U.S. 367, 376 (1968), is inapposite to this as-applied claim. "The law here may be described as directed at conduct, . . . but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message." Humanitarian Law Project, 561 U.S. at 28. Plaintiffs are informing the websites of who they are, and claiming to be employers, much in the same way that the defendant in Alvarez had claimed to be a decorated war veteran, or the plaintiffs in Humanitarian Law Project had sought to train terrorists to engage in peaceful activity. All of these forms of conduct communicate messages to the recipients. Moreover, it is the content of plaintiffs' speech to the targeted websites—that they represent their identities falsely or misleadingly instead of truthfully—that triggers the sites' ToS and, thereby, the criminal penalties of the CFAA. In other words, Mislove and Wilson would violate the Access Provision "because of the [false] content of [their] particular message." Id. In these circumstances, the government must meet a "more demanding standard" than the O'Brien test. Id. (quoting Johnson, 491 U.S. at 403). Even if that test were applicable, however, "in the last analysis [it] is little, if any, different from the standard applied to time, place, or manner restrictions," Johnson, 491 U.S. at 407, and incorporates narrow tailoring requirements, see Edwards, 755 F.3d at 1002–03, so the analysis would not meaningfully change.

From the information available so far, significant interests appear to underlie the Access Provision. In addition to the legislative history regarding theft prevention, the government suggests that the Court analogize the CFAA to trespass law, arguing that Congress was also trying to prohibit the digital equivalent of trespassing. Def.'s Reply at 3–5. While plaintiffs dispute the trespass analogy, they recognize that the CFAA was passed to prevent computer theft and other cybercrime, and have not disputed that this is a significant interest. Pls.' Mem. at 31. The question is thus whether the statute fails narrow tailoring as applied to Mislove and Wilson's plan to "creat[e] profiles containing false information," Compl. ¶ 124, and "access[] websites using artificial tester profiles, in violation of [ToS] that prohibit providing false information," id. ¶ 154.

"To satisfy narrow tailoring, the [government] must prove the challenged regulations directly advance its asserted interests." Edwards, 755 F.3d at 1003. This means "the government must show 'a close fit between ends and means,'" such "that the regulation 'promotes a substantial government interest that would be achieved less effectively absent the regulation,'" and does "not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" A.N.S.W.E.R. Coalition v. Basham, 845 F.3d 1199, 1213–14 (D.C. Cir. 2017) (citations omitted). At this early stage, the government has not put forward any evidence to show that prosecuting those who provide false information when creating accounts, without more, would advance its interest in preventing digital theft or trespass.

Indeed, presuming the allegations in the complaint to be true, it appears that the government's interest "is not implicated on these facts" at all. Johnson, 491 U.S. at 410. Plaintiffs allege that their conduct "will not cause material harm to the target websites' operations," and that "they have no intent to commit fraud or to access any data or information that is not made available to the public." Compl. ¶ 4. It is difficult to argue that trespass or theft concerns can justify

37

restricting—or even apply to—viewing information that a website makes available to anyone who chooses to create a username and password. Cf. Kerr, Cybercrime's Scope, supra, at 1646. And any inadvertent "fraud" plaintiffs may perpetrate against the target websites by creating fictitious accounts will be, plaintiffs allege, harmless. The CFAA already punishes harmful, intentional fraud in a separate section, see 18 U.S.C. § 1030(a)(4), providing additional evidence that the government can further its legitimate interests just as well without applying the Access Provision to plaintiffs' bare false statements. At this stage, "absent any evidence that the speech [would be] used to gain a material advantage," Alvarez, 567 U.S. at 723, plaintiffs' false speech on public websites retains First Amendment protection, see id. at 722, and rendering it criminal does not appear to advance the government's proffered interests. Hence, plaintiffs have plausibly alleged an as-applied First Amendment claim, and the motion to dismiss that claim will be denied.

### E.  RIGHT TO PETITION

In addition to their free speech and press claims, plaintiffs allege that the Access Provision violates their rights under the Petition Clause of the First Amendment. Compl. ¶ 193. That clause states: "Congress shall make no law . . . abridging . . . the right of the People . . . to petition the Government for a redress of grievances." U.S. Const. amend. I.  Plaintiffs assert that the Access Provision, by criminalizing websites' prohibitions on critical speech or publishing, prevents people from using any information they might gain from plaintiffs' planned research to inform Congress or agencies about potential discrimination by those websites. Id. ¶¶ 162–67, 189.  They also assert that, for the same reasons, the Access Provision prevents people from accessing the courts to enforce Title VII or the Fair Housing Act: nobody who had visited a website with a non-disparagement clause in its ToS could bring discrimination claims against that site in court without opening him- or herself up to a potential CFAA prosecution. Id. ¶¶ 168–69, 190.

These allegations are focused on ToS that restrict subsequent speech: disparagement, for instance, or use of the sites' information in court. However, such ToS constitute restrictions on the use of information, not on access to it. They therefore do not fall within the Access Provision's ambit, as properly interpreted. But even if one assumes that plaintiffs allege that <u>access</u> restrictions criminalized by the Access Provision violate the Petition Clause, <u>see</u> Compl. ¶ 162, plaintiffs' petition challenge is, at best, no stronger than their free speech challenge. Speech and petition rights are "generally subject to the same constitutional analysis," <u>Wayte v. United States</u>, 470 U.S. 598, 610 n.11 (1985), unless "the special concerns of the Petition Clause would provide a sound basis for a distinct analysis," <u>Borough of Duryea v. Guarnieri</u>, 564 U.S. 379, 389 (2011). Here, the rights appear to overlap: plaintiffs' Petition Clause claim focuses on speech restrictions that could then affect the petitioning process. Thus, plaintiffs "just as easily could have alleged"—and do, in fact, allege—a Speech Clause violation on the same set of facts. <u>Id.</u> at 387.

And it is on that free speech claim that plaintiffs' First Amendment case must rise or fall. The Speech and Press Clauses, rather than the Petition Clause, provide the more natural home for plaintiffs' concerns about the Access Provision. Plaintiffs assert that the CFAA "prevents them from engaging in" petitioning because some websites' ToS (and thus the Access Provision) "prohibit the speech necessary to engage in . . . petitioning." Pls.' Mem. at 43. The real concern, then, is the Access Provision's alleged restrictions on <u>speech</u>, which have ripple effects in a variety of contexts. The application of the Access Provision to the petitioning process constitutes one small subset of the speech and conduct the provision allegedly prohibits. Any effect the statute might have on plaintiffs' petition rights, then, is an extra step removed from the central speech harm, and is thus too attenuated to state a plausible claim for relief.

Ultimately, "the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes," and "[i]nterpretation of the Petition Clause must be guided by the objectives and aspirations that underlie the right." Borough of Duryea, 564 U.S. at 387–88. As the government notes, the clause is not aimed at the right to gather facts, or to speak while doing so, as a preliminary step to help prepare that petition in a preferred way. See Def.'s Mem. at 28. That right is more naturally the province of the Speech and Press Clauses than of the Petition Clause. See Burt Neuborne, Madison's Music: On Reading the First Amendment 11–12, 89 (2015) (arguing that the First Amendment's protected rights form "a rigorous chronological narrative of free citizens governing themselves in an ideal democracy," and that the Petition Clause "concludes Madison's narrative, protecting [an] idea's introduction into the formal democratic process, forcing the legislature to place the issue on its agenda"). Hence, plaintiffs' Petition Clause claim will be dismissed.

## F. VAGUENESS

Plaintiffs next allege that the Access Provision violates the Due Process Clause because it is unconstitutionally vague. A statute is void if it is "[1] so vague that it fails to give ordinary people fair notice of the conduct it punishes, or [2] so standardless that it invites arbitrary enforcement." Johnson v. United States, 135 S. Ct. 2551, 2556 (2015). Plaintiffs allege that the Access Provision meets both prongs of this test. Compl. ¶¶ 171–72. Because of potential chilling effects, "a more stringent vagueness test" applies when a law "interferes with the right of free speech." Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499 (1982).

Properly interpreted, however, the Access Provision is not unconstitutionally vague. "A plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim" based on a lack of fair notice. Expressions Hair Design v. Schneiderman, 137 S. Ct. 1144, 1151–52 (2017)

(quoting Humanitarian Law Project, 561 U.S. at 20). Nor can that plaintiff bring a facial vagueness challenge "based on the speech of others." Humanitarian Law Project, 561 U.S. at 20. As we have already seen, the Access Provision plainly proscribes the creation of false accounts, but does not prohibit plaintiffs' other activities. Indeed, plaintiffs allege that they are aware that their proposed conduct would violate their target websites' ToS restrictions on creating false accounts. Compl. ¶ 124. As the Court has determined that the Access Provision applies to one of their activities but not to the others, and as plaintiffs admit that they have the requisite mens rea to commit the crime, no facial claim or as-applied notice claim can go forward.

Nor can plaintiffs plausibly allege that the Access Provision invites arbitrary enforcement. "[A] statute's vagueness is either susceptible to judicial construction or is void for vagueness based on the application of traditional rules for statutory interpretation." United States v. Bronstein, 849 F.3d 1101, 1106 (D.C. Cir. 2017). Thus, "before striking a federal statute as impermissibly vague," courts must "consider whether the prescription is amenable to a limiting construction." Welch v. United States, 136 S. Ct. 1257, 1268 (2016) (citation omitted). The Court has already determined that a more limited construction is not only possible, but is in fact more natural than the broad reading that raises vagueness concerns. Read to apply only to access, and not to use, restrictions, the Access Provision severely curtails both websites' ability to define the law and prosecutors' freedom arbitrarily to enforce it. Plaintiffs' Fifth Amendment vagueness claim will be dismissed.

### G. NONDELEGATION DOCTRINE

Finally, plaintiffs allege that the Access Provision violates the Fifth Amendment because it delegates the content of criminal law to private parties. Compl. ¶¶ 173–77, 201. The primary case laying out the private nondelegation doctrine is Carter v. Carter Coal Co., 298 U.S. 238 (1936). The statute at issue in that case delegated to coal industry groups the power to create

41

binding codes for the regulation of coal miners' wages and hours.  Id. at 310–11.  The Court stated that this power "is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business."  Id. at 311.  Prior to Carter Coal, the Supreme Court also twice struck down ordinances that sanctioned a "standardless delegation of power to a limited group of property owners."  City of Eastlake v. Forest City Enterprises, Inc., 426 U.S. 668, 678 (1976) (discussing Eubank v. Richmond, 226 U.S. 137 (1912), and Washington ex rel. Seattle Title Trust Co. v. Roberge, 278 U.S. 116 (1928)).

The D.C. Circuit has gleaned two rules from these cases.  First, "[f]ederal lawmakers cannot delegate regulatory authority to a private entity."  Ass'n of Am. R.Rs. v. U.S. Dep't of Transp. (Ass'n of Am. R.Rs. I), 721 F.3d 666, 670 (D.C. Cir. 2013), vacated and remanded on other grounds, 135 S. Ct. 1225 (2015).  Unlike with delegations to agencies, "[e]ven an intelligible principle cannot rescue a statute empowering private parties to wield regulatory authority."  Id. at 671.  And second, "the due process of law is violated when a self-interested entity is 'intrusted with the power to regulate the business . . . of a competitor.'"  Ass'n of Am. R.Rs. II, 821 F.3d at 31 (quoting Carter Coal, 298 U.S. at 311).  Plaintiffs claim that the Access Provision violates the first of these principles.  They allege that the law allows website owners to define the content of a crime—thus sweeping beyond other statutes that merely enforce private contractual agreements— and that the statute relinquishes any government control over the lawmaking process.  Compl. ¶¶ 174–76.  They also assert that the Access Provision provides no standards to guide what website owners may effectively criminalize.  See Pls.' Mem. at 40.

Plaintiffs raise an intriguing argument, but it is ultimately an unsuccessful one.  As with First Amendment overbreadth and vagueness, the courts can avoid nondelegation concerns by

"giving narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional." <u>Mistretta v. United States</u>, 488 U.S. 361, 373 n.7 (1989). Plaintiffs assert that the Access Provision provides a limitless, standardless delegation of power to individual websites to define crimes. But that assertion is based on a reading of the provision that sweeps in use, purpose, or manner restrictions on obtaining or altering information. Properly read as applying only to access restrictions, websites can write whatever ToS they please, but a congressionally-imposed standard limits which ToS can lead to liability or prosecution. Nor do websites have the power to impose formal rules on an industry or otherwise exercise regulatory authority in the manner that courts have found constitutionally impermissible. <u>See, e.g.</u>, <u>Yakus v. United States</u>, 321 U.S. 414, 424 (1944); <u>Carter Coal</u>, 298 U.S. at 310–11; <u>Ass'n of Am. R.Rs. I</u>, 721 F.3d at 670–72. Plaintiffs have cited no case—nor has the Court found one—in which a court struck down on private nondelegation grounds a statute that incorporated private parties' chosen restrictions, which are only binding on those who interact with those parties' individual businesses. It is thus difficult to argue that the Access Provision improperly delegates legislative or regulatory authority.

Indeed, when read narrowly, the Access Provision looks similar to many criminal laws that are rendered operative by a private party's decision whether to authorize certain conduct. Examples cited in the government's brief, <u>see</u> Def.'s Mem. at 32–33, include criminal trespass laws, <u>see</u> D.C. Code § 22–3302; 25 C.F.R. § 11.411, and laws against misappropriation of trade secrets, <u>see</u> 18 U.S.C. § 1831, copyrights, <u>see</u> 17 U.S.C. §§ 106, 506, individuals' identities, <u>see</u> 18 U.S.C. § 1029, and money (e.g., embezzlement). In none of these instances does a private party's control over the law's operation render it a nondelegation problem. Rather, "a legislative delegation to private citizens" is constitutional so long as "[1] the underlying exercise of authority [is] a reasonable regulation within the power of the government . . . . and [2] the legislature's

43

restriction [is] in the form of a general prohibition, and the delegation [is] in the form of permitting private citizens to waive the protection of that prohibition." Silverman v. Barry, 845 F.2d 1072, 1086 (D.C. Cir. 1988). A different rule would make it so that "[a]lmost any system of private or quasi-private law could be subject to the" nondelegation doctrine. New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co., 439 U.S. 96, 109 (1978). Since the Access Provision creates a blanket prohibition on accessing information in protected computers, which owners of those computers can waive through permission, plaintiffs do not plausibly allege that the provision unconstitutionally delegates legislative power. Hence, the nondelegation claim will be dismissed.

## CONCLUSION

This case raises important questions about the government's ability to criminalize vast swaths of everyday activity on the Internet. However, the Court need not answer all of them today, because it concludes that the CFAA prohibits far less than the parties claim (or fear) it does. For the reasons explained above, plaintiffs have plausibly alleged that they have standing to sue, and that the Access Provision violates the Free Speech and Free Press Clauses of the First Amendment as applied to them. The government's motion to dismiss for lack of standing and on this single as-applied claim will therefore be denied. But the Access Provision, as the Court reads it, does not sweep widely enough to render plausible plaintiffs' First Amendment overbreadth and petition claims, or their Fifth Amendment vagueness and nondelegation claims. The government's motion to dismiss those claims, therefore, will be granted. A separate order will issue on this date.


 _____
/s/
 JOHN D. BATES
 United States District Judge

Dated: March 30, 2018